U.S. DISTRICT COURT
DISTRICT OF VERMON
FILED

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

2009 APR -2  AM 9: 38

BY_____
DEPUTY CLERK

JONATHAN CROWELL            )
SAMANTHA KILMURRAY          )
    Plaintiffs,             )
                           )
v.                         )          Civil Case No. 2:08-cv-55
                           )
ROBERT KIRKPATRICK         )
MICHAEL GORMAN             )
CHUCK ALECK                )
PETER DIMARINO             )
    Defendants.            )

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

This lawsuit arises from the arrest of the Plaintiffs for trespass after the Plaintiffs

unlawfully occupied private property in the Town of Brattleboro on July 24, 2007.   The incident

began on July 23, 2007, when the Plaintiffs joined a group of people at a privately owned lot at

the corner of Black Mountain Road and Putney Road in the Town of Brattleboro to protest what

they mistakenly believed to be the imminent development of the land. *See* Statement of

Undisputed Material Facts ("Statement"), ¶¶6-8.  The owners of the land advised the Brattleboro

Police Department that they did not want the group on their property and asked that the police

issue notices against trespass. Id. at ¶9.

Two Brattleboro police officers, Michael Gorman and Robert Kirkpatrick, went to the

scene, where they advised the protestors that there was no plan to develop the property, that the

owners did not want the protestors on the property, and that the protestors would have to leave.

Id. at ¶10.  They allowed the protestors a period of time to leave the property, but when

Lieutenant Kirkpatrick returned, many of the protestors, including the Plaintiffs, were still

MCNEIL,
LEDDY &
SHEAHAN
BURLINGTON, VERMONT 05401

occupying the property. Id. at ¶¶10-12.  After conferring with the property owners, Lieutenant

Kirkpatrick informed the remaining members of the group that they could stay overnight, but

that they must vacate the property in the morning.  Id. at ¶12.

Despite the reprieve, the Plaintiffs did not leave the property and, at approximately 7:00

a.m. the following morning, Officer Gorman and Lieutenant Kirkpatrick returned and advised

the Plaintiffs that they were trespassing and would be arrested if they did not leave.  Id. at ¶13.  It

is undisputed that the order to leave the property was a lawful order and that the Plaintiffs did not

leave the property as directed by the officers.  Id. at ¶¶15-16.

When the officers were directing the Plaintiffs to leave the property, Plaintiff Crowell

had one arm in a PVC pipe inside a barrel, with a chain wrapped around his arm and then clipped

to rebar inside the barrel using a carabiner.  Plaintiff Kilmurray was using an identical device, but

on the opposite side of the barrel.  Id. at ¶17.  The barrel contained dirt, string, cement and rebar,

weighed at least 300 pounds and was too heavy to move.  Id. at ¶18.  The device used by the

Plaintiffs is known as a "sleeping dragon" or "bear claw" and its purpose is to defeat an officer's

attempt to take an individual into custody and remove the person from the scene.  Id. at ¶19.

When multiple attempts to convince the Plaintiffs to leave proved to be unsuccessful, the

Plaintiffs were advised that they were under arrest.  Id. at ¶20.  When the Plaintiffs still refused to

release themselves from the barrel and to accompany the officers, backup was called.  Id. at

¶¶20-21. Officer Peter DiMarino and Lieutenant Aleck arrived, and the officers continued their

efforts to persuade the Plaintiffs to separate themselves from the barrel.  Id. at ¶22.  When those

efforts failed to have the desired effect, the officers attempted to dig the dirt out of the barrel.  Id.

at ¶24.  When they made no progress, they proceeded to call the Brattleboro Department of



MCNEIL,
LEDDY &
SHEAHAN
BURLINGTON, VERMONT 05401

2

Public Works ("DPW"), in the belief that DPW employees would be able to assist in extricating Plaintiffs from the barrel. Id. at ¶¶24-25.

The officers tried to pull the Plaintiffs out of the barrel, because they thought the Plaintiffs were holding hands inside the barrel, but stopped when the Plaintiffs complained that the officers were hurting them. Id. at ¶26. Two DPW workers arrived and attempted to dig the dirt from the barrel before realizing that the bottom of the barrel was filled with cement and rebar. Id. at ¶27. The officers attempted to move the barrel, but the barrel was too heavy to move. Id. at ¶28. The officers explored the possibility of tipping the barrel over, but the Plaintiffs asked the officers not to because they feared that such action might break their arms. Id. at ¶29. Throughout, the Plaintiffs were capable of informing the officers how they were attached to the barrel, but chose not to, and the Plaintiffs had the ability, if they chose to do so, to detach themselves from the barrel and comply with the officers' directive to leave the property. Id. at ¶¶30-31.

As the officers were discussing their options, Plaintiff Kilmurray yelled to a friend to call members of the group so that they would return to the property. Id. at ¶33. This development caused the officers to have concerns that if they did not take action to remove the Plaintiffs from the scene there was a risk that other members of the original group could intervene in the arrest process and the situation could escalate. Id. at ¶34.

The officers decided to use a Taser in the drive stun mode on the Plaintiffs. Id. at ¶35. Before doing so, Lieutenant Kirkpatrick and Officer DiMarino explained to the Plaintiffs what the Taser was and what they intended to do in the hopes of eliciting cooperation. Id. at ¶ 38. The Plaintiffs knew that they would be tased if they did not separate themselves from the barrel but, despite having the ability to do so, neither Plaintiff released from the barrel. Id. at ¶¶40-41.



