U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2009 APR -2 AM 9:38

BY_____
      DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | |
|---|---|
| JONATHAN CROWELL ) <br> SAMANTHA KILMURRAY ) <br>     Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> ROBERT KIRKPATRICK ) <br> MICHAEL GORMAN ) <br> CHUCK ALECK ) <br> PETER DIMARINO ) <br>     Defendants. ) | Civil Case No. 2:08-cv-55 |

### DEFENDANTS' LOCAL RULE 7.1(C)(1) STATEMENT OF UNDISPUTED MATERIAL FACTS

NOW COME Defendants Robert Kirkpatrick, Michael Gorman, Chuck Aleck and Peter DiMarino ("Defendants" or "officers"), by and through their attorneys, McNeil, Leddy & Sheahan, P.C., and, pursuant to Local Rule 7.1(c)(1), hereby state that the following material facts are undisputed:

1. At all relevant times, Robert Kirkpatrick was employed as a lieutenant with the Brattleboro Police Department ("BPD"). *See* Exhibit A, Affidavit of Robert Kirkpatrick, ¶1. He graduated from the Vermont Police Academy in 1990 and, in 2007, he had approximately 22 years of experience as a police officer. Id.

2. At all relevant times, Michael Gorman was employed as an officer with the Brattleboro Police Department ("BPD"). *See* Exhibit B, Affidavit of Michael Gorman, ¶1. He graduated from the Vermont Police Academy in 1988 and, in 2007, he had approximately 20 years of experience as a police officer. Id.

3. At all relevant times, Chuck Aleck was employed as a lieutenant with the Brattleboro Police Department ("BPD"). *See* Exhibit C, Affidavit of Chuck Aleck, ¶1.

McNEIL,
LEDDY &
SHEAHAN
BURLINGTON, VERMONT 05401

He graduated from the Vermont Police Academy in 1982 and, in 2007, he had approximately 28 years of experience as a police officer. Id.

4. At all relevant times, Peter DiMarino was employed as a patrol officer with the Brattleboro Police Department ("BPD"). See Exhibit D, Affidavit of Peter DiMarino, ¶1. He graduated from the Vermont Police Academy in 2002 and, in 2007, he had approximately 6 years of experience as a police officer. Id.

5. In 2007, Officers Kirkpatrick, Gorman, Alex and DiMarino were certified by the State of Vermont Criminal Justice Training Council as full time law enforcement officers in the State of Vermont. See Exhibit A ¶2; Exhibit B ¶2; Exhibit C ¶2, Exhibit D ¶2.

6. On July 23, 2007, the Plaintiffs were part of a group of people gathered at a recently cleared lot at the corner of Black Mountain Road and Putney Road in Brattleboro, Vermont. See Complaint ¶ 5; Plaintiff Jonathan Crowell's Responses to Defendants' Requests for Admission ¶1, pertinent portions attached hereto as Exhibit E; Plaintiff Samantha Kilmurray's Responses to Defendants' Requests for Admission ¶1, pertinent portions attached hereto as Exhibit F.

7. The Plaintiffs were protesting what they perceived to be the imminent development of land owned by Cheshire Oil. See Complaint ¶¶ 5, 8 and 10; Exhibit E ¶2; Exhibit F ¶2. There were no such plans. See Complaint ¶10.

8. The Plaintiffs were aware that the land on which they were gathered was private property. See Exhibit E ¶3.

9. The owners of the land advised the Brattleboro Police Department that they did not want the group on the property and they asked that the police issue notices against



McNEIL,
LEDDY &
SHEAHAN
BURLINGTON, VERMONT 05401

trespass. *See* Complaint ¶11; Exhibit A ¶11; Exhibit B ¶11; Exhibit K, Affidavit of James Robertson, ¶¶1-3.

10.     Officers Gorman and Kirkpatrick went to the scene, where they advised the protestors that there was no plan to develop the property, that the owners did not want the protestors on the property and that they would have to leave. They notified the protestors that they would return in approximately one hour and anyone who was left on the property at that time would be arrested for trespassing. *See* Complaint ¶¶10-13; Exhibit A ¶11; Exhibit B ¶12; Exhibit E ¶¶5-6; Exhibit F ¶¶4-5.

