# EXHIBIT  3

# A STUDY AND REPORT CONCERNING THE USE OF TASERS AND OTHER LESS LETHAL MEANS OF FORCE BY VERMONT LAW ENFORCEMENT

## APRIL 7, 2007

**WILLIAM H. SORRELL**
**JOHN TREADWELL**
**THOMAS HOWELL**
**OFFICE OF THE ATTORNEY GENERAL**
**109 STATE STREET**
**MONTPELIER, VT 05609**
**WWW.ATG.STATE.VT.US**

## TABLE OF CONTENTS

**Page**

Introduction                                    2

Summary Findings                                3

Recommendations                                 4

Process of Study                                6

Less Lethal Means of Force                      7

Tasers and Vermont Law Enforcement             17

Brattleboro Protest Incident                   30

Brattleboro Retreat Incident                   40

Conclusion                                     42

## INTRODUCTION

Over the past several years there has been much public focus both within and outside Vermont on law enforcement use of deadly force.  Similarly, as technology has evolved and law enforcement agencies have made progress adding less lethal means of force alternatives to the options open to police officers in the effective performance of their duties, public concern about the appropriate use of these technologies, particularly Electronic Control Devices (ECDs), has been on the rise.  Since the ECDs industry leader for law enforcement nationally and in Vermont is Taser International, in this report we use the term "taser" when we refer to any ECD.

The Attorney General's Office has been asked to look into two particular taser incidents that occurred in Brattleboro, Vermont during the summer of 2007.  In one case, two individuals protesting a contemplated commercial development were tased when they refused police orders that they leave their protest site.  In the other case, police responded to a call for assistance at the Brattleboro Retreat, a residential treatment facility for individuals experiencing mental health, addiction and/or other issues.  A teenaged boy in state custody was tased after he had barricaded himself in his room and was damaging property.

In the first incident, then Brattleboro Police Chief John Martin asked the Attorney General's Office to review the appropriateness of the tasing of the protestors.  In the second incident, Governor Douglas, by letter of August 2, 2007, asked the Attorney General to study the appropriateness of the tasing of the youth in state custody.

Rather than look only at the two Brattleboro incidents, we decided to look generally at the use of less lethal means of force by Vermont law enforcement agencies and more specifically at police use of tasers, with particular focus on

2

the two situations confronted by the Brattleboro police.  The results of the study are set forth in this report.

## SUMMARY FINDINGS

1.     Less lethal means of force are and can be effective and efficient weapons available to Vermont law enforcement personnel in a use of force continuum.  When used appropriately, they can save lives and greatly reduce injuries to law enforcement and rescue personnel, the general public and to individuals who are the subject of police interventions.

2.     Like all weapons, less lethal means of force, including tasers, OC (pepper spray), beanbags and batons, are subject to abuse and misuse.

3.     Tasers are Electronic Control Devices (ECDs), also called Conductive Energy Weapons (CEWs), which override the body's central nervous system by means of a stream of 50,000 volts of electrical current.

4.     More than 7,000 police agencies in the US, including approximately 28 in Vermont, provide tasers to their personnel.

5.     The hierarchy of the Brattleboro Police Department failed to provide adequate supervision and direction to the officers assigned on July 24, 2007 to handle a peaceful protest at the site of a contemplated commercial development.

6.     On July 24, 2007, the Brattleboro Police Department should have given greater consideration to options involving the disassembly of a barrel mechanism used by two protestors at a peaceful protest.

7.    On July 24, 2007, the Brattleboro Police Department, in apparent violation of its then-existing Use of Force Policy, erred in repeatedly tasing two protestors engaged in a peaceful sit-in.

8.    On or about February 8, 2008, the Brattleboro Police Department Use of Force Policy was amended to make it clear that tasers should not be used against subjects displaying only passive resistance.

9.    The Brattleboro Police Department has been negligent in not accurately recording and maintaining data detailing the dates and durations of its taser deployments.

10.   Considering the evidence made available, on July 3, 2007, it was appropriate for the Brattleboro Police to use a taser to promptly halt the destructive and threatening behavior of an out-of-control youth at the Brattleboro Retreat.  However, without additional evidence to establish otherwise, the duration of the tasing of the youth was unnecessary and inappropriate.

## RECOMMENDATIONS

1.    Law enforcement in Vermont, before making tasers available to departmental personnel, should engage in a process to obtain community or non-law enforcement feedback on appropriate and inappropriate uses of tasers.

2.    Vermont law enforcement agencies are advised to have written protocols governing the use of lethal and less lethal means of force, reporting obligations when force is used in the line of duty and mechanisms in place to review the appropriateness of the use or uses of force deployed in specific situations.

3.    For departments with the technology, the use of force policy should contain specific provisions relating to tasers.

Consideration should be given to addressing the appropriateness of taser deployments in the "drive stun" and "probes" modes, against particular classes of individuals and/or in particular situations and when multiple tasings or extended continuous tasings of a subject are appropriate.

4.    Consideration should be given to inclusion in the written protocols as to when medical personnel will be used to remove probes or to otherwise treat or examine a person who has been tased.

5.    Tasers should not be used against passively resistant individuals who pose no danger to themselves or others.

6.    As is the case with any lethal or less lethal means of force, personnel should be appropriately trained by competent instructors in the use of the taser.  Consideration should be given to a requirement that an officer be subjected to being tased or at least afforded the opportunity to be tased before being authorized to carry a taser in the line of duty.

7.    There should be a written record of any taser deployment with such record reviewed by a supervisor to determine the appropriateness of the deployment. Consideration should be given to a requirement of such recording obligation when a taser is removed from its holster, even if not fired.  The written records should be retained for an appropriate length of time.

8.    Tasers should be calibrated and periodically checked to assure accurate recording of the date, time, number and duration of any unit deployments.

9.    Information stored in a taser's data port should be downloaded periodically, retained and compared for accuracy to written deployment reports.

10.   There should be periodic reviews of the departmental use of force policy after consideration of experiences in the field, to determine whether amendments to the policy should be made.

## PROCESS OF STUDY AND INVESTIGATION

In preparation for the completion of this report, the Office of the Attorney General communicated with all Vermont state and municipal law enforcement agencies soliciting information on what less lethal means of force are used by each agency, what, if any, written protocols exist concerning the use of these tools and written reports or information concerning actual experiences with tasers, pepper spray, etc. during the period from August 1, 2006 through July 31, 2007.  We experienced a 100% response to our survey requests.

We obtained police and other reports concerning the two Brattleboro taser incidents that prompted this review, and traveled to Brattleboro and St. Johnsbury to interview many of those familiar with the two incidents.  Our interviews included the two protestors, staff at the Brattleboro Retreat and several Brattleboro police officers.  We observed a lengthy demonstration of the taser, OC and beanbags at Burlington Police Department HQ and interviewed other law enforcement personnel.

We collected and reviewed voluminous written reports concerning tasers and other less lethal means of force technology, including the results of national and international studies as well as reports by the police departments of Seattle, Phoenix and Oakland, among others.  It should be noted that we also obtained and reviewed reports critical of tasers, e.g. Amnesty International's "Excessive and lethal force? Amnesty International's concerns about deaths and ill-treatment involving police use of tasers" and the American Civil

Liberties Union of Northern California's "Stun Gun Fallacy: How the Lack of Taser Regulation Endangers Lives."

