# EXHIBIT 6



AJS Consulting, Inc.
750 Elm Tree Lane
Boca Raton, Florida 33486
(561) 302-0756 Tel
(561) 892-8250 Fax
ascott@ajspoliceconsulting.com
www.ajspoliceconsulting.com

September 18, 2008

**CASE:**

Jonathan Crowell
Samantha Kilmurray
 v.
Robert Kirkpatrick
Michael Gorman
Jeremy Evans
Chuck Aleck
Peter DiMarino

U.S. District Court, District of Vermont
Docket Number: 4: 24:08-CV-55

**ATTORNEY:**

David Sleigh.

**FIRM ADDRESS:**

364 Railroad Street, Suite E
St. Johnsbury, VT 05819

(T): 802-748-5176
(F): 802-748-6618

**DATE RETAINED:**

September 3, 2008.

**ITEMS REVIEWED:**

- Report on investigation of TASER deployment on July 24, 2007 by officers of Brattleboro Police Department by Gordon Black.
- A Study and Report Concerning the Use of TASERs and Other Less Lethal Means of Force by Vermont Law Enforcement dated April 7, 2007 by William H. Sorrell, John Treadwell and Thomas Howell, Office of the Attorney General, State of Vermont.
- Complaint and Jury Trial Demand.
- Complaint and Defendants' Answers.
- Various documents, Bates stamped 000001 through 000157.
- Brattleboro Police Department Policy, Procedures and Rules, Use of Force #601, effective December 17, 2003.
- Brattleboro Police Department Policy, Procedures and Rules, Use of Force #601, effective date February 19, 2008.
- Brattleboro Police Department Policy, Procedures and Rules, Weapons and Training #603, effective April 1, 2004.
- YouTube video of arrest.

## INCIDENT, DATE AND TIME:

July 24, 2007, 7:15 a.m.

## INCIDENT LOCATION:

1002 Putney Road
Brattleboro, Vermont

## INDIVIDUALS INVOLVED:

Jonathan Crowell
Samantha Kilmurray

## LAW ENFORCEMENT:

Lieutenant Robert Kirkpatrick
Officer Michael Gorman
Officer Jeremy Evans
Officer Chuck Aleck
Officer Peter DiMarino

2

## JURISDICTION:

Brattleboro Police Department, Vermont.

## INCIDENT SUMMARY:

On July 23, 2007 at approximately 1:00 p.m., a group of 15 to 20 protesters gathered at a cleared lot at the corner of Black Mountain Road and Putney Road (1002 Putney Road). The Brattleboro Police Department was notified and subsequently Police Officer Gorman and Lieutenant Kirkpatrick responded to the scene. While on the scene the officers learned that the protest was apparently staged in reaction to a report that a company by the name of Cheshire Oil was planning to build a truck stop at that location.

The police contacted the owners of the property and determined no development plans existed for that plot of land and there were no applications for permits with the Town of Brattleboro for that site. The owners of the property wanted the protesters to leave the property. That message was relayed to the protesters by the police officers however the protesters remained on the property. The police indicated that they would give the protesters an hour to leave the property. During the day it started to rain and it was conjectured by the police department that the rain would most likely cause the demonstrators to vacate the property. The group of protesters was described as peaceful by the Brattleboro Police Department.

At approximately 4:00 p.m. Lieutenant Kirkpatrick and Officer Evans responded back to the property. They discovered that the protesters were still on site. The officers contacted the Chief of Police, John Martin, and advised him of the situation. Chief Martin advised the officers to be flexible with the protesters and that the State Attorney's Office would most likely not prosecute the offenders. Subsequent to that conversation the officers re-contacted the property owner whereupon the owner agreed that the protesters could remain on the property for the evening but they were to be removed the following morning if they were still there. Lieutenant Kirkpatrick discussed this with the protesters and informed them they could stay the night but they would have to leave by morning.

During the course of the day Brattleboro Police Chief Martin was kept abreast of the incident. Chief Martin described his impression of the protesters as being a nuisance and that they did not appear to have the potential to create any further problems. Furthermore Chief Martin explained to Lieutenant Kirkpatrick not to be heavy-handed with the protesters during this incident.

