# EXHIBIT  7

1

```
1              UNITED STATES DISTRICT COURT              ┌─────────────────┐
                        FOR THE                         │    RECEIVED     │
2              DISTRICT OF VERMONT                       │   NOV 2 5 2008  │
3                                                        │ SLEIGH & WILLIAMS│
                                                         └─────────────────┘
4

5    JONATHAN CROWELL          )
     SAMANTHA KILMURRAY        )
6                              )
                Plaintiffs     )
7    v.                        )   CIVIL CASE NO. 2:08-cv-55
                               )
8    ROBERT KIRKPATRICK        )
     MICHAEL GORMAN            )
9    JEREMY EVANS              )         COPY
     CHUCK ALECK               )
10   PETER DIMARINO            )
                               )
11              Defendants     )
12
13
14


                        - - -

15
             THE DEPOSITION OF ANDREW J. SCOTT, III
16           TAKEN IN THE INSTANCE OF THE DEFENDANTS
17                      - - -
18
19
20
21
22
23                              Boca Raton, Florida
                                Thursday, November 20, 2008
24                              1:05 p.m. - 4:15 p.m.
25
```

2

1                        APPEARANCES

2

FOR THE PLAINTIFFS:

3

        SLEIGH & WILLIAMS
4       364 Railroad Street
        Suite E
5       St. Johnsbury, Vermont  05819
        BY:  DAVID C. SLEIGH, ESQ.

6

7

FOR THE DEFENDANTS:

8

        MCNEIL, LEDDY & SHEAHAN
9       271 South Union Street
        Burlington, Vermont  05401
10      BY:  NANCY GOSS SHEAHAN, ESQ.

11

12                        - - -

13

14

15

16

17

18

19

20

21

22

23

24

25

3

INDEX

| Witness | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Andrew J. Scott, III | | | | |
| (by Ms. Sheahan) | 6 | | | |

- - -

EXHIBITS

| Exhibit | Description | Page |
|---|---|---|
| 1 | Article "Use of Force - How Much is Too Much" | 7 |
| 2 | Mr. Scott's file | 8 |
| 3 | Mr. Scott's report dated September 18, 2008 | 15 |
| 4 | Mr. Scott's CV | 17 |
| 5 | Mr. Scott's fee schedule | 17 |
| 6 | Mr. Scott's testimony list | 18 |
| 7 | IACP Policy | 76 |
| 8 | Article entitled "Taser Liability" | 79 |

- - -

4

STIPULATIONS

IT IS HEREBY STIPULATED AND AGREED by and
between the attorneys for the respective parties hereto,
as follows:

1.   That the testimony of ANDREW J. SCOTT, III
may be taken and treated as if taken pursuant to notice
and order to take deposition, and that all formalities
of notice and order are waived by the parties, and the
signatures of this stipulation are in like manner
waived;

2.   That all objections except as to matters
of form are reserved until the deposition, or any part
thereof, is offered into evidence;

3.   That the deposition may be signed by the
said ANDREW J. SCOTT, III before any Notary Public.

*     *     *

5

1          The deposition of ANDREW J. SCOTT, III was

2   taken before me, Lisa Gropper, RPR and Notary Public,

3   State of Florida, at 1515 N. Federal Highway, Boca

4   Raton, Florida, on November 20, 2008 beginning at 1:05

5   p.m. pursuant to the Notice in said cause for the taking

6   of said deposition, which is attached to the Court file

7   herein, at the instance of the Defendants in the

8   above-styled cause pending in the above-named Court.

9

10

11

12

13

14

15

16

17

18

19

20   THEREUPON,

21          ANDREW J. SCOTT, III

22   having been duly sworn to tell the whole truth, as

23   hereinafter certified, testified as follows:

24

25                  - - -

1    DIRECT EXAMINATION

2    BY MS. SHEAHAN:

3        Q    Can you state your name and address for the

4    record, please.

5        A    Andrew J. Scott, III, 750 Elm Tree Lane, Boca

6    Raton, Florida 33486.

7        Q    Mr. Scott, my name is Nancy Sheahan.   I

8    represent the defendants in this case.

9             I'm sure you've been deposed before; is that

10   right?

11       A    Yes, ma'am.

12       Q    All right.   But if you have any questions, if

13   you need to take a break, just let me know, please.

14       A    Okay.

15       Q    Did Mr. Sleigh by any chance send down to you

16   a subpoena that we had sent to him for you to bring your

17   file and also an article that you had written called

18   "Use of Force - How Much is Too Much"?

19       A    Yes, ma'am.

20       Q    Did you bring your file and that article here

21   today?

22       A    Yes, ma'am.

23       Q    Can I see the article, please.

24       A    Yes.   I only brought one copy, so if we need

25   to make additional copies we'll do so.

7

1        MS. SHEAHAN:  Can I have you mark that,

2    please.

3        (Thereupon, Defendants' Exhibit 1 was marked

4    for identification.)

5    Q    Mr. Scott, I'm going to show you what's been

6    marked as Defendants' Exhibit 1 and ask you if you can

7    identify that, please.

8    A    Yes, ma'am.  It's an article I authored last

9    year for a publication called The Florida Defender.

10   Q    What is The Florida Defender?

11   A    I'm sorry, ma'am?

12   Q    What is The Florida Defender?

13   A    It's a quarterly publication that comes out

14   for the public defender's office for the State of

15   Florida.

16   Q    Did somebody in particular ask you to write

17   this article?

18   A    I believe the editor was aware of my

19   credentials and asked me if I would be interested in

20   creating a report relative to the use of the taser,

21   and --

22        Excuse me, let me backtrack that.  Actually on

23   the use of force, and taser happened to also be part of

24   the article as a sidebar.

25   Q    You said you authored this last year; is that

8

1    right?

2         A    Yes, ma'am.

3         Q    Do you remember the month?

4         A    Yes, winter of 2007, Volume 19, No. 4.

5         Q    Okay.

6              And then you brought your file; is that right?

7         A    Yes, ma'am.

8         Q    Is that it sitting in front of you?

9         A    Yes.

10        Q    You're looking to the side, but --

11             I wonder if we can just put a sticker on that

12   file.  I'm not going to take the file away from you, but

13   if there's any question later on, if you can keep the

14   entire file intact, that would be great.

15        A    Now or --

16        Q    Right now.

17        A    Okay.

18             (Thereupon, Defendants' Exhibit 2 was marked

19   for identification.)

20        Q    Can you just give me the exhibit number,

21   Mr. Scott.

22        A    2.

23        Q    So is Defendants' Exhibit No. 2 your file in

24   this case?

25        A    Yes.

9

1      Q    Can you describe for me the contents of your

2   file.

3      A    We will start off with my report that I

4   generated, in addition to my C.V. and the testimony

5   list, and I believe perhaps a fee schedule was involved

6   in that as well.

7           I have notes that I've taken keeping track of

8   time; I have the report from Gordon Black; I have the

9   report from the Office of the Attorney General on this

10  matter; I have various Brattleboro Police Department

11  policies, including a "Subject - Use of Force" effective

12  date February 19, 2008; I have another Brattleboro

13  Police Department policy, "Subject - Use of Force"

14  effective date December 17, 2003; I have another

15  Brattleboro police policy and procedures on weapons, but

16  I can't seem to find it just yet.  Hold on.

17          Oh, here it is.  It's titled "Department of

18  Weapons and Training", effective date April 1, 2004.

19          I also have a copy of another policy from the

20  Brattleboro Police Department, "Use of Force", and this

21  one was dated October 26, 2007, and this was pulled off

22  of the internet.

23          I have a host of documents that were submitted

24  to me by Mr. Sleigh.  Would you like for me to go down

25  through each individual --

1     Q    No.  Are those documents Bates stamped down in

2  the corner, Mr. Scott?

3     A    Yes, they are.  They're Bates stamped 000001

4  thru 000145.

5          I have the Complaint and Defendants' Answers

6  on this matter; I also have the initial Complaint and

7  Jury Trial Demand; I have some email correspondence with

8  Mr. Sleigh, initial letter -- excuse me, letter dated

9  October 20, 2008 indicating the deposition, Notice of

10  Deposition; I have a subpoena regarding this case; as I

11  mentioned some other email correspondence, and a letter

12  of engagement, and also a letter sending me my retainer

13  check.

14          I also have as part of my file the

15  International Association of Chiefs of Police "Model

16  Policy on Electronic Control Weapons" dated August 2005;

17  I also have an article discussing taser liability from

18  the FBI LEEDA, L-E-E-D-A, publication called The

19  Insighter, dated October 2008, Issue 3; and I have the

20  CALEA standards, which is not part of the file, 5th

21  Edition; and I also have a CD with interviews of four

22  officers of the Brattleboro Police Department.

23     Q    Does that about do it?

24     A    I think so, ma'am.  If there's something, if

25  there's an oversight, it's minimal.

1      Q     May I see the notes that you were referring

2    to.

3      A     Sure.   There's some notes, and then there are

4    some others here as well (indicating).

5            Do you want me to take them out of the file,

6    ma'am?

7      Q     Yes, actually that would be helpful.

8      A     Well, actually it's just a listing of the time

9    that I've used on this case, but it is not current.

10     Q     Mr. Scott, the notes on the yellow legal pad,

11   would it be fair to say that these are your notes from

12   reviewing the interviews of the officers with the

13   Attorney General's office?

14     A     I'm not sure if they're with the Attorney

15   General's office, but they are interviews of the

16   Brattleboro Police Department officers.

17     Q     The interviews that you listened to are --

18     A     Yes, ma'am.

19     Q     -- on the CD?

20     A     Yes.

21     Q     So are these part of your file?

22     A     Yes, ma'am, they will be.

23     Q     Then these are the other notes to which you

24   were referring; is that right?

25     A     Yes.

12

1      Q      These appear to be notes of the time that you

2    have spent on this file.  Would that be correct?

3      A      Up to the date of September 21, 2008.  I've

4    not updated it.

5      Q      Then also from your file may I see the emails

6    that you were referencing, and the correspondence too

7    while you're in that part of the file.

8      A      Why don't we do this, Counselor, to make life

9    easier here for everybody here, you can take a look at

10   the file, and I'll just direct you to where they're at.

11     Q      All right, that will work.

12     A      There you go.

13            That would be what you're looking for on that

14   side (indicating).

15            MS. SHEAHAN:  Off the record.

16            (Thereupon, a discussion was had off the

17   record.)

18     Q      So, Mr. Scott, that one-page notation of the

19   times that you've spent on this case, is that the only

20   thing you have by way of billing other than the original

21   retention?

22     A      What do you mean, I'm sorry, Counselor?

23     Q      In other words, in terms of billing on this

24   file --

25     A      Oh, sure.

13

1      Q     -- it's that one-page sheet and then obviously

2  whatever the initial engagement was?  Is that it for

3  billing?

4      A     That's correct.  I haven't billed anything

5  else as of yet.  I'm not sure what the amount of hours

6  I've used in the case thus far, but it just indicates on

7  these notes, you know, an hour was on 11/17; you know,

8  on 11/18 another hour was spent on another deposition;

9  and so on and so forth, which I usually transfer to one

10 sheet that makes it easier for me to calculate the time

11 just in case, you know, the client wants to take a look

12 at it.  And then what I'll do is, once the retainer's

13 expired, then I will send a bill with the appropriate

14 amount of hours showing the deduction of the retainer.

15 So that will be -- that should be forthcoming.

16     Q     Are there any other documents or material that

17 you've reviewed in connection with your work on this

18 case that is not included in your file?

19     A     No, other than I mentioned to you the CALEA

20 standards.

21     Q     The 5th edition, correct?

22     A     The 5th edition, correct.

23           And I just checked the -- some of the

24 standards that have been cited in the Brattleboro Police

25 Department use of force policy just to compare what this

14

1    states in the standard relative to their policy, and I

2    can get you a copy of that particular standard that's

3    cited if you so desire.

4        Q    Which standard is that off?

5        A    1.31.

6             Actually 1.3.1.

7        Q    Other than the CALEA standards, is there any

8    material or document that you've reviewed in connection

9    with your work on this case which is not included in

10   your file?

11       A    No.

12       Q    Now, Mr. Scott you've served as an expert for

13   both plaintiffs and defendants; is that right?

14       A    Yes, ma'am.

15       Q    In connection with acting as an expert

16   witness, have you also testified on behalf of plaintiffs

17   and defendants?

18       A    Yes.

19       Q    In terms of civil cases, what percentage of

20   your testimony would have been for plaintiffs and what

21   percentage for defendants?

22       A    Approximately 75 percent for plaintiffs and

23   the remainder for defendants.

24       Q    About how many of those cases have been in

25   federal court?

15

1       A      About 95 percent of them.  Maybe a little bit

2    less.  I haven't paid attention to it.

3       Q      The majority fair to say?

4       A      Yes, ma'am.

5       Q      So then is it fair to say you've become

6    familiar with the requirement in federal court that you

7    provide a written report of your opinions and the basis

8    for your opinions and the data that supports those

9    opinions?

10      A      Yes, ma'am.

11             MS. SHEAHAN:  Let's mark that.

12             (Thereupon, Defendants' Exhibit 3 was marked

13    for identification.)

14      Q      Mr. Scott, did you prepare such a report in

15    this case?

16      A      Yes, I did.

17      Q      Would that be the report dated September 18,

18    2008?

19      A      May I take a look at that if it's going to be

20    included as an exhibit?

21      Q      Well, I was going to ask you if this is the

22    report dated September 18, 2008.

23      A      I just want to make sure you have all the

24    pages.

25             (Thereupon, the witness reviews the document.)

16

1        A      Yes, it is.

2        Q      Have you prepared any written reports in

3    connection with this case other than what's been marked

4    as Deposition Exhibit 3?

5        A      No, ma'am.

6        Q      The material and documents that are in your

7    file, were any of those reviewed by you for the first

8    time after September 18th?

9        A      Yes, the -- the FBI LEEDA Insighter.

10       Q      Do you recall when it was that you reviewed

11   that?

12       A      Sometime in October of this year.

13       Q      Now, does your file contain all the notes or

14   material that you prepared during the course of your

15   work in this case, including any drafts of your report?

16       A      No, it doesn't have the drafts, simply because

17   they were just typos.  So I -- after I completed the

18   report I didn't print it out.  I completed the report,

19   reviewed it, corrected some typos, but the substantive

20   part of the report as you see it today is what was

21   created, other than some typos after reviewing it.

22       Q      Other than those typos have there been any

23   changes, corrections or amendments to your report?

24       A      Perhaps -- no, there has been no written

25   amendment, but I do want to make it clear that I did not

17

1    get these depositions until about a week ago, and those

2    are the depositions from the Brattleboro Police

3    Department officers.

4         Q    In connection with your review of those

5    interviews of the officers, did that in any way change

6    your opinions in this case?

7         A    No, ma'am.

8              MS. SHEAHAN:  Can I have you mark that.

9              (Thereupon, Defendants' Exhibit 4 was marked

10   for identification.)

11             MS. SHEAHAN:  While you're at it, would you

12        mark this.

13             (Thereupon, Defendants' Exhibit 5 was marked

14   for identification.)

15        Q    For the record, Mr. Scott, could you identify

16   what's been marked as Exhibit No. 5.

17        A    It appears to be a portion of my letter of

18   engagement.

19        Q    Would it be accurate to say that that is your

20   fee schedule?

21        A    Yes, ma'am.

22        Q·   Is that the fee schedule that applies to this

23   case?

24        A    Yes.

25        Q    Now could you take a look at Deposition

18

1     Exhibit 4.

2             (Thereupon, the witness reviews the document.)

3     A     Yes, ma'am.

4     Q     What is Deposition Exhibit 4?

5     A     It is my curriculum vitae.

6     Q     Is that a complete and accurate copy of your

7     current C.V.?

8     A     Yes.  That's the most updated copy.

9             MS. SHEAHAN:  Let's mark this.

10            (Thereupon, Defendants' Exhibit 6 was marked

11    for identification.)

12    Q     Mr. Scott, I'm going to show you what's been

13    marked Deposition Exhibit 6, which is a document that

14    you handed to me at the start of this deposition.  Can

15    you identify that for me, please.

