.

# EXHIBIT  9

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| STEPHEN E. PARKER | * | |
| | * | |
| Plaintiff | * | |
| | * | |
| v. | * | CIVIL ACTION NO. 2:06-CV-129 |
| | * | |
| CITY OF SOUTH PORTLAND, *et al.* | * | |
| | * | |
| Defendants | * | |
| | * | |
| | * | |

## AFFIDAVIT OF JOHN RYAN

I, John Ryan, having been duly sworn, hereby depose and state as follows:

### Background/Qualifications

1. My name is John Ryan. I have been actively involved in police practices and law enforcement since 1981. I was an active police officer for twenty years. In the final year of my active career and since my retirement in June of 2002 from police services, I have been involved in police and law enforcement practices as a private consultant regarding law enforcement issues.

2. My education includes a Bachelor of Science Degree in the Administration of Justice from Roger Williams University in Bristol, Rhode Island; a Master of Science Degree in the Administration of Justice from Salve Regina University in Newport, Rhode Island and; a Juris Doctor Degree from Suffolk University Law School.

3. From 1993 until 2002 I served as an adjunct faculty member in the graduate Administration of Justice Program at Salve Regina University in Newport, Rhode Island. In that capacity I was responsible for graduate courses on

Constitutional Issues in Law Enforcement; Police Misconduct/Civil Liability; Managing Police Organizations; Contemporary Issues in the Justice Field; Juvenile Justice; Mental Health Law and; Business Crime.

4.  Since 2000, I have written ten manuals for use by police officers.  Two of these manuals are extensively used by Rhode Island Law Enforcement agencies. These manuals are:  Rhode Island Law Enforcement Officers' Guide to Criminal Procedure, 2000, and Rhode Island Law Enforcement Officers' Bill of Rights, A Guide to Investigations and Hearings, 2000.  The other eight manuals are nationally distributed by the Public Agency Training Council as materials used in conjunction with training programs for public employees.  These manuals are: Legal and Liability Issues in the Public Schools, 2001; Policy Development for Public Safety Agencies, 2002, Civil Liability and Risk Management for Law Enforcement Agencies, 2003, Use of Force, 2004, Administrative Investigations In Law Enforcement Agencies, 2004, Legal and Liability Issues for Hostage Negotiators, 2005, Public Safety Media Relations (Manual and Guide) 2005, and  Arrest Search and Seizure, 2005.

5.  I also author an annual publication for law enforcement officers titled, Case Law for Critical Tasks in Law Enforcement.  This field guide provides officers with a legal update on critical tasks such as search, seizure, use of force, pursuit, investigations and interrogations.  This guide has been adopted by agencies around the United States for use by law enforcement personnel.

6.  I am currently the co-director of the Legal and Liability Risk Management Institute along with James Alsup, G. Patrick Gallagher and Lou Reiter.  In that

2

capacity I author and edit the institute's legal update service for law enforcement.

7. As part of the Legal and Liability Risk Management Institute I also conduct policy, training and operations reviews for law enforcement agencies throughout the United States. These reviews focus on the manner is which agencies treat the critical tasks in law enforcement operations. As part of these reviews I assist agencies in identifying areas in policy, training and operations that may be improved upon to bring the agency within the legal mandates and generally accepted practices in law enforcement operations.

8. Since 1993, I have conducted numerous training sessions for public employees. Participants in this training have included law enforcement officials, school officials, attorneys and judges. I have provided training in the following areas:

      a. Policy development for public safety agencies.

      b. Legal Issues in police use of force.

      c. Legal Issues in internal affairs investigations.

      d. Police misconduct/civil liability.

      e. Legal/Liability Issues in Narcotics Operations.

      f. Arrest, Search and Seizure, & Interrogation.

      g. Racial profiling.

      h. Legal issues in public schools.

      i. Media relations for public safety agencies.

      j. Constitutional Update for law enforcement officers.

      k. Basic training for detectives.

      l.  Law enforcement officers' bill of rights/due process in administrative investigations.

      m.  Legal/Policy and decision making factors in law enforcement pursuits including use of force/intervention tactics.

      n.  Legal and Policy Issues for Hostage Negotiators.

      o.  Legal and Liability Issues for SWAT Operations

9.  I am a former police Captain of the Providence Police Department in Providence, Rhode Island where I served for twenty years before retiring in 2002. During my tenure as a police officer I served in the following capacities: patrol officer in both the Patrol Division and the Tactical Unit; a detective in the Detective Bureau; a sergeant in the Patrol Division; a lieutenant in the Patrol Division; Director of Training; Director of the Department's Office of Public Affairs and; Director of the Department's Administrative Staff. During most of my career I also took an active role in researching and authoring department policy.