McNEIL,
LEDDY &
SHEAHAN
BURLINGTON, VERMONT 05401

3

Each of the Plaintiffs was tased for one to two seconds in the forearm using the Taser in the drive stun mode, but refused to release from the barrel. Id. at ¶¶42-43. Lieutenant Kirkpatrick and Officer DiMarino told the Plaintiffs that they would be tased a second time if they did not comply with their directives, but the Plaintiffs continued to refuse to comply with the officers' directives. Id. at ¶44. Plaintiff Crowell was tased a second time for three to four seconds, but he refused to release himself from the barrel. Id. at ¶45. Plaintiff Kilmurray, on the other hand, was tased a second time for one to three seconds at which time she released herself from the barrel. Id. at ¶46.

Once Plaintiff Kilmurray had released, the officers were able to determine for the first time the manner in which the Plaintiffs had attached themselves to the barrel. Id. at ¶47. Armed with this new information, they tried tipping the barrel in an effort to release Plaintiff Crowell from the barrel, but these efforts were unsuccessful. Id. at ¶48. Concerned that further efforts to release Plaintiff Crowell from the barrel by manipulating the barrel might result in permanent injury to Plaintiff Crowell, the officers ceased their efforts and warned Plaintiff Crowell that he would be tased a third time if he did not release from the barrel. Id. at ¶¶49-50. Crowell refused to release and he was tased a third time for approximately two to three seconds before he released himself. Id. at ¶¶50-51. Both Plaintiffs were removed from the scene and neither Plaintiff complained of any injury. Id. at ¶52.

On March 20, 2008, Plaintiff Crowell entered a plea of guilty to a charge of unlawful trespass. Id. at ¶¶53-54. Following a finding of probable cause for the offenses of unlawful trespass and resisting arrest, Plaintiff Kilmurray was referred to Diversion. Id.

In their suit, the Plaintiffs allege, in essence, that the use of the Tasers constituted excessive force under federal and state law. The Plaintiffs' claims fail, however, because the



McNEIL,
LEDDY &
SHEAHAN
BURLINGTON, VERMONT 05401

4

officers are entitled to qualified immunity.   Accordingly, summary judgment should be granted in favor of the Defendants.

## ARGUMENT
## I.   SUMMARY JUDGMENT STANDARD

Summary judgment is an established "tool for clearing the calendar of doomed lawsuits." Weinstock v. Columbia University, 224 F.3d 33, 40 (2d Cir. 2000), *cert. denied*, 540 U.S. 811 (2003).  Summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law" F.R.C.P. 56(c), or "'[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'"  Konikoff v. Prudential Ins. Co. of Am., 234 F.3d 92, 97 (2d Cir. 2000) (*quoting* Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

A party may obtain summary judgment when its opponent is unable to establish an essential element of a claim upon which it would have the burden of proof at trial.  Although the moving party bears the burden of demonstrating that no genuine issue exists as to any material fact, Celotex Corp. v. Catrett, 477 U.S. 317, 323-25 (1986),  "as to issues on which the non-moving party bears the burden of proof, the moving party may simply point out the absence of evidence to support the non-moving party's case."  Nora Beverages, Inc. v. Perrier Group of America, Inc., 164 F.3d 736, 742 (2d Cir. 1998).  The burden then shifts to the non-moving party.  "The non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful."  D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir.), *cert. denied*, 524 U.S. 911 (1998).  "If the evidence is merely colorable, or is not significantly probative, summary



judgment may be granted." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249-50 (1986) (citations omitted).

## II. THE DOCTRINE OF QUALIFIED IMMUNITY IS A COMPLETE BAR TO THE PLAINTIFFS' FEDERAL CLAIMS

The defense of qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>McEvoy v. Spencer</u>, 124 F.3d 92, 97 (2d Cir. 1997), *quoting* <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982).  It is more than just a defense; the doctrine of qualified immunity is an immunity from suit. <u>Scott v. Harris</u>, 127 S.Ct. 1769, 1774 n.2 (2007).

The application of qualified immunity to claims against police officers is well recognized.  The Supreme Court has emphasized that law enforcement officers "should not be held personally liable" for reasonable mistakes that are "inevitable" in their line of work. <u>Anderson v. Creighton</u>, 483 U.S. 635, 641 (1987).  In fact, "[t]he protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" <u>Pearson v. Callahan</u>, ___ S.Ct. ___, 2009 WL 128768, *6 (U.S. Jan. 21, 2009)(*citing* <u>Groh v. Ramirez</u>, 540 U.S. 551, 567 (2004)(Kennedy, J., dissenting).  Notably, qualified immunity operates "to protect officers from the sometimes hazy border between excessive and acceptable force." <u>Saucier v. Katz</u>, 533 U.S. 194, 206 (2001) (internal quotation marks and citation omitted). The doctrine recognizes that the police may make understandable errors and that the difficult task of protecting the public without fear of harassing litigation demands a rule other than strict liability. *See, e.g.,* <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 814 (1982).