11.     Some members of the group chose to vacate the property, but the Plaintiffs elected to stay. *See* Exhibit E ¶7; Exhibit F ¶6.

12.     Two or three hours later, Lieutenant Kirkpatrick returned to the property and informed the Plaintiffs and the remaining members of the group that the owners of the property were allowing them to stay overnight, but they must vacate the property in the morning. *See* Complaint ¶¶19-20; Exhibit A ¶12; Exhibit L, Affidavit of G. Bryant Robertson, ¶3.

13.     At approximately 7:00 a.m. the following morning, July 24, 2007, Officers Gorman and Kirkpatrick returned to the property and advised the Plaintiffs that they were trespassing and would be arrested if they did not leave the property. *See* Complaint ¶33, Exhibit A ¶¶13, 15; Exhibit B ¶13, 14, 16; Exhibit E ¶9; Exhibit F ¶8.

14.     Officer Gorman tried to persuade the Plaintiffs to leave by pointing out to the Plaintiffs that they had gotten their message out because their activities had been reported in the newspaper. *See* Exhibit B ¶16.



McNEIL, LEDDY & SHEAHAN
BURLINGTON, VERMONT 05401

15. The order to leave the property was a lawful order. *See* Deposition of Plaintiff's Expert Andrew J. Scott, III, November 20 at 53, pertinent portions attached hereto as Exhibit G.

16. The Plaintiffs did not leave the property as directed by the officers. *See* Exhibit A ¶15; Exhibit B ¶16; Exhibit E ¶10; Exhibit F ¶9.

17. When the officers were directing the Plaintiffs to leave the property, Plaintiff Crowell had one arm in a PVC pipe inside a barrel, with a chain wrapped around his arm and then clipped to rebar inside the barrel using a carabiner. Plaintiff Kilmurray was using an identical device, but on the opposite side of the barrel. *See* Exhibit E ¶11-12; Exhibit F ¶10-11.

18. The barrel contained dirt, string, cement, rebar, chicken wire, screws and nails, weighed at least 300 pounds and was too heavy to move. *See* Complaint ¶34; Exhibit A ¶20; Exhibit B ¶19; Exhibit C ¶17; Exhibit D ¶20; Exhibit E ¶13; Exhibit F ¶12.

19. The device used by the Plaintiffs is known as a "sleeping dragon" or "bear claw" and the purpose of the device utilized by the Plaintiffs is to defeat an officer's attempt to take an individual into custody and remove the person from the scene. *See* Exhibit H, Affidavit of Defendants' Expert John J. Ryan, ¶29; Exhibit G at 59.

20. Lieutenant Kirkpatrick and Officer Gorman attempted to convince the Plaintiffs to leave without being arrested, but the Plaintiffs refused to leave. Finally, the Plaintiffs were advised by the officers that they were under arrest, but they still refused to release themselves from the barrel. *See* Exhibit A ¶17; Exhibit B ¶18; Exhibit E ¶¶18-19; Exhibit F ¶¶17-18.


McNEIL,
LEDDY &
SHEAHAN
BURLINGTON, VERMONT 05401

21.     Lieutenant Kirkpatrick called for Lieutenant Chuck Aleck and Officer Peter DiMarino to come to the scene.  *See* Exhibit A ¶16; Exhibit B ¶17; Exhibit C ¶11; Exhibit D ¶14.

22.     The officers continued to advise the Plaintiffs that they were under arrest and needed to remove themselves from the barrel, but the Plaintiffs refused to comply with the officers' requests or to inform the officers how they were connected to the barrel.  *See* Exhibit A ¶ 17; Exhibit C ¶¶14, 17; Exhibit D ¶¶17, 20.

23.     The officers removed a sleeping bag and jug containing an unknown liquid from Plaintiff Crowell.  *See* Exhibit A ¶¶18-19; Exhibit C ¶¶15-16; Exhibit D ¶¶18-19.

24.     The officers attempted to dig the dirt out of the barrel without success.  *See* Complaint ¶35; Exhibit A ¶20; Exhibit B ¶19; Exhibit C ¶17; Exhibit D ¶20; Exhibit E ¶20; Exhibit F ¶19.