We did not approach this task from the perspective of public health experts with the intention of making findings as to the health risks of tasers when deployed generally, used on certain types of subjects or when a person has been subjected to numerous tasings within a relatively brief period of time.  We leave medical questions to medical experts.  We are mindful, however, that at least hundreds of Vermonters have been tased and evidence of any resulting serious bodily injury has not been brought to our attention.

We are grateful to all those who cooperated with us in obtaining the information we reviewed during this endeavor and the interviews we conducted with individuals with knowledge of particular tasing incidents and/or more general information about tasers and their use both within and outside Vermont.  We particularly wish to express our gratitude to Burlington Police Department Deputy Chief Walter Decker, to former Burlington Chief, now Commissioner of Public Safety, Thomas Tremblay and to UVM Police Services Deputy Chief Lianne Tuomey.

## LESS LETHAL MEANS OF FORCE

Subjects interacting with the police are typically described as fitting into one of the following categories:

>    Co-operative – appropriately responsive to the officer's presence, direction and control.

>    Resistant (Passive) – the subject refuses, with little or no physical activity, to appropriately respond to the officer.

>    Resistant (Active) – the subject uses non-assaultive physical activity to resist, e.g. walking or running away.

Assaultive – by actions or attempts, exerts force against another or presents an imminent threat to do so, e.g. kicking, shoving and/or punching.

Grievous Bodily Harm or Death – by the subject's actions, there is a reasonable fear that he/she will imminently cause or attempt to cause death or serious bodily injury to self or another, e.g. through the use of a weapon.

In the performance of lawful duties, police are authorized and expected to obtain compliance or cooperation from those whose behaviors fit into the last four categories.  In certain situations, they do so through the use of force, ranging from verbal commands, hand-to-hand physical force, so-called intermediate weapons and in the most serious cases by using lethal force, most typically through the use of deadly weapons.

Trying to describe the "typical" scenario when police resort to use of force is fraught with peril.  Indeed, virtually every such situation is unique, representing an interplay of factors including the individual profiles of all persons involved in the event, the psychological and physical functioning of each, individual subjective and objective perceptions, the physical setting and other factors too numerous to describe in this report.

At the same time, however, national studies and anecdotal reports from Vermont law enforcement support the conclusions that police uses of force are more likely during interactions with persons who are under the influence of drugs or alcohol and on some occasions when dealing with subjects manifesting mental health issues.  Subjects against whom force is used can be combative or assaultive, engaging in active, physical resistance to police efforts to

8

control the situation and can intend to inflict harm on themselves or others.

When scrutinizing a police use of force, the main question is whether the use of force was objectively reasonable in that particular time and place.  Factors considered in making a determination on reasonableness focus primarily on: 1. the seriousness of the underlying behavior for which the police are interacting with the subject; 2. whether the suspect posed an imminent threat to the officer or another person; and 3. whether the subject was actively resisting or attempting to evade arrest.

Studies have shown that physical injuries to officers occur in approximately 10% of general use of force situations, most often when hand-to-hand physical force is used.  These same officer injury rates climb to 30-40% when using force against mentally ill and impaired subjects.  In general, during use of force situations, approximately 38% of subjects are reported injured, most typically having suffered bruises or abrasions.

Most police departments have a use of force policy describing the various options available to officers when use of force is appropriate and leaving it to the officers involved, again, held to an objective reasonableness test, to determine the appropriate use of force in a given situation.  Typical police use of force protocols do not require the use of option A before employing option B, etc.

What follows below is not an exhaustive list of all less lethal or intermediate means of force but does encompass the vast majority of such means currently available to and used by various Vermont law enforcement personnel.  We do not focus on the use of the older generation stun gun.

## I.    Baton

The baton or nightstick is carried by or is at least available to nearly all Vermont uniformed law enforcement personnel. When used to control a subject, the officer typically strikes the subject in the elbows, knees and/or abdomen. Batons are useful only in close quarter contact situations. When displayed, like other less lethal means of force, they can be effective in causing some subjects to cease disruptive behavior. When used in a physical confrontation, however, batons typically result in bruising and/or other potentially disabling injuries to the subject of the blows. Like other conventional impact weapons, police studies have shown that batons have a "high potential for escalation of subject resistance if they were not immediately effective."

## II. Oleoresin Capsicum (OC or Pepper Spray)

OC is a chemical mixture delivered via a spray or, in the case of a "pepper ball", in a powdered form delivered via round gel-like projectiles fired by a weapon similar to those used in paintballing. The instrument or launcher used to discharge pepper balls has the advantage of being able to be loaded with up to 150 projectiles and thus can be used when confronting a large number of disruptive subjects. A pepper ball can be used relatively accurately in that a particular subject may be targeted from a distance of ten or more feet. A subject struck by a pepper ball suffers pain and potential bruising associated with being hit by the projectile and then is impacted by the OC powder released when the capsule breaks open.

As a spray, OC can be delivered at relatively close range to a single or small number of targets from a small canister carried by an officer or directed at an unruly crowd at a distance of up to approximately twenty feet from a fogger, i.e. a large canister and hose configuration.

OC's active ingredients are those found in hot peppers. They inflame the mucous membranes in the eyes and

breathing passages and incapacitate by causing severe pain and difficulty seeing and breathing.  Some subjects vomit after inhaling OC.

OC's advantages include effectiveness in rendering many unruly subjects unable to continue their behaviors and an ability to be simultaneously deployed from a safe distance against numerous subjects.  Police departments adding OC to their use of force options have found a reduced need for use of batons.  Among its disadvantages is that, particularly when used in confined spaces, OC can incapacitate nearby law enforcement and/or rescue personnel and innocent bystanders.  It can be ineffective and inaccurate in windy conditions.  There is anecdotal evidence that its use can escalate the behaviors of some subjects. Further, the pain, irritation and disabling effects of OC can persist for hours after first contact.  There are reported deaths attributable to OC, particularly when the subject struck by pepper spray suffers from asthma or a similar breathing disability.  OC is less effective in cold weather and it reportedly has little or no effect on approximately 15% of the population.

## III.  Beanbags

Beanbags are a specialty impact munition, intended to deliver a severe concussive blow to a subject.  They offer the advantage of being able to be deployed from distances that enhance the safety perimeter of the police, although the concussive impact is reduced the further the distance to the target.  The projectile, delivered in what appears to be a typical shotgun shell, is a cloth bag containing a number of small lead BBs.  It is fired from a shotgun and incapacitates primarily from the pain suffered when being struck.  Display of the shotgun can cause some subjects to halt their combative and/or unruly behaviors.

In a study conducted by the Orange County (FL) Sheriff's Office (OCSO), approximately 80% of subjects hit with a

beanbag suffered some injury, most typically severe bruising or abrasions.  Some subjects have suffered permanently disabling injuries depending on where hit and the distance from which the beanbag has been fired.  The OCSO study reported 8 deaths in 373 deployments.

## IV.  Tasers

> **"The M26 taser is intended to provide officers with a force option to help in overcoming a subject's combative intent, physical resistance, and/or assaultive behavior; in disabling or subduing persons bent on harming themselves or others; or in providing self-defense.  As with all applications of force, officers using less lethal options are expected to use necessary and reasonable force to effect a lawful purpose. 'Necessary and reasonable' uses are defined by the totality of the circumstances that confront officers."**
> Seattle Police Department Special Report 2002
> (The more modern taser model is the X26.)