On July 24, 2007 Lieutenant Kirkpatrick and Officer Gorman responded back to 1002 Putney Road after discovering there were two remaining protesters onsite. Apparently the protesters had

attached themselves to a metal barrel that was filled with dirt. The barrel was extremely heavy and there was no way for the officers to manually remove the protesters from the barrel. Shortly after their arrival additional Brattleboro Police Officers arrived on the scene (Officers Aleck and DiMarino).

The protesters were informed they were trespassing and that they were going to be arrested and removed from the property if they did not leave on their own. The protesters did not comply with the lawful orders of the Brattleboro police officers and refused to cooperate. The protesters were informed that their refusal to leave would be considered active resistance to arrest. Shortly thereafter Lieutenant Kirkpatrick informed the protesters that if they did not leave the property that they were going to use their TASER weapons to force them to cooperate. Both of the protesters refused to leave the property.

Lieutenant Kirkpatrick then administered a TASER drive stun to the male protester (Crowell) and Officer DiMarino administered a TASER drive stun to the female protester (Kilmurray). Both protesters were tased for (1) to (2) seconds in the forearm. Despite this action the protesters did not release themselves from the barrel. The officers then administered a (2) to (3) second drive stun to Kilmurray which caused her to cooperate and release herself from the barrel. Crowell was tased on the biceps area the second time for (3) to (4) seconds. He still refused to comply. The officers then threatened Crowell with a (5) second shot from the TASER. Crowell protested that they were torturing him and if they simply left him alone he would "quit from dehydration or hunger." Officer DiMarino used the TASER a third time on Crowell and he removed himself from the barrel. Once both individuals released themselves from the barrel they were arrested.

## INCIDENT DETAILS:

- On July 23, 2007 at approximately 1:00 p.m., a group of protesters (15 to 20) gathered at a cleared lot located at 1002 Putney Road.
- The Brattleboro Police Department was summoned whereupon Officer Gorman and Lieutenant Kirkpatrick arrived on the scene.
- The police determined that the protest was staged in reaction to a report that Cheshire Oil was planning on building a truck stop at the location.
- The police contacted the owners of the property and learned that no such development plans existed and they confirmed that by determining there was no permit application was filed with the Town of Brattleboro for that site.
- The owners of the property requested the officers to direct the protesters to vacate the property.

- The protesters were informed of the demand for them to leave the property but none of the protesters left.
- The police determined that they would provide a one-hour window for the protesters to leave.
- The police felt that due to the heavy rain that day that it would dissuade the protesters from remaining on the property and thought that they would have dispersed upon their return.
- Upon arriving at 4:00 p.m. on July 23rd Lieutenant Kirkpatrick and Officer Evans determined that the protesters still remained onsite.
- The officers conferred with Police Chief John Martin, whereupon he explained to the officers to be flexible with the protesters and that in all likelihood the State Attorney's Office would not prosecute the protesters.
- The officers re-contacted the property owner and the property owner agreed to allow the protesters to remain on the property for the evening but wanted them off the property by morning. On July 23, 2007 no arrests were made of the protesters.
- Chief Martin described his impression of the protesters as being a nuisance and that they did not appear to have the potential to create any further problems. Furthermore Chief Martin explained to Lieutenant Kirkpatrick not to be heavy-handed with the protesters during this incident.
- On July 24, 2007 at approximately 6:00 a.m. Officer Gorman responded to the site and observed two protesters on the property.
- At 7:00 a.m. Lieutenant Kirkpatrick and Officer Gorman arrived on the property and discovered the two remaining protesters chained to a barrel.
- There was no way to unlock the protesters from the barrel and the barrel was filled with dirt.
- There was an attempt by the police to remove the dirt from the barrels and make it lighter but this was not successful.
- The protesters initially refused to identify themselves.
- Additional Brattleboro police officers arrived on the scene (Officers Aleck and DiMarino).
- The protesters were informed that they were under arrest for unlawful trespassing and were instructed to leave the property.
- Both protesters did not comply with the directive by the officers.
- The police advised the protesters that their non-compliance was considered to be an act of active resistance to an arrest.
- The officers on the scene threatened to use a TASER weapon on the protesters if they did not comply with their directive.

- It was determined by Lieutenant Kirkpatrick that the protesters should be administered a shock by the TASER in the drive-stun mode to both the male and the female protester.
- The protesters did not release themselves from the barrel after the first TASER application.
- The officers administered a second TASER activation to both the female and the male protester. The female protester Kilmurray (released herself from the barrel).
- The male protester (Crowell) was tased a third time and he released his grip from the barrel.
- Both protesters were taken into custody.