16    A     It's a testimony list of all cases that I've

17    testified in, either deposition or by trial.

18    Q     Is that a current list?

19    A     Yes.

20    Q     Mr. Scott, how much of your annual income do

21    you derive from providing expert testimony?

22    A     For which year?

23    Q     Well, let's say 2007.

24    A     Approximately 35 percent.

25    Q     How about so far for 2008?

19

| | | |
|---|---|---|
| 1 | A | Approximately 80 percent. |
| 2 | Q | Have you personally ever brought a lawsuit? |
| 3 | A | No. |
| 4 | Q | Have you ever been sued? |
| 5 | A | Yes. |
| 6 | Q | By whom? |

7   A   I can't specifically remember the name of the

8 first lawsuit.  It was a robbery suspect who pointed a

9 gun at me and I subsequently shot them.  Did not kill

10 him.  Wound up -- while he was in prison he wound up

11 suing me for civil rights violation.

| | | |
|---|---|---|
| 12 | Q | What was the outcome of that case? |
| 13 | A | Dismissed for prejudice. |
| 14 | Q | Any other lawsuits? |
| 15 | A | No. |
| 16 | Q | Now, Mr. Scott, you have served as a police |

17 officer; is that right?

| | | |
|---|---|---|
| 18 | A | Yes, ma'am. |
| 19 | Q | When did you start in law enforcement? |
| 20 | A | 1976. |
| 21 | Q | For what department? |
| 22 | A | Dania Beach Police Department. |
| 23 | Q | I'm sorry? |
| 24 | A | Dania, D-A-N-I-A. |
| 25 | Q | Where is Dania? |

20

1      A     Dania is just south of Fort Lauderdale on the

2    east coast.

3      Q     How were you employed prior to that?

4      A     Prior to that?

5      Q     Yes.

6      A     I was employed as -- full-time employee with a

7    grocery store referred to as Winn Dixie.

8      Q     Don't have them in Vermont, but I've seen them

9    down here.

10           All right, Mr. Scott.  When did you attend the

11   police academy?

12     A     April of 1978.

13     Q     Was that here in Florida?

14     A     Yes.

15     Q     So given the fact that you attended the police

16   academy after you were working with the City of Dania,

17   is it fair to assume that you were working part-time for

18   Dania?

19     A     I was working as an auxiliary officer and had

20   attended an auxiliary police academy prior to that.

21     Q     Was that also with the State of Florida?

22     A     Yes.

23     Q     Now, following the police academy who did you

24   work for?

25     A     North Miami Police Department.

21

1  Q   How long did you work for North Miami Police

2  Department?

3  A   Approximately three-and-a-half years.

4  Q   What was your rank when you left?

5  A   Police officer.

6  Q   Why did you leave the North Miami Police

7  Department?

8  A   To go to North Miami Beach Police Department,

9  better opportunities, better equipment, better pay.

10  Q   So North Miami PD is different than North

11  Miami Beach PD?

12  A   Yes.   It's a different municipality.

13  Q   Okay.

14  A   But they border each other.

15  Q   How long did you work for North Miami Beach

16  PD?

17  A   Approximately 16-and-a-half years.

18  Q   What did you do while you were with North

19  Miami Beach?

20  A   Started out as a police officer, and then from

21  that position I was elevated into the detective bureau

22  as a crime scene investigator investigating all types of

23  crimes from a forensics perspective, including

24  homicides.

25  Q   And you left in what year?

22

1     A    1998.

2     Q    What was your rank when you left?

3     A    Assistant chief.

4     Q    Did you retire?

5     A    Yes.

6     Q    How old were you when you retired?

7     A    43.

8     Q    That's the job to have.

9           All right.  After retiring from North Miami

10 Beach, is that when you became chief of Boca Raton PD?

11    A    Yes.

12    Q    When were you appointed chief?

13    A    October of 1998.

14    Q    When did you leave Boca Raton?

15    A    February 1st or 2nd of 2006.

16    Q    Did you retire?

17    A    Resigned.

18    Q    Why did you resign?

19    A    I had a disagreement with the union and the

20 union took exception to a decision I made and

21 subsequently had a vote of no confidence, and I

22 subsequently decided it would probably be best if I

23 resigned as opposed to going through the aggravation.

24    Q    What was the decision that you had a

25 disagreement with the union about?

23

1      A     Pretty simple actually, but it turned out to

2   be, you know, a political quagmire.

3          There was a member of the community that got

4   involved in a drunken altercation at a local restaurant.

5   He subsequently got arrested and I was notified by both

6   my staff and by citizens that this individual had been

7   arrested.  Came to the police department to see what the

8   issues were, what the situation was.

9          Long story short, I authorized the individual

10  to be released from my jail after he was booked to go

11  with his attorney pending turning himself into the

12  county jail on Monday.  This was over a weekend.  My

13  decision to authorize him to be released from our jail

14  after his booking was due to his well-known heart

15  condition, and I felt that if his -- he went down to the

16  county jail that night he might exacerbate if not get

17  involved in another altercation which would create --

18  and if he got -- if he died from his heart condition he

19  would -- I'd have some significant issues.

20         So that was my decision, and subsequently the

21  union took exception to it.

22     Q     What was your relationship to this individual

23  for whom you made these arrangements?

24     A     Relationship was nothing more than I had with

25  many of my other constituents.  The one thing that he

24

1    did do -- excuse me, that's going to sound bad on the

2    deposition.   The one thing he contributed to is I had a

3    charity for our kids during Christmas called Shop with a

4    Cop, and he was a donor of about $1,500 each year where

5    we take about 25 disadvantaged kids to breakfast and

6    then we take them shopping with that money and

7    subsequently prepare them for Christmas and what have

8    you.   And so the only extraordinary relationship I had

9    with him was the fact that he was a donor over the

10   course of the years, as were many other individuals

11   within the city.

12        Q     Would you consider him a friend?

13        A     No.

14        Q     Did you ever have any type of business

15   association with him?

16        A     No.

17        Q     What was this individual's name?

18        A     Greg Talbot, T-A-L-B-O-T.   I'm not sure if

19   there's another T.

20        Q     Mr. Scott, were there ever any ethics

21   complaints filed against you when you were with North

22   Miami Beach or with Boca Raton?

23        A     With Boca Raton I had a few ethics complaints

24   filed.   I had a former deputy chief who filed I think

25   two ethics complaints during that seven-year period.

25

1   They were summarily dismissed.   I had a third ethics

2   complaint related to this incident with Mr. Talbot that

3   was dismissed.   And I had a fourth ethics complaint

4   around the same time with regards to Mr. Talbot, and it

5   regarded a news reporter, investigative news reporter

6   that was seeking an interview from a handyman who had

7   scammed an elderly couple within our community on some

8   work.   She was trying to get an interview with him so

9   she could get some type of reparations back to the

10  elderly couple.   She asked if we could try -- she asked

11  if we would ever stop him could we -- could she have an

12  interview with him, and I said well, explain yourself.

13          Well, apparently she had been sitting on the

14  house for a couple of weeks trying to get an interview

15  from him but she found that she couldn't.   He would

16  leave his residence all different times, run through the

17  stop signs, run red lights, make immediate U-turns in

18  the middle of the street and so on and so forth.

19          So we looked into it, because we thought

20  perhaps there was some drug dealing going on.   We were

21  not convinced the drug dealing was indeed going on.

22          So I had authorized an officer to assist her

23  to set up where this individual would run the stop sign

24  and stop him -- if he were to run and violate the law,

25  you stop him, issue him an appropriate citation, and

26

1    then subsequently if he wants to stick around for an

2    interview that's fine.

3            And so that's what transpired.  One day he did

4    run a stop sign.  One of our officers was there.  He was

5    issued a citation and the reporter was notified and was

6    on scene close by.  Our officer on the scene said to the

7    driver listen, if you want to speak to this individual

8    you can or you're free to go, and he chose to speak to

9    her.

10           An ethics complaint was filed.  Subsequently

11   stipulated -- I stipulated to an agreement.

12      Q    What exactly was the nature of the complaint?

13      A    Oh, misuse of my public official -- my

14   official position.

15      Q    Okay.

16      A    I kind of put the cart before the horse.

17      Q    No, I would have asked --

18      A    I figured we'd get to it.

19      Q    I would have asked you for the specifics, but

20   somewhere in there I figured there was a charge.

21           So the actual charge was misusing your

22   official position, correct?

23      A    That's correct.

24      Q    Am I correct that essentially, if you had to

25   summarize it, it was somehow using your position to

27

1    assist this reporter?

2         A    Assist a reporter in acquiring an interview,

3    setting that up.

4         Q    You said you stipulated to a finding that you

5    had committed a violation; is that correct?

6         A    I stipulated -- no, that is not the case.

7         Q    What did you stipulate to?

8         A    The stipulation was I did not commit a

9    violation; however, the ethics commission would be able

10   to determine as such, and so that was the stipulation.

11        And it was a business decision frankly,

12   Counselor.  I had spent approximately -- we had spent

13   approximately $26,000 just based on the two ethics

14   complaints initially, and the state had said to me

15   listen, we'll drop the Talbot -- we'll dismiss the

16   Talbot ethics complaint but we want you to stipulate to

17   a finding of fault.  And I said I'm not going to

18   stipulate to a finding of fault, but I'll stipulate to

19   the following, through my attorney obviously, that I

20   admit no guilt or no fault and that you can find me at

21   fault if you desire, and that's what it was.  And it was

22   a business decision because I was going to have to spend

23   about another $40,000 for it to go to an administrative

24   hearing and I -- it was a business decision.

25        Q    Was any fine imposed as a result?

28

1    A     Yes, ma'am.  There was -- the stipulation was

2    a $5,000 fine.

3    Q     Have you paid that fine?

4    A     Yes, ma'am.

5    Q     When did you pay that?

6    A     This year.  I can't remember when though.

7    Q     When was the ethics complaint filed, the one

8    involving the reporter?

9    A     They filed in 2005.

10   Q     Was there any kind of reprimand or censure?

11   A     Yes.  The governor censured me, publicly

12   censured me.  That was part of the stipulation.

13   Q     Now, Mr. Scott, what did you do after leaving

14   Boca?

15   A     I wound up working for a restoration company,

16   it's a construction restoration company, as the COO, and

17   this particular company focused on disaster reparation

18   and rebuilding of homes, businesses should a disaster

19   occur, fire, tornado, hurricane, what have you.

20   Q     What's the name of the --

21   A     Antol, A-N-T-O-L, Restoration.

22   Q     How long did you work for Antol Restoration?

23   A     Approximately 10 months.

24   Q     What construction experience did you have?

25   A     I had none.  However, I had significant

29

1  management experience and I also was very familiar with

2  dealing with emergency management, and they needed

3  somebody to manage the company and to hopefully let it

4  grow and I would be able to manage that oversight.

5      Q    Why did you leave Antel (phonetic)?

6      A    Antol?

7      Q    Antol.

8      A    I left simply because it just was incongruent

9  with what I think is my level of expertise and

10  knowledge, and so I decided well, let me move into the

11  consulting business and utilize what knowledge I have

12  over my 30-plus years as a police officer and as a

13  chief.  So that's what prompted me.  Best thing I ever

14  did.

15     Q    So what did you do when you left Antol?

16     A    I opened up my -- well, I had my AJS

17  Consulting company for about six years prior -- five

18  years prior to leaving the police department and I would

19  do some consulting work on accreditation, law

20  enforcement accreditation, but I thought I'd expand

21  that, given the knowledge base that I have, and go into

22  expert witness consultation and security consultation.

23  And I was hired -- I had a major client hire me in 2007

24  dealing with security and CPTED concepts, C-E-P-T --

25  excuse me, CPTED -- yeah, I think it's Crime -- oh, it's

30

1    C-P-E-T-D (sic), Crime Prevention Through Environmental

2    Design.

3         Q    That's a mouthful.

4         A    So I was able to attract a very good client

5    and progressively built my consulting business, expert

6    witness consulting business at the same time.

7         Q    So is it fair to say then that AJS Consulting,

8    you provide expert witness services and you do security

9    assessments; is that right?

10        A    Yes.

11        Q    How much time does your company devote to

12   expert witness consultation versus security assessments?

13        A    Right now?

14        Q    Yes.

15        A    At this time?

16        Q    Yes.

17        A    Right now it's a hundred percent expert

18   witness consulting.

19        Q    When you left Antol and became more active in

20   AJS Consulting, about how much time was expert witness

21   versus security assessments?

22        A    Security assessment was approximately

23   85 percent and expert witness consulting was about

24   15 percent of my time.

25        Q    Do you have any employees with AJS Consulting?

31

1      A      No.

2      Q      So right now AJS Consulting does no security

3   assessments, correct?

4      A      I do not have any clients that are desiring

5   that as of yet, but if a company was to call me I'd be

6   able to provide that for them.

7      Q      What year did you start AJS?

8      A      I have to go back to about 2003, 2004.

9      Q      So you were still with Boca --

10     A      Yes.

11     Q      -- at the time you started this consulting

12  company?

13     A      Yes.

14     Q      So since leaving Antol, other than AJS, have

15  you had any other employment?

16     A      I've opened up two other companies.  I've

17  opened up a company called The Evidence Storage Company.

18  The acronym is TESCO, T-E-S-C-O, and I'm currently

19  involved with a partner of mine with a company called

20  Scott Roberts & Associates, and we do employment

21  screening, tenant screening and background checks.

22     Q      TESCO, where is that located?

23     A      TESCO is not located anywhere yet.  I use my

24  current home address.  The company is not a viable

25  company as of yet due to the economic uncertainties.  A

1  lot of money to expend if I were to get TESCO up and

2  running.

3            But to let you know, I could pull the trigger

4  on it in two weeks, get it up and running if everything

5  was right, if the universe was aligned.

6       Q    I think you indicated that Scott Roberts &

7  Associates does employment screening, tenant

8  screening --

9       A    And background checks.

10      Q    And background checks, all right.

11           When did you start that company?

12      A    In January of this year.

13      Q    So January 2008?

14      A    Yes.

15      Q    Is that an active business?

16      A    Yes, very active.

17      Q    Where is that located?

18      A    West Palm Beach.

19      Q    What is your position with the company?

20      A    Vice president and principal.  I have a

21  partner who's president and principal.

22      Q    What is your partner's name?

23      A    Robert Buchholz, B-U-C-H-H-O-L-Z.

24      Q    Do you have any employees?

25      A    Yes, two.

1        (Witness produces business card.)

2     Q    Thank you.  Nice card.

3          How much of your annual income is from AJS and

4    how much is from --

5          Is it Scott Roberts?

6     A    That's correct.

7          A hundred percent from AJS.  We anticipate

8    that to change nicely in 2009, so that percentage will

9    start to seek some balance.

10    Q    So with AJS you started that while you were

11   working with Boca and therefore your involvement was

12   limited to assessments; is that correct?

13    A    Law enforcement accreditation.

14    Q    Accreditation, okay.

15         As that evolved, what other areas did you

16   consult on with AJS up until the present time?

17    A    I'm not understanding the question.

18    Q    You started out doing accreditations.  Did you

19   do any other work in terms of consultations while you

20   were with --

21         Well, you still are, but while you have been

22   with AJS.

23    A    No, a hundred percent of that company was

24   focused solely on law enforcement accreditation in its

25   infancy up until the time that I moved into the expert

34

1    witness consultation.

2         Q    The expert witness consultation that you've

3    done with AJS, is that limited to matters that are in

4    litigation?

5         A    No.

6         Q    What other areas have you provided expert

7    services on?

8         A    Some criminal cases.  Not many.  And also from

9    time to time an insurance company will call me.  And

10   thus far I've only had one so I can only say one at this

11   time.  An insurance company asked me to assist them in

12   discerning what had transpired at a particular home

13   where a homeowner claimed something had happened, and it

14   involved the accidental discharge or the alleged

15   accidental discharge of a firearm.

16        Q    In your capacity working with AJS Consulting,

17   have you done any work for police departments --

18        A    Yes.

19        Q    -- other than the accreditations that you did

20   originally?

21        A    Yes.  My testimony list will reflect that I

22   have police departments as clients, and there are others

23   that I've not provided testimony for that are my clients

24   as well.