10. Since my retirement in June of 2002 I have taught numerous courses on police policy and procedure, arrest, search and seizure, use of force, police pursuits, civil liability for law enforcement agencies and specialized courses for narcotics officers, SWAT commanders, and Internal Affairs officers. . Participants in these courses have come from over 2500 police departments nationally. Officers in attendance have come from departments with under ten sworn officers and departments with sworn officers numbering in the thousands.

11. This course on policy and procedure focuses on critical tasks in law enforcement and includes, inter alia, policy issues relating to use of force; police pursuits; domestic violence; sexual harassment and external sexual misconduct; off-duty conduct; hiring & retention issues; internal affairs; supervisory practices; search and seizure; property and evidence; care, custody and transport of prisoners as well as training issues relating to critical tasks in law enforcement.

12. As a co-director of the Legal & Liability Risk Management Institute I regularly research and draft policies for law enforcement agencies relating to high-risk critical tasks including use of force, arrest-search & seizure, pursuit, emergency vehicle operation, special operations, internal affairs, hiring and selection-retention of officers, care-custody-control & restraint of prisoners, sexual harassment-discrimination & sexual misconduct, domestic violence, and dealing with the mentally ill.

13. In 2002, I was a featured speaker at the national conference for the International Association of Law Enforcement Planners, which was held in Long Beach, California.

14. In 2002, I was a featured speaker at the National Internal Affairs Investigators Association conference, which was held in Tampa, Florida.

15. In 2004, I was a featured speaker at the Rhode Island Bar Association's Annual Meeting, speaking on Constitutional Issues related to Law Enforcement practices.

16. In 2005, I was a featured speaker at the National Sheriffs' Association Annual Conference, held in Louisville, Kentucky, where I presented training for legal advisors on Internal Affairs and Employee Discipline.

17. In 2005, I was a featured speaker at the annual national conference for Public Risk Managers (PRIMA) in Milwaukee where I conducted training for risk managers and attorneys representing police departments. One of the trainings involved use of force while the second covered the high liability areas in law enforcement operations to include arrest, warrants, and other issues involving search and seizure, as well as police pursuits.

18. I have been a featured speaker annually, to include the 2006 session, of Georgetown Law Center's annual §1983 Civil Rights Litigation program. I have regularly presented materials related to law enforcement policy, training and supervisory practices. In 2006 I developed and presented materials related to policy and training issues in police use of force.

19. In November of 2005, I was a featured speaker at the annual National Conference of the National Leagues of Cities & Towns in Seattle, Washington speaking on Contemporary Liability Risks for Law Enforcement Agencies.

20. In October of 2006, I was a featured speaker at the annual conference of National Internal Affairs Investigators' Association in Gatlinburg, Tennessee.

21. I have also provided lectures for attorneys on civil rights litigations relating to law enforcement operations, most recently in November of 2006 for the Georgia Bar Association's ICLE program.

22. My experience, training and background are more fully described in the attached resume. (Exhibit 1.)

**The Taser Weapon**

23. Although electronic control devices have been around since the mid 1970s, they were not widely used in the law enforcement community until recently. The Taser is one brand of electronic control devices, distributed and marketed by Taser International.

24. The Taser is a hand-held electronic control devices, which fires two barbed darts up to a distance of 21 feet. The darts remain connected to the gun by wires. The fish-hook like darts are designed to penetrate up to two inches into the target's clothing or skin and deliver a 50,000 volt shock. The shock overrides the body's central nervous system, causing total incapacitation to the body's muscles and instant collapse. *See* United States of America: Excessive and lethal force? Amnesty International's concerns about deaths and ill-treatment involving police use of tasers, Amnesty International, at 1-2, available at *www.amnesty.org/library*, attached as Exhibit 2. (The "Amnesty International Report").

**Factual Foundation**

25. I have reviewed the following materials to date regarding this case

        a.  Police Report 2005POO2754
        b.  Deposition Officer Gerrish
        c.  Deposition Sergeant Bernard
        d.  Deposition Chief Googins
        e.  Deposition Officer Caldwell
        f.  Deposition Stephen Parker
        g.  Taser Training
        h.  Officers Taser Training Records

     i.  Use of Force Policy
     j.  Taser Policy
     k.  Discipline/Complaint Policy
     l.  Performance Policy
     m. Defendants' Answers to Interrogatories
     n.  Plaintiff's Answers to Interrogatories
     o.  Use of Force Summary
     p.  Videotape of Incident
     q.  Defendants' Memorandum In Support of Summary Judgment, Statement of Material Facts, and affidavits and exhibits thereto.