McNEIL,
LEDDY &
SHEAHAN
BURLINGTON, VERMONT 05401

Until just recently, the analysis of a qualified immunity defense had required a court to answer a "threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" <u>Saucier</u>, 533 U.S. at 201; *see also* <u>Scott v. Harris</u>, 127 S.Ct. 1769, 1774 (2007)(*quoting* <u>Saucier</u>). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." <u>Saucier</u>, 533 U.S. at 201. "If, and only if, the court finds a violation of a constitutional right, 'the next, sequential step is to ask whether the right was clearly established ... in light of the specific context of the case.' " <u>Scott</u>, 127 S.Ct. at 1774 (*quoting* <u>Saucier</u>, 533 U.S. at 201). The <u>Saucier</u> protocol, while no longer mandatory, may be applied by this Court if it deems it beneficial to do so. <u>Pearson v. Callahan</u>, ___ S.Ct. ___, 2009 WL 128768, *9 (U.S. Jan. 21, 2009).   In this case, it does not matter whether the Court follows the <u>Saucier</u> procedures or not because the answer to both the question of whether the officers violated the Plaintiffs' Fourth Amendment Rights and whether there existed any clearly established law is "no."

A.   <u>Plaintiffs' Fourth Amendment Rights Were Not Violated</u>

Plaintiffs' Fourth Amendment unlawful arrest claim and parallel state law false imprisonment claim are easily disposed of.  "[T]he existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest, whether that action is brought under state law or under §1983." <u>Covington v. City of New York</u>, 171 F.3d 117, 122 (2d Cir. 1999) *quoting* <u>Weyant v. Okst</u>, 101 F.3d 845, 852 (2d Cir. 1996).  Plaintiffs knowingly occupied private property without permission to do so and refused to leave after the property owners requested that the police remove the trespassers, thus providing the Defendants with ample probable cause for arresting the Plaintiffs. *See* Statement at ¶¶8-12.  In addition, the



MCNEIL,
LEDDY &
SHEAHAN
BURLINGTON, VERMONT 05401

Supreme Court has held that there can be no §1983 cause of action for a claim that would call into question the validity of a prior criminal conviction, unless that conviction has been invalidated.  Heck v. Humphrey, 512 U.S. 477 (1994).  Plaintiff Crowell was found guilty of unlawful trespassing, thereby barring a civil suit challenging the validity of the arrest.

Excessive force claims arising out of arrests are analyzed under the Fourth Amendment's objective reasonableness standard.  Graham v. Connor, 490 U.S. 386 (1989). "The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application." Graham, 490 U.S. at 396 (internal quotation marks omitted). Instead, courts must examine the facts and circumstances of each particular case as they "slosh [their] way through the factbound morass of 'reasonableness.'" Scott v. Harris, 127 S.Ct. 1769, 1778 (2007).  In that process, the Supreme Court has stressed that reasonableness must be judged from the perspective of a reasonable police officer on the scene and not on the basis of 20/20 hindsight, emphasizing that the "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396-97; accord Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)("not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers" violates the Constitution).

The proper consideration of what force is reasonable in a particular situation involves balancing "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." Scott v. Harris, 127 S.Ct. at 1778 (quoting United States v. Place, 462 U.S. 696, 703 (1983)). Factors to consider in assessing the government interests at stake include "the facts and



McNEIL,
LEDDY &
SHEAHAN
BURLINGTON, VERMONT 05401

circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." <u>Graham</u>, 490 U.S. at 396.  In this regard, the Supreme Court has rejected the notion that objective reasonableness is a question of fact for a jury, explaining that "[a]t the summary judgment stage ... once we have determined the relevant set of facts and drawn all inferences in favor of the nonmoving party *to the extent supportable by the record* ... the reasonableness of [the officer's] actions ... is a pure question of law." <u>Scott</u>, 127 S.Ct. at 1776 n.8 (*italics in original*).  If, and only if, the force used was objectively unreasonable should the Court even consider qualified immunity and address the second question: whether the right violated was clearly established.

In the context of the present case, the government most certainly has an interest in enforcing the law and effecting arrests as expeditiously as possible with the least amount of risk of injury to police officers, suspects and members of the public.  In particular, when private property is unlawfully invaded, the government has an interest in removing the trespasser in order to prevent self-help by the property owner or damage to the property.  In attempting to balance the risk of injury to the Plaintiffs from the officers' actions in this case with the risk of continued lawlessness and potential for vigilante justice that the officers wished to prevent, the Supreme Court has made it clear that courts should take into account the "relative culpability" of the parties. <u>Scott</u>, 127 S.Ct. at 1778.

Applying the reasoning in <u>Scott</u>, it was the Plaintiffs who intentionally placed themselves in a situation which required the use of force by the officers when the Plaintiffs chose to continue to engage in unlawful behavior and refused to separate themselves from the barrel.  It is undisputed that the Plaintiffs repeatedly failed to comply with the officers'



directives that they release themselves from the barrel, that the officers made numerous unsuccessful attempts to separate the Plaintiffs from the barrel prior to resorting to the Taser, and that prior to using the Taser the officers warned the Plaintiffs that the Taser would be used and that it would be painful.  The Plaintiffs may suggest that the officers could have avoided the use of the Taser completely by waiting them out.  Clearly, however, "[a] person being placed under arrest has no right to prescribe the conditions under which he will comply with an officer's orders…"  Schumacher v. Halverson, 467 F.Supp. 2d 939, 951 (D. Minn. 2006).  Also, as noted by the Court in Scott, "the police need not have taken that chance and hoped for the best."  Scott, 127 S.Ct. at 1778.  Removing the Plaintiffs from the property they were unlawfully occupying "was *certain* to eliminate the risk" that the Plaintiffs would continue their unlawfulness with the help of the remainder of their group or that the lawful property owners would take matters into their own hands.  Id. at 1778-79.