25.     The officers called the Brattleboro Department of Public Works ("DPW"), in the belief that DPW employees would be able to assist in extricating Plaintiffs from the barrel.  *See* Exhibit A ¶20; Exhibit B ¶19; Exhibit C ¶17; Exhibit D ¶20.

26.     The officers tried to pull the Plaintiffs out of the barrel because they thought they were holding hands inside the barrel.  When the Plaintiffs complained that they officers were hurting them, the officers stopped.  *See* Exhibit A ¶20; Exhibit B ¶19; Exhibit C ¶17; Exhibit D ¶20.

27.     Two workers from the Department of Public Works attempted to dig out the dirt from the barrel before realizing that the bottom of the barrel was filled with cement and rebar.  *See* Exhibit A ¶20; Exhibit B ¶19; Exhibit C ¶17; Exhibit D ¶20.

28.     The officers attempted to move the barrel, but the barrel was too heavy to move.  *See* Complaint ¶34; Exhibit A ¶20; Exhibit B ¶19; Exhibit C ¶17; Exhibit D ¶20.


McNEIL,
LEDDY &
SHEAHAN
BURLINGTON, VERMONT 05401

29. The officers explored the possibility of tipping the barrel over, but the Plaintiffs asked the officers not to do so because they feared that such action might break their arms. *See* Exhibit A ¶20; Exhibit B ¶19; Exhibit C ¶17; Exhibit D ¶20; Exhibit E ¶22; Exhibit F ¶21.

30. The Plaintiffs were capable of informing the officers how they were attached to the barrel, but chose not to. *See* Exhibit E ¶¶15-16; Exhibit F ¶¶14-15.

31. The Plaintiffs had the ability, if they chose to do so, to detach themselves from the barrel and comply with the officers' directive to leave the property. *See* Exhibit E ¶17; Exhibit F ¶16.

32. The officers advised the Plaintiffs that their non-compliance amounted to actively resisting arrest. *See* Complaint ¶40.

33. Plaintiff Kilmurray yelled to a friend to call members of the group so that they would return to the property. *See* Exhibit A ¶ 22; Exhibit B ¶21; Exhibit C ¶19; Exhibit D ¶ 22; Exhibit F ¶23.

34. The officers had concerns that if they did not take action to remove the Plaintiffs from the scene there was a risk that other members of the original group could intervene in the arrest process and the situation could escalate. *See* Exhibit A ¶23; Exhibit B ¶22; Exhibit C ¶20; Exhibit D ¶23.

35. The officers decided to use a Taser in the drive stun mode on the Plaintiffs. *See* Exhibit A ¶21; Exhibit B ¶20; Exhibit C ¶18; Exhibit D ¶21.

36. The officers considered the use of pepper spray, but rejected that idea because of the risk of officer contamination as well as the prolonged pain and discomfort that pepper spray can cause. *See* Exhibit A ¶21; Exhibit B ¶20; Exhibit C ¶18; Exhibit D ¶21.


McNEIL, LEDDY & SHEAHAN
BURLINGTON, VERMONT 05401

37. Batons were not a good option because they can cause permanent injury as well as prolonged pain and the officers did not want to use saws because they were not sure where the Plaintiffs' hands were located within the barrel. *See* Exhibit C ¶18.

38. Lieutenant Kirkpatrick and Officer DiMarino explained to the Plaintiffs what the Taser was and what they intended to do in the hopes of eliciting cooperation. *See* Complaint ¶43; Exhibit A ¶24; Exhibit B ¶23; Exhibit C ¶21; Exhibit D ¶24.

39. Prior to using the Taser on the Plaintiffs, the officers warned the Plaintiffs that if they did not comply with the police directives they would be tased and that it would hurt a lot to be tased. *See* Exhibit A ¶24; Exhibit B ¶23; Exhibit C ¶21; Exhibit D ¶24; Exhibit E ¶23, 26; Exhibit F ¶24.

40. Both Plaintiffs knew before they were actually tased that they would be tased unless they extracted themselves from the barrel. *See* Exhibit E ¶24; Exhibit F ¶25.