A taser is a handheld Conductive Energy Weapon (CEW) that causes electromuscular disruption (EMD). The most popular CEWs are manufactured by Taser International.  In this report, "taser" is used to describe all CEWs.  The use of tasers by law enforcement is steadily increasing.   There are now more than 7,000 police departments that include this weapon among the less lethal means of force available to their personnel.   Currently there are approximately 28 Vermont law enforcement organizations, including several of the largest municipal departments, using tasers, with more actively considering employing taser technology.

A taser is typically used to deliver 50,000 volts of electricity at low amperage for five seconds.  The voltage causes

severe muscular contraction and the individual is rendered essentially unable to voluntarily control his/her behaviors while the current flows.

When discharged, a taser stores downloadable data, including the date and time of discharge and the number of cycles employed.  In the "probes mode", small pieces of confetti-like paper are discharged.   These "AFIDS" contain information unique to the cartridge used in the deployment and can be collected at the scene.

In the probes mode, two sharply pointed probes are fired from a cartridge attached to the end of the barrel of the taser.  The probes are propelled by a nitrogen gas and travel at approximately 200 feet per second.  They remain connected to the cartridge by thin copper wires.  The most common wire lengths carried in Vermont are 21 feet or 25 feet.  To be effective, the probes must puncture the skin or be in close proximity to the skin.  At a distance of 10 feet, the probes will typically spread approximately 20 inches. The length of charge is a standard five seconds in tasers used for law enforcement purposes.  This charge can be abbreviated by turning off the taser.  It can be extended if the deploying officer continues to depress the trigger. As long as the probes remain in place, a second or subsequent charge cycle can be inflicted.

In "drive stun mode", which requires direct contact between the taser and the subject, the taser does not typically incapacitate the subject by muscular contraction but is a pain compliance implement.  In this mode, the taser discharges current for as long as the person in control of the weapon depresses the trigger and remains in contact with the subject.  It should be noted that there have been reports on the part of police volunteering to be tased not only of a burning sensation when being tased in the stun mode but of significant skin redness at the contact site(s) which lasted approximately a week after the tasing.

There are tasers available for private sale on the market. These can deliver a ten second and a thirty second charge cycle.  The taser models used by law enforcement sell for approximately $900 per unit.  There are now models on the market that include a videocamera (presently used by UVM police) and cost approximately $1250 per unit.  The models available for private use cost approximately $300 apiece.

Except in cases in which serious injuries are suffered — most often when the subject is injured during a fall while experiencing the muscle contraction or when a probe strikes a particularly vulnerable location, e.g. the eye, the significant pain or discomfort experienced during the tasing cycle ends abruptly once the current flow has ceased.  The probes are relatively easily removed, typically without the need for intervention by medical personnel. Other than a possible spotting of blood as might be experienced after having a flu shot, there are seldom injuries suffered of even a short-term duration.

To be sure, nationwide there have been approximately 280 deaths of subjects following tasing incidents.  For the vast majority, if not all of these deaths, there have been indications that some other cause, e.g. heart disease, acute cocaine or other drug intoxication, excited delirium syndrome, positional asphyxiation et al., rather than the taser, has been the primary cause of death.  Interactions with police, particularly if involving a physical struggle, handcuffing and/or other restraint, etc. can be extremely stressful.  Since in many cases this stress is exacerbated by one or more of the conditions mentioned above, there are medical experts of the opinion that a number of the subject deaths would likely have occurred even if no tasing had taken place. There are reports on in-custody deaths in Canada and the United States occurring in psychiatric hospitals and geriatric care facilities when restraints have been applied but no tasings have taken place.

Depending on the probes' locations and due to the intense muscular contraction during a tasing cycle, normal respiratory patterns can be significantly altered.  There have been studies on pigs that have been subjected to multiple tasings over a brief period of time (three minutes of five seconds on, five seconds off cycling) that have shown dramatic physiological effects on the animals.  Clearly, more study is called for before health concerns generally and in the cases of particular classes of individuals can be known with certainty.  Thus, multiple tasings of an individual over a brief period of time should be avoided if reasonably possible.

We are certainly not equipped to definitively rule on the conflicting medical opinions concerning the dangers inherent in taser use.  We are mindful of Amnesty International's call for a suspension of taser use until more study of their effects on subjects has been conducted.  At the same time, we are mindful of studies like that presented during the fall of 2007 to the American College of Emergency Physicians' Research Forum in Seattle.  Lead study investigator Dr. William Bozeman, an emergency medicine specialist at Wake Forest University, reported that in his analysis of 597 tasing incidents, serious injuries were suffered approximately 0.3% of the time.  This is roughly consistent with the results provided to us anecdotally and through written reports from Vermont law enforcement.

When the Bozeman study was released, Dr. Corey Slovis, professor and chair of emergency medicine at Vanderbilt University, was quoted as saying: "Tasers save lives, but tasers are not perfectly safe.  A taser should not be used unless force is absolutely necessary…"  Similarly, Dr. Bozeman was quoted as follows: "These are not 100 percent safe.  These are weapons and must be treated as such."  Law enforcement in Vermont should continue to be mindful of these realities.

Given Vermont's relatively small number of law enforcement personnel and the relatively recent deployment of tasers by law enforcement in the state, some of our observations and conclusions concerning taser use must come from reports by large out of state police agencies that have used tasers for a number of years.  These include the Columbus, Ohio, Phoenix and Seattle police departments.

Phoenix police, the first major city police department in the country to fully deploy tasers to patrol officers, reported employing tasers 354 times during 2003, an increase of 139% over its 2002 usage numbers.  At the same time, its officer-involved shootings fell 54% and its fatal shootings fell 31%.

In a Columbus police report on six months of taser use during 2005, there was a reported nearly 24% drop in citizen complaints about the police, an over 25% reduction in excessive force complaints, injuries to officers from physical confrontations declined over 23% and injuries to subjects involved in physical confrontations with police declined over 24%.  Further, the report described twelve documented incidents when subjects attempting suicide were tased and taken into custody and fourteen incidents when tasers were deployed but deadly force was justified.

A particular area of concern in the use of tasers is the deployment against a subject who is not actively resisting police orders.  Simply because a taser does not typically result in serious injury to a subject, typical use of force policies do not allow for or encourage the use of a taser when it would be inappropriate to use baton strikes, OC or bean bags against a subject.  Following a reported review of model policies and studies conducted in the US and Canada, the Legal & Liability Risk Management Institute has suggested that use of force policies prohibit the use of tasers against passively resistant subjects.

## TASERS AND VERMONT LAW ENFORCEMENT

Of the approximately 72 state and local law enforcement agencies in Vermont, approximately 28 have a total of approximately 220 individual taser units available for use by their personnel.

As of the completion of the surveys prepared in conjunction with this study, of those agencies owning taser units, availability ranges from one unit for the 5 members of the Ludlow Police Department to 30 units for the 39 law enforcement personnel of the South Burlington Police Department and 44 units owned by the Burlington Police Department.

## THE BURLINGTON EXPERIENCE

"**Use of Electronic Control Device** – The ECD is designed as a tool to respond to threat levels, which place the officer or other individuals in the threat of physical harm due to the actions and behaviors of a suspect.  The suspect **must  be actively aggressive and presenting a risk of injury to the officer(s), him/herself or others** ...**ECDs are not to be used in a punitive or coercive manner, and shall not be used to**... **gain compliance from passively resistant subjects**."
Burlington Police Department Use of Force Policy
(Emphasis added.)