## SUMMARY OF PRIMARY OPINION(S):

I presently hold the following opinion(s) to a reasonable degree of professional certainty:

### Opinion 1:

The use of the TASER weapon on the protesters in this incident was excessive and inappropriate use of force and was not consistent with standard law enforcement police practices and procedures. The use of force in this case was not objectively reasonable.

### Basis:

The use of the TASER on non-violent, passively resistant, individuals is excessive and inappropriate. The use of a TASER in the Use of Force Continuum concept known by law enforcement agencies throughout the nation allows for the TASER to be used on individuals who are actively (by physical force) or aggressively resisting an officer's actions or arrest. In this particular case both of the individuals were passively resisting the orders of the police officers. The police officers failed to utilize any other type of technique to persuade the individuals to leave the property. Furthermore, the individuals were nonviolent and were on a vacant piece of land that was not populated nor was it causing a disturbance. The decision to utilize the TASER in a drive-stun mode was wrong and was clearly not consistent with the application of force in the Use of Force Continuum concept widely utilized by law enforcement agencies throughout the country.

The TASER has two types of deployment modes: discharging of the probes and drive-stun. The deployment of the probes is used to incapacitate a physically resistant individual or violent individual. The deployment of the TASER in the drive-stun mode is for pain compliance. Specifically, the drive-stun mode causes the individual to experience a significant electrical

shock that is extremely painful but does not immobilize the individual. Multiple use of the drive-stun in this situation clearly was used to gain compliance of passively resistant individuals. Although compliance was ultimately achieved by having both these individuals release their attachment to the barrel other techniques should have been used that were far less intrusive and hurtful.

A review of the Use of Force Continuum throughout the United States reflects that the TASER falls within the area or the level of force used for those individuals who are actively (physically) resisting an officer by thwarting his ability to arrest him/her by physically pushing or punching the officer. In this particular case the protesters were doing nothing other than refusing to move from the vacant lot. They had attached themselves to a barrel filled with dirt which made it very difficult for officers to physically move them. Regardless of their particular position the Brattleboro Police Department should not have used the TASER as a means to coax the protesters off the property.

The Brattleboro Police Department's Use of Force policy # 601, effective date: December 17, 2003 was the policy in force at the time of this incident. The policy specifically states: **"We recognize our legal and moral responsibility to use force wisely and judiciously. When officers reasonably believe it is necessary in the defense of themselves or others and under the performance of legal duties, appropriate force may be used. Officers are expected to make an objectively reasonable choice from among the force options, based on the facts and circumstances known to them at the time. This shall be in accordance with current departmental training and court rulings which may change from time to time."** The Use of Force policy in place at the time did not provide clear guidelines as to when various types of force or various levels of force could be used and when they should be used. The officers were left with little guidance as to its application given a particular situation. The policy does not provide a Use of Force Continuum to guide officers in applications of certain levels of force.

The Brattleboro Police Department officers in this instance violated its own policy by not recognizing their "legal and moral responsibility to use force wisely and judiciously" and failed to make an "objectively reasonable choice" when using force.

### Overall Basis:

My opinions are based upon my thirty years of law enforcement experience, knowledge and training (see attached curriculum vitae). My experience includes over seven years as Chief of Police and four years as an Assistant Chief of Police. My experience and training include being an assessor for the Commission on Accreditation for Law Enforcement Agencies, Inc. (CALEA) and a trained assessor and former chairperson for the Commission on Florida Law Enforcement

Accreditation, Inc. (CFA). As an assessor for both of these accrediting bodies I have conducted assessments for over a hundred law enforcement agencies throughout the country. These assessments include the review of all of the departments' Use of Force policies. My opinions were also derived from my experience as Commander of the Personnel & Training Unit and the Internal Affairs Unit during my law enforcement career. My opinions are also supported by written material published by the International Association of Chief of Police (model policies), CALEA standards, and the Police Executive Research Forum (PERF) literature.

*I reserve the right to amend my opinions as needed in order to rebut the opinions set forth by the Defendant's expert and/or new information is brought to light upon further discovery.*

Respectfully submitted,

Andrew J. Scott, III
AJS Consulting, LLC
ascott@ajspoliceconsulting.com
561-302-075

**APPENDICES:**

Curriculum Vitae
Testimony List
Fee Schedule

8