25        Q    If you haven't provided testimony for them

35

1    what services do you provide to them?

2        A    Right now they've -- they would hire me on a

3    particular case.  For example, the Village of

4    Southampton, New York has hired me.  The case has kind

5    of drug on for about a year.  They've asked me to review

6    some documents.  This is related to a taser case

7    involving a death of the individual.  So those types of

8    things where I have not been deposed yet.

9            And there may be some cases, and I can't think

10   off the top of my head, that I've provided reports that

11   I've not gotten to either be deposed or deposed to go to

12   trial -- or subpoenaed to go to trial.

13       Q    What other police departments other than the

14   Village of Southampton, New York Police Department have

15   you offered your services to?

16       A    I always seem to lose track of these.  The

17   City of Aventura Police Department in Florida.

18       Q    The city of what?

19       A    Aventura Police Department, A-V-E-N-T-U-R-A.

20       Q    Okay.  Any others?

21       A    Yes, Albuquerque, New Mexico Police

22   Department.  I have a few cases with them.

23       Q    Your cases with Albuquerque, are they all in

24   litigation?

25       A    Yes.

1    Q    What about the City of Aventura?

2    A    Yes.

3    Q    Any others?

4    A    Yes, Counselor, there are.  I always forget

5    what they are, but there's about another two or three

6    other clients, and I apologize for that.

7    Q    Now, it sounds like the case with the Village

8    of Southampton involves a use of force claim; would that

9    be fair?

10   A    Wrongful death, excessive use of force, yes.

11   Q    What about the case with the City of Aventura?

12   A    It would be a taser case.

13   Q    And the cases with Albuquerque?

14   A    One involves a wrongful death suit involving a

15   police chase, and the other involves a use of force case

16   involving a taser.

17   Q    With the City of Aventura case involving the

18   taser, just briefly what are the allegations in that

19   case?

20   A    Excessive use of force with the use of a

21   taser.

22   Q    But give me a little bit of the facts.

23   A    There were two police officers working off

24   duty at a bar.  It was late at night, probably two or

25   three o'clock in the morning.  Some patrons got into a

1    fight in the bar, and it was heavily attended, and the

2    fight kind of spilled out into the outside area.  The

3    police officers attempted to break up the combatants and

4    what have you and then other individuals got involved in

5    the fray and the taser had to be deployed on I think two

6    individuals if I recall correctly based on the fact that

7    the individuals were trying to get at the officers

8    and/or attack the officers.

9         Q    How about the taser case in Albuquerque?

10        A    That involves a -- you know, a -- oh, in

11   Albuquerque.  Yes, that involves an arrest of an

12   individual who resisted arrest, violently resisted

13   arrest.

14        Q    Have you given depositions in the City of

15   Aventura case and the Albuquerque case both involving

16   tasers?

17        A    No, not yet.

18        Q    In any of the other cases in which you have

19   assisted police departments, have any of those gone to

20   trial?

21        A    No.

22        Q    Mr. Scott, when did you begin providing actual

23   expert witness services, what year?

24        A    It would be late 2006.  December of 2006 would

25   be my first case that I received.

38

1      Q      Do you advertise your services?

2      A      The only place I advertise is on the internet.

3      Q      Do you have a website?

4      A      Yes.

5      Q      You do.

6             Www.ajspoliceconsulting.com?

7      A      Yes, ma'am.

8      Q      If someone were to Google you, put in

9   something like police expert, would your name pop up?

10     A      My website, yes.

11     Q      Have you Googled yourself?

12     A      Yes, but not too often because it's pay for

13   click.

14     Q      Do you advertise your services anywhere other

15   than through the internet?

16     A      There's one other expert service.  It might be

17   HG Experts.  And that's it.

18     Q      What is your arrangement with HG Experts?

19     A      And I'm not sure if that's indeed the name of

20   the company, but apparently they put me in some type

21   of -- and isn't this terrible I really don't know what

22   I'm getting.  They provide access to attorneys who are

23   interested in certain police experts, and there's some

24   type of a data repository where they can come in and

25   take a look at who are the alleged experts and they can

1    pick and choose.  I've never gotten a client off of that

2    particular directory.

3         Q    Do you know if in fact you were to get a

4    client using HG Experts whether then you would pay some

5    fee to HG Experts for having connected you with this

6    client?

7         A    No.

8         Q    You don't know or you wouldn't?

9         A    I apologize, Counselor.  No, I do not pay any

10   additional fee.  I pay them a fee each year to be

11   listed, but that's it.

12        Q    Do you know how it was that Attorney Sleigh

13   managed to hook up with you in this case?

14        A    I believe it was through the internet.

15        Q    Have you at this point ever actually testified

16   in a trial for either plaintiff or defendant?

17        A    Yes.

18        Q    Can you tell me the caption of the case in

19   which you've testified in trial?

20        A    As far as the who against who?

21        Q    Yes.

22             If you're not able to do that, if you can

23   recall the name of the person for whom you provided the

24   expert testimony.

25        A    It would be for the plaintiff on both counts.

40

1          Goodness.  I can't remember, I apologize.

2      Q    So it sounds like, and correct me if I'm

3  wrong, it sounds like there are two cases that you have

4  actually testified at trial?

5      A    Yes, ma'am.  One is federal court; one is

6  state court.  Federal court down here in Broward County,

7  it was a plaintiff versus the Broward County Sheriff's

8  Office, and then another case just recently in the State

9  of Maryland involving an improper arrest based upon

10  improper photo array.

11      Q    The case in federal court down here in

12  Florida, what did that case involve?

13      A    That was excessive use of force involving a

14  taser.

15      Q    When did you testify?

16      A    Perhaps August, July or August of this year.

17      Q    Just briefly what were the allegations in that

18  case?

19      A    Excessive use of force by a law enforcement

20  officer in the use of the taser and -- involving a

21  traffic stop, involving a boyfriend and a girlfriend,

22  and the deputy allegedly utilized his taser improperly

23  and drive stunned an individual, and subsequently the

24  suit was brought forth.

25      Q    In what way was the deputy alleged to have

1    improperly used his taser?

2         A    He alleged that the individual, the plaintiff,

3    made a furtive move towards a driver's door of the car

4    that she was occupying, but she was outside, and he

5    claimed that she did not listen to his command and then

6    tried to get into the car and then allegedly brushed him

7    back with his hand -- with her hand as he tried to reach

8    her, and he subsequently drive stunned her twice.

9         Q    What was the outcome of that case?

10        A    It settled on behalf of the plaintiff.

11             Excuse me, I take that back, on behalf of the

12   defendants.

13        Q    When you say settled on behalf of the

14   defendants --

15        A    Excuse me.

16        Q    -- what exactly do you mean by that?

17        A    If we could strike that, the defendants

18   prevailed.  In court, they prevailed in court.

19        Q    So there was a defendants' verdict?

20        A    Yes, thank you.  I lost that terminology.

21        Q    That's quite all right.

22             Mr. Scott, do you know if that case is on

23   appeal?

24        A    Not to my knowledge.

25        Q    I assume that case would be listed somewhere

1    in Deposition Exhibit 6?

2         A    Yes.   That would have been easier, Counselor.

3         Q    There we go.   Sometimes we get to use these.

4              (Thereupon, the witness reviews the document.)

5         A    There we go.   That would have been way too

6    easy.   That one right there (indicating).

7         Q    So I think you have your thumb on Mr. and Mrs.

8    Charles Barkley vs. Broward Sheriff's Office; is that

9    correct?

10        A    Yes.

11        Q    Stuart Address, is that the attorney who

12   engaged your services?

13        A    Yes.

14        Q    Do you know the name of the attorney

15   representing the defendants?

16        A    Do not recall.

17        Q    So we've covered the two cases in which you've

18   testified at trial; is that right?

19        A    Yes, ma'am.

20        Q    I assume, since you've testified at trial,

21   that you were either qualified as an expert witness or

22   at least not disqualified; is that fair?

23        A    In both cases I was qualified as an expert.

24        Q    Now, if I followed the emails correctly in

25   your file it appears that you may have actually been

1    retained in this case on August 29th; is that correct?

2          And feel free to look through the

3    correspondence.

4          (Thereupon, the witness reviews the document.)

5    A    There was an email exchange on August 29th,

6    and it appears on September 3rd I received the

7    official notification, 2008.

8    Q    When was your first contact in this case?

9    A    That would be through an email dated

10   August 26, 2008 from Mr. Sleigh.

11   Q    Had you previously worked for Mr. Sleigh or

12   anyone else in his firm?

13   A    No.

14   Q    Was that initial contact then by email?  He

15   didn't call you first?  Just sent you an email?

16   A    I recall it was an email.

17   Q    Since I don't have it in front of me, if you

18   can just look at it, what did Mr. Sleigh ask you to do

19   in that initial contact?

20   A    The second to last sentence said, "I need an

21   expert to testify that the use of the taser as a pain

22   and compliance device was wrongful under these

23   circumstances."

24         And by the way, now that I think about it, I

25   believe Mr. Sleigh did contact me by phone first.

1          I got his email, and then I was in an airport

2    and I responded to his email shortly after I received

3    the email.  So I got the email first and then I

4    contacted him by phone.

5          Q    What information did Attorney Sleigh give you

6    during that first conversation?

7          A    He gave me a very brief cliff notes example of

8    what transpired.  He stated that there were two -- a

9    group of protestors in this particular town that were

10   protesting a possibility of a vacant lot being built up

11   for some type of either oil company or trucking depot, I

12   can't remember exactly what it was, and that some

13   individuals, the group of protestors, some of those

14   individuals -- excuse me, that the group of folks were

15   there, the police came out, spoke to them briefly, told

16   them they had to leave, explained to the protestors that

17   the officers would be back in a few hours and that they

18   needed to be gone, that once that had transpired there

19   was a discussion with the either supervisor or

20   supervisors that were there on the scene with the chief

21   of police discussing how to handle this, what's going

22   on.

23          The chief in the media alleged states --

24   allegedly stated that, you know, don't -- and I don't

25   know the exact words, but don't do anything out of the

45

1   ordinary.  I can't remember the exact words based on

2   that telephone conversation.

3           They contacted the landowner and the landowner

4   wanted them off the property.

5           Subsequently they went back.  The protestors

6   were all there.  They contacted the landowner again.

7   The landowner said listen, you know, let them stay for

8   the night but get them off the property in the morning,

9   and subsequently that was relayed to them by the police

10  officers again when they arrived.

11          The following day in the morning time the

12  protestors were seen on the lot.  In fact, there was

13  only two of them.  And subsequently the lieutenant, a

14  couple of the lieutenants and a couple of officers

15  responded back to have them vacate the property.  That's

16  when they found out that these two protestors had

17  attached themselves to a 55-gallon drum and were

18  refusing to leave and disengage from the drum.

19          After several attempts of discussion with the

20  protestors by the police officers discussing their

21  options, a decision was made to utilize the taser, but

22  prior to utilizing the taser actively that they would

23  show -- they would tell them they're going to utilize

24  the taser on them, they were -- if they didn't disengage

25  and get up and leave, and subsequently they refused to

46

1   leave and disengage.

2        The tasers were pulled out and simultaneously

3   both the female and the male protestor were tased the

4   first time.  It's somewhat unclear as to when the female

5   disengaged, but the bottom line is the female disengaged

6   then either after a second drive stun -- the male did

7   not disengage until about the fourth or fifth drive

8   stun, and they were subsequently arrested.

9        That was it based on the conversation that I

10  had with Mr. Sleigh.

11  Q    So that represents what you believe attorney

12  Sleigh relayed to you during your conversation over the

13  phone while you were in the airport?

14  A    I have no other reason to believe anything

15  other than what he told me.

16  Q    Did you render a preliminary opinion at that

17  time based upon the telephone call with Attorney Sleigh?

18  A    I try not to, and I don't think I did in this

19  case simply because, and no offense to both attorneys

20  here, what's relayed to me and then what ultimately I

21  see in the documents sometimes are a little bit

22  different.  Mr. Sleigh and I had that conversation.

23  I've had that experience; it's not a good experience.

24  And I asked him straight up, you know, what you've told

25  me is indeed what you feel is the essence of the case.

47

1   He did and -- he said that that was indeed the essence

2   of the case, and subsequently additional material was

3   sent out to me and --

4         Oh, he also informed me that there was an

5   Attorney General's report, investigation that was

6   conducted on this, that there was an independent

7   attorney for the City of Brattleboro that investigated

8   this as well.  Both parties determined that the force

9   used was indeed excessive and unnecessary.

10        I do recall having a brief conversation with

11  Mr. Sleigh asking him why do you need an expert in this

12  matter, it seems to be pretty clear that it was, you

13  know, from two independent bodies, that it was excessive

14  force.  And I don't recall the comment other than, you

15  know, I do need to have an expert for this and would you

16  be interested in the case based on what you've told me,

17  and yes, I'll except the case.

18        Q    Did you accept the case during that telephone

19  conversation?

20        A    Yes, with the caveat that what I get and what

21  he tells me are pretty much congruent.

22        Q    And then Attorney Sleigh provided you

23  documents; is that correct?

24        A    Yes, ma'am.

25        Q    And then you reached an agreement which I

48

1    think is reflected in your retention letter; is that

2    right?

3        A    My letter of engagement, that is correct.

4        Q    Have you ever offered opinions prior to this

5    case involving any police department in the State of

6    Vermont?

7        A    No.

8        Q    Mr. Scott, what specific training and/or

9    experience do you have with the use of tasers?

10       A    Back in 2001-2002 I was the first police chief

11   in Palm Beach County to bring tasers to my police

12   officers in Boca Raton.  That decision was based upon

13   research done by one of my assistant chiefs and one of

14   my trainers relative to this technology that had become

15   available for us and that they did their research and

16   strongly recommended that the taser should be utilized

17   and deployed in the Boca Raton Police Department.  That

18   was done and deployed to all of our officers in the

19   police department.

20           Taser International came out and trained our

21   officers and, in addition to, trained the trainer so to

22   speak, meaning they certified some of our officers to be

23   able to train in the taser, and during that training

24   period I did attend a portion of the class and I wanted

25   to see what the taser felt like, so I was hooked up to

1    the taser and appropriately jolted.

2              And then from there I took a refresher course

3    a few years -- a couple of years after that, and had a

4    refresher course on taser, a four-hour block of taser

5    and taser use.

6              And in 2005, late 2004 or 2005 I was

7    designated as the chair to create a model policy for the

8    chiefs of police and the sheriff in the use of taser for

9    Palm Beach County, and a committee was convened through

10   the Law Enforcement Planning Council of Palm Beach

11   County, and I chaired that committee, of which we had

12   the State Attorney, the medical examiner of Palm Beach

13   County, in addition to several chiefs of police and

14   trainers in varying police departments in Palm Beach

15   County, and created a model policy.

16             From that model policy -- it was distributed

17   to all of the agencies in Palm Beach County and they

18   could either adopt it, adjust it, manipulate it, so on

19   and so forth.  That model policy was recognized by the

20   International Association of Chiefs of Police in their

21   conference here in Miami in 2005, if I recall correctly,

22   acknowledging the fact that Palm Beach County had

23   attempted to create a model policy for the use of the

24   taser.

25        Q    So that I'm clear, Mr. Scott, this model

50

1   policy was created late 2004, early 2005; is that right?

2       A    Yes.

3       Q    Do you have a copy of that model policy?

4       A    No, I do not.

5       Q    Is that something that you could get?  Does it

6   still exist?

7       A    I would think you'd contact the Boca Raton

8   Police Department or the Palm Beach County Law

9   Enforcement Planning Council.  I don't have it with me.

10      Q    Is that anything that you looked at or relied

11  upon in formulating your opinion in this case?

12      A    No.

13      Q    Mr. Scott, have you ever spoken to either one

14  of the plaintiffs in this case?

15      A    No.

16      Q    I know you reviewed the interviews of the

17  officers that were taken by the Attorney General's

18  office.  Have you reviewed the interviews of the

19  plaintiffs that were taken by the Attorney General's

20  office?

21      A    No.

22      Q    Have you reviewed any written statements given

23  by the plaintiffs?