26. The opinions expressed in this Affidavit are based upon the materials provided to this date. These are based upon my specialized experience, training and knowledge of police practices as well as my continued research and work with law enforcement nationally. This work includes conducting training for law enforcement around the United States as well as auditing the policies and operations of law enforcement agencies around the United States. My opinions are provided with a reasonable degree of certainty within the fields of law enforcement, police activity and police administration and supervision. I am familiar with police civil litigation and know the normal phases of discovery. With this in mind I recognize that there may be additional documentation as the case progresses.  In the event that additional material is produced I shall be prepared to supplement my opinions.

27. The events giving rise to this lawsuit began at around 7:00 p.m. on July 21st 2005 in South Portland Maine.  Officer Kevin Gerrish, while out of his vehicle, observed what he believed to be a traffic violation (speeding) being committed by the operator of a pickup truck.  The operator of this truck was the plaintiff in this case, Stephen Parker.  Officer Gerrish got into his police vehicle and caught up with the Parker vehicle on Sawyer Street where Officer Gerrish initiated a

8

traffic stop.  This stop was captured by the police vehicle's mobile video recorder (MVR), however no audio of the stop was captured.

28. The estimation of speed by Officer Gerrish was not done with a radar/laser device or through clocked speed, using a calibrated speedometer.  Officer Gerrish estimated the speed while standing outside his vehicle.  According to deposition testimony, this was the only observed conduct justifying his stop of the vehicle.

29. Once the vehicle was stopped Stephen Parker was removed from the vehicle and taken to a position between his pickup truck and the rear of Officer Gerrish's police vehicle where the events were captured on video.

30. It is clear from the video, where Parker is allowed by the officer to stand with his hands in the pockets of cargo shorts that Parker was not perceived as a threat by the officer.  At any time when an officer perceives a subject to be a threat, generally-accepted police practices are that the officer have the subject remove his hands from his pockets.

31. Officer Gerrish then conducted a field sobriety test in which it appears from the video as well as Officer Gerrish's report and testimony that Parker is compliant and attempting to cooperate with the test.

32. During the test, Officer Caldwell, who is in plainclothes, arrived at the scene and remained off to the side.

33. Following the one-legged stand phase of the field sobriety test, Parker appears, through the video, to realize that he is unable to successfully complete the test

9

and he turns toward his truck and appears to offer himself for arrest. This is backed up by the testimony of the officers.

34. At that point either Officer Gerrish or Officer Caldwell ordered Parker to turn back around so that more questions could be asked so that Gerrish could develop more evidence to support his OUI charge. Gerrish acknowledged that his only question to Parker was asking Parker to rank his own intoxication from 1-10.

35. Officer Gerrish reported that he then moved in to arrest Parker, who now was facing the officer with his arms crossed, and Parker tensed up.

36. Gerrish reported and testified that he handed his handcuffs to Officer Caldwell and he stepped back and drew his electronic control device (Taser X-26). Gerrish and Caldwell asserted that Parker was told to turn around and put his hands behind his back. Parker can be seen on the video complying with this command. The officers stated that Parker held one wrist with his opposing hand, thereby having his hands together behind his back.

37. At this point Sergeant Bernard arrived at the scene and he too drew his Taser. He testified that he drew the Taser because he observed that Officer Gerrish had his drawn.

38. Officer Caldwell was able to secure a handcuff on Parker's left hand at which point he testified that Parker tensed up and held his hands together in a manner which made it difficult to handcuff him. Officer Caldwell testified that he ordered Parker to release his hands. He acknowledged that Parker complied with this command. He acknowledged that in doing so, Parker moved his hands a couple of inches, which, although it was in response to a command, he

perceived this movement as further resistance.  Officer Caldwell, in reviewing the video during his deposition acknowledged that at video mark 07:57:39, he had Parker's left wrist cuffed, at 07:57:43, Parker's hands separate and Caldwell is attempting to cuff Parker's right wrist, at 07:57:44 Caldwell is focused on Parker's right hand; and, at 07:57:45 Parker is tased.  Thus, if the video clock is accurate, Parker moved his right hand for one-second, in response to the commands of the officer.

39. Officer Gerrish testified that he deployed his Taser because he believed that Parker's movement was threatening to Officer Caldwell.  He testified that this movement was threatening because it appeared to pull Caldwell off-balance. Officer Caldwell acknowledged in deposition testimony that Parker moved about two inches, but reported that he thought Parker was going to strike him. Officer Caldwell also acknowledged that the movement described by the officers cannot be clearly seen in the video.

40. While it outside the province of an expert to opine on credibility issues, it must be noted that a review of the video raises issues which taken on their face, are not entirely consistent with the testimony and reports of officers.  One such issue is the resistance/movement of Parker.

## Opinions

41. It is my opinion, based upon a review of the materials presented to date  as well as my specialized training, experience, background, education and my continued work with law enforcement nationally, that the actions of Officer Gerrish in

11

deploying his Taser under the circumstances he faced was inconsistent with generally accepted practices, policy, and training in law enforcement.