Applying the so-called *Graham* factors, although the severity of the crime at issue initially in this case, trespass, is low, the Plaintiffs were uncooperative and resisted the officers attempts to arrest them.  In addition, the situation was tense and changing due to the failure of the Plaintiffs to provide any information regarding themselves or the device to which they were attached and the likelihood that reinforcements in the form of the original group were quite likely to reappear in response to Plaintiff Kilmurray's directions to a friend to call members of the group so that they would return to the property.  Similarly, even though the Plaintiffs may not have posed a substantial threat to people not involved in the incident, there was a potential threat to the officers due to the unknown nature of the device as well as Plaintiff Kilmurray's efforts to rally the troops.



McNEIL,
LEDDY &
SHEAHAN
BURLINGTON, VERMONT 05401

It is the third factor under *Graham* - whether the suspect actively resisted arrest or attempted to evade arrest by flight – that has become somewhat of a focal point in this case. Graham, 490 U.S. at 396. Clearly, the Plaintiffs were not attempting to evade arrest by flight, just as they were clearly resisting the officers' efforts to take them into custody. The Plaintiffs are of the view that, because they characterize themselves as protestors, they can not be considered as having "actively" resisted arrest unless they had physically assaulted an officer or made some attempt to do so. However, refusing to comply with an officer's lawful commands, or making movements or verbal gestures that indicate an unwillingness to cooperate with a police officer's lawful commands, constitutes active resistance justifying the use of a Taser. *See, e.g.,* Schumacher v. Halverson, supra, 467 F.Supp.2d 939, 951 (D. Minn. 2006)(plaintiff's act of locking his arms around a basketball post and refusing to let go constituted active resistance with the court noting that "[w]here a suspect repeatedly refuses to comply with an officer's lawful command, use of a [T]aser has been found reasonable."); Magee v. City of Daphne, 2006 WL 3791971, *10 n.20 (S.D. Ala. Dec. 20, 2006)("[i]t would defy logic and common sense to characterize" the refusal of an officer's command to come outside to be handcuffed "as anything other than actively resisting arrest."). "Actively" resisting includes acting with premeditation to defeat an officers' ability to effect an arrest. Thus, as illustrated by Schumacher, where suspects resist arrest by gripping stationary objects, they may not be violent toward the police but they are thwarting the officers' attempts to arrest them by means intentionally applied. [1]

---

[1] According to the Plaintiffs' expert, the Police Executive Research Forum ("PERF") and the International Association of Chiefs of Police ("IACP") are organizations that provide guidelines to law enforcement agencies. *See* Statement at¶¶ 68, 70.  It is noteworthy that PERF defines "actively resisting" as "physically evasive movements to defeat an officer's attempt at control, including bracing, tensing, pushing or verbally signaling an intention to avoid or prevent being taken into or retained in custody," and that IACP's model policy relating to use of non-deadly force authorizes officers to use non-deadly force in situations which include to "bring an unlawful situation safely and effectively under control." Id. at ¶¶69, 71.  The use of the barrel device was a very clear signal by the Plaintiffs that they intended to prevent the officers from taking them into custody and thus satisfies the PERF definition of "actively



MᴄNEIL,
LEDDY &
SHEAHAN
BURLINGTON, VERMONT 05401

Moreover, a recent case, <u>Buckley v. Haddock</u>, 2008 WL 4140297 (11th Cir. 2008), totally debunks the notion that it is per se unreasonable to use a Taser on a suspect whose resistance is, in contrast to the Plaintiffs, passive. In <u>Buckley</u>, a motorist was stopped for speeding and issued a citation. When he refused to sign the citation he was arrested and handcuffed without incident. As he was being escorted to the patrol car, he voluntarily went limp and dropped to the ground. The deputy asked the motorist several times to get up and walk to the car. The motorist refused. The deputy tried to lift the motorist to his feet, but the motorist remained limp and would not stand. The deputy warned the motorist that he would be tased if he did not stand. When the motorist did not stand, the Taser was applied for five seconds in the drive stun mode. The deputy again asked the motorist to stand, but the motorist did not. After another warning that the Taser would be used, the Taser was used for another five second cycle. The deputy called for backup and then proceeded to order the motorist to stand up. When the order was ignored, the deputy warned that the Taser would be used. Once again the motorist failed to stand and the Taser was a applied a third time. When the backup officer arrived, the two officers were able to place the motorist into the patrol car.

The Eleventh Circuit Court of Appeals, noting that "[t]he taser delivers an electrical shock; it hurts," concluded that the deputy's use of force "was not outside the range of reasonable conduct under the Fourth Amendment." <u>Id.</u> at *1, *3. Of particular relevance to the present case are the court's observations that the motorist's actions prevented the deputy from completing the arrest and the deputy did not resort to the Taser until trying unsuccessfully to persuade the motorist to cooperate, attempting without success to physically lift the motorist to his feet, and after delivering a warning that the Taser would be used. <u>Id.</u> *3. The court

---

resisting." The officers' use of the Taser complied with the IACP model policy in that the unlawful situation created by the Plaintiffs was brought under control.



acknowledged that the offense for which the motorist was arrested was minor, but pointed out that "[t]he government has an interest in arrests being completed efficiently and without waste of limited resources; police time and energy that may be needed elsewhere at any moment." Id. at *3. In reaching its conclusion that the deputy acted reasonably, the court characterized the use of the Taser "as – at most – moderate, non-lethal force" and observed that the Fourth Amendment does not require officers to use the least intrusive or even less intrusive alternatives. Id. *4.