41. Despite having the ability to do so, neither Plaintiff released from the barrel prior to the Taser being used on them. *See* Exhibit E ¶27; Exhibit F ¶27.

42. Each of the Plaintiffs was tased for one to two seconds in the forearm using the Taser in the drive stun mode. *See* Complaint ¶46; Exhibit A ¶25; Exhibit D ¶25.

43. Despite having the ability to do so, neither Plaintiff released from the barrel after being tased. *See* Complaint ¶47; Exhibit A ¶26; Exhibit C ¶23; Exhibit D ¶25; Exhibit E ¶29.

44. Lieutenant Kirkpatrick and Officer DiMarino told the Plaintiffs that they would be tased a second time if they did not comply with their directives, but the Plaintiffs continued to refuse to comply with the officers' directives. *See* Exhibit A ¶27; Exhibit C ¶24; Exhibit D ¶27; Exhibit E ¶¶30-31; Exhibit F ¶31-32.



McNEIL, LEDDY & SHEAHAN
BURLINGTON, VERMONT 05401

7

45. Plaintiff Crowell was tased a second time for three to four seconds, but he refused to release himself from the barrel. *See* Exhibit C ¶25; Exhibit D ¶28; Exhibit E ¶35.

46. Plaintiff Kilmurray was tased a second time for one to three seconds at which time she released herself from the barrel. *See* Complaint ¶48; Exhibit A ¶¶28-29; Exhibit C ¶¶25-26; Exhibit D ¶28; Exhibit E ¶34; Exhibit F ¶33.

47. Once Plaintiff Kilmurray had released herself from the barrel, the officers were able to determine for the first time the manner in which the Plaintiffs had attached themselves to the barrel. *See* Exhibit A ¶29; Exhibit B ¶25; Exhibit C ¶26; Exhibit D ¶29.

48. The officers tried tipping the barrel in an effort to release Plaintiff Crowell from the barrel, but these efforts were unsuccessful. *See* Exhibit A ¶32; Exhibit B ¶27; Exhibit C ¶29; Exhibit D ¶32; Exhibit E ¶36.

49. The offices were concerned that further efforts to release Plaintiff Crowell from the barrel by manipulating the barrel might result in permanent injury to Plaintiff Crowell. *See* Exhibit A ¶32; Exhibit B ¶27; Exhibit C ¶29; Exhibit D ¶32.

50. Plaintiff Crowell was warned that he would be tased a third time if he did not release from the barrel, but he refused to release. *See* Complaint ¶50; Exhibit A ¶33; Exhibit B ¶28; Exhibit C ¶30; Exhibit D ¶33.

51. Plaintiff Crowell was tased a third time for approximately two to three seconds and then released himself from the barrel. *See* Complaint ¶52; Exhibit A ¶34; Exhibit B ¶28; Exhibit C ¶31; Exhibit D ¶34; Exhibit E ¶37.

52. Neither Plaintiff complained of any injury. *See* Exhibit A ¶36; Exhibit B ¶30; Exhibit C ¶33; Exhibit D ¶36.



McNEIL, LEDDY & SHEAHAN
BURLINGTON, VERMONT 05401

53. The Plaintiffs were charged with unlawful trespass in violation of 13 V.S.A. §3705(a) and resisting arrest in violation of 13 V.S.A. §3017(a)(1). The Vermont District Court found probable cause for all charges on September 7, 2007. *See* Exhibit I, certified copy of docket entries in State v. Jonathan Crowell; Exhibit J, certified copy of docket entries in State v. Samantha Kilmurray.

54. On March 20, 2008, Plaintiff Crowell entered a plea of guilty to the unlawful trespassing charge and the resisting arrest charge was dismissed. *See* Exhibit I. Plaintiff Kilmurray was referred to diversion on November 8, 2007 and again on March 24, 2008 and June 24, 2008. Diversion was completed on November 6, 2008 at which time the charges were dismissed. *See* Exhibit J.

55. As of 2007, Officers Kirkpatrick, Gorman, Alex and DiMarino had all received training both at the Vermont Police Academy and the BPD in the lawful use of force in connection with arrests, including training relating to the continuum of force. *See* Exhibit A ¶3; Exhibit B ¶3; Exhibit C ¶3, Exhibit D ¶3.