The Burlington Police Department (BPD) is the largest municipal police force in the state.  Deputy Chief Walter Decker began considering the feasibility of using the taser while enrolled at the Police Executive Research Forum's Senior Management Institute during 2004.  Decker learned that the Cincinnati Police Department, under federal court order after numerous allegations of police brutality and civil

17

rights violations, was issued tasers by the federal
government.

BPD first provided information on tasers to and obtained
training for its firearms instructor, its use of force instructor
and one of its corporals.  All responded positively to the
possibility of adopting the taser as a less lethal means of
force option for the department.

To assist the lay Burlington Police Commission in
determining the appropriateness of taser use by the
department, a special committee was formed to look in more
depth at taser-related issues.  There was a medical
component and a community input component to the
committee's efforts.  Interested parties were invited to
presentations concerning the weapon, including
demonstrations of taser deployments.

In looking at adopting a written policy for use of the taser,
BPD considered a model policy from the International
Association of Chiefs of Police and policies from a number of
other police departments from around the country.  These
were reviewed by the committee and there was much
discussion about the appropriate thresholds for use of the
taser, including consideration of special populations, e.g. the
very young, the elderly and pregnant women, and particular
situations, e.g. school settings, when a subject is in control
of an automobile, the physical location of a subject, etc.
Ultimately, after an approximately year long process, the
Police Commission adopted a written policy concerning taser
use.  The policy remains subject to periodic reevaluation and
change.

BPD adopted a standard protocol that includes a reporting
obligation when a taser is even brandished in the
performance of duty.  Departmental experience is that
brandishing incidents outnumber actual deployment by
approximately 3 to 1.  After deployment, BPD officers pose

standard questions to subjects, including whether the individual is on any drugs, has a pacemaker or other similar medical device, etc.  Initially, medical or rescue personnel were always engaged to remove probes and/or to examine subjects who had been tased.  BPD received medical advice that this was not necessary.  Its written protocols currently mandate medical evaluation of a subject who has been tased if the subject "has exhibited signs of extreme uncontrolled agitation or hyperactivity prior to the ECD exposure or does not appear to recover properly after being energized." Medical personnel may be engaged depending on location of the probes, e.g. in the groin area, or on the answers to certain standard questions.

There are 66 uniformed officers at BPD.  A phased deployment of the taser was begun in May, 2006.  The department now owns approximately 44 tasers, of which approximately 39 are in active use.  Training is provided by three in-house instructors for a minimum of six hours.

Deputy Chief Decker reports that the tasers have proven effective over 80% of the times they have been deployed. Their use has dramatically reduced and all but eliminated workers' compensation claims by officers due to injuries sustained in combative situations.  There has been only one complaint of excessive force lodged by a subject who has been tased and in that case, the allegation of multiple tasings was disproved by the taser unit deployment history recording mechanism.  It is standard practice for the units' use history data to be downloaded regularly in order to confirm the accuracy and reliability of the use of force reporting procedures.

Given factors including the size of Burlington, its busy downtown area with numerous bars and a large population of college students and residents in their 20s and the fact that BPD has more tasers than any other law enforcement agency in the state, tasers have been brandished and

deployed more times in Burlington than anywhere else in the state.  What follows below are descriptions from officers' reports of a few Burlington tasing incidents.

On January 11, 2007, at approximately 4:45 PM, Burlington police officers were dispatched to a location in response to a complaint of a stolen motor vehicle.  They were advised that the subject was outside the vehicle.  On arrival, they located the vehicle in question with an open rear door and a man doing something in the back seat.  The man stood approximately 6'4" tall and weighed approximately 325 pounds.  He was apparently startled by the police arrival. Wanting to see his hands to make sure he wasn't armed, the police ordered him to show them his hands and to approach them.  He shouted "No" and backed away from the police. He began to reach for his waistband and then started to run up the street with the police in pursuit yelling for him to stop.  He ran into a narrow alley and appeared to be reaching for his pockets.  A Burlington officer fired his taser, causing the subject to fall to the ground.  He rolled onto his back despite police orders for him to get onto his stomach. When he reportedly reached quickly for his pants, an officer drew his firearm and threatened the subject.  Shortly thereafter he allowed himself to be handcuffed.

While searching him incident to the arrest, the police found multiple crack stems, two packets of heroin and a Leatherman tool in his pocket.

On May 28, 2007, just before 1 AM, Burlington police were alerted that a suicidal male had walked away from Fletcher Allen Health Care.  Shortly thereafter the man in question was located wearing hospital clothing on upper Main Street near the UVM campus.  When a second officer arrived on the scene, the man took off running with the police in pursuit. After a brief chase he stopped but refused the police order to get on the ground.  He stated: "I have a gun" and said something to the effect that the police should go ahead and

shoot him.  He continued to refuse to get on the ground after being advised that he would be tased.  He was tased and promptly fell to the ground but began to get up immediately after the flow of current stopped. He was tased for another cycle.  This time he remained on the ground, was handcuffed and soon thereafter returned to the hospital. While searching him, the police found no weapon, only a cell phone.

On August 10, 2007, just before 1:30 AM, Burlington police were dispatched to ACT 1, an alcohol treatment facility, to respond to a complaint of an intoxicated male who was causing a disturbance.  Upon arrival, the responding officer was advised that the male had admitted himself earlier for detox but that he was being disruptive and needed to be sent to another facility.  The officer confronted the subject in a hallway near an emergency exit.  He swore at the officer, shouting that he wasn't going anywhere.  He then went out the exit and held the other side of the door preventing the officer from following.  Assistance was requested but the subject let go of the door and began to run through some bushes into an adjacent driveway.  He was ordered to stop and place his hands behind his back.  Instead, he grabbed a ladder and began swinging it at the officer.  The officer had unholstered his taser.  He fired it and the subject was immediately incapacitated.  A second officer arrived on the scene and handcuffed the subject, who was then taken to a secure detox facility after it was determined that he was the subject of an outstanding arrest warrant.

And in one of numerous incidents in and around Burlington bars, on August 26, 2007, shortly after midnight, police on downtown patrol were approached by an employee of a Church Street bar who requested their assistance.  In the front of the bar they found several bar employees wrestling with an individual on the ground.  A responding officer ordered the combative male subject to turn onto his stomach.  The subject refused and attempted to get up.

Two Burlington officers grabbed his arms to obtain his compliance but he told them he wouldn't comply.  Instead, he grabbed onto a nearby table, thus preventing the officers from getting him onto his stomach.  He was threatened with being tased and told the officers to go ahead and do so.  He was tased and became briefly compliant but then continued his resistance.  Ultimately the table he was grasping was flipped over, thereby releasing his grip and he was handcuffed.

He remained combative while being brought to a cruiser for transport and once in the cruiser he continued yelling threats at the police and tried to kick out the rear window. He stopped the kicking only after being threatened with being pepper sprayed.  He continued his verbal threats and lack of cooperation with the police, ultimately being lodged at the correctional center for several offenses.

Finally, on Christmas Eve afternoon of 2007, BPD officers were dispatched to an apartment on College Street in response to a complaint that an identified male subject was threatening another male with a knife.  Upon arrival, the police recognized the allegedly armed individual from a prior history of interactions.  Although they could see the subject seated at a table in the kitchen, he ignored police knocks on the door.

The police gained entry and observed the subject pick up a bottle of tequila.  He initially ignored police orders to put the bottle down, first taking a drink.  It appeared to the police that the subject was intoxicated.  He grabbed a steak knife from his lap and pointed the knife at one of the officers, saying: "You don't want a piece of this."  The officer had his taser unholstered and ordered the subject to put down the knife or he'd be tased.  The subject complied, throwing the knife on the table.  He was ordered to stand and place his hands behind his back.  He did so but asked the officer if he wanted to fight and on the way to the correctional facility

yelled that he would kill the officer.  He was lodged and charged with assault on a law enforcement officer.