24      A    Let me check.  It doesn't stand out in my mind

25  that I did, but let me take a look at what we've looked

1    at here.

2            (Thereupon, the witness reviews the

3    documents.)

4        A    It doesn't list on my items reviewed.  Let me

5    just make sure, one last thing.

6            (Thereupon, the witness reviews the

7    documents.)

8        A    I don't think I did, ma'am.

9        Q    You did review the police reports, correct?

10       A    Yes.

11       Q    Have you spoken to any witnesses?

12       A    No.

13       Q    Did you speak to Mr. Black who authored one of

14   the reports?

15       A    No.

16       Q    Have you spoken to anybody from the Attorney

17   General's office?

18       A    No.

19       Q    Now, is there anything that occurred on day

20   one of this event that impacted your opinion in this

21   case?

22       A    Could you be a little bit more specific,

23   ma'am.

24       Q    Well, day one being July 23rd, when the

25   initial report came to the police department regarding

52

1   these individuals on this piece of property, was there

2   anything that occurred during that day that impacted

3   your opinion in this case?

4        A    Well, I think the only thing that was of some

5   significance was the conversation between Lieutenant

6   Kirkpatrick, I think there was a captain, the chief, and

7   I'm not sure if Mr. DiMarino, Officer DiMarino was

8   present, whereby they provided information to the chief,

9   and I believe the chief was pretty deliberate in his

10  statements with regards to -- either don't let this get

11  out of hand -- and I don't have that in front of me,

12  Counselor, and I apologize, or -- I don't have the exact

13  verbiage that the chief used, or allegedly used, and it

14  was just to, you know -- don't let this get out of hand

15  or don't do anything out of hand, something like that.

16       Q    In what way did that conversation impact your

17  opinion in this case?

18       A    Well, it just gave some indication that the

19  chief did not want anything out of the ordinary to be

20  done in this case in that they were protestors and they

21  weren't doing anything other than being on a particular

22  piece of property, and that, you know, be deliberate and

23  prudent is how I interpreted that conversation.

24       Q    Let's turn to day two, July 24th, and

25  specifically --

53

1    I don't know if it's easier for you to refer

2    to your report.  Do you have a copy of your report in

3    front of you?

4        A    Yes, I do, ma'am.

5        Q    Okay.  Now, as you've noted in your report,

6    Mr. Scott, the plaintiffs were informed that they were

7    trespassing; is that correct?

8        A    Yes, ma'am.

9        Q    As you've also noted in your report, the

10   plaintiffs were advised that they would be arrested and

11   removed if they did not leave on their own; is that

12   correct?

13       A    Yes.

14       Q    Would you agree that the order to leave given

15   by the police was a lawful order?

16       A    Yes.

17       Q    Would you agree that the plaintiffs did not

18   comply with that lawful order?

19       A    Yes.

20       Q    And as a result of that the plaintiffs were

21   arrested, correct?

22       A    Yes.

23       Q    Do you have an understanding of the outcome of

24   the criminal charges against the plaintiffs?

25       A    No, I don't.

54

1      Q    But would you agree that the police officers

2    acted lawfully when they placed the plaintiffs under

3    arrest for unlawful trespass?

4      A    Yes.

5      Q    Do you agree that once the plaintiffs were

6    arrested for unlawful trespass that they were advised

7    that they needed to accompany the officers?

8      A    Yes.

9      Q    Do you agree that they refused to do so?

10     A    Yes.

11     Q    Do you agree that the plaintiffs were ordered

12    to undo themselves from the barrel and accompany the

13    officers?

14     A    Yes.

15     Q    Do you agree that the officers made attempts

16    to have the plaintiffs separate themselves from the

17    barrel?

18     A    Yes.

19     Q    What is your understanding of the attempts

20    that the officers did make to have the plaintiffs

21    separate themselves from the barrel?

22     A    First they asked them to separate themselves,

23    to disconnect, and there was quite a bit of attempts to

24    do that, cajoling, if you want to use that word.  So

25    that was used.

1        Then they contemplated and in fact attempted

2    to pull their arms out from the barrel, which was not

3    successful.

4        And then they contemplated doing something

5    with the barrel, and they initially called your public

6    works department, their public works department, and

7    conferred and -- as to how to get them separated.  They

8    tried to shovel out some dirt that was inside the

9    barrel, but that was to no avail.

10        And then again they discussed with them, you

11    know, the options, and I believe Lieutenant Kirkpatrick

12    and in particular Officer DiMarino explained to the

13    individuals what might -- what would transpire had they

14    failed to comply again, and of which there was a

15    discussion as to the use of the taser on them, with the

16    protestors.

17    Q    Would you agree that the plaintiffs were

18    advised that if they did not voluntarily detach

19    themselves from the barrel that they would be charged

20    with resisting arrest?

21    A    Yes.

22    Q    What's your understanding as to how the

23    plaintiffs were actually attached to the barrel?

24    A    My understanding, that they had some type of

25    device around their wrist and there was a carabiner.

56

1   The carabiner was then attached to rebar that was

2   cemented inside the barrel.

3       Q    Do you know if the police asked the plaintiffs

4   how they were attached to the barrel?

5       A    Yes.

6       Q    Did they in fact ask them how they were

7   attached to the barrel?

8       A    Yes.

9       Q    Would you agree that the plaintiffs refused to

10  inform the officers how they were attached?

11      A    That is correct.

12           Can we take a break?

13      Q    Sure.

14           (Thereupon, a recess was taken, after which

15  the following proceedings were had:)

16      Q    (By Ms. Sheahan) Mr. Scott, I think when we

17  left off you had agreed that the plaintiffs did not

18  inform the officers how they were attached to the

19  barrel, correct?

20      A    Correct.

21      Q    Would you agree that they were perfectly

22  capable of telling the officers how they were attached?

23      A    That is my understanding, yes.

24      Q    Would you also agree that the plaintiffs had

25  the ability if they chose to do so to comply with the

57

1    officers' direction and detach themselves from the

2    barrel?

3        A    Yes.

4        Q    Would you further agree that each of the

5    plaintiffs had the ability to release themselves

6    independent of the other plaintiff?

7        A    That's my understanding, yes.

8        Q    So Ms. KilMurray could have released herself

9    even if Mr. Crowell chose to remain attached; is that

10   fair?

11       A    She did that, yes.

12       Q    Exactly.  That's ultimately what happened?

13       A    Yes.

14       Q    Now, before this case were you familiar with

15   the device that was utilized by the plaintiffs in

16   attaching themselves to the barrel?

17       A    Yes.

18       Q    Did you ever encounter it while you were a law

19   enforcement officer?

20       A    No.

21       Q    Do you know what the device is commonly

22   called?

23       A    No.

24            I can give you the vernacular in law

25   enforcement terms but -- I'm teasing.

58

1      Q      Maybe you'd better not on the record.

2             How were you familiar with this device prior

3      to this case?

4      A      Oh, we -- on one major occasion we had an

5      economic summit here in Boca Raton involving the big

6      eight nations, and it was right where Mr. Sleigh is

7      currently staying --

8      Q      Naturally.

9      A      And during that time there was also the North

10     American Free Trade Act Conference being hosted in

11     Miami, and we had numerous meetings with local Palm

12     Beach County law enforcement agencies, including the

13     sheriff, looking into some of the ways in which these

14     individuals have a tendency to protest.  Beyond just the

15     violence, these individuals have means by which the

16     current plaintiffs in this case have used, in addition

17     to some other means to attach themselves that makes it

18     very difficult for law enforcement to separate them and

19     what have you.  And so that's how we became very

20     familiar with those.  But that did not transpire up

21     here.

22             Let me wrap that up.  In preparation for the

23     economic summit, we were very concerned and we had

24     intelligence information that the protestors from NAFTA

25     down in Miami knew of the economic summit here and we

59

1    had anticipated to have protestors as well.

2        Q    Just to be clear, did you ever have protestors

3    connected with the economic summit?

4        A    No, fortunately we did not.

5        Q    Did you follow what happened with other police

6    agencies who were in fact involved with protestors in

7    connection with this economic summit?

8        A    Yes, I did, but I can't recall specifically

9    what that information was now.

10       Q    So, Mr. Scott, you're aware I assume that the

11   purpose of the type of device that was utilized by the

12   plaintiffs in this case is to defeat an officer's

13   attempt to take an individual into custody and remove

14   them from the scene?

15       A    Yes.

16       Q    Other than your discussion in connection with

17   the economic summit back a few years ago, have you had

18   any training regarding these particular types of

19   devices?

20       A    No, I have not.

21       Q    Your discussions surrounding the economic

22   summit, was that to provide training or just sort of an

23   informational this is what we expect and it may come to

24   your area?

25       A    That is correct and, you know, be prepared for

60

1   that and how they're going to be able to tie up traffic

2   and what have you.

3           We were particularly concerned about the

4   violence that was associated with these protestors

5   relative to NAFTA.

6   Q    Mr. Scott, would you agree that the plaintiffs

7   in this case could have detached themselves from the

8   barrel without the necessity of any use of force by the

9   officers?

10  A    Yes.

11  Q    Would you agree that officers are allowed to

12  use some level of force in affecting an arrest?

13  A    Yes, based on Graham vs. Connor and the type

14  of resistance that's being exhibited.

15  Q    Do you agree that an officer does not have to

16  feel threatened before the officer is permitted to use

17  force on a subject that is being lawfully arrested?

18  A    And that force must be reasonable, yes.

19  Q    Let me ask you, do you agree that in fact the

20  plaintiffs were given warnings before the taser was

21  used?

22  A    Yes.

23  Q    Would you also agree that the officers

24  explained to the plaintiffs what was involved with using

25  the taser?

61

1    A    Yes.

2    Q    Mr. Scott, what is your training in connection

3  with nonlethal use of force?

4    A    Every year we would be trained in nonlethal

5  use of force in the police department both at Boca Raton

6  Police Department and in North Miami Beach.

7         And actually it's less lethal use of force,

8  not nonlethal.

9    Q    When was the last time you were actually

10  trained in the use of force at all?

11   A    Back in 2005.

12   Q    So when you were with Boca?

13   A    Yes.

14   Q    And I believe you said that you did a

15  refresher course regarding the use of the taser; is that

16  right?

17   A    Yes.

18   Q    When was that?

19   A    2005.

20   Q    Are you certified in the use of the taser?

21   A    No.

22   Q    Are you or have you ever been certified as a

23  use of force instructor?

24   A    No.

25   Q    Are you certified as an instructor in any

62

1    particular area?

2         A    I've been in -- I am a -- I was a certified

3    instructor in general to teach various courses for law

4    enforcement officers back in the '80s.  I currently

5    teach criminal justice classes, including the use of

6    force, with Florida Atlantic University, Capella

7    University online.

8         Q    I'm not sure if I quite understand.  You teach

9    use of force but you're not a certified use of force

10   instructor?

11        A    That's correct.  I can teach in the concepts

12   of use of force but it does not mean I need to be

13   certified to teach that.

14        Q    Who do you teach use of force to?

15        A    College students as part of the whole concept

16   of the criminal justice system.

17        Q    Does your instruction to college students

18   involve hands-on instruction?

19        A    No.

20        Q    Just sort of the theory as it relates to

21   criminal justice; would that be fair?

22        A    Well, actually it dovetails beautifully into

23   theory versus practitioner and being able to dovetail

24   both of those as a practitioner and as an instructor.

25        Q    I assume since you're not certified to use a

63

1  taser that you've never been certified as a taser

2  instructor?

3      A    No.

4      Q    What training if any have you had in dealing

5  with protestors?

6      A    Oh, goodness, back in the day, in the '80s, we

7  would do -- and actually it continued to follow through,

8  we would have training on a regular basis involving

9  mobile field force down in Miami-Dade County and North

10 Miami Beach and then brought that concept up to Boca

11 Raton, the mobile field force, and how to deal with

12 protestors.

13     Q    When was your last training in terms of

14 dealing with protestors?

15     A    Probably either 2004 or 2005.

16          I did take great pride in participating in

17 significant -- aspects of training that I thought was

18 significant, and as a chief I felt it was necessary to

19 show my officers that I was also a police officer first

20 as opposed to a chief and I did need certain training.

21 Mobile field force was one of those.

22     Q    Describe for me briefly what mobile force

23 training consisted of.

24     A    That would be mobile field force training.

25     Q    I'm sorry.

64

1      A     And it was a concept that was developed by the

2    Miami-Dade Police Department right after one of our

3    major riots back in 1979 or 1980, and during that time

4    we had a significant riot down in Miami and a lot of

5    people were killed, and there was a question as to how

6    Miami-Dade and Miami police departments responded.  So

7    they created the concept called mobile field force.

8            It's a contingent of 52 officers that are

9    trained in tactical approach to protestors, how to deal

10   with an unruly mob, how to deal with the ringleader so

11   to speak and what tactics to use.

12           I subsequently authored an article that took

13   that concept and referred to it as rapid deployment

14   squads.  I took the mobile field force concept from a

15   larger agency and then just redeveloped it for smaller

16   agencies so they don't have the manpower to fulfill a 52

17   person contingency field force, and we manipulated it so

18   it would work for smaller agencies.  So I authored an

19   article back in the '80s on that, and subsequently just

20   having refresher training on mobile field force either

21   every year or every other year.

22      Q     Do these mobile field force units, for lack of

23   a better term --

24      A     Training would probably be the better --

25      Q     Okay.  Well, in terms of the people that are

65

1    assigned to the mobile field force deployments, what

2    weapons are they entitled to use?

3        A    Well, a mobile field force can utilize any

4    weapons that they choose to do so based upon the actions

5    of the individual or the protestor.  So, for example, if

6    deadly force is being used or perceived being used on a

7    mobile field force officer, that individual may use

8    deadly force.

9        Q    So there are no restrictions on the officers

10   who are assigned to the mobile field force unit in terms

11   of dealing with protestors?

12       A    I'm not understanding the question.

13       Q    In other words, if you're assigned to the

14   mobile field force unit and were responding to a

15   protest, there is no absolute prohibition that you

16   cannot use for example deadly force?

17       A    No.  That would be insanity.

18       Q    Okay.

19       A    Yeah.  It clearly has to fall within the

20   purview of the policy and state statute in anything

21   that -- regardless if it was a field force participation

22   or if it was an individual officer on an off duty

23   incident.

24       Q    Now, when you were describing the training

25   that you had with tasers, you had the refresher course

1    in 2005, so did you actually complete the course prior

2    to 2005?

3         A    I did not go through the taser certification,

4    but I did take a taser refresher course.  It was a

5    four-hour course.

6         Q    So is it fair to say you really had one

7    training, one full block of training with respect to the

8    taser?

9         A    Yes, formalized training, that's correct.

10        Q    That's the one in 2005, correct?

11        A    Uh-huh.

12        Q    You have to say yes or no.

13        A    Yes.

14        Q    What model taser were you trained on?

15        A    Don't recall.

16        Q    Now, I think you mentioned earlier, I think it

17   was prior to 2005 you were actually tased; is that

18   correct?

19        A    Yes.

20        Q    When you were with Boca, did you require that

21   all officers that were being issued a taser actually

22   have the taser used on them?

23        A    Yes.

24        Q    When the taser was used on you, was it used in

25   the probe or drive stun mode?

67

1      A      Probe.

2      Q      How long a cycle were you subjected to?

3      A      Five seconds.

4      Q      What was your reaction when you were tased?

5      A      Physically incapacitated and experienced

6      tremendous pain.

7      Q      Were there any marks left from the taser?

8      A      Yes.

9      Q      What did those marks look like?

10     A      Small burn holes on my back.

11     Q      What diameter?

12     A      I can't recall, Counselor.

13     Q      Well, are we talking something the size of a

14     saucer or are we talking something the size --

15     A      Less than a cigarette burn.

16     Q      How long were those marks visible?

17     A      About six weeks.

18     Q      Did you experience any long term effects from

19     the tasing?

20     A      What type of effects:  Physical, emotional,

21     psychological?

22     Q      Any.

23     A      Yes.  Physical, no; emotional and

24     psychological, I -- convinced of the utility of the tool

25     and that I did not want to get tased ever again.