42. In evaluating any use of force one must utilize the three-part approach which is trained to all law enforcement officers and is utilized by agencies in reviewing use of force. First, how serious is the offense which the officer suspected at the time the force is used, second, what is the physical threat to the officer or anyone else, and finally is the subject actively resisting or attempting to evade arrest by flight.[1]

43. In this case, any offense committed by Parker (OUI) had concluded. Thus, any great need to get an intoxicated motorist off the road was diminished by the fact that Parker had been stopped. Additionally a trier of fact, reviewing the video may conclude that Parker committed no further offense in his 1 to 2 second movement in response to a police command during the handcuffing.

44. With respect to physical threat, officers are trained that they should consider things such as offender/officer size and ability. In this case, Officer Gerrish acknowledged his size advantage over Parker and clearly was not concerned as the video shows Officer Gerrish, in a non-bladed stance throughout the stop and at various points allowing Parker to stand with his hands in his pockets. Officers are trained to maintain a bladed stance so that they will not be off balance if a suspect were to assault them. Officers are also trained to consider persons present. In this case, there were three officers present and only one

---

[1] This formula is derived from *Graham v. Connor*, 490 U.S. 386 (1989) and can be found in law enforcement training lesson plans as well as Use of Force policies throughout the United States. See e.g. International Association of Chiefs of Police, Use of Force Model Policy 2005, IACP Model Policy Center, Virginia 2005.

suspect. The officers acknowledged that they did not consider Parker a threat to others. Sergeant Bernard acknowledged that he never observed any conduct that he would classify as creating an imminent risk, he merely observed resistive conduct.

45. Officers are also instructed to consider the subject's "active resistance" or any attempt to evade arrest by flight.

46. It is acknowledged in testimony that Parker was not a risk of flight. Although "active resistance" is a common term to law enforcement, Officer Gerrish indicated that he did not know or use this term. Officer Gerrish, according to testimony, was familiar with the term "passive" resistance. Agencies throughout the country regularly use these two terms to provide officers with direction on the appropriate level of force.

47. Agencies throughout the United States regularly provide officers with clear definitions of subject resistance levels so that officers will be provided with clear direction on the appropriate subject control response.

48. The decision to use a Taser to gain compliance for purposes of overcoming passive resistance is inconsistent with generally accepted practices, training and model policies related to the use of electronic control devices. See International Association of Chiefs Of Police Electronic Control Device Model Policy and Concept Paper 2005. IACP Virginia 2005 "As such, the device is prohibited from being used:

    a.      In a punitive or coercive manner.

13

b.  On a handcuffed/secured prisoner, absent overtly assaultive behavior that cannot be reasonably dealt with in any other less intrusive fashion.

c.  On any suspect who does not demonstrate their overt intention (1) to use violence or force against the officer or another person or (2) to flee in order to resist/avoid detention or arrest (in cases where officers would pursue on foot).

49. In this case, even if one credits the reports and testimony of the officers, the use of the Taser in this case, where Parker was not "overtly assaultive" would be inconsistent with generally accepted law enforcement practices.

50. Even if the trier of fact were to conclude that Parker's slight movement constituted resistance the manner in which the Taser was deployed was inconsistent with generally accepted police practices and training.

51. Chief Googins acknowledged that he was the final policy maker for the South Portland Police Department. He further acknowledged a belief that the use of the Taser/use of force, in this case was consistent with the policy of his agency.

52. The officers involved in this case, Officer Gerrish, Officer Caldwell and Sergeant Bernard, who also sits on the department's use of force review board also indicated a belief that the use of the Taser was consistent with agency policy and/or training. Sergeant Bernard testified that by department policy, any physical resistance to arrest, including non-compliance with an officer's attempt to handcuff would allow the use of a Taser.

14

53. The use of a Taser under such circumstances would be inconsistent with generally accepted practices, training, model policies and contemporary studies on the use of Taser which have been adopted by law enforcement throughout the United States. The officer's testimony setting forth the interpretation of their policy or the custom and practice of the South Portland Police Department exhibits a practice which is inconsistent with training and policy throughout the United States. This policy or custom and practice are clearly the interpretation of the final policy maker as acknowledged by the chief in his testimony.

Dated: _3/19___, 2007

_____
John Ryan        RI Lic. 7705870

STATE OF ~~MAINE~~ RI
_____, SS.

Dated: _3/19/07___, 2007

Personally appeared the above-named John Ryan and stated that the foregoing statements by him are true and correct based upon his own personal knowledge or upon information and belief.

_____
Notary Public/Attorney
Lindi Annaul
my Comm. exp. 8/9/09

John Ryan Affidavit.doc

15