In the present case, the Plaintiffs each had one arm in a PVC pipe inside a barrel, with a chain wrapped around their arm and then clipped to rebar inside the barrel using a carabiner. The barrel contained dirt, string, cement and rebar, weighed at least 300 pounds and was too heavy to move. The purpose of the device utilized by the Plaintiffs is to defeat an officer's attempt to take an individual into custody and remove the person from the scene. Had the Plaintiffs been content to act as true "passive" protestors, who forego barrel-type devices and simply resist arrest by going limp, it is likely that there would have been no Tasers and no controversy.

It is undisputed in this case that the Plaintiffs were lawfully placed under arrest by the officers. The fact that there was a lawful arrest is important because the right to make an arrest "necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Graham, 109 S.Ct. at 1871-72. Does the fact that the officers were entitled to use force to effect the arrest mean that any level of force, up to and including deadly force was appropriate? No. Application of the *Graham* factors in this case is helpful in the sense that it makes it clear that it would have been unreasonable for the officers to have responded to the Plaintiffs' resistance with extreme measures such as the use of impact weapons or deadly force. It also suggests that the officers should, if feasible, have attempted less forceful



means of gaining compliance prior to using the Taser. This is, of course, exactly what the officers did.

In determining the proper level of force in response to suspect resistance, officers are trained in a force continuum. *See* Statement ¶55. The use of force continuum has, at its lowest level, officer presence. Id. at ¶73. In this case, it is undisputed that the officers were in uniform, thereby establishing their authority to issue commands, and that mere officer presence was insufficient to elicit compliance by the Plaintiffs. Id. at ¶74. The second level of force involves verbal communication. Id. at ¶73. Once again, there is no dispute that the officers attempted to resolve the situation with both persuasion and direct orders, but these efforts were unsuccessful. Id. at ¶75. The third level of force is often referred to as soft-hand control and generally involves some limited physical contact for the purpose of, for example, escorting a suspect. Id. at ¶76. In this case, the Plaintiff's expert concurs that the officers' attempt to move the barrel and to empty the barrel of dirt constituted soft-hand control and that those efforts were unsuccessful. Id. The fourth level of force involves the use of physical control, either in the form of take-downs or pain compliance devices. Id. at ¶77. The purpose of a pain compliance device is to achieve compliance with officer directives, and the Taser, when used in the drive stun mode as in this case, constitutes a pain compliance device. Id. at ¶¶64,65.

The Plaintiffs may argue that the officers should have employed no force at all or attempted some different tactic. It is absurd in the first instance to suggest that police offices should throw up their hands and walk away if an arrestee refuses to comply with an officer's lawful attempts to take the arrestee into custody. "Our system of law enforcement depends on police officers having the ability to back up their directives with force and take a subject into custody once he is placed under arrest. It would render their authority illusory if police officers



MᴄNEIL,
LEDDY &
SHEAHAN
BURLINGTON, VERMONT 05401

14

with probable cause to arrest a suspect were obligated to abandon their arrest whenever a suspect disregards lawful commands to effect the arrest." Magee v. City of Daphne, supra, 2006 WL 3791971 *9 (S.D.Ala. Dec. 20, 2006). As to alternatives, consistent with the Supreme Court's teachings, courts have afforded officers considerable discretion to make choices among various use of force tactics. Thus, an officer is not obligated to use the least intrusive means to effect a seizure, and as long as the officer's actions fall within a broad range of reasonable means, his or her actions will be deemed constitutional. *See e.g.*, Schulz v. Long, 44 F.3d 643, 649 (8th Cir. 1995) (rejecting argument that police officers should have responded in a different manner or with less force, noting "the Fourth Amendment does not allow this type of 'Monday morning quarterback' approach because it only requires that the seizure fall within a range of objective reasonableness."); Hegarty v. Somerset County, 53 F.3d 1367, 1377 (1st Cir. 1995), *cert. denied sub nom.*, Hegarty v. Wright, 516 U.S. 1029 (1995) (officers were entitled to qualified immunity for their decision to make an immediate unannounced approach to a cabin in an effort to apprehend an armed suspect, rather than pursuing a more conservative containment strategy); Plakas v. Drinski, 19 F.3d 1143, 1148-49 (7th Cir. 1994), *cert. denied*, 513 U.S. 820 (1994) (officers acted reasonably in shooting a suspect and were not required to use available alternatives of maintaining distance from the subject with the protection of a barrier, or to use chemical spray or a canine). In other words, courts "do not sit in judgment to determine whether an officer made the best or a good or even a bad decision in the manner of carrying out an arrest." Buckley v. Haddock, supra, 2008 WL 4140297 *2 (11th Cir. Sept. 9, 2008). Rather, they answer the question of "whether an officer's conduct falls within the outside borders of what is reasonable in the constitutional sense." Id.



In terms of determining reasonableness, this Court can and should consider the fact that the less intrusive means of effecting the arrest such as officer presence, verbal commands, and soft-hand controls proved to be ineffective with the Plaintiffs. The Plaintiffs had expressed concern that initial attempts to move them or the barrel might result in broken limbs; a result that the officers wished to avoid. Plaintiff Kilmurray had yelled to a friend to call members of the original group so that they would return to the property. The officers knew that one risk in not removing an arrestee from the scene is that sometimes outsiders who have a close relationship to the person being arrested intervene in the process and the situation escalates. The officers considered use of pepper spray, but rejected that alternative because pepper spray carries a risk of self-contamination and requires a lengthy period of decontamination during which the suspect experiences prolonged pain and discomfort. The Court should also consider the fact that the officers explained what the Taser was and what they intended to do in the hopes of eliciting cooperation, that the officers told the Plaintiffs that the Taser would hurt a lot, and that both Plaintiffs elected not to release themselves from the barrel. Ultimately, the officers concluded, and a reasonable officer on the scene could have likewise concluded, that the Taser was a safe and effective force option to effect the arrest. Thus, the use of the Taser was objectively reasonable and the Plaintiffs' Fourth Amendment rights were not violated.