56. As of 2007, Officers Kirkpatrick, Gorman, Aleck and DiMarino had all received training in the use of force both at the Vermont Police Academy and the BPD, including training on all weapons that they were issued. *See* Exhibit A ¶5; Exhibit B ¶5; Exhibit C ¶5; Exhibit D ¶5.

57. In 2007, Officers Kirkpatrick, Gorman, Aleck and DiMarino were issued various weapons by BPD including firearms, pepper spray and a Taser. *See* Exhibit A ¶6; Exhibit B ¶6; Exhibit C ¶6; Exhibit D ¶6.

58. In 2007, Officers Kirkpatrick, Gorman, Aleck and DiMarino were certified for carrying and using a Taser. *See* Exhibit A ¶7; Exhibit B ¶7; Exhibit C ¶7; Exhibit D ¶7.


McNEIL,
LEDDY &
SHEAHAN
BURLINGTON, VERMONT 05401

59.     In 2007, Officer DiMarino was certified as a Taser instructor. *See* Exhibit D ¶7.

60.     To become certified to carry and use a Taser, Officers Kirkpatrick, Gorman, Aleck and DiMarino successfully completed classroom training and written testing regarding the Taser in addition to demonstrating hands-on proficiency with the Taser. As a part of their training with the Taser, the Taser was used on each of the officers. *See* Exhibit A ¶8; Exhibit B ¶8; Exhibit C ¶8; Exhibit D ¶8.

61.     To become certified as a Taser instructor, Officer DiMarino successfully completed an initial 16 hour instructor training course in 2005 as well as a 16 hour instructor re-certification training course in 2007, both of which included classroom training, written testing, and hands-on proficiency with the Taser. As part of his instructor certification, the Taser was used on Officer DiMarino. *See* Exhibit D ¶8.

62.     Taser is one brand of electronic control devices, distributed and marketed by Taser International, Inc. *See* Exhibit D ¶9.

63.     The Taser, when used in the probe mode, fires two barbed prongs connected by thin wires at a suspect that lodge in the suspect's clothing or skin and deliver pulses of electricity that cause incapacitation of the body's muscles thereby enabling officers to restrain the suspect. *See* Exhibit D ¶10; Complaint ¶¶63-65; 69.

64.     When used in the drive stun mode, the probe cartridge is removed and the Taser is placed against a suspect's clothing or skin. An electrical charge is delivered that causes localized pain in the area touched by the Taser, but there is no incapacitation of the muscles. *See* Exhibit D ¶11; Complaint ¶¶71-75.


McNEIL,
LEDDY &
SHEAHAN
BURLINGTON, VERMONT 05401

65. When a Taser is used in the drive stun mode, it is being used as a pain compliance tool. *See* Exhibit A ¶9; Exhibit B ¶9; Exhibit C ¶9; Exhibit D ¶12; Exhibit G at 81.

66. The purpose of a pain compliance device is to achieve compliance with officer directives. *See* Exhibit G at 72.

67. When a Taser is used in the probe mode, it is suggested that it should not be cycled more than three times on an individual. *See* Exhibit G at 82. There is no similar restriction on Tasers used in the drive stun mode. Id.

68. The Police Executive Research Forum ("PERF") is an organization that law enforcement agencies look to for guidance in terms of what operational practices are accepted in police work. *See* Exhibit G at 97.

69. PERF defines "actively resisting" as "physically evasive movements to defeat an officer's attempt at control, including bracing, tensing, pushing or verbally signaling an intention to avoid or prevent being taken into or retained in custody." *See* Exhibit H at ¶46.

70. The International Association of Chiefs of Police ("IACP") has created model policies relating to the use of force. *See* Exhibit G at 75-77.

71. The IACP Model Policy relating to use of non-deadly force has been in existence since August 2001 and provides as follows:

> 1. Where deadly force is not authorized, officers may use only that level of force that is objectively reasonable to bring an incident under control.
> 2. Officers are authorized to use department-approved, non-deadly force techniques and issued equipment to
>    a. Protect the officer or others from physical harm;
>    b. Restrain or subdue a resistant individual; and/or
>    c. Bring an unlawful situation safely and effectively under control.