As reflected in the excerpt from the BPD Use of Force Policy quoted at the beginning of this section, BPD would not have used a taser in the handling of the peaceful protest situation confronted by Brattleboro police on July 24, 2007.  At the same time, Deputy Chief Decker is in agreement with the Brattleboro officer who opined that the taser is perhaps the best advancement for law enforcement that he has seen in the last twenty years.

## OTHER VERMONT EXPERIENCES

## RUTLAND

One night in July 15, 2007, at approximately 10 PM, Rutland police were dispatched to a location to deal with a reported suicidal 14-year-old male with a knife who was threatening to harm himself.  Upon arrival at the scene, the responding officer observed two adult males struggling with a subject down on the sidewalk.  The subject was attempting to free himself from two adult males, ultimately identified as the juvenile's father and stepfather.  The subject was swearing at the men as well as his mother, who was on a nearby porch.

The officer inquired of the juvenile where the knife was located.  Eventually he was told that it was in a pocket.  The officer told the subject that if he didn't stop fighting, he would be tased.  The juvenile said he would stop fighting. The officer asked the adult males to let the juvenile up.  The juvenile followed a command to stand up but when he was told that he'd be handcuffed until the situation had stabilized and any weapons had been secured, he became resistant, pulled away from the officer and reached towards his pocket.  The officer wrestled the subject to the ground, unholstered his taser and ordered the juvenile to put his

hands behind his back.  The juvenile ignored the order and began getting back up.

In probes mode, the officer fired his taser, striking the subject in the left rib cage area.  He was immediately incapacitated. When the five seconds cycle was over, he promptly obeyed an order to put his hands behind his back and he was handcuffed.  A knife was removed from his pants pocket and the officer then removed the probes.  The juvenile, upset over a breakup with a girlfriend, admitted to having consumed alcohol and taken some prescription medication.

Since the juvenile had become calm, his mother offered to let him remain with her after he promised there would be no further problems.  He was left in the care of his mother, facing the possibility of future juvenile court proceedings.

## SOUTH BURLINGTON

 On September 10, 2007, South Burlington Police were dispatched to Country Club Drive just before 2 AM, in response to multiple complaints of a male "yelling and smashing things".  They arrived on the scene and located an apparently intoxicated 21-year-old male walking with a bicycle.  Although he contended that he had not been drinking, he gave a sample of his breath, which produced a reading of over .19%.

The officers informed the subject that he was going to be placed into protective custody and that he was to place his hands behind his back.  When the officers grabbed his hands to handcuff him, he began to actively resist, throwing an elbow and almost striking one of the officers in the face.  He was wrestled to the ground, the officers delivering multiple strikes to his body in order to gain compliance.  These were unsuccessful as the subject continued to kick and flail about. One of the officers tased the subject in the stomach in drive

stun mode.  This was not successful in causing him to stop fighting, so the officer backed away and fired his taser in probes mode, striking the subject in the chest and thigh.

He was then taken into custody but continued to be combative and disorderly to the police and rescue personnel who were called to evaluate his condition.  He was transported to the hospital where he continued to yell and manifest mood swings, including paranoia.  Ultimately, he refused medical care.  The police were of the view that the man had ingested something other than alcohol.  Just before 5 AM, the subject was discharged from the hospital and detoxed, facing criminal charges of disorderly conduct and resisting arrest.

## SPRINGFIELD

On September 29, 2006, at approximately 12:30 AM, Springfield police were attempting to arrest a man for disorderly conduct after responding to an alleged domestic assault.  The individual refused to be handcuffed and approached the police in a threatening posture.  He was pushed to the ground but then continued to resist being handcuffed and attempted to get up.  He grabbed one officer's wrist and held it underneath him.  The officer freed his wrist and then sprayed the subject with OC on the right side of his face.  The OC had no immediate effect so the officer drew his taser, removed the probe cartridge and pressed the taser into the man's back, threatening to tase him.  Rather than being tased, the subject promptly placed his hands behind his back, was handcuffed and taken into custody.

In another Springfield incident, on May 26, 2006, at approximately 7 PM, police received a complaint from a person who wished to remain anonymous, reporting concerns that a 17-year-old female who had been vomiting outside a residence might have overdosed.  The girl was

allegedly the girlfriend of an identified male subject.  Upon
arrival at the location, the police were informed by the
boyfriend that his girlfriend had left a half hour earlier.  But
another person present advised the police that the girlfriend
was in the bathroom.

The male subject denied this, saying that it was his mother
in the bathroom and that she was taking a shower.  He took
a position in front of the bathroom door.  An officer
attempted to open the bathroom door but the boyfriend
pushed it shut and braced himself against the door.  The
officer grabbed the subject's wrist to pull him away from the
door but the subject pulled his wrist away and took up a
fighting stance.  Another officer attempted a neck pull down
on the boyfriend but he successfully avoided the attempt.
When it appeared that the male was going to throw a punch,
one officer hit him with his flashlight, using it as an impact
weapon.  In the tight quarters the two officers and the male
subject fought.  It was unclear to one officer whether he was
successfully hitting the male with the flashlight but any hits
were not stopping the fighting.  The other officer then
unholstered his taser and fired probes into the boyfriend's
torso.  The deployment seemed to achieve muscular
disruption only intermittently.  The subject was on the floor
and continuing to thrash about.  One officer hit him with the
flashlight on his thigh.

The subject only complied with orders to put his hands
behind his back when he was threatened with being tased a
second time.  He was handcuffed and the police saw blood
on the floor.  He was found to have an approximate one-inch
cut above his left eye.  It was unclear whether the cut was
caused by a flashlight blow or from broken glass that was on
the floor or from shelving or food items that were strewn
about.  Rescue personnel were called and brought him to the
hospital for treatment.  The 17-year-old girlfriend was
located in the bathroom and found to have a BAC of .13%.

## UVM POLICE

At approximately midnight on September 2, 2006, UVM police were dispatched to a residence hall in response to a complaint that a nude male was assaulting a resident of the dorm.  They encountered a nude 19-year-old male exhibiting signs of impairment by a drug or drugs.  He had muscle rigidity, was perspiring and his pupils were dilated.  The officers were in the hallway outside a room in which the male was located.  He was ordered to get down on the floor, but instead of complying, he began to swing his fists at the police.  One officer had unholstered his taser and when ordered by a superior officer, fired probes into the subject's abdomen.

He fell to the floor, was handcuffed behind his back and subsequently transported to the hospital.  Prior to going to the hospital, he advised the police that he had consumed "a lot" of "ecstasy and mushrooms".  The police learned that before they were called, he had entered a dorm room uninvited and fondled a female student.  After discharge from the hospital he was lodged at the Chittenden County Correctional Center for multiple felony charges.

## Vermont State Police

At present, the Vermont State Police, although the state's largest law enforcement organization, has only 18 tasers.  They are assigned to its Tactical Services Unit personnel.  Consequently, VSP has few taser deployments.  A more typical VSP use of force incident occurred in Lunenburg at approximately 7:00 PM on November 8, 2006.  Troopers responded to a female's 911 call reporting an argument with a male subject.  Upon arrival at the scene, they found a heavily intoxicated male who admitted that he and his girlfriend had been having a fight over financial and other matters.  One trooper got the male out of the residence while the other trooper talked to the female.