68

1    Q     So when you went through your refresher course

2  I assume that you were not tased?

3    A     No.

4    Q     Did you experience any posttraumatic stress

5  disorder from being tased?

6    A     No, ma'am.

7    Q     The emotional and psychological effects that

8  you just testified to, was it something that you

9  required counseling for?

10   A     No.

11   Q     Did you require any kind of medical treatment

12  at all?

13   A     No.

14         I'm going to give you an example, ma'am, of

15  the psychological or emotional affiliation I had with

16  that.

17         As a young child, unbeknownst to you, you

18  would have touched a hot plate or a hot stove.  You

19  would have recognized forever that you would never want

20  to touch a hot stove again.  That is similar to my

21  experience with the taser.  I would never want to get

22  tased again.

23   Q     Have you ever had the taser used on you in the

24  drive stun mode?

25   A     No, I have not.

69

1      Q     When you were back in Boca, as part of your

2   training of officers, if they were going to carry

3   tasers, did you require that they experience the taser

4   in the drive stun mode?

5      A     No.

6      Q     So just the probes?

7      A     Yes.

8      Q     Why was that?

9      A     I wanted to show the officers that the tool

10  that we were giving to them, if it got into the hands of

11  the subject, could be debilitating and could be very

12  dangerous.  And so we wanted them to experience that in

13  the sense of how debilitating it was and that if anybody

14  ever got a taser on them that, you know, they were going

15  to be incapacitated and they were not going to be able

16  to defend themselves.

17     Q     Why did you elect not to have the officers

18  experience the taser in the drive stun mode?

19     A     Simply because it was not part of the

20  training, number one, and number two the majority of our

21  deployments, based on statistical analysis that we had,

22  was going to be in the probe deployment.

23            And the other thing is that the drive stun has

24  a tendency at times to leave significant burn marks.

25     Q     More than the burn marks that you've described

70

1    that lasted six weeks in the probes?

2    A    Yes.

3       Now, keep in mind, Counselor, that how those

4 burn marks impacted me, there are other individuals who

5 were tased, probes deployed, and they received no

6 markings.

7    Q    Would that likewise be the case if the taser

8 is used in the drive stun mode?

9    A    I believe so.

10    Q    Did officers under your command in Boca carry

11 pepper spray?

12    A    Yes.

13    Q    Have you been trained in the use of pepper

14 spray?

15    A    Yes.

16    Q    And whether in training or otherwise have you

17 been subjected to pepper spray?

18    A    Yes.

19    Q    What was your reaction to being sprayed?

20    A    Significant burning of the eyes, nasal,

21 throat, tearing, runny nose, burning sensation,

22 temporary blindness so to speak.

23    Q    How long did you feel the effects of the

24 spray?

25    A    Probably about a half-hour, 40 minutes.

1    Q    I assume there was somebody there to help you

2    wash out the spray from your eyes?

3    A    Yes.

4    Q    Did you have similar emotional and

5    psychological reaction to the pepper spray as you did

6    with the taser?

7    A    No.

8    Q    So you would not mind being pepper sprayed

9    again?

10   A    Absolutely -- well, let's put it this way,

11   Counselor.  I wouldn't prefer to have either one of

12   them, but the pepper spray was burning and

13   uncomfortable, but no, it did not leave that thought in

14   my head that I gave you the example of the hot plate,

15   no.

16   Q    Fair to say you don't know what your

17   psychological or emotional reaction would be to the

18   taser in the drive stun mode since you've never

19   experienced that?

20   A    Let's say that it probably would be similar.

21   I wouldn't want to have to go through that, that's

22   number one, and number two I wouldn't want to have to go

23   through that again if it did happen.  So it would

24   probably be similar to my O.C. experience and my

25   tasering experience and -- if I were to have been drive

72

1    stunned.  Nobody wants to go through a series of painful

2    encounters if they don't have to.

3         Q    Which is part of the purpose of pain

4    compliance devices, correct?

5         A    A pain compliance is supposed to achieve

6    compliance of the officer's demands.

7         Q    In terms of repeat customers so to speak would

8    you agree that if they have experienced the taser or

9    O.C. spray that, when advised that they are about to be

10   subjected to them again, that many of these subjects

11   will in fact comply with an officer?

12        A    I wouldn't say many.  I'd say the majority --

13   most of them -- majority of them would, but there are

14   some that don't.

15        Q    Oh, absolutely.  But there are a significant

16   number who would, in fact, comply?

17        A    Yes.

18        Q    When you were with Boca did you require that

19   all officers who are going to carry pepper spray be

20   subjected to the pepper spray?

21        A    Yes.

22        Q    When you were with Boca did your officers

23   carry some form of a baton, whether it be a PR-24 or

24   straight baton?  I don't know what you used.

25        A    We required them to carry an asp.

73

1    Q    Have you ever carried an asp?

2    A    Yes.

3    Q    Are you trained in its use?

4    A    Yes.

5    Q    Have you ever been struck with an asp without

6  protective gear?

7    A    Accidentally, yes.

8    Q    In a training situation?

9    A    Yes.

10    Q    Did you require that officers under your

11  command be struck with an asp without protective gear

12  prior to being allowed to carry it?

13    A    No.

14    Q    Probably an obvious question, but why not?

15    A    Because it could possibly do some physical

16  damage to them.

17    Q    Now, have you ever actually used a taser?

18    A    No.

19    Q    Other than in training have you been present

20  when a taser was used?

21    A    Yes.

22    Q    When was that?

23    A    That would be 2005 when I had my experience

24  with the taser jolt.

25    Q    I'm sorry, other than in training.

74

1    A    Oh, I apologize.  No, no.

2    Q    Have you ever carried a taser?

3    A    No.  Chose not to.

4    Q    Who did you receive your taser training from?

5    A    Taser International.

6         Oh, I -- which time?

7    Q    Well, it sounds like your, I don't want to

8    call it real training, but your four-hour block of

9    training was in 2005.

10   A    I'm not going to argue with you, Counselor,

11   with regards to that comment, but that was training.  It

12   was not unreal training.  So -- it was certified

13   training.

14   Q    Okay.  The certified training, who did you

15   receive that from?

16   A    That would be from Tom Cicarellia.  He was a

17   captain with the Boca Raton Police Department and he was

18   trained by Taser.

19   Q    Other than the training you received from him

20   have you received any other formal training in terms of

21   how the taser works or its effects?

22   A    Yes, International Association of Chiefs of

23   Police would hold seminars, and I've attended one of

24   them.

25   Q    When did you attend that?

75

1    A    Perhaps 2004.

2    Q    Where was that?

3    A    Los Angeles.

4    Q    Was there a particular instructor for that

5  course?

6    A    There were several of them but I don't know

7  their names or who they were.

8    Q    Are you aware of any deaths that have occurred

9  as a result of using a taser in the drive stun mode?

10   A    No.

11   Q    At the time of this incident, so it would have

12 been July of 2007, were you aware of any nationally

13 accepted standards related to the use of tasers?

14   A    Yes.

15   Q    What are those standards?

16   A    The model policy created by the International

17 Association of Chiefs of Police.

18   Q    Is that the policy that you have here today?

19   A    Yes.

20   Q    Is that something you have separate in your

21 file that you can easily grab?

22   A    Yes.

23   Q    Can I just see that for a second?

24   A    Sure.

25        Take a break?

76

1          MR. SLEIGH:  Sure.

2          (Thereupon, a recess was taken, after which

3     the following proceedings were had:)

4     Q     (By Ms. Sheahan) Mr. Scott, just looking at

5     the IACP policy --

6          MR. SLEIGH:  Is that marked?

7          MS. SHEAHAN:  It's part of his file, but if

8     you want --

9          MR. SLEIGH:  Do you want to mark it just so

10    that we have a specific reference?

11         MS. SHEAHAN:  Sure.

12         MR. SLEIGH:  That would be great.

13         (Thereupon, Defendants' Exhibit 7 was marked

14    for identification.)

15    Q     (By Ms. Sheahan) All right.  Mr. Scott, we've

16    marked the IACP policy as Deposition Exhibit No. 7,

17    correct?

18    A     Yes.

19    Q     In Paragraph 2 it indicates that electronic

20    control weapons --

21         And I assume that includes tasers, correct?

22    A     Yes.

23    Q     That, "They will be used by authorized and

24    trained personnel in accordance with this use of force

25    policy and additional guidelines established herein."

1          Is there a use of force policy that the IACP

2     has?

3          A    Yes, there's a standard model policy of which

4     I don't have with me.

5          Q    That was going to be my question.

6               Did you look at that policy?

7          A    I've looked at it before in previous cases.   I

8     did not review it on this one.

9          Q    Any particular reason you did not review it in

10    connection with this case?

11         A    No.

12         Q    Other than this model policy marked Deposition

13    Exhibit 7, were you aware of any other what you would

14    call nationally accepted standards related to the use of

15    tasers at the time of this incident?

16         A    Oh, at the time of the incident?

17         Q    Yes.

18         A    No.

19         Q    Were there any other articles, case law, any

20    kind of writing that you reviewed to determine the

21    accepted standard in the field of law enforcement for

22    the use of tasers in 2007?

23         A    Any material that came out relative to the use

24    of tasers that was authored in 2007?

25         Q    That would have been in existence in 2007,

78

1    specifically July 2007.

2         A    No, I don't recall I did.

3         Q    Do you have any familiarity in terms of how

4    courts have addressed the use of tasers in the context

5    of Graham vs. Connor?

6         A    Can you be a bit more specific on that?  I

7    think each circuit has -- if I recall correctly, there's

8    case law relative to each circuit, federal -- excuse me,

9    each federal district, if I recall correctly, or one

10   federal district may opine on how the taser is utilized

11   in the use of force spectrum and another district might

12   not have an opinion on that, so to clarify your question

13   a little bit --

14        Q    Well, did you review any case law in terms of

15   how any particular court has viewed the use of taser in

16   the context of Graham vs. Connor?

17        A    Yes.

18        Q    What case law did you review?

19        A    Beaver vs. the City of Federal Way.

20        Q    What district is that case from?

21        A    Western District of Washington in Seattle.

22        Q    What year?

23        A    2007.

24        Q    Any other cases?

25        A    Graham vs. Connor, I reviewed that.

1      And by the way all of these are synopsized

2  from an article that I've used to give my opinion on

3  this, which is out of the FBI LEEDA magazine called The

4  Insighter.

5      Let's just stay with what I've just gone with.

6  Q    So you located those cases from this article?

7  A    Yes.

8      MS. SHEAHAN:  Let's mark this one, too.

9      (Thereupon, Defendants' Exhibit 8 was marked

10  for identification.)

11  Q    Mr. Scott, I'm just going to show you what's

12  been marked as Deposition Exhibit 8 and ask you if this

13  is the FBI article to which you have referred.

14  A    Yes.

15  Q    I'm sorry, what was the date of this

16  publication?

17  A    October 2008.

18  Q    So this is something that you reviewed after

19  you issued your opinion in this case; is that correct?

20  A    Yes, ma'am.

21  Q    Are there any articles or case law, other

22  writings that you reviewed to determine accepted

23  standards in law enforcement for dealing with protestors

24  in 2007?

25  A    No.

80

1      Q    Are you aware of any state which has adopted a

2  statewide standard for taser use in 2007?

3      A    No, I'm not.

4      Q    Are you aware of any state which adopted a

5  statewide standard for dealing with protestors in 2007?

6      A    No, ma'am.

7      Q    So going back to July 24th of 2007 do you

8  agree that, after warning the plaintiffs that they were

9  going to use the tasers and that the tasers were going

10 to hurt, that the officers used the tasers on the

11 plaintiffs in the drive stun mode?

12     A    Yes.

13     Q    What's your understanding as to, with respect

14 to the first time the plaintiffs were tased, how long

15 they were tased for?

16     A    I believe it was a second.

17     Q    Do you know which officer tased Mr. Crowell?

18     A    No.

19     Q    Do you know which officer tased Ms. KilMurray?

20     A    You know, off the top of my head, no, I don't.

21 At this deposition, no.

22     Q    In terms of anything in your report as to

23 which officer tased which plaintiff and for how long,

24 what would the source of your information be?

25     A    It would be the reports that I received from

81

1    Mr. Black, I believe his name was, Gordon Black, and

2    also from the Attorney General's office, and then

3    subsequent to that I received additional material from

4    Mr. Sleigh relating to the officers' reports.

5        Q    So did you also look at the officers' reports

6    in terms of determining that information?

7        A    I can't remember if it was from their reports

8    specifically.  I just know that the information was

9    within all the material that I provided you.

10       Q    I take it you would agree that when an officer

11   uses a taser by deploying the probes the result is the

12   immobilization of the subject?

13       A    Incapacitation, yes.  That's the goal.  It

14   doesn't work all the time.

15       Q    Would you agree that when an officer uses the

16   taser in the drive stun mode that it is being used as a

17   pain compliance tool?

18       A    Yes.

19       Q    Let me ask you, are you aware that there have

20   been discussions about whether there should be a limited

21   number of cycling when the taser is used in the probe

22   mode?

23       A    Yes, there has been discussions both in law

24   enforcement -- in particular law enforcement.

25       Q    Are you aware of similar discussions regarding

82

1    limiting the number of times or duration of a taser when

2    it's used in the drive stun mode?

3        A    Did you just ask that question, Counselor?

4        Q    I asked in the probe mode prior to that.

5        A    Oh, I -- okay, I'm sorry.

6            To go back to your probe mode, yes, very

7    specifically there's a policy out there that suggests no

8    more than three times that the taser should be cycled.

9    As far as the drive stun mode, no, I don't think that

10   there has been a standardized number of the number of

11   times.

12       Q    So there's no maximum number of times that a

13   taser should be used when it's in the drive stun mode?

14       A    No.

15       Q    That --

16       A    Reasonableness though is the key.

17       Q    So it would entirely depend on the

18   circumstances, would you agree?

19       A    Totally.

20       Q    Was it your experience when you were in Boca

21   that once you began using the taser injuries to officers

22   and subjects went down?

23       A    Yes, and complaints went down, although I did

24   have some officers that inappropriately used the taser.

25       Q    Have you seen any pictures or other depiction

83

1    of any wounds or injuries inflicted as a result of the

2    tasers in this case?

3        A    No.

4        Q    Are you aware of either of the plaintiffs

5    sustaining any injuries in this case?

6        A    No, I'm not aware.

7        Q    Did you ever ask that question?

8        A    I may have with Mr. Sleigh, and it's my

9    understanding there was no -- no injuries.

10       Q    Now, after the plaintiffs were tased the first

11   time, and I believe you said that was for about a

12   second, did they separate themselves from the barrel?

13       A    The female did, but it wasn't clear based on

14   testimony that I heard in the deposition whether she

15   simultaneously separated herself as she was being tased

16   again or as she was about to be tased.  It wasn't clear

17   in the deposition.  So she releases her -- from -- she

18   releases from the barrel, either just prior to the

19   second attempt to tase her or at the same time, and she

20   immediately releases.

21       Q    Before using the taser a second time would you

22   agree that the officers warned the plaintiffs that they

23   would be tased again if they didn't separate themselves

24   from the barrel?

25       A    Yes.

84

1      Q     Did the plaintiffs comply?

2      A     No.

3      Q     Do you know how long, and understanding that

4  you can't quite recall on Miss KilMurray, but how long

5  the tasers were deployed for the second time?

6      A     I think it was a couple of seconds.

7            The premise was to increase the duration of

8  the length of the cycle with each progressive use of it.

9      Q     There again do you recall which officer tased

10  which plaintiff?

11     A     As we sit here right now, no.

12     Q     But somewhere in this just before or

13  simultaneously with the second tasing your understanding

14  is that Miss KilMurray released herself; is that

15  correct?

16     A     Yes.

17     Q     Did she stand up on her own?

18     A     I don't recall.

19     Q     Do you know whether she was able to walk to

20  the police --

21     A     Oh, yes.

22     Q     -- cruiser on her own?

23     A     Yes.

24     Q     After she was taken to the police cruiser do

25  you know what attempts the officers made to remove

1  Mr. Crowell from the barrel?

2       A    Yes.

3       Q    What were those attempts?

4       A    From my recollection, they again discussed

5  with Mr. Crowell what was going to occur.  They had

6  mentioned that they were going to increase their

7  duration of the tase cycle and that, you know, you've

8  satisfied what you wanted to satisfy by being here, the

9  media has come out.