B.   <u>It Was Not Clearly Established at the Time of the Incident that Use of the Taser to Effect the Arrest of the Plaintiffs Violated Clearly Established Law</u>

Assuming *arguendo* that the Plaintiffs were able to establish that the officers' actions violated their constitutional rights, it cannot be said that the parameters of those rights were "clearly established" as that term is applied in the context of a qualified immunity defense. Police are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have



McNEIL, LEDDY & SHEAHAN
BURLINGTON, VERMONT 05401

16

known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982).  A right is "clearly established" when "[t]he contours of the right [are] ... sufficiently clear that a reasonable official would understand that what he is doing violates that right ... [T]he unlawfulness must be apparent." <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987);  <u>Hope v. Pelzer</u>, 536 U.S. 730 (2002).

Although some courts view the second inquiry in the qualified immunity analysis as simply one of whether the right was clearly established, in deference to the Supreme Court's caution that government officials should not be held liable for reasonable, but mistaken, judgments, the Second Circuit is one of several courts of appeal that has  "further refined the second inquiry" into two subparts, granting qualified immunity whenever "the defendant's action did not violate clearly established law" *or* where "it was objectively reasonable for the defendant to believe that his action did not violate such law." <u>Poe v. Leonard</u>, 282 F.3d 123, 132-133 (2d Cir. 2002) (internal quotation marks omitted); <u>Walczyk. Rio</u>, 496 F.3d 139, 154 (2d Cir. 2007)("Even if the right at issue was clearly established in certain respects . . . an officer is still entitled to qualified immunity if 'officers of reasonable competence could disagree' on the legality of the action at issue in its particular factual context" *quoting* <u>Malley v. Briggs</u>, 475 U.S. 335, 341 (1986)).

The "clearly established" requirement exists so that officers will have "fair warning" of the unlawfulness of their behavior.  <u>Hope v. Pelzer</u>, 536 U.S. 730 (2002).  It also ensures that the protection of qualified immunity is afforded to "all but the plainly incompetent or those who knowingly violate the law."  <u>Malley v. Briggs</u>, 475 U.S. 335, 341 (1986); *see also*, <u>Mitchell v. Forsyth</u>, 472 U.S. 511, 528 (1985)(officials are immune unless "the law clearly proscribed the actions they took").  For this reason, the unlawfulness that is alleged must be established by preexisting case law which is sufficiently similar factually to the case at issue that it can be fairly



McNEIL,
LEDDY &
SHEAHAN
BURLINGTON, VERMONT 05401

concluded that a reasonable person would be on notice that a constitutional right is being violated.  If some degree of factual similarity were not required a qualified immunity defense could never succeed because "[i]t could plausibly be asserted that any violation of the Fourth Amendment is 'clearly established,' since it is clearly established that the protections of the Fourth Amendment apply to the actions of police."  Wilson v. Layne, 526 U.S. 603, 615 (1999).

In Saucier v. Katz, 533 U.S. 194 (2001), the Supreme Court re-emphasized the need to look carefully at the "contours" of the right allegedly violated by a public official when undertaking the qualified immunity analysis. The Court stressed that, not only should the right itself be identified with a higher degree of specificity, but the precise contours of the application of that more specific right to the facts at hand must be made by the court when reviewing a defense of qualified immunity. Thus, the Supreme Court has made it clear that "it is not enough" to state  that *"Graham* clearly establishes the general proposition that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness." Brosseau v. Haugen, 543 U.S. 194, 198-199 (2004) (internal quotation marks omitted). Citing Anderson v. Creighton, 483 U.S. 635 (1987), the Supreme Court has stressed "that the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Brosseau, 543 U.S. at 198-199 (internal quotation marks omitted). Moreover, general standards are particularly deficient where, as here, the constitutional "area is one in which the result depends very much on the facts of each case." *Id.* at 201.

Applying the Second Circuit's test, this Court must decide whether there was, at the time of this incident, any clearly established law which would prohibit the use of the Taser



on a lawfully arrested individual who has ignored officer presence, verbal commands, and efforts at soft-hand control and who, by deliberate action, resists the efforts of an officer to take the individual into lawful custody despite warnings that the Taser would be deployed. The answer is clearly "no."