*See* Exhibit H ¶40.

McNEIL, LEDDY & SHEAHAN
BURLINGTON, VERMONT 05401

72.  Based upon their training and experience, Officers Kirkpatrick, Gorman, Aleck and DiMarino understood that the Plaintiffs' use of the barrel to prevent the officers from taking the Plaintiffs into custody and removing them from the scene constituted active resistance. *See* Exhibit A ¶37; Exhibit B ¶31; Exhibit C ¶35; Exhibit D ¶37.

73.  The continuum of force is a sliding scale that provides guidance to law enforcement officers as to how much may be used against a resisting subject in a given situation. *See* Exhibit A ¶4; Exhibit B ¶4; Exhibit C ¶4; Exhibit D ¶4; Exhibit G at 106. The steps include officer presence, verbal communication, soft hand control, hard hand control, impact weapons, and deadly force. Id.

74.  The officers in this case were in uniform which constitutes officer presence. *See* Exhibit G at 108. Officer presence was not enough to be successful in dealing with the Plaintiffs. Id.

75.  The officers used verbal commands, which constitute communication; however, those efforts were not successful. *See* Exhibit G at 108-109.

76.  Soft hand control includes limited physical contact for the purpose of, i.e. escorting or directing the movement of a suspect. *See* Exhibit A ¶4; Exhibit B ¶4; Exhibit C ¶4; Exhibit D ¶4. The officers' attempts to separate the Plaintiffs from the barrel by moving the barrel and digging out dirt from the barrel constituted soft hand control; however, those efforts were not successful. *See* Exhibit G at 109.

77.  Tasers are placed at the same level as OC (pepper) spray on the continuum of force. *See* Exhibit G at 106. That level is the fourth level of hard hand control and involves the use of physical control, either in the form of take-downs or pain compliance devices. *See* Exhibit A ¶¶4, 9-10; Exhibit B ¶¶4, 9-10; Exhibit C ¶¶4, 9-10; Exhibit D ¶¶4, 12-13; Exhibit G at 106.


McNEIL, LEDDY & SHEAHAN
BURLINGTON, VERMONT 05401

78. As part of their training, Officers Kirkpatrick, Gorman, Aleck and DiMarino have all been sprayed with pepper spray. *See* Exhibit A ¶10, Exhibit B ¶10, Exhibit C ¶10; Exhibit D ¶13.

79. In the experience of Officers Kirkpatrick, Gorman, Aleck and DiMarino, pepper spray has a risk of contamination to the officer using the spray and has a lengthy period of decontamination so that the person being sprayed experiences prolonged pain and discomfort. *See* Exhibit A ¶10, Exhibit B ¶10, Exhibit C ¶10; Exhibit D ¶13.

80. As part of their training, Officers Kirkpatrick, Gorman, Aleck and DiMarino have had the Taser used on them. *See* Exhibit A ¶8; Exhibit B ¶8; Exhibit C ¶8; Exhibit D ¶8.

81. In the experience of Officers Kirkpatrick, Gorman, Aleck and DiMarino, persons who have been "tased" cease to feel pain seconds immediately after the Taser device has been turned off. *See* Exhibit A ¶8; Exhibit B ¶8; Exhibit C ¶8; Exhibit D ¶8.

82. As part of their training, Officers Kirkpatrick, Gorman, Aleck and DiMarino have been instructed that the Taser, used in the drive stun mode, is an effective and appropriate tool to gain compliance from an individual who holding onto an object, i.e. a car steering wheel, or lying on their hands. *See* Exhibit A ¶9; Exhibit B ¶9; Exhibit C ¶9; Exhibit D ¶12.

DATED at Burlington, Vermont this 1st day of April 2009.

BY: _____
Nancy Goss Sheahan, Esq.
McNeil, Leddy & Sheahan
271 South Union Street
Burlington, VT 05401
Attorneys for Defendants

cc: David C. Sleigh, Esq.
400000\340

McNEIL, LEDDY & SHEAHAN
BURLINGTON, VERMONT 05401