The male told one trooper that he could stay at a relative's house for the night and that he did not wish to be arrested again because he had been arrested in the past "for beating up cops".  The trooper offered to drive him to the relative's house.  Soon after, the male subject attempted to reenter the residence, saying he wanted to get a beer.  He was told that he could not reenter the residence until the conversation with the female complainant had been completed.  Eventually, for a second time, the male subject began to walk away from the property.  He was told that he could not leave until the investigation had been completed.  The subject ignored the trooper's statement but ultimately did stop and was informed that he was going to be detoxed for the evening.  He was ordered to place his hands behind his back because he was under arrest.  The subject swore at the trooper and refused to comply.  He pulled away when the trooper grabbed his arm.

Eventually the trooper took out his OC and sprayed him directly in the face.  The subject yelled: "you f----g sprayed me."  He continued to resist the trooper's efforts to control him.  When it appeared that he was about to throw a punch, he was sprayed again to the right side of his face, including his right eye.  The subject proceeded to charge the trooper and try to tackle him.  The trooper eluded the charge and then wrestled the subject into the side of a motor vehicle and onto the ground.  The subject, on all fours, continued to fight, ignoring orders to put his hands behind his back.  It appeared to the trooper that the subject was trying to grab something from the trooper's belt.  He became concerned that the subject would grab his baton.  The trooper punched the subject with a closed fist in the face and then kneed him.

Due to fatigue and/or the delayed impact of the OC, the subject began to struggle less.  The second trooper came out of the residence and assisted in placing the subject in

handcuffs.  The male had superficial cuts to his face and hands and requested medical treatment.  He was taken to the hospital, treated and then taken for detox, ultimately facing several criminal charges.

Although relatively few troopers are provided with tasers, VSP does have a written taser deployment policy.  In part, it reads as follows:

> "3.3 Tactical Considerations and Limitations – **Do not use the taser in any of the following situations:…**
> (2) Any known or obviously pregnant female…
> (6) Should not be used as a tool of coercion or punishment.
> (7) Excessive use of the X26 Taser in subduing a subject is forbidden.
> Vermont State Police Rules & Regulations – Operational Policies & Procedures
> (Emphasis not added.)

In a VSP taser incident, during August, 2006, troopers were dispatched at approximately 9:30 PM to a residence in Rutland County.  Prior to arrival, the troopers were advised by dispatch that a male in his 20s was damaging his mother's residence.  They were also advised that the male had a history of mental health issues, was becoming increasingly violent and was in the process of strangling his dog.  One of the troopers had had numerous non-violent interactions with the subject prior to this date.

The troopers found that the front and back doors of the residence had been kicked in.  There was broken glass in the back porch area.  A scared woman answered the troopers' knocks and reported that her son was having a violent episode.  The son was seen standing in the living room swinging a large dog bone and striking the wall with it.  He was ordered to drop the bone.  He did not do so but made some growling noises and went into his bedroom.  A trooper

unholstered his taser and advised the male that if he did not drop the bone he would be tased.  The male subject proceeded to pound the floor the floor with the bone and attempt to go under his bed and strike his dog with it.  The dog bit the subject's hand and then exited the room.

The male subject stood, still holding the bone, and advanced on the troopers.  He was shot in the chest area with the probes.  He immediately dropped to the floor and was handcuffed.  He promptly became docile, was brought to a standing position and the probes were removed.  The subject advised that he would no longer be a problem.  His mother thanked the troopers for their prompt and injury free actions.  Her son was transported to the hospital for an emergency mental health evaluation.

As is readily apparent from these descriptions of tasing incidents in Vermont, in the hands of a trained officer making reasoned decisions on appropriate deployment, the taser can be very efficient in allowing police to promptly control a stressful and potentially dangerous situation.  And further, that compared to other uses of force, this prompt taking of control can typically be realized without serious injury or even other than temporary discomfort to the subject involved, the police and any bystanders.

## BRATTLEBORO PROTEST INCIDENT

"The Tasers are **NOT** for use on strictly non-compliant subjects without some information or fear that the suspect is going to do harm to the officer or someone else."  Rutland PD 12/13/06 directive to Sergeants (Emphasis not added.)

We interviewed the two protestors who were tased in this incident and all of the police officers who were at the scene. What follows is a description of what happened.  Clearly,

there are differing views, perceptions and interpretations of what happened and why.  The following description reflects a desire to present the recollections of the major participants.

During July, 2007, a group of approximately 20 individuals who reside in the Windham County area were concerned about the possible commercial development of a vacant lot located on the Putney Road in Brattleboro into a truck stop or other form of strip development.  The group decided to conduct a protest on the property to raise public awareness of the issue.  Their intention was to begin a community garden by planting flowers on the site and to maintain a physical presence for two to three days.

Whereas most of the group planned to be at the site only periodically, Jonathan Crowell and Samantha Kilmurray, both 32 and residents of West Dummerston, intended to remain on the site throughout the protest and to make it difficult for anyone attempting to remove them while the protest was in progress.  Their preparations included the construction of a barrel mechanism to which they could attach themselves and hinder police efforts to clear the site.

A metal 55 gallon drum was partially filled with concrete in which steel rebar was vertically set.  Two holes were created on opposite sides of the barrel with PVC piping large enough to accommodate a human forearm running horizontally from the holes to the rebar.  Much of the rest of the barrel was filled with dirt.

Crowell and Kilmurray each had chains and mountain climbing carabiners attached to their wrists. The barrel mechanism design allowed them each to place an arm inside the PVC piping and to clip the carabiner on the chain attached to the wrist to the rebar configuration.  At the same time, the police or others would not be able to access the inside of the barrel without removing the dirt, etc.

Kilmurray estimated that the barrel weighed approximately 300 pounds.  It was brought to the protest site in a pickup truck.  A blue tarp was used to create a makeshift tent over the barrel in order to shield Crowell and Kilmurray from the elements.

The protest began on Monday, July 23 shortly before noon. Kilmurray describes the day as rainy and chilly.  The barrel was placed under the tarp and flowers were planted.  Within roughly an hour of the beginning of the protest, police arrived on the scene.  Upon their arrival, Kilmurray and Crowell were locked into the barrel.  The police were "cordial and polite" as were the protestors.  The police made clear that the protestors were trespassing and had to leave the property.  They were told that if they were still present when the police returned that they would be charged with trespassing.

The police contend that they were content to let the protestors make their point, get media attention to dramatize their cause and have the incident resolved without arrests, criminal charges or other law enforcement intervention.

Later in the afternoon two police officers returned.  Most of the protestors had departed.  Lieutenants Robert Kirkpatrick and Jeremy Evans were the two officers at the scene. According to Kilmurray, they were "not very aggressive". The police told Kilmurray and Crowell that they would have to leave but the couple made clear that they intended to remain.  One of the officers allegedly said that there would be "no arrests on my clock" and indicated how long his shift would run.  Kilmurray thought that perhaps they would not face arrest.

According to Evans and Kirkpatrick, when Kilmurray and Crowell refused to vacate the premises, they asked the dispatcher to communicate with the property owners.  This

was done and permission was obtained for the protestors to remain on the property overnight, as long as they vacated by the next morning. This was communicated to Kilmurray and Crowell before Evans and Kirkpatrick left the scene.