10           I think they just tried to talk him through it

11  again, and he still remained attached.

12      Q    Do you know if they made any efforts to

13  maneuver the barrel in any fashion?

14      A    Not based on the records that I have.

15           Are you referring to Mr. Crowell or the

16  police?

17      Q    That the police made some efforts to somehow

18  maneuver the barrel in some fashion.

19      A    Yes, I believe that in the beginning when they

20  were both attached to the barrel they tried to move the

21  barrel with them in there and that created some pain

22  towards the protestors.  That's the only time that I

23  recall that the barrel was -- they attempted to move the

24  barrel.

25      Q    So just to be clear you don't recall any

86

1  subsequent efforts to manipulate the barrel by the

2  officers prior to Mr. Crowell being tased a third time?

3      A    No, I don't recall that.  If it's in the

4  record, I've overlooked it or can't remember it.

5      Q    Do you agree that Mr. Crowell was warned that

6  he would be tased a third time if he did not comply with

7  the officers' request to release himself from the

8  barrel?

9      A    Yes.

10     Q    Did he comply?

11     A    No.

12     Q    Do you know how long the taser was used in the

13 drive stun mode the third time?

14     A    A couple of seconds.

15     Q    I take it you don't recall which of the

16 officers used the taser the third time?

17     A    No.  Once again I'm thinking it's perhaps Mr.

18 DiMarino, Officer DiMarino, but it could have been

19 Kirkpatrick.  It could have been.  It's obviously one of

20 those two individuals.

21          And it could have been a second; it could have

22 been a two-second.  It -- you know, the length and

23 duration of those was questionable only in the sense of

24 what the officers were saying the length was.

25     Q    What happened after the third tasing?

87

1    A    Nothing.  I don't believe that he released

2    himself, if I recall correctly.

3    Q    So what happened after the third tasing

4    attempt?

5    A    I think there was a discussion again as to

6    what was going to happen and that they were going to

7    give him a full five cycle shot of it if he did not

8    disengage.

9    Q    Was there a fourth tasing?

10    A    Yes.

11    Q    What happened after the fourth tasing?

12    A    Either -- the fourth, the fourth tasing and

13    the fifth tasing came almost around the same time.  If I

14    recall correctly one of the officers was saying that

15    they tried it either on his hand, although there's some

16    discrepancy in was it the elbow, but the bottom line is

17    his hand moved and they tased him again, and then that's

18    when he said he'd had enough.

19    Q    Did Mr. Crowell then release himself from the

20    barrel?

21    A    Yes.

22    Q    Once he released himself from the barrel,

23    what's your understanding as to whether or not he

24    cooperated with the officers?

25    A    It's my understanding that he did cooperate

88

1    with the officers.

2        Q    Do you know if he voluntarily stood up for the

3    officers?

4        A    Oh, I don't recall.

5        Q    Do you know whether he walked himself over to

6    the cruiser?

7        A    You know, I -- no, I don't recall.

8        Q    Was there anything that the officers did after

9    that last tasing with respect to Mr. Crowell in terms of

10   escorting him to the cruiser that you felt was

11   inappropriate?

12       A    No.

13       Q    Was there anything that the officers did in

14   the subsequent processing of either of the plaintiffs

15   that you felt was inappropriate?

16       A    Not to my recollection.

17       Q    Given the validity of the arrest, which you've

18   already indicated, is it your understanding that the

19   appropriate standard by which you evaluate use of force

20   would be Graham vs. Connor?

21       A    Yes.

22       Q    Would you agree that the right to make an

23   arrest necessarily carries with it the right to use some

24   degree of physical force?

25       A    Yes.

89

1    Q    Would you agree that police officers are not

2    required to use the least intrusive degree of force

3    possible to affect an arrest?

4    A    That's correct.  Only that it is reasonable.

5    Q    Let me ask you, given the fact that you have

6    two individuals who have been placed under arrest who

7    are refusing lawful commands of the police, in your view

8    is any use of force appropriate?

9    A    Given the circumstances at hand no force was

10   appropriate in this case.

11        The trespassers accomplished what they wanted

12   to accomplish based upon what has transpired, Counselor.

13   Q    So in your view absolutely no use of force was

14   appropriate in this case; is that correct?

15   A    Given the totality of circumstances, no force

16   was necessary.

17   Q    Now, it appears from your report that you are

18   of the opinion that it is appropriate to use a taser in

19   those situations in which there is active or aggressive

20   resistance.  Is that an accurate statement?

21   A    That's an accurate statement.

22   Q    Would it be accurate to define active or

23   aggressive resistance as an individual who is thwarting

24   the attempt of an officer to take them into custody?

25   A    No.

90

1    Q    If an officer was for example attempting to

2  handcuff the suspect and the suspect made an evasive

3  maneuver, would it be appropriate to use a taser in that

4  case?

5    A    It depends on what the evasive maneuver is,

6  the extent of the evasive maneuver, the type of crime

7  that the individual is being arrested for.  There's a

8  variety of other variables.

9    Q    Would you consider an evasive maneuver when an

10 officer was trying to handcuff a suspect as passive or

11 active resistance?

12   A    It all depends on how he's trying to evade the

13 officer.  Is he walking away from him?  Is he not

14 complying with the order to come forward?  Is he

15 immediately turning around to elbow the officer?  Those

16 are variables, ma'am, that you're going to have to be a

17 little bit more specific on that.

18   Q    Let's assume that when an officer is

19 attempting to handcuff the individual the individual

20 walks away.  Do you consider that to be passive or

21 active resistance?

22   A    Passive.

23   Q    Let's assume that the individual wraps himself

24 around a basketball pole.

25   A    Right.

1    Q    Would that be active or passive resistance?

2    A    Passive.

3    Q    So in your opinion would an individual

4    actually have to make some sort of gesture at the

5    officer to be active resistance?

6    A    You would have to clarify that a little bit

7    further.  A gesture could be something like that

8    (indicating), or a gesture could be a facial --

9    Q    Does there have to be physical contact between

10   an individual and an officer for there to be active

11   resistance?

12   A    Yes.

13   Q    Is a swing at an officer active or passive

14   resistance?

15   A    Active.

16   Q    What about waving one's arms?  Is that active

17   or passive resistance?

18   A    It depends on how it's used.

19   Q    So would it depend upon the view of the

20   officer who's on the scene?

21   A    It depends on the actions of the individual

22   and the officer on the scene.

23   Q    Let me ask you, would you agree that one risk

24   in not removing an arrestee from a scene is that

25   sometimes outsiders who have a close relationship with

92

1    the person who's arrested may intervene in the process

2    and the situation escalates?

3        A    It could possibly happen.

4        Q    Is it reasonable for police officers to be

5    concerned that if they don't take action to remove an

6    arrestee from the scene that other people might show up

7    and actually outnumber the police?

8        A    Given the circumstances at hand, there's no

9    indication that regardless of the amount of people that

10    were on the scene or were theoretically going to arrive

11    were violent.  So the fact that somebody shows up on the

12    scene doesn't necessarily mean that the officers have to

13    be overtly concerned that there's going to be violence

14    generated towards them.

15        Q    So do you think it's unreasonable for an

16    officer to be concerned that if, in fact, they don't

17    remove an arrestee from the scene that in fact other

18    people could arrive and they could outnumber the police?

19        A    And -- of course they could outnumber the

20    police, but what would be -- you see, now you're asking

21    me to conjecture.  Is it an unruly crowd?  Are they

22    throwing rocks and bottles?  What's the nature of the

23    crime and what is the purpose of the arrest -- not the

24    arrest, but the incident which precipitated the arrest?

25    And you have to take in a totality of circumstances

93

1  relative to that.

2          So if you have, as you have on a traffic

3  homicide scene in a particular intersection, you will

4  have -- police officers will have up to 50, 60, maybe a

5  hundred people standing around looking and milling

6  around.  Does that necessarily mean they have to call in

7  more officers because there's a crowd there?  No.

8      Q    So would you in your opinion think officers

9  should take a wait and see approach in terms of

10  assessing the temperament of the crowd once they show

11  up?

12     A    It depends on the incident that we're talking

13  about, Counselor, so I can't answer that question with a

14  correct answer.  You have to be more specific.

15     Q    What's your understanding, if any, regarding

16  whether any of the people from the first day showed up

17  during the arrest on the second day?

18     A    I think a few folks showed up from the

19  previous day.  I don't know how -- I don't have -- it's

20  not articulated clearly in the report as to how many

21  showed up.

22     Q    Did you take back those articles?

23          (Witness produces documents.)

24     Q    Thanks.

25          You mentioned that you looked at the standards

1    for CALEA, is that correct, and specifically was it

2    1.3.1?

3        A    Yes.

4        Q    Can I just see that, please?

5        A    Sure.   There you go.

6             (Witness produces documents).

7        Q    Thank you.

8             So 1.3.1 states that a written directive

9    states personnel will use only the force necessary to

10   accomplish lawful objectives; is that correct?

11       A    Yes.

12       Q    Is that the only portion of the CALEA

13   standard, 5th edition, that you looked at in connection

14   with this case?

15       A    I reviewed the entire chapter, but with

16   regards to specifically being enumerated in the policy

17   that's the one I looked at.

18       Q    What importance in your view does 1.3.1 have

19   with respect to this case?

20       A    They cited it.   I wanted to see what that

21   citation was, meaning what the standard was, and if it

22   indeed was in compliance with that particular standard.

23       Q    And your opinion with respect to whether or

24   not it complies with that particular standard?

25       A    Yes, the most recent version of it does, yes.

95

1    Q    You're talking about policies?

2    A    That's correct.  Isn't that what you were

3  asking?

4    Q    I think we got a little bit in a circle, but

5  that's okay.

6    A    Okay.  Fire away.

7    Q    Was your purpose in reviewing 1.3.1 to

8  determine whether the policy of the police department

9  complied with the CALEA standard?

10   A    Yes.

11   Q    And as I understand it from your testimony

12  just now in your opinion the 2008 policy does in fact

13  comply with the CALEA standard?

14   A    Yes.

15   Q    Did you compare the earlier policies with this

16  standard?

17   A    Yes.

18   Q    Did you have an opinion as to whether the

19  earlier policies complied with this standard?

20   A    No, the earlier policies were too vague and

21  really did not provide the direction that the -- an

22  officer would need when it involved use of force.

23   Q    Would you agree that direction, in terms of

24  use of force, is covered in training of officers?

25   A    Yes, it could be covered in training of

96

1    officers, but you'd have to take a look at what the

2    content and the lesson plan was relative to that

3    training and does it comport with state statute and

4    national standards.

5         Q    Did you review any training material in this

6    case to determine whether or not the officers were

7    trained in the use of force that complied with that

8    CALEA standard?

9         A    No, I have not.  I've asked, but I have not

10   received.

11        Q    Now, Mr. Scott, have you had any particular

12   involvement, any kind of role, with IACP?

13        A    Yes.

14        Q    Can you tell me what that's been.

15        A    Yes.  I'm a member, have been a member for

16   approximately eight years.  I am actively involved in

17   two committees with IACP.  One is the forensics

18   committee and the other committee is the crime

19   prevention committee.

20        Q    How long have you been involved with those two

21   committees?

22        A    About five and -- five years for the crime

23   prevention; about four years for the forensics

24   committee.

25        Q    Is there a use of force committee?

97

1       A    No, not to my knowledge.

2       Q    Now, I take it you're familiar with PERF?

3       A    Yes, Police Executives Research Forum, yes,

4  and I'm a member of that.

5       Q    How long have you been a member?

6       A    Approximately four or five years.

7       Q    Is PERF an organization that law enforcement

8  agencies might look to for guidance in terms of what

9  operational practices are accepted in police work?

10      A    It's a think tank, yes.

11      Q    Do you have any particular role with PERF the

12 way you do with IACP?

13      A    No, I do not..

14      Q    I think according to your report you indicate

15 that your opinions are supported by policies or

16 standards of IACP, CALEA and PERF; is that correct?

17      A    Yes.

18      Q    Did you review any other policies, standards

19 or guidelines regarding use of force or tasers in

20 formulating your opinion?

21      A    No.

22      Q    So CALEA was the 1.3.1, correct?

23      A    Yes.

24      Q    Was there any other model policy --

25           I'm sorry, CALEA was standards.  Any other

98

1    CALEA standards that you considered in reaching your

2    opinion in this case?

3         A    I'd say the whole chapter, use of force, all

4    the standards related to use of force I looked at, but

5    the bottom line is 1.3.1 is the one I focused on solely

6    because it was mentioned within the Brattleboro Police

7    Department policy.

8         Q    We've marked as Deposition Exhibit 7 the IACP

9    model policy with respect to electronic control weapons,

10   correct?

11        A    Yes.

12        Q    Is this the sole model policy that you

13   reviewed from IACP in formulating your opinion?

14        A    Yes.

15             There is no other model policy.  There is no

16   other entity that creates a model policy for law

17   enforcement.

18        Q    Mr. Scott, let me ask you, do you agree that

19   non-deadly force may be used to restrain or subdue a

20   resistant subject?

21        A    Less lethal force, yes.

22        Q    Would you agree that it's a generally accepted

23   standard for use of force that less lethal force may be

24   used to restrain or subdue a resistant subject?

25        A    I wouldn't say restrain.  Maybe you could

99

1    clarify that.  But to subdue a violently resisting

2    subject who is going to either kill or use great

3    bodily -- do great bodily harm to an individual, yes,

4    deadly force is appropriate.

5        Q    No, I'm sorry, I said non-deadly.

6        A    I'm sorry.  So repeat the question then, I'm

7    sorry.

8        Q    Okay.  Do you agree that it's a generally

9    accepted standard for use of force that - well, I

10   actually tried to use less lethal because you seemed to

11   like that term better - less lethal force --

12       A    That's the industry standard in law

13   enforcement, less lethal.

14       Q    Okay.  That that may be used to restrain a

15   resistant subject?

16       A    Actively resistant person, yes.

17       Q    So in your view is it appropriate to use a

18   taser on an actively resisting subject?

19       A    Who is physically resisting, yes, based upon

20   the totality of the circumstances.

21       Q    So I take it that it is your opinion that it

22   is not appropriate to use a taser on a passively

23   resistant subject; is that correct?

24       A    That's correct, which is also corroborated

25   through Graham vs. Connor.

100

1     Q     Would it be fair to say that the basis for

2  your opinion that the taser was excessive then and

3  inappropriate comes from your view that the plaintiffs

4  were passively resisting as opposed to actively

5  resisting?

6     A     It's very clear that they were passively

7  resisting.

8     Q     So is the answer then yes?

9     A     Yes.  Sorry.

10    Q     In your report you indicate that, "The taser

11 falls within the level of force used for individuals who

12 are actively (physically) resisting an officer by

13 thwarting his ability to arrest him/her by physically

14 pushing or punching the officer," correct?

15    A     Uh-huh.  Yes.

16    Q     So are you saying that the suspect has to make

17 actual physical contact with the officer in order to be

18 considered actively resisting?

19    A     Yes.

20    Q     And if a suspect makes physical contact with

21 the officer, then in your view is the officer entitled

22 to use a taser?

23    A     Yes, and let me clarify my previous statement.

24        The individual who's actively resisting an

25 officer does not necessarily have to physically strike

101

1    the individual, but can show that he is going to make

2    that strike.  So the officer doesn't necessarily have to

3    get punched before he can use the taser.

4            So I -- I just want to make sure we clarify

5    that.

6        Q    So in your opinion can an officer ever use a

7    taser if someone is fleeing?

8        A    It depends on the nature of the crime.

9        Q    Let's assume that it's a misdemeanor offense

10   and not --

11       A    And a misdemeanor is?

12       Q    It doesn't involve physical violence.

13           Can an officer use a taser on the suspect if

14   the suspect is fleeing the scene?