At the time of this incident, no case had held that deploying a Taser in the drive stun mode on a lawfully arrested person who had resisted an officer's attempts to take the person into physical custody following a warning to the person of the intended action violated the Fourth Amendment. In fact, it was clearly established that such a use of the Taser did not violate the Constitution. For example, in Draper v. Reynolds, 369 F.3d 1270 (11th Cir.), *cert. denied*, 543 U.S. 988 (2004), the driver of a tractor trailer truck, was pulled over for a minor motor vehicle violation and refused to cooperate with the officer's request that he provide a bill of lading, proof of insurance and log book. Although Draper never physically attacked the officer or verbally threatened the officer with physical violence, the officer deployed the Taser even before arresting the Plaintiff and without warning. The Court, in affording qualified immunity to the officer, observed that the Taser deployment was a reasonably proportionate response to Draper's conduct and was not excessive. *Accord* Dargan v. Hernandez-Vega, 2006 WL 822558 (M.D. Fla. March 24, 2006)(sheriff's deputies entitled to qualified immunity where they deployed a Taser on a misdemeanor trespass arrestee who attempted to leave premises as ordered by the deputies); Devoe v. Rebant, 2006 WL 334297 (E.D. Mich. Feb. 13 2006)(use of a Taser in the drive stun mode was reasonable to deal with uncooperative arrestee whose only offense was refusing to identify himself but who refused to enter a patrol car); Johnson v. City of Lincoln Park, 434 F.Supp.2d 467 (E.D. Mich. 2006)(no excessive force where officers tased juvenile who was resisting arrest where juvenile was



McNEIL,
LEDDY &
SHEAHAN
BURLINGTON, VERMONT 05401

warned that Taser would be used and juvenile did not seek medical treatment as a result of being tased); RT v. Cincinnati Public Schools, 2006 WL 3833519 (S.D. Ohio Dec. 29, 2006)(no excessive force where officer tased juvenile female who refused orders to get off the hallway floor and report to in-school suspension following warning that she would be tased); Schumacher v. Halverson, supra, 467 F.Supp. 2d 939 (D. Minn. 2006)(no excessive force where officer used taser on arrestee who refused to release his grip on a basketball pole following warning that taser would be deployed); Willkomm v. Mayer, 2006 WL 582044 (W.D.Wis. March 9, 2006)(no excessive force where plaintiff was tased following his refusal to place his left hand behind his back for handcuffing, tased again for refusing to swing his legs into the police cruiser, and tased a third time while face down on the ground to allow the officers to reposition his handcuffs); and Magee v City of Daphne, supra, 2006 WL 3791971 (S.D. Ala. Dec. 20, 2006)(no excessive force where arrestee was tased for refusing officer commands to come outside).

Alternatively, this Court must determine whether a reasonable officer could have believed that use of a Taser in the drive stun mode to effect the arrest of two individuals who had resisted all efforts to be taken into custody was lawful, in light of clearly established law and the information possessed by the officers. The answer to this question is decidedly "yes."

As the foregoing cases suggest, it was not clearly established in 2007, nor is it clearly established in 2009, that the officers' conduct violated the Plaintiffs' Fourth Amendment rights. Rather, the most analogous cases decided as of 2007, DeVoe, Schumacher, and Magee, upheld the use of the Taser on an uncooperative individual who refused the lawful commands of an officer. And many other cases have approved deployment of the Taser in situations in which an individual is, as here, warned that the Taser is going to be used or



where any physical injury attributed to being tased is not so serious as to require medical treatment.  No authorities clearly establish or even hinted that the officers' use of the Taser in the situation that confronted them was unconstitutional.

As far as counsel is aware, there is no Supreme Court or Second Circuit Court of Appeals precedent establishing that it is unconstitutional for police officers to use a Taser under the circumstances presented in this case.  If that is to become the law, it is obviously not a standard that was clearly established on July 24, 2007. Given the state of the law in 2007 coupled with the fact that the officers had made a lawful arrest, that the Plaintiffs had ignored officer presence, disregarded verbal commands and deliberately thwarted any resort to soft-hand controls, that the officers provided full warning of the action that they were going to take, it was certainly reasonable for the officers to conclude that the use of the Taser in the drive stun mode comported with the Fourth Amendment's concerns.

### III.  PLAINTIFFS' STATE CLAIMS FAIL AS A MATTER OF LAW

    A.    <u>The Use of Reasonable Force is a Bar to the Assault and Battery Claim</u>

"At common law, the civil tort of assault is defined as 'any gesture or threat of violence exhibiting an attention [sic] to assault, with the means of carrying that threat into effect ... unless immediate contact is impossible.'" <u>Billado v. Parry</u>, 937 F.Supp. 337 (D.Vt. 1996)(*citing* <u>Bishop v. Ranney</u>, 59 Vt. 316, 318 (1887).   In cases in which assault and battery by a police officer is alleged, "the inquiry is whether the officer's conduct was reasonably necessary and thereby privileged." <u>Smith v. District of Columbia</u>, 882 A.2d 778, 788 (D.C. 2005)  Thus,  "[a] police officer has a qualified privilege to use reasonable force to effect an arrest, provided that the means employed are not 'in excess of those which the actor reasonably believes to be necessary.'" <u>Id</u>. At 787.   The standard is thus one of reasonableness, making the analysis the


MCNEIL,
LEDDY &
SHEAHAN
BURLINGTON, VERMONT 05401

21

same as with the Fourth Amendment claim above, and leading to the same conclusion: the officers used reasonable force to effect the arrest of the Plaintiffs thereby defeating any claim for assault and battery.[2]

### B.     The Defendants' Conduct was not Extreme and Outrageous

In Count Four, Plaintiffs assert what appears to be an Intentional Infliction of Emotional Distress ("IIED") claim against the Defendants. "A prima facie case of intentional infliction of emotional distress requires a plaintiff to establish 'outrageous conduct, done intentionally or with reckless disregard of the probability of causing emotional distress, resulting in the suffering of extreme emotional distress, actually or proximately caused by the outrageous conduct." Cook v. Arrowsmith Shelburne, Inc., 69 F.3d 1235, 1242 (2d Cir. 1995) (*quoting* McHugh v. University of Vermont, 758 F. Supp. 945, 949 (D. Vt. 1991), *aff'd*, 966 F.2d 67 (2d Cir. 1992) (citations and internal quotation marks omitted)) (applying Vermont law); *accord* Fromson v. State, 2004 VT 29, ¶14, 176 Vt. 395, 399, 848 A.2d 344, 347.  But because nothing Plaintiffs accuse the Defendants of doing is sufficiently outrageous, their IIED claim must fail.