There are clear differences between written reports and witness testimony on the issue of whether supervisory directives were issued to the police concerning appropriate uses of force attendant with attempts to resolve the protest situation.  For the day shift commencing at approximately 7:00 AM on the 24th, Lieutenant Kirkpatrick was the shift supervisor.  Kirkpatrick contends that neither on the 23rd after first visiting the site nor at any time before returning to the site the next day, did then-Chief John Martin or any captain at Brattleboro PD discuss with him or issue orders on the issue of appropriate uses of force to resolve the protest situation.

To the contrary, in several updated written communications on police department letterhead to Acting Town Manager Barbara Sondag, dated July 30, 2007 and August 1, 2007, then-Captain and present Acting Chief Gene Wrinn wrote that then-Brattleboro Police Chief John Martin on July 23 had directed that the officers assigned to responding to the protest "would take a laid back approach" to the problem. Allegedly Martin "again talked with Lt. Kirkpatrick and reiterated that he did not want a heavy handed approach used with protestors."

There appears to be no dispute that there were no supervisory communications to Lt. Kirkpatrick on appropriate uses of force on the morning of July 24, 2007.  Nor were any captains or the then-chief present at the scene.

On July 24, 2007, the police department did have a written use of force policy.  The policy had an effective date of December 17, 2003.  Provisions of the policy included: "When officers reasonably believe it is necessary in the

defense of themselves or others **and** in the performance of legal duties, appropriate force may be used.  Officers are expected to make an objectively reasonable choice from among the force options, based on the facts and circumstances known to them at the time."  (Emphasis added.)

The policy had no specific provisions concerning appropriate or inappropriate uses of force when officers confront passive resistance on the part of subjects with whom they interact.  At the same time, the department required officers to complete a "Response to Aggression or Resistance" form whenever a taser, OC or any other weapon described in the departmental "Use of Force Continuum" has been used or brandished.   The form asks the officer to indicate whether at the time of the deployment of the force, he/she "was engaged in: Effecting arrest, Defending Self, Defending another, Restraining Subject for Own Safety, Preventing a Violent Felony or Other (please explain)".

Thus, and potentially contrary to the then-existing Use of Force Policy, it is at least arguable that the departmental protocols allowed a use of force in effecting an arrest, even if the officers were not "in the defense of themselves or others".  The officers at the scene believe they were fully justified in the actions they took since they were "Effecting arrest".

One couple remained with Kilmurray and Crowell for most of the night but then departed about 5:00 AM on Tuesday the 24th.  At approximately 7:00 AM, the police returned and Kilmurray described their tone as different than that of the day before.  There were four Brattleboro officers at the scene: Detective Michael Gorman, Lieutenant Robert Kirkpatrick, Officer Peter DiMarino and Lieutenant Charles Aleck.  When the police arrived, the couple was not attached to the barrel but they promptly reconnected to the rebar.

According to the police, they again made clear to the couple
that they were trespassing, that the owners wanted them
removed from the property and that they could avoid
criminal charges if they promptly departed.  The police also
either showed the couple a story in that day's local
newspaper about the protest or told the couple of the
existence of the story.  The police tried to convince the
couple that they had accomplished their goal of dramatizing
the issue of the potential commercial development of the
site and that they could now depart with a feeling of
accomplishment.  When the couple refused to move, the
police told them that they would be charged with criminal
trespass but not be arrested.  When again they refused to
move, they were legally placed under arrest.  The police
then had to confront how to take the couple physically into
custody.

According to the couple, the police almost immediately
began moving the couple's belongings.  The police contend
that they removed the blue tarp in order to more clearly
examine the barrel and to strategize how to extricate the
couple.  Crowell and Kilmurray were each under a sleeping
bag.  The police, wanting to clear the area and to make
certain the couple had no weapons, removed the sleeping
bags.  Officer DiMarino described Kilmurray as passive but
Crowell as more actively resistant in that he flailed and
kicked at the police when his sleeping bag was removed and
what they found to be a water bottle was obtained from
Crowell's possession.  After observing this behavior,
Lieutenant Aleck allegedly opined as to Crowell that he
would physically fight the police, once removed from the
barrel.

According to DiMarino, the protestors were largely silent but
at one point early on he asked them to "Give us an option to
stop this."  Crowell allegedly suggested that they be denied
food and water for three days.  The police did not see that
as a viable option for a variety of reasons.  They then

discussed how to most expeditiously resolve the situation. The police first used a shovel to try to dig the dirt from the barrel.  Soon they discovered wire, the rebar and concrete and came to the conclusion that even accomplishing the difficult task of removing the dirt was not going to solve their problem.

Next, believing that the couple was actually holding hands within the barrel, the police tried physically pulling them apart.  According to DiMarino, Crowell and Kilmurray cried out in pain and the police stopped trying to extricate them by force.  DiMarino said the police discussed tipping over the barrel but the couple protested that this could break their arms so the police decided to leave the barrel upright.

The police considered the available less lethal means of force at their disposal.  They rejected using nightsticks due to their feeling that that would be brutal treatment and could cause significant bruising and possibly more serious injuries. OC was considered and rejected since it can be very ineffective but can also cause significant pain and discomfort for a prolonged period after exposure to a direct application. Eventually, the police decided to employ their tasers as a pain compliance technique.  DiMarino thought that using the tasers in the probe mode, causing the intense muscle contractions would be more effective.

According to Kilmurray, Lieutenant Kirkpatrick appeared to be in charge.  In fact, he was.  He decided to use his taser for the first time in the line of duty and to do so in the "drive stun" mode.  He and DiMarino removed the probe cartridges from their tasers.  DiMarino "sparked" his taser to show the couple the current flow.  He made clear that they were going to use the tasers unless the couple cooperated.  They were warned "this will hurt a lot."  Crowell and Kilmurray began to feel anxious and Crowell told the police: "You don't have to do this."  He suggested taking away their food and water to

"wait us out", bringing in the fire department to dismantle the barrel or bringing in a mediator.

The police were not dissuaded from their plan.  Allowing the violation of the criminal trespass law to continue into the indefinite future did not seem to them a reasonable law enforcement response.  And one can reasonably speculate there could have been a public uproar about inhumane treatment of the protestors if the police had denied them food and water for a number of days.

According to Crowell, it was explained to the couple that they would be simultaneously tased for three seconds. A second tasing, if necessary, would be for five seconds. Kirkpatrick and DiMarino unholstered their tasers. The couple was simultaneously tased, Kirkpatrick on Kilmurray, DiMarino on Crowell.  The police then tried unsuccessfully to pull Kilmurray from the barrel.  They warned of a second tasing and one to two minutes after the first tasing, again simultaneously tased the couple.

The police and the couple disagree on the length of the tasings.  One of the worthwhile features of tasers is the ability to record the exact date, time, number and duration of the times a unit is fired.  Over the past two plus months we repeatedly requested the download data from the tasers used at the protest site.  We only recently received a response to our requests.  Unfortunately, it appears that Brattleboro PD was at least lax in accurately calibrating its tasers to provide accurate firings data.  Further, its recordkeeping of downloaded data has been deficient.

The department was only able to provide us with data concerning one taser unit's use at the site of the protest. The information demonstrates that the unit was fired twice for five seconds each, the firings being exactly one minute apart.  This purports to be data relating to the protestors' incident but the downloaded data reflects the firings to have

occurred on March 12, 2000 at 16:44:41 and 16:45:41, whereas the tasings took place on July 24, 2007 at approximately 7:00 AM.  The number of firings and the duration are consistent with Lieutenant Kirkpatrick's account of his tasings of Kilmurray.