15       A    You've got to be a little bit clearer on that,

16   Counselor.  I mean, there's just so many misdemeanors.

17   It all depends on the misdemeanor.  It depends on the

18   circumstances.

19       Q    Is there a misdemeanor that you're comfortable

20   with an officer using a taser on the suspect if the

21   suspect is fleeing?

22       A    Sure.  If an individual who takes a swing at

23   somebody and has a stick misses and sees the officer and

24   the officer says freeze, halt, yeah, that would be

25   appropriate, sure, because he used some physical

102

1    violence or attempted to use some physical violence

2    towards either the officer or another individual, sure.

3        Q    So for you does the test seem to be using

4    physical violence or attempting to use physical

5    violence?

6        A    Yes, given the circumstances that you've just

7    discussed.

8        Q    So how do you define passive resistance and

9    active resistance?

10       A    Noncompliance.

11            I think I've described what active resistance

12   is.

13            The passive resistance is noncompliance:

14   Sitting down, not getting up, not listening to the order

15   of the police officer, not creating any type of a threat

16   to the officer, in conjunction with the type of crime

17   that the individual allegedly committed.  And what is

18   the immediate threat to the officer, in addition to is

19   the individual a threat to the community if he is

20   allowed to run or flee, those types of things.  Those

21   are all important in making those determinations as to

22   when to use force.

23       Q    So specifically, Mr. Scott, where did you get

24   your definitions of passive resistance and active

25   resistance?

103

1    A    Based upon my training over the course of, I

2    don't know, 30-plus years.

3    Q    Is there any particular standard that you

4    looked at, whether it be IACP, CALEA, PERF, to determine

5    what the standard is for active versus passive

6    resistance?

7    A    No, I don't have that definition here.  It's

8    based upon my 30 years of training throughout those

9    years and understanding the issue of passive resistance

10   does not involve violence or the threat of violence.

11   Q    Let's assume that the officer did not have the

12   benefit of your 30 years of experience.  Would it be

13   reasonable for an officer to turn to CALEA, IACP or PERF

14   to determine what constitutes passive resistance versus

15   active resistance?

16   A    It could very well have been, but then we have

17   the fundamental issue of failure to train by a law

18   enforcement agency to a younger officer that does not

19   have the benefit of my experience but should have had

20   that appropriate training as to define what passive

21   resistance is and what active resistance is.  That's an

22   issue that is fundamentally a problem throughout the

23   United States with law enforcement agencies, their

24   failure to train properly.

25   Q    All right.  Well, assume that I'm a trainer

104

1   and I'm going to train an officer.  Would it be

2   appropriate as a trainer to look to CALEA, IACP and PERF

3   to determine, I'm going to instruct somebody, what is

4   passive resistance and what is active resistance?

5       A    Sure, you would want them to go towards those,

6   but those are not the sole repertoire so to speak of

7   information relative to passive or resistant (sic).

8   You'd have to take a look at your state statutes.  You'd

9   have to take a look at obviously local ordinances, so on

10  and so forth.  So -- if it is there.  Sometimes they're

11  not discussed within the state statutes.

12      Q    Did you look at any Vermont state statutes

13  to --

14      A    I tried to.  I was not able to access them.

15  So for this deposition no, I did not.

16      Q    Did you look at any local ordinances?

17      A    No, I did not.

18      Q    Now, let me ask you, I assume you're aware

19  from your review of the police reports that Mr. Crowell

20  was pushing the officers away as they were attempting to

21  remove the sleeping bag from him prior to using the

22  taser; is that correct?

23      A    I didn't hear that -- I didn't read anything

24  that said that he was pushing them away.  It indicated

25  that he was trying to prevent them from getting the

105

1    sleeping bag off of them and he resisted that, tried to

2    kick them.

3        Q    Is attempting to kick an officer a form of

4    active resistance?

5        A    Yes.  In that sterile universe, yes, that

6    you've just explained.

7            And if that was indeed the case, given the

8    scenario, the -- and if the officers felt that the

9    individual was a flight risk and that he had the ability

10   to hurt them and that the crime was of such severity,

11   yeah, the officers would have been authorized to use the

12   taser in that sense, but that was not the case in this

13   situation.

14       Q    In a situation if Mr. Crowell used his arm to

15   push the officers away from him, would you consider that

16   active resistance?

17       A    No, given the fact that he had a 300-pound,

18   55-gallon drum that he was attached to and that he was

19   immobile.  There was no way that he was going to flee.

20   There was just no way.

21       Q    Let me ask you, Mr. Scott, would you agree

22   that the plaintiffs in this case signaled an intent to

23   avoid or prevent being taken into custody?

24       A    Yes.

25       Q    Now, you've also stated in your report that

106

1    the decision to use the taser in the drive stun mode was

2    not consistent with the use of force continuum concept?

3        A    Yes.

4        Q    When you use use of force continuum, what is

5    your understanding of what the use of force continuum

6    consists of?

7        A    It's a sliding scale provided for law

8    enforcement officers that provides them with the levels

9    of force and the applicable response that is occurring

10   by the individual that they are going to apply force to,

11   and that force starts as simple as presence and goes all

12   the way up to deadly force.

13       Q    What are the steps in between as you

14   understand them?

15       A    Communication after presence, soft hand, hard

16   hand controls, impact weapons, deadly weapons.

17       Q    Where would O.C. spray fall under your

18   continuum?

19       A    It falls into -- and each state has -- you

20   know, each state doesn't necessarily have a uniform use

21   of force continuum, but it falls into the level three.

22       Q    And by level three you mean what?

23       A    Hard hand.

24       Q    What about tasers?

25       A    Same thing.

107

1     Q    I assume the asp would be an impact weapon?

2     A    Yes.

3     Q    Do you know if the use of force continuum was

4     in place in Brattleboro in 2007?

5     A    Yes.

6     Q    Would it be the same continuum as you've just

7     described?

8     A    Based on what I've seen and heard in the

9     depositions, yes.

10         I have to take another break.  I'm sorry to

11    mess up, but I've got to make a phone call and go to the

12    bathroom.

13    Q    Okay.

14         (Thereupon, a recess was taken, after which

15    the following proceedings were had:)

16         MS. SHEAHAN:  Where did I leave off?

17         (Thereupon, the portion referred to was read

18    by the reporter as above recorded.)

19    Q    (By Ms. Sheahan) I think you may have already

20    stated this, Mr. Scott, but would you agree that the use

21    of force continuum can vary even among a particular

22    state?

23    A    Yes.

24    Q    In other words different agencies within a

25    state can use different continuums of force, correct?

108

1      A     Yes.

2      Q     So I take it then there's no national use of

3  force continuum that police officers follow?

4      A     No, but there's pretty much -- there are

5  parameters.  I mean, the use of force continuums are not

6  so diverse throughout the country, the ones that I've

7  seen.  They may have five steps as opposed to six, or

8  they may have seven steps as opposed to five or six.

9      Q     And they can have ladders and wheels and

10  pyramids; is that true?

11      A     I'm not understanding that, I'm sorry.

12      Q     In terms of models.

13      A     Oh, yes, yes.

14      Q     Okay.

15      A     Yes, they can.

16      Q     Now, let me ask you, in this case were the

17  officers in uniform?

18      A     Yes.

19      Q     So that would constitute officer presence,

20  correct?

21      A     Yes.

22      Q     Was officer presence enough to be successful

23  in this case?

24      A     No.

25      Q     Did the officers use verbal commands?

109

1      A      Yes.

2      Q      That would fall under, I think you term it as

3    communication; is that true?

4      A      Yes.

5      Q      Were those efforts successful?

6      A      No.

7      Q      I think you've already testified that the

8    officers attempted to separate the plaintiffs from the

9    barrel by moving it, digging out the dirt, that type of

10   thing, correct?

11     A      Yes.

12     Q      So would that be using soft hand control?

13     A      Yes.

14     Q      Was that successful?

15     A      No.

16     Q      In fact, there was really no way for the

17   officers to unlock the plaintiffs from this barrel; is

18   that correct?

19     A      No, I wouldn't say that.  It would have taken

20   a considerable amount of time and effort, but it could

21   have been done, but it would have been -- it would have

22   taken quite a while.

23     Q      Would it have exposed the plaintiffs to some

24   risk of injury to do that?

25     A      Yes.

110

1      Q    Now, when you state in your report that the

2   officers failed to utilize any other type of technique

3   to persuade the plaintiffs to comply, are you

4   disregarding officer presence?

5      A    No.

6      Q    Are you disregarding verbal commands or soft

7   hand techniques?

8      A    No.

9      Q    So --

10     A    They could have very easily have allowed the

11  individuals to remain there until they voluntarily

12  departed.

13          Which, by the way, they said they were.   It

14  just wasn't within the timeframe that the officers

15  wanted it to happen.

16     Q    So in your view should the officers just have

17  allowed them to remain on the premises until the

18  plaintiffs were prepared to leave?

19     A    Given the totality of the circumstances,

20  absolutely.   There was absolutely no need to use any

21  type of force on such a minor, minor situation,

22  misdemeanor obviously at best.   It was not creating a

23  traffic jam.   There was no threat to any individual.

24  The crime was trespass, and perhaps resisting an

25  officer's lawful order.   You know, you could go with a

1    bunch of misdemeanors on this.  But the bottom line is

2    they were nonviolent.  They had no intention to be

3    violent.  The officers wanted them to move.  They

4    weren't going to move at that particular time, and so,

5    you know, levelheadedness must come into play on some of

6    these things, and a little bit of patience would have

7    been far more appropriate than the use of a taser.  The

8    taser is not to be used on a passive resistant

9    individual.

10           And if you really want to take this one step

11   further, those individuals were handcuffed.  They were

12   cuffed, or they were tied into, through their carabiner,

13   to the barrel.  So they really weren't providing

14   anything other than a simple trespass on a vacant lot

15   during a rainy day.

16       Q    Is there any requirement that an officer

17   permit an arrestee to dictate the time and manner in

18   which they're taken into custody?

19       A    Repeat the question, I'm sorry.

20           MS. SHEAHAN:  Actually, can you just read the

21       question back.

22           (Thereupon, the portion referred to was read

23   by the reporter as above recorded.)

24       A    No.  But every circumstance is different,

25   Counselor.  Common sense is a wonderful thing, patience,

112

1    prudence.

2            And if I recall correctly, now that I

3    remember, the chief in his comments were, you know,

4    don't use any -- don't be heavy-handed with these

5    individuals.  So even the chief, with his brief meeting

6    with Lieutenant Kirkpatrick, clearly states hey, listen,

7    you know, take it as it goes and -- you know, patience

8    was the key, along with, I guess, and some common sense.

9        Q    So would you have allowed these protestors to

10   remain on the property for days?

11       A    Sure.  My contention is they've committed a

12   misdemeanor.  The landowner had no use for the property.

13   Understanding the landowner wants them off, but that

14   probably wouldn't have been days, but we don't know,

15   obviously they needed to use the facility, unless they

16   were going to defecate and urinate on themselves; they

17   were going to need some food and what have you.  Yeah,

18   days would have been -- it would have been fine.  If it

19   was my jurisdiction and that was the issue and I've got

20   a property owner that's not all over me -- and even if

21   he was all over me or she was all over me with regards

22   to I want them off the property, you've just got to use

23   common sense here.  They weren't blocking traffic and

24   they were of no harm to anybody.

25       Q    So if the property owner was coming to you and

113

1    insisting that they wanted these individuals off their

2    property, what if anything would you have done?

3         A    Exactly what I've discussed with you right

4    now.  I would have continued to do what those officers

5    were doing in the sense of cajoling, explaining to them,

6    trying to get them to use a little bit of their own

7    common sense.  Obviously time was on the side of the

8    police officers.  This was not an issue of a felony.

9    This was not an issue of community safety.

10        Q    Would you have left the officers on scene

11   until such time as the plaintiffs determined that they

12   were going to release themselves?

13        A    Sure, sure.

14        Q    And if that took days you would have left the

15   police officers there on scene for days?

16        A    Of course I would have rotated the officers

17   out there.  Sure.  Why not?  It's far less expensive

18   than what they're paying us now.

19             And I'm not trying to be a smart aleck on that

20   one, but that's -- that's pretty much the truth.

21        Q    No, I just want to understand.  So, regardless

22   of how long it took, you would have had police officers

23   staying there on the scene until the plaintiffs

24   determined that they were going to release themselves

25   from the barrel?

114

1    A    Or better yet, we could have provided them

2    with a -- some type of mandatory notice to appear, left

3    them there if they desired.   They would have eventually

4    left without having a police officer there.   And compel

5    them to come to court, or demand that they go to court.

6    You know, we have what we call a P.T.A., promise to

7    appear.   That could have been issued, if it wasn't

8    issued, and they could have been compelled to go to

9    court.

10    Q    If they ignored, and we don't have P.T.A., but

11    if they ignored the Court's direction that they show up

12    in court, what would you have the officers do?

13    A    Well, there would be a warrant for their

14    arrest I would imagine based on failure to appear.

15    Q    What, if anything, would you have had the

16    officers do if there was a warrant?

17    A    Are you talking about them still being there

18    present?

19    Q    Yes.

20    A    Oh, well, I'd probably keep them there.

21         You've got to understand that we want to place

22    into our officers the ability to make arrests and not to

23    be thwarted, but in the big global scheme, Counselor,

24    common sense has got to prevail.   They are doing nothing

25    but sitting on a piece of dirt, hurting nobody.   The

115

1    trespass is not violating anything.

2           Or, if you wanted to, you could definitely

3    make an effort to crack open that container, crack open

4    the barrel.  You could do that.  That's an option.

5      Q    But just so I'm clear in terms of, you know,

6    what your reaction would have been.

7           So, if necessary - there's a warrant issued

8    for their arrest because they failed to show up in court

9    in response to the citation - you would have still had

10   the officers remain on scene with the plaintiffs?

11     A    If I knew who they were, okay, as we do here,

12   I knew who they were, sure, that -- you know, the

13   warrant -- the warrant is a warrant, and the bottom line

14   is they could be picked up now if they were to release

15   themselves or they could be picked up later somewhere

16   down the line.

17          It's very clear that warrants are the

18   preferred method in many cases versus a physical arrest

19   on the scene, particularly when it involves felonies and

20   what have you when you do investigations.

21     Q    Would you have permitted the officers to use

22   any other level of force if there was a warrant in

23   place?

24     A    The warrant is of such a minor nature.  The

25   crime here, Counselor, is such a minor nature that I

116

1    wouldn't have expended that kind of time and effort.

2         Q    So it sounds like at least in your opinion it

3    doesn't matter if there's a warrant or not a warrant.

4    It's just that the nature of the offense in your view is

5    so trivial that it doesn't rise to the level of using

6    any force; is that correct?

7         A    That is my opinion in this, given this, the

8    totality of the circumstances, absolutely.

9              Now, mind you, the major issue here that is

10   preventing them from being physically removed is that

11   barrel full of concrete, rebar and dirt.  That has

12   made -- that is indeed the issue as to why they're not

13   being physically removed.

14        Q    Do you believe that the government has any

15   interest in arrests being made efficiently and without

16   wasting police resources?

17        A    Do they have any obligation?  Ideally that's

18   what we would like government to do but, Counselor, as

19   you can see government doesn't do it that way.  So to

20   answer your question, in the ideal world yeah, we want

21   to be efficient.  Practicality and reality, no,

22   absolutely not, we're not efficient.

23        Q    In your view that the police officers should

24   remain on scene for as long as it might take, would you

25   take into consideration that police presence may be

117

1    needed at some other event within the jurisdiction?

2        A    Sure.   I'd call in somebody for overtime.

3    Absolutely.   Understanding that given the small nature

4    of the police department, I'd definitely call somebody

5    in for overtime or call somebody in to work that

6    particular detail, obviously rotating them out if it was

7    necessary.

8        Q    Mr. Scott, what is a lesser use of force,

9    using the taser in the drive stun mode or using it with

10   the probes?

11       A    I can't answer that.   Both -- they do

12   different things.

13            If you're suggesting that the probe deployment

14   would have been appropriate versus the drive stun,

15   absolutely not.