A plaintiff's "burden of proof on a claim of intentional infliction of emotional distress is a heavy one." Gallipo v. City of Rutland, 163 Vt. 83, 94 (1994).  "'It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort.'" Ploof v. Brooks Drug, Inc., 1991 WL 497170 at 6 (D. Vt. 1991) (*quoting* RESTATEMENT § 46 comment (d)) (Appendix D).  The Court must determine as a threshold question whether a jury could reasonably find that the conduct at issue was "so outrageous and extreme as to 'go beyond

---

[2] Plaintiffs' false imprisonment claim has been discussed in the context of their Fourth Amendment unlawful seizure claim, supra.

all possible bounds of decency.'" <u>Jobin v. McQuillen</u>, 158 Vt. 322, 327 (1992) (*quoting* <u>Demag v. American Insurance Companies</u>, 146 Vt. 608, 611(1986)). This determination is made as a matter of law. <u>Denton v. Chittenden Bank</u>, 163 Vt. 62, 66 (1994); <u>Murray v. St. Michael's College</u>, 164 Vt. 205, 212 (1995).

In this case, the Plaintiffs broke the law and then refused to comply with the officers' lawful directives to release from the barrel. The officers resorted to the Taser only after officer presence, verbal communication and soft hand controls had failed and only after warning the Plaintiffs that the Taser would be used. The undisputed facts simply do not support a conclusion that officers' decision to use the Taser was wrong or malicious, or that their actions even remotely approached the outrageous. Accordingly, Plaintiffs' IIED claim must fail.[3]

    C.    <u>The Doctrine of Qualified Immunity is a Complete Bar to the State Law Claims</u>

Qualified immunity is equally applicable to Plaintiffs' state law claims. Under Vermont law, "[q]ualified immunity is a judicially created doctrine that shelters state and municipal officials from suits for acts performed in the course of their duties." <u>Morais v. Yee</u>, 162 Vt. 168, 171 (1993). Vermont law extends qualified immunity to government employees "(1) acting during their employment and acting, or reasonably believing they are acting, within the scope of their authority; (2) acting in good faith; and (3) performing discretionary, as opposed to ministerial, acts." <u>LaShay v. Dep't of Soc. And Rehab. Servs.</u>, 160 Vt. 60, 65 (1993).

In this case, it cannot be seriously disputed that the Defendants were acting within the scope of their authority as police officers, thereby satisfying the first prong of the test. It should be equally beyond dispute that the Defendants were performing discretionary acts. In Vermont, a discretionary duty is defined as "one requiring the exercise of judgment in its performance," in

---

[3] The Plaintiffs have also failed to demonstrate by factual allegations that their alleged emotional distress was severe or extreme, and for this reason also their IIED claim should be dismissed.



MCNEIL,
LEDDY &
SHEAHAN
BURLINGTON, VERMONT 05401

contrast to a ministerial duty, which is "one where 'nothing is left to discretion – a simple and definite duty, imposed by law, and arising under conditions admitted or proved to exist.'" Lebercent v. Aldrich, 149 Vt. 76, 81 (1987) (*quoting* State v. Howard, 83 Vt. 6, 14 (1909)).  The decision of the officers to arrest the Plaintiffs followed by a determination as to the appropriate level of force to effect the arrest requires the exercise of judgment.

As to the second prong, "in applying qualified official immunity to state tort law claims, [Vermont law uses] the federal objective good faith standard 'to prevent exposing state employees to the distraction and expense of defending themselves in the courtroom.'" Cook v. Nelson, 167 Vt. 505, 509 (1998)(*quoting* Sabia v. Neville, 165 Vt. 515, 521 (1996)).  Thus, "if the official's conduct does not violate clearly-established rights of which a reasonable person would have known, the official is protected by qualified immunity from tort liability." Id.  As indicated above, the Defendant officers did not violate a clearly established right by using a Taser to effect the arrest of the Plaintiffs, both of whom took affirmative action to prevent the arrest.  The officers therefore satisfy the second prong of good faith.

Qualified immunity, as to the Plaintiffs' state law claims, applies because the Defendants performed a discretionary act in good faith during the course of and within their authority as police officers.  Thus, Defendants' motion for summary judgment as to the state law claims should be granted.

## CONCLUSION

WHEREFORE, for any and all of the reasons stated above, this Motion for Summary Judgment should be granted in its entirety, dismissing all of Plaintiffs' claims against Officers Kirkpatrick, Gorman, Aleck and DiMarino with prejudice.



MCNEIL,
LEDDY &
SHEAHAN
BURLINGTON, VERMONT 05401

DATED at Burlington, Vermont, this 1st day of April 2009.

ROBERT KIRKPATRICK,
MICHAEL GORMAN,
CHUCK ALECK, and
PETER DIMARINO

BY: _____

McNeil, Leddy & Sheahan, P.C.
Nancy G. Sheahan, Esq.
271 South Union St.
Burlington, VT  05401
Attorneys for Defendants

c:      David C. Sleigh, Esq.

400000\340

MCNEIL,
LEDDY &
SHEAHAN
BURLINGTON, VERMONT 05401

25