Of even more concern is that Brattleboro PD has produced no information concerning the data downloaded from the taser unit carried by DiMarino.  The Department apparently did not properly track the assignment of particular tasers to specific officers and failed to properly synchronize the tasers.  As a result, Brattleboro PD has indicated there are, at a minimum, very significant barriers to the recovery of accurate information concerning DiMarino's use of a taser at the protest site.   Consequently, we have no independent data on the number of firings or the durations of the cycles deployed against Crowell.

 Kilmurray, with her left arm in the barrel up to her forearm, said that the taser was in direct contact with her skin in the area of her elbow.  Although Kirkpatrick reported that the couple suffered no injuries, Kilmurray indicated that she suffered "burn-like lesions" for ten to twelve days after the incident.  After the second tasing, Kilmurray said: "I can't do this anymore.  I'm going to release."  She did so, was handcuffed and brought to a police cruiser.

Crowell was advised that he'd be tased a third time in the stun gun mode but then the taser would be used with the prongs shot into his back.  The barrel was tipped over but Crowell remained clipped in.  He was again tased on the bare arm near his elbow, after which he said: "OK, OK, I'm done.  I'm going to release."  He did so and, like Kilmurray, was handcuffed, brought to a cruiser, to a local rescue squad headquarters for a brief physical exam and ultimately to the police station for processing and release with a citation to appear in court to answer to a charge of unlawful trespass.

Lt. Kirkpatrick completed "Response to Aggression or Resistance" forms for the tasings of both protestors.  In each case he checked boxes that the tasings took place while the police were "Effecting arrest" and "Restraining Subject for Own Safety".  Clearly, the former was accurate but the latter is most typically used when a subject is exhibiting suicidal or other self-destructive behavior. That was not the case here.

Acting Chief Wrinn has reported that on the morning of July 24, then-Chief Martin left Brattleboro to attend a meeting with other chiefs of police and Vermont State Police hierarchy.   There is little doubt in our minds that the hierarchy of Brattleboro PD should have provided more direction and guidance to the officers dispatched to the protest site.

It is unclear to us why Crowell's suggestion that the Fire Department or other personnel be called in to dismantle the barrel mechanism was not given more serious consideration. In the past, the Burlington Police Department has encountered scores of abortion protestors who occupied private property and used tires, a large truck and specialized locks to hinder police efforts to effect their removal and arrest.  Rather than resort to batons or other "pain compliance" methods, Burlington Police used equipment normally used at motor vehicle accident scenes to free and remove the abortion protestors.

There was significant public outcry in the Brattleboro community after the protestors' tasings took place.  The Town Manager and Select board were actively involved. Acting Chief Wrinn described a July 25 meeting of upper management of the police department at which it was decided to "not use force for future protests unless life or property is at risk".

It is remarkable that none of the Brattleboro PD officers to whom we spoke on January 30, 2008, indicated that there had been any official policy change on appropriate uses of force in conjunction with incidents similar to that presented by the protestors.  In fact, the revised Use of Force Policy, issued on October 26, 2007, appeared to make the use of tasers in future passive resistance protest incidents even **more acceptable** than was the case under the policy in effect on July 24, 2007.

However, on or about February 8, 2008, Brattleboro released its own report on the protestors' tasing incident. The report, prepared by Attorney Gordon Black, opines that the use of the tasers in this instance was "unwise and unreasonable under the circumstances".  Attorney Black also advised that the Brattleboro use of force policy be further amended to clarify that a taser can be used only against a subject exhibiting "active aggression".  Effective February 9, 2008, the Brattleboro Police Department Use of Force Policy was amended and in relevant part makes clear that "Tasers should not be used, either through the use of a shot probe or through Drive Stun mode: …Against any person displaying passive resistance…"

## BRATTLEBORO RETREAT INCIDENT

We initially intended to describe this incident in this report in significant detail.  But on reflection, after reviewing Vermont statutes on the confidentiality of records concerning alleged criminal behavior on the part of juveniles, we have elected to be brief and only superficially descriptive.

The incident in question involved a youth in state custody and a call for police assistance to help address the fact that the youth had barricaded himself in his room and was manifesting significant destructive behaviors.  The police responded, ultimately gained access to the room and tased

the juvenile in the probes mode.  He promptly calmed down and was moved to a "safe room".

After reviewing police and Retreat records, interviewing Retreat and police personnel and considering all of the surrounding circumstances, it is the opinion of this office that a tasing of the juvenile was appropriate.

Like the tasers data from the protestors' incident, over the past two months we repeatedly requested from Brattleboro PD the downloaded data from the taser used during the Retreat incident.  It was only very recently that we received a response to our requests.  Of significant concern is the fact that the taser unit downloaded data reflects a firing on July 3, 2007 at 16:19:26.  The date is correct but the time is off by approximately two hours.  Of much greater concern is the fact that the downloaded data reflects a taser cycle of 10 seconds rather than the normal 5 seconds.

We reviewed no evidence to support the need for or the appropriateness of a 10 second firing.  Assuming the information provided from the taser unit is accurate as to duration of the cycle, absent additional or different evidence, we believe that the duration of the tasing was excessive, inappropriate and unnecessary.

It should be noted that we also reviewed Brattleboro Police Department records of other interactions with residents of the Brattleboro Retreat, including incidents in which tasers were brandished and readily obtained compliance with police directives and one particular incident in which a taser was deployed from a distance in probes mode and prevented further seriously self-destructive and injurious behavior on the part of a female juvenile.

## CONCLUSION

**"The most powerful asset in a police officer's arsenal is public support.  Anything that erodes that support reduces the ability of an officer to successfully discharge his/her responsibility on behalf of the public.  For that reason, law enforcement use of the conducted energy weapon (CEW), and other use of force techniques, is a public policy issue.  The very nature of policing and the dynamics of the relationship between the police and those who are policed call into question actions and techniques vested with law enforcement personnel that would otherwise be illegal to most citizens."**
**RCMP Use of the Conducted Energy Weapon (CEW) Interim Report December 11, 2007**

Providing alternatives between wrestling on the one hand and lethal means of force on the other, less lethal means of force such as the baton, OC, beanbags and tasers are valuable tools for Vermont law enforcement in controlling subjects who are at least actively resisting lawful police orders.  Still, they are weapons and should be treated as such.  Officers should be properly trained in their use and they should be deployed only in accordance with a written departmental use of force policy.

Vermont law enforcement should seek public input during the process of creating and revising a use of force policy.  Departmental protocols should require completion of written incident reports whenever weapons are used in the line of duty.  These reports should be reviewed by superior officers to determine the appropriateness of the deployment and whether changes in officer training and/or the department's use of force policy should be revised.

The taser has proven to be an effective law enforcement tool, both in Vermont and nationally.  When used

appropriately, it has reduced the use of lethal force and has significantly lessened subjects', officers', rescue personnel and bystanders' injuries in situations when uses of force are reasonably necessary to control a situation.  There remain questions about the safety of the taser's use in certain situations and on certain categories of subjects.  These questions are particularly important in situations when multiple tases or extended continuous tasings of a subject are inflicted and when subjects are manifesting a condition called "excited delirium".  Continued study of the safety and health effects of tasers is warranted.

A departmental use of force policy should address issues of appropriate taser use against certain classes of subjects, in certain situations and multiple tasings of a subject.  Given the possibility of abuse and/or excessive use of taser technology, it is recommended that departments prohibit deployment against subjects who are passively resisting police directives, absent overriding public safety concerns.