16       Q    Not my suggestion, but just the question.

17       A    Okay.   Because it did come up by the --

18   Mr. -- Officer DiMarino that it was his suggestion that

19   they use the probe.

20       Q    But, just to be clear, the probes were not

21   used in this case; is that correct?

22       A    That is correct.

23       Q    I believe you answered this and I apologize if

24   you have, but did you review the IACP model policy on

25   use of force?

118

1      A      No, I did not.

2             May I take Exhibit 7?  May I take a look at

3      it?

4      Q      Oh, sure.

5             Does CALEA have a model policy or guidelines

6      for the use of tasers or other electronic devices?

7      A      Not that I'm aware of, and I did have a call

8      into them and I didn't get a call back.  They should,

9      but I haven't seen it and I've ordered the most recent

10     edition.  I think they're into a 6th edition.  So they

11     might have one.

12     Q      So clearly if they do it's not something that

13     you relied upon in reaching your opinion in this case?

14     A      No.

15            And the other thing with regards to CALEA

16     standards is they suggest and recommend that a policy

17     should be created for a particular topical area.  They

18     tell you what the topic is.  They don't tell you what

19     the policy should be.

20     Q      Now, you indicated in your report that your

21     opinion was supported by PERF literature, and what

22     literature from PERF did you view?

23     A      I did not get that.  I did not get that.  I

24     asked specifically from PERF information on a white

25     paper on the taser and I have not received it.  So I

119

1    apologize for that.

2        Q    So did you rely upon any material from PERF in

3    reaching your opinions?

4        A    No, with the anticipation that I was.

5        Q    Did you have in the back of your mind that you

6    thought that there was some PERF literature that did

7    support your opinion?

8        A    I was -- actually inquired with PERF and asked

9    them if they could send me any type of material that

10   they had.  It's my understanding they have some material

11   but it's limited.  But this is a topical area.  This is

12   an important area for PERF, so I would imagine that they

13   have some.

14       Q    Do you know if PERF has a model policy or

15   guidelines on use of force?

16       A    I'm not sure, no.

17       Q    Did you ask them specifically about tasers or

18   use or force or both?

19       A    Taser.

20            Actually, to set the record straight, Taser is

21   a brand name.  They -- there's agencies that use

22   electro-muscular disruption devices, or IACP uses

23   electronic control weapon.  So Taser is a model and a

24   brand.

25       Q    Right.  I'm using it more in the generic

120

1   sense.

2           Mr. Scott, just to make sure that I understand

3   your distinction with respect to active and passive

4   resistance and when a taser is appropriate for use, what

5   if you have an individual, and we kind of alluded to

6   this, but what if you have an individual who is being

7   arrested for a nonviolent misdemeanor, let's say it's a

8   driving while license suspended or something like that,

9   and in the course of escorting that individual to the

10  cruiser he breaks away and wraps himself around a

11  basketball pole, I think I used before.  Now, is that

12  active or passive resistance in your view?

13       A    It's passive resistance.

14       Q    Would it be appropriate or inappropriate for

15  an officer to use a taser on that individual if the

16  individual continued to refuse to comply with officer

17  directives to release himself from the pole?

18       A    If the officers made a physical attempt to

19  remove him from the pole and as they stripped his arm

20  off of the pole and -- the individual grabs the pole

21  back or he resists the officers attempt to keep his arm

22  off the pole, that's physical resistance, of which I

23  would think the taser would be appropriate.  He's

24  physically resisting the officer.

25       Q    What if, just so I can try to understand, what

1    if an officer stops an individual for speeding and let's

2    just say, I don't know, he doesn't have appropriate

3    documents or whatever so the officer, under state law,

4    is entitled to arrest the individual, okay, and the

5    officer is in the process of escorting the individual

6    back to the cruiser and he simply drops to the ground

7    and refuses to get up, and the officer attempts to lift

8    the individual to his feet but he's too heavy, he goes

9    limp, and the officer can't do that, and he stays on the

10   ground?

11        A     Passive resistance.

12        Q     So would it be appropriate or inappropriate to

13   use a taser on that individual?

14        A     I would say it would be inappropriate to use

15   the taser on that individual as a passive resistant

16   individual.

17        Q     Would the time period matter, if this goes on

18   for a protracted period of time, say it's 15 minutes,

19   half-an-hour?

20        A     All I can add to this, Counselor, what if it's

21   on a busy traffic side road; what if it's raining; what

22   if there's multiple accidents; what if, you know, the

23   officer's backup is two seconds away versus, you know,

24   35 minutes away?  We can what-if this to death.  All I

25   can tell you is based upon the totality of circumstances

122

1   and the mere dropping down, based upon somebody being

2   arrested, is not physical resistance.  It's passive

3   resistance.

4       Q    Do any of those outside factors, say it's a

5   busy road, say backup is coming, do those factors change

6   your view at all?

7       A    Of course.  That's why I mentioned it.  And --

8   they do.  They do play into some role.

9            For example, let's just say that they're so

10  close to the road that the individual -- the officer

11  can't pick the individual up, the individual is laying

12  there, they're so close to a major thoroughfare, and

13  that the officer is fearful that the individual or both

14  of them are going to get killed.  Using the taser in a

15  drive stun mode I would think would be defensible and

16  appropriate given that specific circumstances.

17           We can do this for another eight hours --

18      Q    We could.

19      A    -- with the what-ifs --

20      Q    We won't.  We won't.

21      A    -- with the what-ifs, Counselor, so -- I want

22  you to be aware of that.

23      Q    All right.  Let me just ask you though,

24  Mr. Scott, in the scenario that you just described, a

25  lot of traffic and everything, does the fact that

123

1    there's a lot of traffic change the suspect from a

2    passive to an active resister?

3        A    No.  I think the circumstances of the danger

4    and the inability of the officer to compel the

5    individual to do what he wants him to do --

6            And by the way, out of this scenario, is the

7    individual handcuffed?

8        Q    Yes, let's say he's handcuffed.

9        A    Okay.  So --

10       Q    So am I correct then that there are some

11   situations in which it is appropriate to use a taser on

12   a passively resisting individual?

13       A    Some, but very rare, because there's no

14   definitiveness in anything we do, and if the officer can

15   articulate his reasonable use of that force, based upon

16   the totality of the circumstances, oh, sure, sure,

17   there's always exceptions.

18           But this is not the case.  We're not talking

19   about that.  We're talking about two people chained to a

20   barrel in a vacant field just trespassing.

21       Q    I just want to be clear that there are then

22   situations when it is appropriate to use a taser on an

23   individual who is in your definition passively

24   resisting.

25       A    Based on the brief scenario that you gave me,

124

1    yes.

2         Q    And there are likely other scenarios, wouldn't

3    that be true?

4         A    I would not deny that, absolutely.

5              (Interruption in the proceedings.)

6         Q    Mr. Scott, have you consulted with anyone in

7    an effort to formulate your opinions in this case?

8         A    No.

9         Q    I apologize once again because I think you

10   answered this question, but have you seen any

11   definitions of passive and/or active resistance from

12   CALEA, IACP or PERF?

13        A    Not to my recollection.

14        Q    Did you make any attempt from those

15   organizations to find out whether there were such

16   definitions?

17        A    I don't recall, to be honest with you.

18        Q    You stole that policy away, didn't you?

19        A    Oh, I have it here.

20        Q    Can I just see it for a second.

21             (Thereupon, the request was complied with.)

22        Q    Thanks.

23             To be clear, Mr. Scott, in your opinion would

24   it also have been inappropriate for the officers to use

25   pepper spray in this situation?

125

1      A      I don't think pepper spray would have been an

2   appropriate use of force either.

3      Q      And the reasons for that?

4      A      First and foremost it's uncomfortable, as

5   we've discussed with the use of the drive stun.  It also

6   would create a logistics problem so to speak because you

7   need water and it's a long-term effect.

8          So I don't think force of any kind would have

9   been appropriate or necessary in this.

10          Are you going to take those away from me?

11      Q      No.  I just may get copies of some of them.

12          No, I won't take them away from you.

13      A      Yeah, we'll get copies.

14      Q      There are actually very few documents -- I

15   mean, I think I have most of them, but there are a few

16   of them that I probably would ask you to copy.

17          MS. SHEAHAN:  Off the record.

18          (Thereupon, a discussion was had off the

19   record.)

20      Q      Just with reference to Exhibit 7, Mr. Scott,

21   what portion of the IACP model policy did you consider

22   in terms of your opinion in this case?

23      A      Well, I considered the entire policy

24   naturally, but in particular the deployment

25   prohibitions, specifically, "It is forbidden to use the

1    device as follows," this is C(1)(a), "In a punitive or

2    coercive manner; (b) on a handcuffed or secured prisoner

3    absent overtly assaultive behavior that cannot be

4    reasonably dealt with in any other less intrusive

5    fashion;" and then, "(c) on any suspect who does not

6    demonstrate an overt intention, (1) to use violence or

7    force against the officer or other person, or (2) to

8    flee in order to resist or avoid detention or arrest (in

9    cases where officers would pursue on foot)."

10            And that is it.

11   Q    If I can just see that back for a second.

12            (Thereupon, the request was complied with.)

13   Q    With respect to those considerations,

14   Mr. Scott, in your opinion did the officers use the

15   tasers in a punitive or coercive manner?

16   A    Coercive.

17   Q    Coercive in terms of trying to get the

18   plaintiffs to comply with the officers' directives?

19   A    Yes.

20   Q    The officers had not handcuffed the

21   plaintiffs; is that correct?

22   A    No.  They did a pretty good job themselves

23   attaching themselves to the 300-pound, 55-gallon drum.

24   Q    So are you treating them as handcuffed

25   prisoners for purposes of this model policy because they

127

1   themselves had handcuffed themselves in the barrel?

2       A    That's correct, and they incapacitated

3   themselves from doing any type of violence towards the

4   officers.

5       Q    But to be clear, Mr. Scott, would you agree

6   that they were not totally incapacitated in that they

7   had it within themselves to be able to release

8   themselves from the barrel?

9       A    That's correct, but they were incapacitated --

10  there was no time that they were not incapacitated from

11  that barrel -- I mean removed from that barrel while the

12  officers were there.  There was no time until excessive

13  force was used.

14      Q    Would you agree, Mr. Scott, that there is no

15  way for the officers to know what, if anything, the

16  plaintiffs had inside the barrel?

17      A    No.

18      Q    No, you would not agree?

19           Sorry, bad question.

20      A    No, the officers did not know what was inside

21  that barrel, but none of them articulated any concern

22  relative to what was inside that barrel, i.e. did they

23  have weapons.  Their predominant concern was how are

24  they hooking themselves together.

25      Q    But you do agree that there's no way for the

128

1    officers to know what the plaintiffs had inside the

2    barrel?

3         A    That's correct, and none of the officers

4    articulated any fear of what might have been in that

5    barrel.  There was no discussion to that whatsoever.

6         Q    Mr. Scott, just in terms of your

7    interpretation of C(1)(c), the second part regarding

8    fleeing, do you interpret that to mean that this only

9    applies in cases where officers pursue on foot?

10        A    No, that is -- if I am interpreting this

11   correctly, on any suspect that does not give an overt

12   intention of fleeing or to use violence or force against

13   the officers.

14             These individuals gave no intent to flee.  As

15   a matter of fact, just the opposite.  Their intent was

16   to stay.  And so there was no need.  And based on the

17   IACP model policy it was inappropriate to taser the

18   individuals.  They were not going to flee.  They were

19   not going to use violence against the officers.

20        Q    So conversely then, Mr. Scott, does that

21   section mean that it is appropriate to use a taser on a

22   fleeing suspect?

23        A    No.  It also says -- it's also inappropriate

24   to use the taser -- it says, "To flee in order to resist

25   or avoid detention of arrest in cases where officers

129

1    would pursue on foot."

2        Q    Right.  I know what it says, but how do you

3    interpret that?

4        A    Oh, I understand.  Okay.  I missed that, that

5    they could use it on a fleeing suspect.

6        Q    I think I might be done, if it were possible

7    to get just copies of those three.  I don't have any

8    further questions.

9             MS. SHEAHAN:  David?

10            MR. SLEIGH:  None for me.

11            MS. SHEAHAN:  Thank you, Mr. Scott.

12            (Thereupon, a recess was taken, after which

13   the following proceedings were had:)

14            THE COURT REPORTER:  Mr. Scott, reading or

15       waiving?

16            THE WITNESS:  Reading.

17            THE COURT REPORTER:  Will you be ordering the

18       transcript?

19            MS. SHEAHAN:  Yes.

20            THE COURT REPORTER:  Would you like a copy?

21            MR. SLEIGH:  Yes.

22            (Thereupon, the deposition concluded at 4:15

23   p.m.)

24

25

130

1

2      RULE 1.310, FLORIDA RULES OF CIVIL PROCEDURE PROVIDES

3

4          (e)      Any changes in form or substance which the

5      witness desires to make, shall be upon the deposition by

6      the officer with a statement of the reasons given by the

7      witness for making them.

8

9      PAGE    LINE      CHANGE          REASON

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

131

1        I, ANDREW J. SCOTT, III, do hereby certify that I

2  have read the foregoing transcript of my deposition on

3  November 20, 2008; that, together with any additions or

4  corrections made herein, it is true and correct.

5

6

7

                             _____

                             ANDREW J. SCOTT, III

8

9

10

11

12        I do hereby certify that the deposition of ANDREW

13  J. SCOTT, III was submitted to the witness for reading

14  and signing; that after he/she had read and examined the

15  deposition, he/she signed the same in the presence of

16  the undersigned authority on the _____ day of

17  _____ 2008.

18

19

20

                             _____

                             Notary Public, State of

21                             Florida at Large.

                             My Commission Expires:

22

23

24

25

1          ## CERTIFICATE OF OATH

2

3

4      THE STATE OF FLORIDA    )
                               )
5      COUNTY OF PALM BEACH    )

6

7          I, the undersigned authority, certify that the

8      witness personally appeared before me and was duly

9      sworn.

10

11

12                                   _Lisa Gropper_
                               LISA GROPPER, RPR

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                     C E R T I F I C A T E

 2      STATE OF FLORIDA        )
                               )
 3      COUNTY OF PALM BEACH    )

 4          I, LISA GROPPER, Registered Professional Reporter

 5      and Notary Public in and for the State of Florida at

 6      Large;

 7          DO HEREBY CERTIFY that the foregoing transcript, to

 8      the best of my ability, is a true and complete record of

 9      the testimony given by the deponent, who was first duly

10      sworn by me; that I am neither a relative or employee

11      nor attorney nor counsel of any of the parties, nor a

12      relative or employee of such attorney or counsel, nor

13      financially interested in the action.

14          This certification is expressly withdrawn and

15      denied upon the disassembly or photocopying of the

16      foregoing transcript of the proceedings or any part

17      thereof, including exhibits, unless said disassembly or

18      photocopying is done by the undersigned Court Reporter

19      and/or under the auspices of Palm Beach Reporting

20      Service, Inc.

21          Witness my hand and official seal in Palm Beach

22      County, Florida, this 24th day of November,

23      2008.

24          LISA GROPPER                    Lisa Gropper
            MY COMMISSION # DD728082
            EXPIRES: November 18, 2011      Lisa Gropper
25          1-800-3-NOTARY  Fl. Notary Discount Assoc. Co.
                                           Registered Professional Reporter
```

1           PALM BEACH REPORTING SERVICE, INC.

              1665 Palm Beach Lakes Boulevard

2             West Palm Beach, Florida   33401

                    (561) 471-2995

3

4    November 25, 2008

5

     Andrew J. Scott, III

6    750 Elm Tree Street

     Boca Raton, Florida   33486

7

8    RE:   CROWELL VS. KIRKPATRICK

9

     Dear Mr. Scott,

10

11      This is a courtesy letter to inform you that the

12   deposition given by you on November 20, 2008 in the

13   above titled case has been transcribed and is ready for

14   your reading and signing.

15      If you will call my office any day Monday through

16   Friday, between the hours of 9:00 a.m. and 4:30 p.m. for

17   an appointment, a copy of the deposition will be

18   available for you to read and sign.

19      Thank you.

20   Sincerely,

21

22   Lisa Gropper, Court Reporter

23

24

25