# EXHIBIT  10



September 2000
Volume 69
Number 9

United States
Department of Justice
Federal Bureau of
Investigation
Washington, DC
20535-0001

Louis J. Freeh
Director

Contributors' opinions and
statements should not be
considered an endorsement by
the FBI for any policy, program,
or service.

The Attorney General has
determined that the publication
of this periodical is necessary in
the transaction of the public
business required by law. Use of
funds for printing this periodical
has been approved by the
Director of the Office of
Management and Budget.

The FBI Law Enforcement
Bulletin (ISSN-0014-5688) is
published monthly by the
Federal Bureau of Investigation,
935 Pennsylvania Avenue,
N.W., Washington, D.C.
20535-0001. Periodical postage
paid at Washington, D.C., and
additional mailing offices.
Postmaster: Send address
changes to Editor, FBI Law
Enforcement Bulletin, FBI
Academy, Madison Building,
Room 209, Quantico, VA 22135.

Editor
John E. Ott

Associate Editors
Glen Bartolomei
Cynthia L. Lewis
Bunny S. Morris

Art Director
Brian K. Parnell

Assistant Art Director
Denise Bennett Smith

Staff Assistant
Linda W. Szumilo

Internet Address
leb@fbiacademy.edu

Cover Photo
© Digital Stock

Send article submissions to
Editor, FBI Law Enforcement
Bulletin, FBI Academy, Madison
Building, Room 209, Quantico,
VA 22135.



## Features

**Myths of Underwater Recovery Operations**
By Ronald F. Becker

 **1**

*By examining some common myths about underwater recovery operations, officers can better understand the importance of these activities in solving crimes.*

**Managing Protests on Public Land**
By Thomas R. King

 **10**

*Cooperation and professionalism represent the keys to balancing the rights of protestors with the need to maintain law and order.*

**Interacting with "Cults"**
By Adam Szubin,
Carl J. Jensen, and Rod Gregg

 **16**

*Using accurate information and avoiding popular misconceptions can help law enforcement agencies deal with "cults."*

**The Americans with Disabilities Act**
By Thomas D. Colbridge

**26**

*The ADA protects both current employees and job applicants from discrimination by employers on the basis of a disability.*

## Departments

**6   Focus on Community Policing**
The Community Outreach Program

**14   Bulletin Reports**
Educational Assistance
Drug Laboratory Enforcement
Use of Force
Autoloading Pistol Tests

**25   Book Review**
Environmental Crime



# Myths of Underwater Recovery Operations

By RONALD F. BECKER, J.D.

© Mark C. Ide

As the number of people using recreational waterways increases, so do the number of accidents, drownings, and violent crimes, including homicides, that occur in such settings. This increase coupled with the influx of criminals seeking a watery repository for weapons and other evidence of wrongdoing has caused law enforcement agencies to become more involved in underwater recovery operations.[1]

Historically, fire departments provided personnel trained in search and rescue diving to the police when incidents occurred that required the retrieval of evidence submerged in water. For many years, law enforcement agencies believed that divers required no other special skills to provide this service. Agencies viewed the handling and processing of underwater evidence as nothing more than a salvage operation. Over time, however, law enforcement agencies have begun to raise questions about the wisdom of this belief. What information do they lose in the salvage process? What could investigators infer from measurements, sketches, and photographs, if not at the time of discovery, perhaps later? What parts of the story remain untold because of a failure to properly handle and package evidence, thereby preventing forensic examination? What value is salvaged material if it cannot be entered into evidence because of a failure to connect it with the defendant? These questions demonstrate that all of the resources of the investigator, criminalist, and crime laboratory could be rendered useless if evidence remains undiscovered, ignored, or contaminated.[2]



*"*

**Although generally seen as an unimportant element, first responding officers set the tenor of underwater investigations.** *"*

*Mr. Becker is an associate professor and director of the Underwater Institute at Southwest Texas State University in San Marcos, Texas.*

The concept of the underwater recovery of evidence as nothing more than a salvage operation represents a major myth that surrounds this process. While some law enforcement agencies have relegated this myth to the past, many still maintain this view. By doing so, these agencies also cling to other myths, or misconceptions, about the underwater recovery of evidence. These include the ultimate objective and composition of the dive recovery team, the forensic value of submerged evidence, the assumptions concerning accidents, and the ability to locate submerged items geographically.[3]

## DIVE RECOVERY TEAM

### Ultimate Objective

*Myth: The dive recovery team's ultimate objective is to recover a submerged item.* If agencies continue to view this process as a salvage operation, then they will conclude that the ultimate objective of dive teams is to find and recover the item sought and return it safely.

Both represent admirable objectives but remain shortsighted and a product of traditional law enforcement policy, practice, and perspective. However, convicting criminals of the unlawful acts they commit (simplistic but fundamental to scientific processing of an underwater crime scene) represents the true objective of a dive recovery team.

### Composition

*Myth: The dive team is made up of a primary diver, safety diver, line tender, on-scene commander, and others involved solely in the recovery process.* Embracing the former myth gives rise to this one. However, when agencies recognize that winning convictions constitutes the primary objective of dive recovery teams, they realize that first responders, investigators, crime laboratory personnel, and prosecutors are dive recovery team players as well.

Although generally seen as an unimportant element, first responding officers set the tenor of underwater investigations. These officers

have the responsibility of ensuring crime scene integrity and witness identification, segregation, and initial interviews; barring access by all unauthorized personnel, including the media, medical personnel, and curious bystanders; and recognizing the potential location of all forensic evidence, including routes of entry and exit, and protecting these sites. Because these officers play a pivotal role in underwater investigations, agencies should train them in the fundamentals of processing an underwater crime scene, including exactly what they must protect, and provide them with descriptions of other team members' roles.

Often, investigators, crime laboratory personnel, and prosecutors also lack an understanding of the scientific approach to processing an underwater crime scene. For example, if only divers realize that submerged evidence has as much forensic value as evidence found on land, then investigators may fail to understand the crucial steps that divers must take to preserve not only the items recovered but the need to collect water and samples of the bottom and surrounding areas as a control for laboratory analysis. Applying the concept of background contamination to underwater evidence collection demonstrates how bottom samples can allow laboratory personnel to exclude the background as the source from which any trace evidence might have originated.

## SUBMERGED EVIDENCE

### Forensic Value

*Myth: All submerged evidence is bereft of forensic value.* Often,

water serves as a preservative for forensic evidence that becomes lost only as a result of the recovery method employed, that is, salvaging. For example, in the true account of a modern murder mystery, a serologist determined that a blood specimen that was submerged for 3 years in salt water was human blood.[4] Also, investigators found fiber evidence on the body of a murder victim even though the perpetrator had disposed of the body in a river.[5] Therefore, while most submerged evidence possesses potential forensic value, all too often, investigators unknowingly overlook, contaminate, or destroy this evidence during the recovery process.

**Firearm Recovery**

*Myth: All submerged firearms are bereft of forensic value.* Firearms constitute the most neglected evidentiary item recovered from water. A variety of places exist on a firearm that may retain forensic material. For example, fingerprints often remain on protected surfaces, especially on lubricated areas, such as the magazine of a semiautomatic pistol or the shell casing of the rounds in the magazine from the individual's thumb that pushed it into the magazine. Also, if the perpetrator carried the weapon in a pocket, under an automobile seat, or in a glove compartment, the firearm could retain a variety of fibers on its sharp edges, especially on sights and magazine levers. Finally, weapons used in contact wounds may have "barrel blowback" (e.g., blood, tissue, bone, hair, or fabric) stored in the barrel of the firearm.[6] When deposited in water, a weapon

primarily fills through the barrel. The water serves as a block for any material deposited inside the barrel. The material resides there until a pressure differential (i.e., raising it to the surface) releases the water in the barrel.

Unfortunately, such critical evidence frequently is lost due to traditional recovery methods, expedience, and ignorance. If divers hold recovered firearms by the barrel and raise them over their heads as they surface, they drain the contents of the weapons and lose potentially crucial evidence. To avoid



> *...water serves as a preservative for forensic evidence that becomes lost only as a result of the recovery method....*

this, divers should package weapons in water, while in the water, and obtain a bottom sample to ensure that any fibers or other material found on the weapons are not the product of immersion.

**Vehicle Recovery**

*Myth: Submerged vehicles are simply stolen.* To resolve this myth, investigators should consider two questions. Are all stolen vehicles immediately reported as stolen? Are all crime vehicles immediately

reported as having been used in a crime? Most investigators realize that they should consider all stolen submerged vehicles as crime vehicles (i.e., stolen for use in the commission of another crime) until proven otherwise. In doing so, they can understand that the conventional recovery method (towing by the axle) seriously alters, contaminates, or destroys any evidence. What should they do instead?

Before instituting the recovery of a submerged vehicle, investigators should catalog any information that may later become important but which the recovery method may alter or destroy. Divers can conduct this cataloging process by compiling a "swim around" checklist. Divers can complete this checklist even in the worst water conditions through touch alone or other means, such as recording the vehicle identification number and license number by using a water bath (i.e., a clear plastic bag filled with water). By pressing the water-filled bag against the license plate and their masks to the other side, divers get a clear medium through which they can see the information; a camera can take a picture using the same process.[7] The "swim around" allows divers to record the location of any occupants of the vehicle; the condition of the windshield, windows, headlights, and taillights; and the contents of the glove compartment. It also helps divers determine if the keys were in the ignition and if the accelerator was blocked. This information can prove essential during the subsequent investigation of the incident.

## ACCIDENT ASSUMPTIONS

### Drownings

*Myth: All drownings are presumed accidents.* Experienced homicide investigators generally presume that all unattended deaths are murders until proven otherwise, except when they occur in the water. Many investigators have participated in the recovery of a presumed accidental drowning victim only to have some serious subsequent misgivings as to the mechanism of death. Therefore, investigators should employ the same investigatory protocol afforded deaths on land to deaths on or in the water.

By correctly processing the bodies of drowning victims, investigators can obtain a variety of forensic evidence. For example, divers should place bodies in body bags to avoid losing transient evidence, such as hair or fibers, and to ensure that any injuries that occur during the recovery process are not mistaken for wounds inflicted before death. Bagging bodies in the water reveals damage to the body bags that corresponds to injuries to the bodies that may occur during the recovery process.

Bagging bodies in the water also keeps the clothing intact. For example, shoes can contain dirt, gravel, or other debris from a prior crime scene, which may prove valuable to investigators and laboratory personnel. Because shoes become lost easily, divers should bag feet, with the shoes intact, to prevent loss and possible contamination during the recovery operation or subsequent transportation of the body to the medical examiner's office.

### Aircraft Crashes

*Myth: All air disasters are presumed accidents.* This myth coexists with another one: *Air crash disasters happen somewhere else.* Aircraft crashes can and do occur in every part of the world. Moreover, because most of the world is covered in water, many aircraft crashes occur in the water. Also, for every large commercial airliner that crashes into water (or on land), several hundred airplanes, with a seating capacity of less than 10, crash into oceans, lakes, and rivers.[8] With this in mind, jurisdictions with any type of body of water within its boundaries can recognize that they may have to conduct an underwater recovery of an aircraft. If they assume that such incidents always are accidents, they may overlook, contaminate, or destroy critical evidence that may indicate that the crash resulted from criminal intervention.

Investigators also must understand the purpose of the recovery operation in aircraft crashes. To identify passengers and to determine what caused the crash constitute the two primary purposes. However, investigators must remember that when an aircraft crashes, even in water, it generally becomes a mass of twisted, convoluted, and shredded metal, and the occupants usually have sustained massive, often disfiguring, fatal injuries.[9] Conducting underwater recoveries of such incidents requires the establishment of contingency plans before an aircraft disaster occurs. In addition, divers involved in the underwater recovery of aircraft and the victims involved in such disasters must have the necessary training and equipment to effectively carry out the operation.



*A diver negotiates the underwater obstacle course during a public safety diver's competition at Southwest Texas State University's Underwater Institute.*

**GEOGRAPHIC RETRIEVAL**

*Myth: It is not necessary or possible to locate submerged items geographically.* This myth has evolved because most underwater recovery operations occur in conditions of limited visibility. However, divers can find a 2,000-year-old submerged vessel; sketch the area where they found it; recover, label, and measure all of the pieces in relation to each other; reconstruct the vessel on land; and tell by the placement of the cargo in the hold what ports the vessel visited and in what order it visited them.[10] The techniques exist if the need does.

Situations where dive recovery teams need to employ such techniques could include an accident reconstruction where one vehicle came to rest in the water. The position of the vehicle would reveal the direction of travel as well as the approximate speed on impact. In a weapon recovery, the position of the weapon in the water may determine its relevance. If divers discover a weapon 500 yards from where a witness places the individual disposing of the weapon, some serious questions could arise about the case.

Investigators must understand the importance of properly marking and recording the location of the recovery site. Failure to do so may result in the—

- loss of the site, in the event that more than one dive is necessary, and considerable expense in time and effort in relocating the site and the evidence at the site;

- inability to orient parts of a dismantled motor vehicle,

---

vessel, or airplane, or dismembered body; or

- evidence subsequently being rendered inadmissible at the time of trial.[11]

**CONCLUSION**

For decades, many law enforcement agencies have viewed underwater recovery operations as nothing more than retrieving submerged items. In the past few years, however, the increasing number of such cases has caused some agencies to take a closer look at this idea. They have encountered several myths, or misconceptions, that have demonstrated the need for on-scene investigators to understand the complexities associated with the underwater recovery process and to no longer view it as a salvage operation.

Dispelling these myths have led agencies to appreciate the forensic value of submerged evidence, the importance of establishing contingency plans for aircraft crashes, and the effectiveness of highly skilled underwater recovery dive teams in solving crimes. Law enforcement agencies must encourage their

---

officers to see the benefits of exploring new methods of investigating underwater crime scenes and not rely solely on past policies and procedures. ✦

**Endnotes**

[1] Ronald F. Becker, *The Underwater Crime Scene* (Springfield, IL: Charles C. Thomas, 1995), 4.

[2] Ibid, 5, 119.

[3] The author uses these myths as the focus of the training he conducts at the Southwest Texas State University, Criminal Justice Department, Underwater Institute. For additional information, contact the author via e-mail at *rb08@swt.edu* or access the Institute's new Web site at *http://www.swt.edu/~rb08/*.

[4] Vincent Bugliosi, *And the Sea Will Tell* (New York: Ivy Books, 1992), 279.

[5] Harold A. Deadman, "Fiber Evidence and the Wayne Williams Trial," *FBI Law Enforcement Bulletin*, May 1984, 10-19.

[6] W.U. Spitz, *Medicolegal Investigation of Death*, 3d. ed. (Springfield, IL: Charles Thomas, 1993), 319.

[7] Based on the author's personal experience.

[8] Robert G. Teather, *Encyclopedia of Underwater Investigations* (Flagstaff, AZ: Best Publishing, 1994), 117.

[9] Ibid.

[10] Supra note 1, 3.

[11] Supra note 1, 41.

---

**Suggested Reading**

- Ronald F. Becker, *Criminal Investigation* (Gaithersburg, MD: Aspen, 2000).

- Paul C. Scotti, *Police Divers* (New York: Julian Messner, 1982).

- Eric Tackett, *Underwater Crime Scene Investigation* (Woodland, WA: Sub-Sea Services, Ltd., 1987).

- Robert G. Teather, *Encyclopedia of Underwater Investigations* (Flagstaff, AZ: Best Publishing, 1994).

# Focus on Community Policing

## The Community Outreach Program
### Putting a Face on Law Enforcement
By William Holley and Maria Fazalare



L aw enforcement agencies often suffer from image problems. At worst, the public views them as authoritarian and paramilitaristic, quick to use force, and slow to admit mistakes. At best, citizens do not really know their local law enforcement officers. Fortunately, law enforcement agencies can do something to change the public's perception of them while fighting crime through community partnerships.

For the first six decades of its history, the FBI maintained a low organizational profile. The situation began to change throughout the 1990s, and today's FBI believes that a positive relationship between a community and its law enforcement officers can fight crime as well as any multiagency task force. As a result, employees from all 56 FBI field offices are actively participating in local events.

For example, the Community Outreach Program (COP) has become one of the FBI's most successful community relations efforts. COP sends FBI employees into neighborhoods and schools to work with children as teachers, coaches, and mentors; to represent the Bureau on public occasions; and to help dispel whatever stereotypes may exist about the FBI as an aloof, secretive organization staffed with shadowy, undercover operatives.

### BACKGROUND

The FBI's Community Outreach Program began in 1990 as a pilot program in a sixth grade classroom located in a high-crime area of the District of Columbia and a youth sports team in Alexandria, Virginia. The year before, the Alexandria neighborhood had experienced a drug bust that had gone wrong, ending in a shootout between the police and the drug suspects that left two residents dead. Although not involved in the shootout, the FBI had sent a special weapons and tactics team to the site. That incident fueled anger and resentment in the community toward law enforcement in general and the FBI in particular. This neighborhood would provide a real test of any public relations initiative.

FBI staff developed a 34-segment lesson plan that focused on helping children develop strong citizenship skills. Then, FBI volunteers went into the school and began teaching thirty 11- and 12-year-old youngsters how to become junior special agents. Other FBI volunteers organized neighborhood basketball and softball teams and served as coaches. The success of this initial COP program became clear when the following spring, the parents of the children on the softball teams held an end-of-season picnic and invited the FBI volunteers as honored guests. Today, the program operates in 165 schools and has reached more than 750,000 students. In various adaptations, COP functions in every FBI field office, and it can work virtually anywhere for any law enforcement organization.

### MODEL COP

Along with FBI field offices, several divisions from FBI headquarters conduct COP activities in the Washington, DC area. Also, the FBI's Criminal Justice Information Services (CJIS) Division in Clarksburg, West Virginia, participates in COP. In July 1995, that division started the Partner in Education Program, initially with the local high school, then with the elementary school, and later a middle school.

Another high school entered the partnership in September 1998. CJIS Division staff and volunteers maintain continuing involvement with the four Partner in Education schools, offering a wide range of educational programs, providing guest speakers, and attending special events at the schools. Students from the partnership schools are always on hand at COP events. They go to the CJIS complex to serve as ushers, lead the Pledge of Allegiance, and shake hands with such special guests as FBI Director Louis Freeh and Attorney General Janet Reno. On a regular basis, they accompany CJIS Division staff to community events to help promote the anticrime, antiviolence, antidrug message.

While the Partner in Education concept serves as the foundation of the CJIS Division's COP, the program is continually expanding. Since its inception in 1995, COP has extended its coverage from a single county to an eight-county radius. Employees have developed a community service curriculum and create new programs as community organizations express a need for them. Currently, two full-time staff members organize and manage the COP calendar. The extent and scope of the program clearly demonstrate the support the CJIS Division gives the program.



**COP...can work virtually anywhere for any law enforcement organization.**

## HIGHLIGHTS OF THE CJIS COP

### The Community Fingerprinting Program

Because the CJIS Division serves as the central fingerprint repository for American law enforcement, the division's COP includes a community fingerprinting program for children throughout north central West Virginia. Student volunteers from local high schools come to the complex to receive training and practice on the inkless fingerprint system. Fingerprinting experts from the CJIS Division's Identification and Investigative Services Section provide 5 hours of training to each school team. Then the young technicians, accompanied by COP staff, travel to schools, day-care centers, shopping malls, and area fairs and festivals to fingerprint children and present

the prints to their parents for safekeeping in the event of a future emergency. To date, the high school technicians have rolled the prints of more than 13,000 area youngsters.

The easy interaction between the high school technicians and their elementary school subjects benefits both partners. After participating, some of the high school students expressed interest in pursuing a law enforcement career. Others found that they like working with the children and are considering careers in education and social services.

### The Junior Special Agent Program

The CJIS Division presents the popular FBI Junior Special Agent Program each year for fifth graders attending the local elementary school. Biweekly, guest speakers present lessons about the FBI and the role of good citizens. Participants pledge to always behave responsibly, to show respect for themselves and others, and to do their best with every task, no matter how small it may seem. FBI special agents, police officers, and other CJIS staff encourage the students to—

• be friendly and polite to others, regardless of racial, religious, or ethnic differences;

• do what they know is right, even if they feel pressured to do something wrong;

• follow all of the rules and laws intended to keep them and their communities safe; and

• learn by listening to adults or others in charge and doing what they say.

Upon completion of the academic-year-long program, the children and their parents attend a graduation ceremony at the CJIS Division complex, and the new junior special agents receive credentials and a badge following their pledge of an Oath of Duty:

*I accept the position of junior special agent for the Federal Bureau of Investigation. I promise to be a good citizen. I will obey all the laws of my country*

*and will do my best in school. I will make the right choices by remaining drug free, staying in school, and practicing nonviolent behavior in handling difficult situations.*

### The School Violence Program

The School Violence Program began as a 2-day seminar presented by experts from the FBI Academy. FBI special agents offered insight into the violent acts that have occurred nationwide in schools and communities. They also discussed common characteristics or behaviors found in youths convicted of violent crimes. More than 700 educators, student teachers, social service workers, church youth group leaders, and parents attended the program. In view of that demonstration of intense interest and concern about the topic, COP staff asked the CJIS Division's Education and Training Services Unit (ETSU) to develop a school violence presentation as a permanent part of the COP curriculum. ETSU staff members now present a 2-hour program numerous times a year to elementary, middle high, and high school faculty, as well as to college-level education students.

### The Finish First in the Race Against Drugs Program

In conjunction with the national Race Against Drugs program created by a government employee and former motor sport participant, CJIS sponsors this family-oriented event in partnership with a local auto race course. Once a year on a designated night, FBI employees and their families join other community members at the race track to promote drug awareness to area youth and adults. COP representatives distribute educational information, activity books, bumper stickers, and posters. Some lucky youngsters win autographed photos of well-known NASCAR drivers.

### The Right Choice Program

The Right Choice Program offers an adventure film featuring adolescents faced with making the right

> **[COP Programs] strengthen the bonds that keep communities safe while changing the public's perception of law enforcement....**

lifestyle choices concerning peer pressure, drugs, and crime. Following a videotape, former law enforcement officers, who now serve as ETSU training instructors, address the young people and share their firsthand accounts of crime, drugs, and violence.

### The Drug-Free America Program

This annual program targets seniors in high schools. Students attend a day-long summit on alcohol and other drug awareness at the CJIS Division Complex. Special guests, such as the head coach for West Virginia University's football team, agents from the Drug Enforcement Administration, and local emergency services personnel help promote the message. In addition, COP volunteers have provided well-attended FBI Career Days in high schools, where the focus is not so much on recruiting future law enforcement officers as delivering the message that students can accomplish any career goal with a drug-free lifestyle.

### The Fallen Officers Memorial Ceremony

The Memorial Ceremony in Honor of Fallen West Virginia Law Enforcement Officers, held each spring at the CJIS complex, fosters a sense of community pride in its law enforcement. The annual observance brings together law enforcement officers and business and community leaders from throughout the region to participate in a tribute to West Virginia's law enforcement officers who have lost their lives in the line of duty. The CJIS Division's Multimedia Productions Group plans and orchestrates the ceremony, which recently included a men's chorus, the CJIS Division Police Force Color Guard, and, of course, area students. In planning the ceremony, multimedia staff invited high school vocalists to audition for the opportunity to sing at the program honoring a 26-year-old senior trooper who had died in a duty-related traffic accident in January 1999. The winner of the audition, an 18-year-old girl, sang the hymn *Amazing Grace* for the family of the honored officer.

**New for 2000**

Safety Programs soon will become a part of the COP curriculum. Volunteers from the CJIS Division police force will plan and present the program, which will cover gun safety and other areas of interest. Internet safety represents another pressing need that COP soon will address. The CJIS Division's Professional Development and Training Unit is developing a program to help students use the Internet responsibly. Students will learn Internet etiquette and how to avoid inappropriate areas. They also will learn how to respond to improper contacts from others.

**CONCLUSION**

When law enforcement agencies reach out to the communities they serve, they strengthen the bonds that keep communities safe while changing the public's perception of law enforcement as aloof and secretive. The FBI's Criminal Justice Information Services Division represents merely one entity that recognizes the value of community outreach. The division makes all of its considerable resources, including many hours of planning, organization, time, and effort, available to its Community Outreach Program.

No one can say with certainty that the division's unstinting civic-service and public-education efforts will lead to reduced crime and violence. However, one thing seems clear: ultimately, the fight against crime, drugs, gangs, and violence can be won only when citizens and their law enforcement agencies join in cooperative partnerships to end such destructive behavior. Every law enforcement agency should invite its neighbors to join in the struggle for stronger and safer communities. ◆

*Mr. Holley serves as the community outreach program manager for the FBI's Criminal Justice Information Services Division in Clarksburg, West Virginia.*

*Ms. Fazalare is a community outreach specialist for the FBI's Criminal Justice Information Services Division in Clarksburg, West Virginia.*

## Subscribe Now

**United States Government INFORMATION**

Order Processing Code:

**\* 5902**

☐ YES, please send _____ subscriptions to:

**FBI Law Enforcement Bulletin** (FBIEB) at $23 each ($28.75 foreign) per year.

The total cost of my order is $ _____.

Price includes regular shipping & handling and is subject to change.

**Credit card orders are welcome!**
Fax your orders (202) 512-2250
Phone your orders (202) 512-1800

**Check method of payment:**

Name or title                    (Please type or print)

☐ Check payable to:  Superintendent of Documents

Company name             Room, floor, suite

☐ GPO Deposit Account ☐☐☐☐☐☐☐–☐

Street address

☐ VISA ☐ MasterCard ☐ Discover

City          State       Zip code+4

☐☐☐☐ ☐☐☐☐ ☐☐☐☐ ☐☐☐☐

Daytime phone including area code

(expiration date)

Purchase order number (optional)

Authorizing signature          10/99

Mail to:  Superintendent of Documents, PO Box 371954, Pittsburgh PA 15250-7954
**Important: Please include this completed order form with your remittance.**   *Thank you for your order!*

# Managing Protests on Public Land

By THOMAS R. KING



© PhotoDisc

**N**ational parks, forests, and other public land comprise nearly 37 percent of the land mass of the United States. While many citizens view them as vacation destinations or recreational havens, others use them as arenas to voice their political views. Indeed, demonstrations and protests often occur on public land, as citizens express their environmental concerns, such as objections to timber sales or grazing permits or the management of natural resources.

Environmental activists claim no link to any groups but rather to philosophies, concepts, and ideals, such as Earth First!, the Earth Liberation Front, and similar movements. A strong polarization often exists between environmental activists and land managers, producing situations that may become volatile.

Because the U.S. Constitution guarantees citizens freedom of speech and the right to assemble, protesters are well within their rights to gather peacefully. However, in many instances, the protests and demonstrations go too far and include acts that constitute violations of state and federal laws. For example, during the 1990s, special agents and law enforcement officers from the U.S. Forest Service, in cooperation with state and local authorities, and the FBI when appropriate, arrested and charged more than 1,000 individuals in the Pacific and Inland Northwest, mostly involving illegal acts committed during timber sale protests. In these and other protests, the acts involve predominantly nonviolent misdemeanors but occasionally include more serious violations, such as the vandalism of expensive logging equipment and assaults on officers.

The great expanse of public land combined with increasing environmental concerns means that any jurisdiction may face these protests. The expertise that Forest Service agents have developed can serve as a guide to other officers, helping them manage protests and reduce the chance of misunderstanding, litigation, and injury.

## ACTS OF ACTIVISM

Environmental activists are persistent and resourceful. They can exist at a protest site for months, going so far as constructing snow caves for habitation during inclement weather. Many of these individuals remain extremely dedicated to their causes. For example, Earth First! lives by the motto, "No Compromise for Mother Earth." The commitment these groups possess strengthens their resolve and leads

them to perform illegal acts to achieve their goal of stopping the officially sanctioned activity. These acts range from merely locking themselves to gates and thereby denying access to a timber sale area, for example, to imaginative and sophisticated lockdowns, blockages, and obstructions.[1]

The protestors may pile logs and debris onto the road to disrupt access, remove culverts from recently constructed roads, and spike trees to inhibit harvesting. More ambitious acts include locking themselves to one another or to special devices, including a "sleeping dragon," a pipe cemented into a road bed into which the protestors can lock their arms. They also may construct bipods and tripods—two or three upright logs lashed together diagonally, anchored in a road, and secured with a system of cables. The activists sit 30 feet or more above the ground on a platform at the top of the bipod or tripod. They then lock themselves to the structure with a device called a "bearclaw," two pipes welded together at a 45-degree angle.

To remove the protestors, specially trained law enforcement officers must use what is commonly called a "cherry picker" (such as those used by telephone line repairers) to lift themselves up to the bipod and then carefully remove the activist from the device. The ever-resourceful protesters bypass this strategy by placing platforms high up (often more than 100 feet) in large trees. This poses a particular problem because law enforcement's equipment cannot reach that height, and no other means exist to safely remove the activists from the

> **"**
> *A strong polarization often exists between environmental activists and land managers, producing situations that may become volatile.*
> **"**

*Recently retired, Mr. King served as the special agent in charge of the Northern Region of the U.S. Department of Agriculture's Forest Service in Missoula, Montana.*

platform. When this occurs, officers on the scene usually cut off the activists' support system by not allowing other activists to provide food and supplies.

Just as they would do during a hostage or barricade situation, law enforcement officers also negotiate with the protestors. They may bring in technical or environmental experts who explain the government's position (the trees have died and need to be cut down, for example) or provide other information to help coax the activists from the site.

## STRATEGIES FOR LAW ENFORCEMENT

Removing activists from the demonstration site represents one step in handling environmental protests. At the same time, law enforcement must implement strategies to quell protests before they turn volatile. To do so, law enforcement must remain calm and professional while working behind the scenes to garner support from the community, the media, prosecuting attorneys, and the courts.

## Prevent Altercations and Confrontations

Activists often disrupt or halt ongoing work, thereby affecting the livelihood of the workers. This causes hostility against the protesters and often leads to confrontations, which may result in repercussions for law enforcement. Following one incident, the activists filed a multimillion dollar lawsuit against the local sheriff's department and the Forest Service after loggers/contractors allegedly raided the activists' encampment, destroying property and threatening the activists. The lawsuit contends that neither the sheriff's department nor the Forest Service handled the incident responsibly. Law enforcement plays a key role in preventing such lawsuits by teaching their officers how to respond to potentially volatile protests.

## Train Officers in Self-control and Confrontation Management

Although most officers have had basic training in confrontation management, officers who respond

to protest activities should attend refresher courses. Many activists want the police to arrest them simply to gain publicity for their beliefs and causes. By their words and actions, protestors attempt to cause officers to react in an unprofessional manner and then rely on the media to exploit the behavior. Protestors may deliberately heckle and taunt officers to get them to use unnecessary force or make inappropriate comments. The entire incident may get recorded for posterity by the media or the protestors, who sometimes hide video cameras to film the reactions they provoke from law enforcement officers on the scene. By not allowing their emotions or personal beliefs to affect their actions, officers maintain the professionalism required to manage protests.

## Gain Community Support

Communities readily lend their support when the local economy depends on work on public land; however, residents in larger, more cosmopolitan communities have less of a stake in the work. In fact, in these latter areas, a sizable number of people may sympathize with the activists' cause. Accordingly, law enforcement should not condemn the cause but, rather, should denounce the illegal tactics and acts of the protestors. The agency's public information officer plays a vital role by calmly, objectively, and accurately portraying the government's position. At the same time, a good working relationship with the media can ensure that the agency receives fair and favorable news coverage.

## Get Good Press

Environmental activists depend on favorable press coverage and often attempt to influence reporters. The activists might portray the government agency as an illegal abuser of the environment. Law enforcement must have an equally good, if not better, relationship with the media to adequately counter the allegations the activists make. Thus, law enforcement agencies must appoint a competent and resourceful public information officer to accomplish the following objectives:

• provide accurate and timely information about protests and related issues to all concerned parties, including the media, without generating undue interest in and attention to the activists or compromising law enforcement operations;



> *Protestors may deliberately heckle and taunt officers to get them to use unnecessary force or make inappropriate comments.*



• monitor media reports to ensure accurate news coverage; and

• maintain accurate records, including telephone calls and contacts.

## Garner Support from Prosecuting Attorneys

Given their heavy caseloads, local, state, and federal attorneys may be somewhat reluctant to prosecute cases involving protest activities. Key law enforcement officials must establish sound relationships and open dialogue with prosecuting attorneys. In addition, ideally, one prosecutor should handle all of the cases in order to become knowledgeable of the intricacies of prosecuting these very difficult cases.

## Earn Support of the Courts

Advance notice of potentially disruptive situations in the courtroom not only will aid in security preparations but also will gain favor with the presiding judge. Generally, large numbers of fellow activists appear in the courtroom in support of the activist/defendant's trial. Their exaggerated facial expressions and hostile demeanor reflect their disdain for law enforcement, the judicial process, and any questioning of their cause or actions. They may moan and groan or make comments that interrupt court proceedings. Obviously, judges do not look favorably upon these outbursts. They may grow intolerant of such behavior and tire of seeing the same individuals in their courtroom for similar offenses. As a result, they may impose harsher sentences, including jail time and strict conditions for release or probation. Accordingly, officers can work with probation and parole officers, providing information for presentence reports that may help judges formulate appropriate sentences. For example, a sentence that prohibits a



Environmental activist occupies an 80-foot tree stand, attempting to prevent the tree's removal.

Activists place debris and obstructions in the road to stop logging operations.

Activists lock themselves to a gate with bicycle locks to make removal difficult.

defendant from returning to the protest site can help law enforcement maintain order on the scene.

## CONCLUSION

Whether they involve spotted owls in Oregon, timber in Montana, or wetlands in Florida, environmental protests occur throughout the United States. Peaceful demonstrations can quickly escalate to more serious violations of the law.

As the U.S. Forest Service has learned, managing protest activities can be intense, volatile work, requiring a balance between protecting the right for people to assemble and speak freely and enforcing the law when protesters' actions become criminal. To accomplish these goals, all affected local, state, and federal law enforcement agencies must cooperate. At the same time, law enforcement officers must develop close working relationships with the media, the community, prosecuting attorneys, and the courts.

Environmental activists show a commitment to their causes that few people can match. Dedicated, highly skilled officers performing their work in a professional manner can counter environmental protests while protecting public land for future generations. ✦

### Endnotes

[1] Investigators may want to research the motives and methods of these groups. Many have Web sites that provide important intelligence, including, for example, detailed descriptions of the devices they use to stage protests.

*The author thanks Director William F. Wasley, Law Enforcement and Investigations Division, U.S. Forest Service, for his assistance in preparing this article.*

# Bulletin Reports

## Educational Assistance for Public Safety Officers' Survivors

Administered by the U.S. Department of Justice, Bureau of Justice Assistance, the Public Safety Officers' Educational Assistance (PSOEA) Program provides financial assistance for higher education to spouses and children of public safety officers killed or permanently and totally disabled by catastrophic injuries sustained in the line of duty. This program supplements the benefits available to these families through the Public Safety Officers' Benefits (PSOB) Program. All too often, families must use the PSOB Program benefits for basic needs and have no reserves left to support the cost of higher education. However, in the aftermath of a line-of-duty tragedy, access to higher education can prove instrumental in helping families move forward. Families must use the PSOEA benefits solely to defray educational expenses, including tuition, room and board, books, supplies, and education-related fees. Currently, the allowance is $404 per month for full-time students, $304 for three-quarter-time students, and $202 for half-time students. Dependents can use the benefits for 45 months of full-time education or training or for a proportional period of time for a part-time program. For further information about the PSOEA Program, contact the Public Safety Officers' Educational Assistance Program, Public Safety Officers' Benefits Program, Bureau of Justice Assistance, 810 Seventh Street, NW, Washington, DC 20531; telephone: 1-888-SIGNL13 (744-6513); Web site: *http://www.ojp.usdoj.gov/BJA.*

## Strategic Approaches to Clandestine Drug Laboratory Enforcement

The Bureau of Justice Assistance's *Strategic Approaches to Clandestine Drug Laboratory Enforcement* Fact Sheet sets forth information on its Clandestine Laboratory Model Enforcement Program. The program provides a foundation on which other jurisdictions can design their own successful clandestine laboratory enforcement efforts. The Fact Sheet includes information on key program elements, services, training, technical assistance, resources, and results. To obtain a copy of the Fact Sheet or *Developing a Strategy for a Multiagency Response to Clandestine Drug Laboratories* monograph, contact the Bureau of Justice Assistance Clearinghouse at 800-688-4252 or access its Web site at *http://www.ojp.usdoj.gov/BJA.*

## Use of Force

*Use of Force by Police: Overview of National and Local Data* is one of a series of use-of-force publications generated by the National Institute of Justice (NIJ) and the Bureau of Justice Statistics (BJS). The report begins with an overview of what is known about police use of force, proceeds to outline what is being learned, and concludes with a proposed plan for future research. It updates two national projects: the BJS survey on police/public contact and the International Association of Chiefs of Police database project that collects use-of-force information from law enforcement agencies across the nation. In addition, the report details two local studies: one on the amount of force used in six jurisdictions and the other on police use of force and suspect resistance. It also proposes that future research should provide new knowledge to significantly increase current understanding of the problem and be policy relevant, comprehensive, and systematic. To obtain a copy of this report (NCJ 176330), contact the National Criminal Justice Reference Service at 800-851-4320 or access the NIJ Web site at *http://www.ojp.usdoj.gov/nij.*

## Autoloading Pistol Tests

Recently, the National Institute of Justice (NIJ), through its National Law Enforcement and Corrections Technology Center (NLECTC) system, published the results of autoloading pistol tests in the *NLECTC Tests Autoloading Pistols for Law Enforcement Use* bulletin. The tests were performed pursuant to the recently revised version of *Autoloading Pistols for Police Officers (NIJ Standard-0112.03, Revision A)* requirements. The bulletin lists the models tested, a summary of the test results, and those models found to comply with the NIJ requirements. To obtain a copy of this bulletin or the *National Law Enforcement and Corrections Technology Center Publications Catalog 2000* (which lists NLECTC and other government publications of interest to law enforcement, corrections, and forensics science practitioners on topics such as, communications, forensics, less-than-lethal weapons, protective equipment, and weapons and ammunition), contact NLECTC at 800–248–2742 or download the publications from JUSTNET at *http://www.nlectc.org.*

***Bulletin Reports***, a collection of criminal justice studies, reports, and project findings, is compiled by Bunny Morris. Send your material for consideration to: *FBI Law Enforcement Bulletin*, Room 209, Madison Building, FBI Academy, Quantico, VA 22135. (NOTE: The material in this section is intended to be strictly an information source and should not be considered an endorsement by the FBI for any product or service.)

# Interacting with "Cults"
## A Policing Model

By ADAM SZUBIN, J.D., CARL J. JENSEN, III, M.A., and ROD GREGG



There is a common tendency to view "cults" with a combination of mistrust and fear. Much of this hostility derives from widespread misconceptions about the nature of "cults," founded upon popular stereotypes and simple ignorance. While such misconceptions are unfortunate in the general populace, they may be dangerous when harbored by law enforcement officers charged with dealing with these groups and ensuring the safety of both "cult" members and the general public. The intent of this article is to shed light on what "cults" are and are not, to give law enforcement officers some general guidance on how to approach such movements, and to provide an illustration of how one police department successfully handled the arrival of a doomsday "cult" in its jurisdiction.[1]

In sociological terms, a "cult" may be defined as a movement that is foreign to the culture in which it lives.[2] Thus, Americans would define a "cult" as a group, generally with a religious foundation, whose beliefs and practices are unfamiliar to the majority of U.S. citizens. Many groups that Americans once thought of as "cults"—such as the early Quakers, Seventh-Day Adventists, or Mormons—have received increased recognition and acceptance and become accredited churches.[3] Other groups, such as

Zen Buddhists, which many Americans may view as "cults," represent mainstream movements in other parts of the world. Thus, defining a group as a "cult" generally has much more to do with the way society perceives the group than it does with the characteristics indigenous to the group itself.

Most scholars of religion avoid the word "cult" altogether because it carries with it a set of negative connotations: "cult" leaders are con artists; "cult" followers are brainwashed sheep; "cult" beliefs are bizarre or ludicrous; and "cult" movements are dangerous, tending toward suicide or violence.[4] These scholars instead refer to cults as "new religious movements" or "NRMs" because the majority of "cults" are young religious movements still in their first generation.[5] To avoid the negative stereotypes often associated with the word "cult," the authors will refer to these groups as new religious movements or NRMs throughout this article.

Scholars of religion have identified various characteristics that are common to NRMs. In practice, however, it proves difficult to provide a specific description of NRMs because they vary so widely, from New Age associations to Buddhist meditation groups to Christian premillennialist movements. NRMs may range in size from groups with just a handful of followers to groups with thousands of members. And, they embrace radically different doctrines, ascetic to hedonistic, from apocalyptic to utopian, and from reactionary to New Age—each with a very different attitude toward society at large.

It is critical to note at the outset that the majority of NRMs stay within the boundaries of the law.[6] Generally, the public only learns about the exceptions—NRM members' committing suicide, violently confronting law enforcement, or engaging in fraudulent financial transactions. Most NRMs, however, practice their religions peacefully,

never attracting the attention of the public, the media, or law enforcement. Regardless of this, NRMs still conjure up negative thoughts in most people's minds primarily because of some long-standing myths, or misconceptions, about such groups and their activities.

## ANALYZING COMMON MYTHS ABOUT NRMS

NRMs engender enormous amounts of fear and mistrust. And, because they ardently advocate beliefs that are unorthodox or countercultural, NRMs usually have few defenders.[7] Moreover, inaccurate or sensational media reports and misinformation spread by organizations that may have an anticult bias often provide the public with its only source of information. Finally, new religious movements themselves do not have the numbers, influence, or, perhaps, interest to change society's impressions of them.[8] Thus, despite the lack of evidence, inaccurate myths



*Mr. Szubin recently graduated from Harvard Law School.*



*Special Agent Jensen is an instructor in the Behavioral Science Unit at the FBI Academy.*



*Lieutenant Gregg serves with the Garland, Texas, Police Department.*

about NRMs persist. To reach an accurate and effective understanding of NRMs, law enforcement officers must start from a clean slate without the prejudices that can hamper effective police work.

## Brainwashing

Brainwashing stands as the most common allegation leveled against NRMs. Even the existence of brainwashing, however, is debated fiercely among behavioral scientists.[9] Clearly, in cases where movements *physically* coerce inductees (e.g., depriving members of food or preventing them from freely leaving), definite grounds exist for law enforcement concern. In the majority of instances, though, NRMs try to attract members through the same methods used by missionaries in mainstream churches or secular movements. NRM members may approach strangers or distribute pamphlets in the hope of enticing the uninitiated to attend a series of classes or lectures about the group's belief system. At these sessions, groups commonly hold extended meetings or prayer services during which they emphasize and repeat certain themes or messages. Absent illegal activity, this process is entirely legitimate. Critics should not apply the term "brainwashing" to the NRM missionary and conversion process simply because they do not approve of or understand the religion in question.

Misconceptions about brainwashing may persist because it is difficult to understand the attraction of the intensely demanding NRM lifestyle. Many people think that sane individuals never would join such a group unless they were coerced physically or mentally. People overlook, however, the enormous social and psychological rewards that NRMs can offer. Converts to NRMs may receive a sense of purpose, a moral compass, a highly structured guide for their daily behavior, and a strong sense of social identity and belonging.[10] In this respect, NRMs often seem more attractive to prospective converts than established churches, which sometimes appear to have

> ❝ ...defining a group as a 'cult' generally has... more to do with the way society perceives the group than...the characteristics indigenous to the group itself. ❞

lost their dramatic sense of revelation and urgency. For individuals who feel unfulfilled by existing outlets in their lives, spiritually adrift, or merely lonely, joining an NRM may provide a successful solution, at least temporarily. To put NRMs into context, the same individuals who join these groups might just as easily find happiness in such secular, high-intensity movements as the armed forces or the Peace Corps.

While it may prove difficult to relate to a member's absolute commitment, it remains vitally important for law enforcement officers to at least recognize the depth and sincerity of that commitment. Dismissing NRM members' beliefs as the products of brainwashing and gullibility can result in sorely inaccurate assessments of NRM officials and members and can lead to ineffective and dangerous policing.

## Con Game

NRMs often are stereotyped as con games run by opportunistic leaders.[11] Undoubtedly, some founders establish NRMs to intentionally bilk followers out of money or to unilaterally promote their own interests. More frequently, though, NRM leaders genuinely believe in their teachings, however outlandish or fantastic these seem. Such leaders or prophets will undergo great sacrifices—up to and including death—for the sake of their message, and it is dangerous for law enforcement officers to approach such leaders as if they were disingenuous con artists.

Certain practices sometimes are mistaken for indicators that leaders are insincere. For example, the fact that NRM leaders enjoy benefits or living comforts that their followers do not simply may reflect the honor that the groups attach to the leaders' positions. Similarly, groups' requirement that members turn over their assets to the movements may be prompted by a genuine attempt to promote an ascetic lifestyle among the members. Law enforcement officers should be very

## Risk Factors

Certain characteristics provide indications of a new religious movement's instability and potential for violence. While some of these factors may prove more significant than others, many may signal a marked shift in a group's attitude, orientation, or behavior toward violent activity.

- History of violent episodes or clashes with law enforcement

- Leader's past or current condition (e.g., history of violence, drug or alcohol abuse, or mental illness; increasing amounts of paranoia;[21] onset of real or perceived serious illness; or recent death)

- Any abrupt reversal of direction, whether the change appears positive or negative (e.g., stops recruiting new members or suddenly changes its message from doom to optimism)

- Recent attempts to obtain the knowledge to carry out a violent act (e.g., recruitment of military or ex-military personnel or those with knowledge of chemical/biological weapons) and intelligence gathering against specific persons, organizations, or locations

- Recent purchases of weapons, poison, or unusual amounts of drugs or drug accessories

- Training in the use of weapons and rehearsals of suicide (e.g., performing ritualistic ceremonies where members jointly consume a single food or drink)[22]

- Instances of violence within the group (e.g., child abuse, sexual abuse, ritualistic violence, violence as a form of social/religious punishment, or violence as a rite of passage)

- Setting an exact date for the imminent transformation of life on earth

- Moving the date for transformation forward, or closer to the present. Conversely, officers can view a group that pushes this date back as less of a threat.[23]

- Phrasing its prophecies or predictions in a detailed manner (e.g., the general claim that "a day will come when evil will be punished" represents less of a risk factor than the more specific claim that "a day will come when America's institutions will burn and its officials will be slain")[24]

- Envisioning an active role for the NRM in the coming transformation (e.g., predictions that "God's chosen people will be taken up," which is phrased passively, versus a prediction that "God's chosen people will shed their mortal bodies and transport themselves to heaven")

- Having the knowledge, means, and ability to carry out a plan that makes sense operationally

hesitant to assume that the leaders of NRMs are not sincere.

If officers suspect that NRM officials have improper motives, they should examine the leaders' backgrounds. Sociopaths[12] or con artists generally will not invest years trying to spread their messages and form groups without a guaranteed payoff. Officers also should remember that NRM leaders and followers may have many complex motivations for their behavior, not all of which are internally consistent. NRM leaders may manipulate others and, yet, still hold sincere religious beliefs. Thus, even if leaders display signs of sociopathic or criminal behavior, officers should not assume that these individuals are insincere about their religious beliefs. In the absence of contrary evidence, officers should assume that NRM leaders are true to their spiritual convictions.

## DETERMINING THE RISKS POSED BY AN NRM

Law enforcement officers face the extremely difficult challenge of

determining how dangerous a particular NRM may be. Such groups as Aum Shinrikyo, which released deadly sarin nerve gas into the Tokyo subway system, pose a definite threat to their communities. Others, such as Heaven's Gate in San Diego, where members killed themselves in order to "beam up" to God's flying saucer, pose a threat to themselves. The majority, the ones that the public rarely hears about, keep mostly to themselves and never bother anyone.

Fortunately, officers can turn to established organizations that provide threat assessments of NRM groups or individuals. For example, law enforcement agencies can contact the FBI's National Center for the Analysis of Violent Crime through their local FBI office and obtain a threat assessment at no cost. Also, scholars of religion often can provide valuable information regarding a group's history and belief system.

The authors have developed a risk assessment table that can be of assistance in evaluating the dangerousness of NRMs. The table divides NRM characteristics into three categories: risk factors (elements that may indicate potential danger), neutral factors (traits that may appear dangerous but in fact shed little light on a group's threat potential), and protective factors (indicators that suggest that a group is stable and not dangerous). Although mainly derived from general threat assessment guidelines, these factors are tailored to the specific attributes that officers often will encounter in NRMs.[13] These factors, however, will not offer a complete "profile" of a potentially violent group.

Rather, officers should consider the risk, neutral, and protective factors as a guide to, not a replacement for, their common sense and firsthand impressions of a specific NRM.

Officers should remember that no single factor, with the possible exception of a history of violence, will determine a group's threat potential. Groups that exhibit several risk factors may never commit violent acts, while groups with few risk factors may become dangerous. For example, NRMs may obtain and stockpile weapons for different reasons. Because most NRMs exhibit a

> **Most scholars of religion avoid the word 'cult' altogether because it carries with it a set of negative connotations....**

certain amount of paranoia, some will arm themselves to protect against an expected attack by the government, private groups, or some other perceived "enemy." Groups with this outlook are quite different from those that arm themselves specifically to embark on a violent crusade. Groups of the latter type have an "offensive" orientation, while those in the former category have a "reactive" one. Offensive groups obviously pose more of a danger to the community and to themselves than reactive groups.[14]

Officers, therefore, should try to determine a particular group's orientation and not assume that a group has violent intentions merely from the presence of weapons or another isolated risk factor.

Officers, of course, also must keep in mind the legal protections afforded to American citizens. Before taking any investigative action, departments should consult their legal representatives to ensure that officers do not violate the rights of potential subjects. Finally, and most important, officers always should exercise caution when dealing with unfamiliar NRMs.

## A CASE STUDY OF THE GARLAND, TEXAS, POLICE DEPARTMENT

Little differentiates Garland, Texas, a suburb of Dallas, from other midsized American cities. The crime rate remains low, thanks in large part to the progressive, community-oriented policing strategies employed by the Garland Police Department. Despite its openminded, modern approach to law enforcement, however, nothing prepared the department for the challenge it faced when the Chen Tao religious movement came to town.

Founded in Taiwan in 1993, the Chen Tao movement,[15] also known as the "True Way," practices a hybrid version of Buddhism and fundamental Christianity. As with some NRMs, the 150 members offer total allegiance to their lone leader.[16] They function as a single unit, and at least some members allegedly have contributed their life's savings to the group.

When the Chen Tao movement arrived in Garland in August

1997,[17] the leader announced that, on March 31, 1998, a flying saucer would land in Garland with God aboard. Coming on the heels of two highly publicized suicides involving religious groups (the Solar Temple in Switzerland and Canada and Heaven's Gate in California), the Garland Police Department understandably became concerned. What steps could the department take to ensure that the situation was resolved as peacefully as possible?

First and foremost, the Garland Police Department mobilized its resources, tasked a group of officers with planning strategy and communicating with the members, and took the lead role in coordinating the various branches of local government that the group's presence might impact. These branches included the city manager's office, the fire department, the sanitation department, child protective services (the group included about 40 children), the transportation department, and, to prepare for every contingency, the medical examiner's office. Next, the Garland Police Department devised a strategy to deal with the situation that included assessing the group's threat potential, creating a meaningful dialogue with Chen Tao officials and members, and planning for potential problems.

**Assessing the Threat**

To determine the true motivations and intentions of the group, the Garland Police Department contacted several sources, including such U.S. government entities as the FBI's National Center for the Analysis of Violent Crime, the U.S. Department of State, and the Immigration and Naturalization Service, as well as such international organizations as the Taiwanese Office of Consular Affairs and Office of Economic Affairs. The department also examined several Web sites relating to NRMs, in general, and Chen Tao, in particular. Last, the department contacted NRM experts in the academic community and developed a partnership with a professor from a local university.[18] Prior to working with this expert, the department set ground rules, including what role the expert would perform (he would serve as an advisor rather than a negotiator); what information the expert subsequently could use in research; and what statements, if any, he could make to the media.

**Creating a Meaningful Dialogue**

Law enforcement behavioral consultants and hostage negotiators have preached the doctrine of dialogue building for some time.[19] However, law enforcement agencies should consider two caveats to dialogue building.[20] First, authorities should approach NRMs only if it appears safe to do so. The second caveat concerns trust—rapport can be established only if the group feels that the department is as good as its word. Broken promises and lies will lead to a complete

---

### Neutral Factors

Because new religious movements exhibit many unfamiliar traits, it becomes difficult to distinguish between risk indicators and characteristics that appear strange but are not necessarily dangerous. Several traits common to these groups exist but are not, in and of themselves, danger signals.

- Members offer absolute and unquestioning adherence to their leader and the belief system. In the absence of other risk indicators, this does not indicate a propensity toward violence or other criminal activity. Indeed, total devotion is the hallmark of new religious movements.

- The group physically segregates itself from others. This also is a common characteristic of many new religious movements and says little about a group's attitude toward violence or suicide.[25]

- Members adopt unfamiliar customs or rituals, which may involve diet, dress, language, or family and social organization.

---

breakdown in communication. In that event, it would have been better not to have tried to establish a dialogue at all.

For the Garland Police Department, creating an ongoing dialogue with Chen Tao officials and members soon after their arrival stands as perhaps its most effective strategy in peacefully resolving a potentially dangerous situation. When the group first arrived, the department assigned a lieutenant to initiate and maintain contact with members during their stay. This officer used an open, friendly approach. He assured members that the department recognized their rights under the U.S. Constitution and stated that, in fact, it was the department's responsibility to protect these rights. The lieutenant and others met often with Chen Tao officials to discuss various newspaper articles or interviews that appeared in the media. In addition, the lieutenant provided a contact number for them to reach him on a 24-hour basis. Relations became so cordial that soon members of the department and Chen Tao were meeting every 2 weeks for dinner at a local restaurant.

The rapport between the group and the department provided many benefits. First, it established a level of trust and made Chen Tao officials and members recognize that the police were, indeed, there to help them. Garland authorities underscored this fact at every meeting or public event by reminding Chen Tao members that the department was there to protect them from individuals who might resent the group or wish to do it harm. Second, the

rapport allowed authorities to become so well acquainted with group activities that they probably would have noticed any changes that might have signaled planned violence or suicide. Finally, the rapport between the group and authorities eventually grew to the extent that officers felt comfortable asking more probing questions, such as whether the group had violent or suicidal intentions, and had confidence in their evaluations of the responses they received.



*...it is dangerous for law enforcement officers to approach...leaders as if they were disingenuous con artists.*

The department also established communication with two other groups in addition to the Chen Tao movement. The first was the community, which did not know quite what to make of the group. Its presence unsettled many Garland residents. They did not understand the group's different style of dress and behavior, and many feared violence. Throughout the group's stay, the department maintained contact with community members and informed them of investigation developments and contingency plans for the community's well-being.

The department also established an ongoing dialogue with the media. Beginning probably with Chen Tao movement's arrival in Garland, media scrutiny proved intense. Reporters and camera crews came from as far away as England, France, Germany, and China to cover the story. As with any major news-breaking event, the Garland Police Department used public information officers to deal with the media. They issued media passes, created press kits, provided interviews, and arranged such logistical considerations as parking and sanitation facilities.

**Planning for Potential Problems**

As the date approached for God's alleged arrival on earth, the Garland Police Department felt relatively certain that, even if God did not show up as planned, Chen Tao members would not resort to violence or suicide. However, the department decided not to take any chances. It set up an on-site command post and had a special weapons and tactics team available to respond if it appeared that the group would harm itself or others. The department had area child protective services on hand to care for children as necessary. In case the group released poisonous gas, the department had fire department units and paramedics on the scene and had established evacuation routes. The department also had a judge available to issue search warrants if necessary. Finally, because it feared that helicopter traffic over the area where Chen Tao members lived could pose a safety hazard, the department had requested that the

## Protective Factors

The presence of some characteristics may indicate that a new religious movement is comparatively stable or is becoming more stable and, hence, less of a danger.

- Members take practical steps to plan for the future (e.g., send their children to school, work at permanent jobs, or make medium to long-term investments in commodities or real estate).

- The group adopts bureaucratic processes that routinize its affairs (e.g., transcribes its leader's teachings to writing for dissemination or appoints a committee to handle such aspects as outreach, finances, or general management).

- When the leader dies, a more conventional style of governance, involving voting or a committee structure, replaces autocratic decision making. Often, this causes outsiders to change their opinion of the group and view it as a religious denomination or mainstream religious organization rather than a new religious movement.

---

Federal Aviation Administration restrict air traffic if necessary.

All of these plans culminated on the morning of March 31, 1998. Law enforcement officers and the citizens of Garland held their collective breaths. Time passed, and God did not arrive. The situation, however, did not end in tragedy. The Chen Tao leader announced that he obviously had misunderstood God's plans, and members quietly returned to their homes. Eventually, those members who did not return to Taiwan relocated to upstate New York to continue their vigil.

The Garland Police Department put a great deal of time and effort into peacefully resolving the Chen Tao situation. At the end of day on March 31, 1998, the department could take pride in its achievement.

## CONCLUSION

Dealing with new religious movement leaders and their followers stands as one of the most sensitive and difficult tasks that face modern law enforcement agencies. The Garland, Texas, Police Department faced the possibility of such a threat when the Chen Tao religious movement arrived in its community. To safeguard Garland residents, as well as group members themselves, the department gathered accurate information about the religious movement, established a meaningful dialogue with the group's members, mobilized community resources, and planned for the worst. By employing this kind of informed, deliberate decision making and avoiding popular misconceptions about "cults," law enforcement officers may achieve similar success with NRMs that they encounter. ✦

### Endnotes

[1] The authors gratefully acknowledge Special Agents Alan Brantley and Kenneth Lanning of the FBI's National Center for the Analysis of Violent Crime, Special Agent James Duffy, formerly of the FBI's Crisis Negotiation Unit, Drs. Anthony Pinizzotto and John Jarvis of the FBI's Behavioral Science Unit, Dr. Catherine Wessinger of Loyola University at New Orleans, Louisiana, and    Dr. James T.

Richardson of the University of Nevada at Reno, Nevada, for sharing their invaluable experience and insight.

[2] For a general discussion of cults and cult movements, see J. Gordon Melton, *Encyclopedia of American Religions*, 5th ed. (Detroit: Gale Research, 1996).

[3] See James R.P. Ogloff and Jeffrey E. Pfeifer, "Cults and the Law: A Discussion of the Legality of Alleged Cult Activities," *Behavioral Sciences and the Law*, 10, n. 9 (1992): 117, 119; and Jeffrey E. Pfeifer, "Equal Protection for Unpopular Sects," *New York University Review of Law and Society Change* 7, n. 9 (1979): 9-10.

[4] J. Dillon and J. Richardson, "The Cult Concept: The Politics of Representation Analysis," *Syzygy: Journal of Alternative Religion and Culture* 3 (Fall/Winter 1994): 185-196.

[5] For a description of structural/demographic features common to cults, see J. Gordon Melton, *Encyclopedia of American Religions*, 5th ed. (Detroit: Gale Research, 1996); and Philip Lamy, *Millennium Rage* (New York: Plenum Publishing, 1996).

[6] Supra note 2.

[7] For an analysis of negative public reactions to NRMs, see David Bromley and Anson Shupe, "Public Reaction Against New Religious Movements" in *Cults and New Religious Movements*, ed. Marc Galanter (Washington, DC: American Psychiatric Association, 1989), 305-330.

[8] However, a few groups have employed public relations workers for this purpose

(Dr. Catherine Wessinger, interview by authors, December 12, 1999).

[9] Many scholars contend that individuals cannot be "brainwashed" to act against their wills. See Miriam Karmel Feldman, "The Mind Control Myth: Is Brainwashing All Wet?" *Utne Reader* 92 (March/April 1999): 14-15; and James T. Richardson and Brock Kilbourne, "Classical and Contemporary Applications of Brainwashing Models: A Comparison and Critique," in *The Brainwashing/Deprogramming Controversy: Sociological, Psychological, Legal and Historical Perspectives*, ed. David G. Bromley and James T. Richardson (New York: Edwin Mellen Press, 1983), 29-45. Other researchers claim that NRMs effectively employ coercive mind control techniques. See Margaret Thaler Singer and Janja Lalich, *Cults in Our Midst: The Hidden Menace in Our Everyday Lives* (San Francisco: Jossey-Bass Publishers, 1995).

[10] For a discussion detailing why individuals join NRM groups, see Philip Zimbardo, "What Messages Are Behind Today's Cults?" available from *http://www.apa.org/monitor/may97/cult.html*; accessed July 13, 2000.

[11] See Saul V. Levine, "Life in the Cults" in *Cults and New Religious Movements: A Report of the American Psychiatric Association*, ed. Marc Galanter (Washington DC: American Psychiatric Association, 1989), 101-102.

[12] The term *sociopath* or *antisocial personality disorder* is a clinical diagnosis used by mental health professionals. For law enforcement purposes, sociopaths generally are totally self-centered individuals who lack a conscience, do not display remorse for their actions, and do not learn from their mistakes. Law enforcement professionals spend a great amount of time dealing with these individuals, who some believe are responsible for most of the criminal acts committed in society. For further information, see *The Sociopath—A Criminal Enigma* (undated) produced by the FBI's Behavioral Science Unit.

[13] For dangerousness typologies relating to militia and extremist groups, see James E. Duffy and Alan C. Brantley, "Militias: Initiating Contact," *FBI Law Enforcement Bulletin*, July 1997, 22-26; Anthony J. Pinizzotto, "Deviant Social Groups," *Law and Order*, October 1996, 75-80; and Catherine Wessinger, "Presentation to the FBI, June 7, 1999"; available from *http://www.loyno.edu/~wessing*; accessed July 13, 2000. Also, the authors gained valuable information from numerous personal dialogues with Special Agent Alan Brantley.

[14] However, if an armed group perceives law enforcement behavior as threatening, even a reactive group could respond with violence or suicide.

[15] This movement originated nearly 40 years ago and grew out of a quasi-academic group known as the Research Group of Soul-Light, which had as many as 3,000 members. The present leader, formerly a sociology professor at Chianan College of Pharmacology and Science in Taiwan, reorganized the group around the revelation concerning God's appearance on earth that he received in 1993. See Matthew Goff, "An Historical Overview of the Chen Tao"; available from *http://www.channel1.com/users/tdaniels/Articles/72-history.html*; accessed July 13, 2000.



> *Officers should remember that no single factor, with the possible exception of a history of violence, will determine a group's threat potential.*

[16] While loyalty to leaders represents an enduring stereotype associated with NRMs, it may vary from group to group. (Dr. James T. Richardson, interview with authors, December 29, 1999).

[17] The group first arrived in the United States in 1996 in San Dimas, California. The leader moved the group to Texas upon alleged instructions from God. The members chose Garland because it sounded to them like "Godland." See Ted Daniels, "Chen Tao and Rationalization of Failure"; available from *http://www.channel1.com/users/tdaniels/Articles/71-chentao.html*; accessed July 13, 2000.

[18] Dr. Lonnie Kliever supplied a great deal of beneficial information to the Garland Police Department. For his perspective, see Lonnie Kliever, "Meeting God in Garland: A Model of Religious Tolerance," *Nova Religio: The Journal of Alternative and Emergent Religions* 3, n. 1 (October 1999): 45-53.

[19] For the benefits and strategies of communicating with militia groups, see James E. Duffy and Alan C. Brantley, "Militias: Initiating Contact," *FBI Law Enforcement Bulletin*, July 1997, 22-26; and Anthony J. Pinizzotto, "Deviant Social Groups," *Law and Order*, October 1996, 75-80.

[20] See the previous section on determining risks of NRMs.

[21] A certain amount of paranoia is normal among NRM leaders. However, high degrees of paranoia or an increasingly paranoid outlook should raise a red flag. For an in-depth analysis of paranoia in groups, see Robert Robins and Jerrold M. Post, *Political Paranoia: The Psychopolitics of Hatred* (New Haven, CT: Yale University Press, 1997).

[22] This illustrates why officers must use their common sense and establish a dialog in interacting with NRM members. While eating and drinking common food and beverages may serve as a rehearsal for suicide, it may act instead as an integral part of a group's religious practices. In Christianity, for instance, parishioners consume wine and bread routinely as part of Communion ceremonies. Law enforcement personnel may, at some point, have to evaluate the purposes of such acts; the best way to do this may be merely to ask group members about it.

[23] A good investigative strategy would include determining whether the group in question has fixed upon other dates in the past. If so, how did it respond when those dates passed? A group that has bounced back from past disappointments is less likely to self-destruct upon arriving at its next unfulfilled prophecy. Precedents exist for dates marking God's return to pass without incident. Groups can easily explain God's failure to return by claiming that he changed his mind or did return but only "believers" could see him.

[24] To protect freedoms of speech and religion, law enforcement agencies should consult their legal advisors before collecting and scrutinizing groups' publications, pronouncements, Web sites, or other material.

[25] For a discussion of the circumstances under which physical isolation may assist in propelling a group toward violence, see Kevin M. Gilmartin, "The Lethal Triad: Understanding the Nature of Isolated Extremist Groups," *FBI Law Enforcement Bulletin*, September 1996, 1-5.

# Book Review



**Environmental Crime: Evidence Gathering and Investigative Techniques** *by Steven C. Drielak, Charles C. Thomas, Springfield Illinois, 1998.*

Environmental crime investigation presents a most unique challenge for law enforcement today. The criminal environmental investigator—a new breed of law enforcement officer—must have extensive training and experience in the environmental sciences and remain familiar with criminal investigative techniques, as well. The author confirms this by illustrating these requirements needed by all investigators.

In the first chapters, the author emphasizes training, equipment, safety, and resources—all necessary for a successful prosecution. Because new investigators may find it difficult to adjust to processing environmental crimes versus traditional criminal investigations, the chronology of the text prioritizes the important information in an easy-to-read format.

For example, the section on hazardous waste explains the protocol in collecting evidence and processing the crime scene. Additionally, the author emphasizes the importance of understanding the laws and rules of evidence in planning environmental investigations.

Later chapters break down specific elements of the search warrant, covering everything from developing probable cause to post-search debriefing. Search warrants remain an effective, necessary, and familiar tool for all law enforcement officers; however, search warrants for environmental crimes are extremely complex and scientific and demand absolute precision in their planning and execution. The author demonstrates his understanding of the requirements by systematically describing the different procedures used to serve an environmental crime search warrant.

The author also discusses the specific functions of various personnel involved in serving the warrant. For example, the case agent or crime scene coordinator remains the key person who supervises all personnel associated with the warrant. In addition to performing the task of drafting and ultimately executing the warrant, this individual must demonstrate the strong leadership skills needed to effectively manage the large number of people involved in the process.

Proper training remains another important responsibility for the investigator, especially when collecting samples of hazardous waste. The author discusses different sampling options and procedures and protocol and helps the investigator recognize the importance of remaining properly trained and prepared. Concise paragraphs explain very specific issues investigators must consider when sampling hazardous waste. This section also includes information important to all personnel involved in the investigation.

The author of *Environmental Crime* has produced a comprehensive handbook for both the novice and experienced environmental crimes investigator. This book provides essential guidelines to follow in collecting evidence and investigating environmental crimes.

Reviewed by
Michael A. Hardee
State Attorney Investigator
Jacksonville, Florida



# The Americans with Disabilities Act

By THOMAS D. COLBRIDGE, J.D.

July 2000 marked the tenth anniversary of the passage of an important piece of legislation—the Americans with Disabilities Act (ADA).[1] Congressional findings set out in the preamble of the act clearly demonstrate the need to protect the disabled from discrimination.[2] While the primary concern of this article is employment provisions of the ADA, the act as a whole deals with broader issues: discrimination against the disabled in the areas of education, transportation, communications, recreation, institutionalization, health services, voting, and access to public services.[3]

The vast majority of Americans would agree with eliminating discrimination against people with disabilities. At the same time, few laws have created as much confusion and concern among employers, both public and private, as the ADA. The legal issues raised by the ADA are certainly complex. Many lawyers now dedicate their entire practice to litigating ADA issues, and court dockets are increasingly filled with cases raising difficult legal questions about the act.

This article is the first in a series that will explore the basic concepts underlying the ADA and discusses the origins of the ADA, its enforcement, who must comply with its provisions, and the concept of "essential functions" of the job. Subsequent articles will focus on issues of who is protected by the act, the obligation of "reasonable accommodation," defenses available to employers faced with ADA claims, and the impact of the ADA

on the hiring process. The goal of the series is to provide police employers and managers with sufficient information to permit them to know when they are facing ADA issues and how to avoid common pitfalls created by the legislation.

## Guidance on the Meaning of the ADA

There are four sources of guidance on the meaning of the ADA. Obviously, the first is the statute itself. In definitional sections,[4] Congress defines many of the important terms it uses in the act. The act also specifies certain acts of employers that are considered discriminatory.[5]

The second source of guidance are two statutes previously passed by Congress, the Civil Rights Act of 1964 (Title VII)[6] and the Rehabilitation Act of 1973.[7] Title VII prohibits discrimination against certain protected classes of people in the exercise of a broad range of rights, including employment rights. The ADA and Title VII prohibit many of the same employment practices and practically have the same remedies for violations. The Rehabilitation Act is Congress' first attempt to address employment discrimination against people with disabilities. The Rehabilitation Act does not cover the private sector or entities not receiving federal funding. However, it remains an important source of protection for federal employees and those working for federal contractors. The ADA adopts many concepts from the Rehabilitation Act. Because of the relationship of the ADA to these prior statutes, many of the administrative rulings and court decisions regarding Title

> **"Understanding who is a 'qualified individual' for purposes of the ADA has not been easy for employers or courts. "**

*Special Agent Colbridge is a legal instructor at the FBI Academy.*

VII and the Rehabilitation Act serve as guidance for those charged with administering and interpreting the ADA.

Another source of guidance regarding the ADA is the Equal Employment Opportunities Commission (EEOC). The EEOC was created by Congress in the Civil Rights Act of 1964.[8] Congress has given the EEOC broad authority to interpret and enforce the provisions of the ADA. In that role, the EEOC has issued regulations[9] and interpretive guidance.[10] The regulations and interpretive guidance are intended to offer advice to employers and regulators regarding issues arising under the ADA, in the absence of definitive legislative action or court rulings on issues argued in actual cases.

The courts have the final word on the ADA. They are increasingly called upon to interpret the meaning of the language of the statute in cases alleging discrimination. While courts are free to, and often do, look for guidance from the

EEOC, they are not compelled to do so and often disagree with EEOC regulations and guidance.[11]

## How is the ADA Enforced?

The EEOC is charged with the responsibility of administering and enforcing the ADA.[12] A person with a disability may file a complaint of discrimination with the EEOC, or the commission itself may file a charge in cases where it sees discrimination but no complaint has been filed.[13] An agency investigation will then be made.[14] The EEOC has broad investigative power, including the authority to subpoena witnesses and evidence.

If the commission determines that discrimination does not exist, it will dismiss the claim.[15] That does not end the matter for the complainant, however. The complainant still has the right to sue the employer in spite of the commission's dismissal of the claim.[16]

Where the commission determines that there is reasonable cause to believe discrimination has

occurred, it will attempt to resolve the problem through conciliation.[17] If conciliation efforts fail, the commission itself may bring a civil action against the respondent, unless the respondent is a government, governmental agency, or political subdivision.[18] In cases where the respondent is a government, governmental agency, or political subdivision, the statute reserves the decision to pursue remedies to the Attorney General. Even where the commission decides that there is a case of discrimination and proceeds with conciliation or civil remedy, the individual suffering the discrimination is still permitted to sue the respondent in court unless the complainant agreed to a negotiated settlement.

## Who Must Comply with the ADA?

The reach of the ADA is extremely broad. By its terms, the ADA prohibits acts of discrimination against qualified people with disabilities by a "covered entity," which the statute defines as an employer, employment agency, labor organization, or joint labor-management committee.[19] An "employer" is any one or more individuals, governments, governmental agencies, political subdivisions, labor unions, partnerships, associations, or corporations that in some way affect commerce and has 15 or more employees.[20] Literally, all but the smallest employers (and the U.S. government, Indian tribes, and tax-exempt membership clubs)[21] must comply with the ADA.

There is currently a debate in legal circles whether Congress violated the Eleventh Amendment[22] to the Constitution when it made states and state units (state police and state universities, for example) subject to the ADA. The U.S. Supreme Court has broadly interpreted the Eleventh Amendment to mean that states generally cannot be sued by individuals except where their immunity has been lawfully waived by the states themselves or lawfully abrogated by Congress.[23] Federal Circuit Courts of Appeals have disagreed on whether the ADA lawfully abrogated the states' sovereign immunity.[24] The Supreme Court recently agreed to hear two cases raising the question,[25] but subsequently dismissed them when the parties to the cases reached settlements.

> **The EEOC has broad investigative power, including the authority to subpeona witnesses and evidence.**

Even if the Supreme Court decides in the future that Congress did not lawfully abrogate state sovereign immunity in the ADA, it would not mean that states and their units are no longer bound by the provisions of the ADA. It would simply mean that the federal courts could not hear cases in which individual plaintiffs allege that a state or state unit discriminated against them on the basis of their disability. States would still be bound by the ADA's prohibition of discrimination against people with disabilities, but the federal courts would not be the forum in which these individuals could make ADA claims against states. Private plaintiffs alleging discrimination could still seek redress for violations of the ADA by the actions of a state employer in state courts where the state has consented to such suits, or waived sovereign immunity by enacting its own statute prohibiting such discrimination.[26] The individual plaintiff could join claims under both the state statute and the ADA, and the state court would have to resolve both.[27] In any event, the Eleventh Amendment does not forbid enforcement of the ADA by the United States in a lawsuit against a state or state unit.[28]

## Who Is Protected by the ADA?

The ADA prohibits discrimination against a "...qualified individual with a disability because of the disability...."[29] This protection extends not only to current employees of covered entities, but also to people with disabilities who apply for employment at a covered entity.[30]

Understanding who is a "qualified individual" for purposes of the ADA has not been easy for employers or courts. Determining who qualifies for ADA protection must start with the language of the statute itself.

The ADA defines a qualified individual as "...an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of

the employment position that such individual holds or desires."[31] Consequently, to claim ADA protection, a person must demonstrate he or she is otherwise qualified for the position, has a disability, and is able to perform the essential functions of the job held or desired, with or without reasonable accommodation by the employer.

**The Qualified Person**

The ADA does not create a statutory preference for people with disabilities. An employer is not required to hire an unqualified disabled person, or even a less qualified disabled person if a more qualified nondisabled person is competing for the same position. The purpose of the ADA is to ensure that disabled persons are given the same employment opportunities as the nondisabled, not to give them an advantage.[32]

Determining if a person with a disability is otherwise qualified under the ADA is a two-step process.[33] The first step is to determine if that person "satisfies the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc."[34] An employer is permitted under the ADA to use such qualification standards if they are "job related and consistent with business necessity,"[35] or if the qualification is mandated by law or regulation.[36] It would be absurd to require an employer to hire someone for a CPA position who has no training as a CPA, just because the applicant is disabled. Similarly, a police department is not mandated by the ADA to consider a person with a disability for the position of

police officer when the applicant has not complied with state mandated certification requirements. Consequently, courts have upheld employers' decisions to not hire people with disabilities who lacked the requisite high school diploma,[37] the government security clearance,[38] or the commercial driver's license,[39] where those qualifications are essential to the performance of the job, or mandated by law.

The EEOC has made it clear that qualification standards will not be considered reasonable unless they clearly apply to the job under consideration (i.e., are job related) and they judge only qualifications necessary to perform the essential functions of that job (i.e., are a matter of business necessity).[40]

The second step in the inquiry regarding qualification under the ADA is whether the otherwise-qualified disabled person is able to perform the essential functions of

the position held or sought, with or without reasonable accommodation. A subsequent article will discuss reasonable accommodation. Suffice it to say here that the ADA imposes a duty upon the employer to accommodate the disability of an otherwise-qualified disabled person if that accommodation can be made without creating an undue hardship on the employer.[41]

Employers must obviously know what the essential functions of a particular position are if they are to make informed decisions about an otherwise-qualified disabled person's ability to perform them, and defend those decisions in court should the need arise.[42] However, defining the essential functions of a job is more art than science. The ADA offers little guidance. It merely says that "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a



written description before advertising or interviewing for the job, this description shall be considered evidence of the essential functions of the job."[43]

Regulations issued by the EEOC are more helpful. They state that essential functions include only fundamental, not marginal, job functions.[44] The regulations go on to set out several reasons for considering a job function essential: the position exists to perform that particular function; there are a limited number of employees to whom the function can be given; or the position is so specialized that the employees were hired because of their expertise or ability to perform it.[45] In deciding whether a function is essential to the job, the EEOC recommends that the following factors be considered: the employer's judgment; written job descriptions; the amount of time spent performing the function; the consequences of not requiring the function to be performed; collective bargaining agreements; and the experience of the job incumbent or incumbents in similar positions.[46]

The wise manager should take the time to identify the essential functions of all positions in his or her organization. For the police manager, some of the work of identifying essential functions of a police officer has been done by the courts. For example, case law has established that firing a weapon and making forcible arrests are essential functions of a police officer.[47] Driving is also essential,[48] as well as evidence collection.[49] This list is obviously not exhaustive. Logically, officers must also be able to

testify in court, communicate with victims and witnesses, and read and write reports. Physical functioning also is crucial to officers—they must be able to see, hear, walk, run, jump, climb fences, or crouch. Taking the time to meticulously identify these essential functions prior to advertising open positions can save time and money if a claim under the ADA arises.

> ...courts have upheld employers' decisions to not hire people with disabilities who lacked... qualifications... essential to the performance of the job....

Some employers are confused concerning application of the essential function concept of the ADA. They have argued that because employees cannot perform the essential functions of their *current* positions, they are not protected by the ADA. However, the ADA protects people with disabilities who can perform the essential functions of their current or *desired* position. If employees cannot perform their current essential functions, the ADA may impose an obligation on the employer to reasonably accommodate those employees with a disability by offering them another

position in the organization that they can perform.[50]

**Conclusion**

Most employers in America today are affected by the Americans with Disabilities Act. The statute protects both current employees and job applicants from discrimination by employers on the basis of a disability. However, it is not a preferential statute. The ADA does not require that employers protect individuals with disabilities who are otherwise unqualified because they lack job-related education requirements, skills, or legally mandated certifications, or even those who are less qualified than other job seekers. It also offers no protection to people with disabilities who are unable to perform the essential functions of the jobs for which they hold or apply.

As a first step toward compliance with the ADA, employers should review the job descriptions of positions in their organizations. They should ensure that all of the essential functions of the position are identified. They should then ensure that all of the qualification standards used to judge job seekers relate both to the job under consideration, and only to the essential functions of that job, or are mandated by law. Assuming individuals are otherwise qualified for purposes of the ADA, those individuals are still not protected by the ADA unless they have a disability. ◆

**Endnotes**
[1] 42 USCA 12101 et seq.
[2] See 42 USCA § 12101.
[3] 42 USCA § 12101(a) (3).

[4] 42 USCA § 12102 and 12111.

[5] 42 USCA § 12112.

[6] 42 USCA § 2000a, et seq.

[7] 29 USCA § 701 et seq.

[8] Supra note 6, at 2000c-4.

[9] 29 CFR § 1630.1 et seq.

[10] 29 CFR 1630, App.

[11] See *Sutton v. United Air Lines, Inc.,* 119 S. Ct. 2139 (1999), and *Albertson's, Inc. v. Kirkingburg,* 527 U.S. 555 (1999) where the Supreme Court held that EEOC regulations and guidance under the ADA are not dispositive interpretations of the ADA.

[12] 42 USCA § 12117.

[13] See 29 CFR §§ 1601.7 and 1601.11.

[14] See 29 CFR § 1601.15.

[15] See 29 CFR § 1601.18.

[16] See 29 CFR § 1601.19.

[17] See 29 CFR § 1601.24.

[18] See 29 CFR § 1601.27.

[19] 42 USCA § 12111 (2).

[20] 42 USCA § 12111 (5) and (7) (incorporating the definition of "person" from 42 USCA § 2000e).

[21] 42 USCA § 12111 (5)(B) exempts the listed entities.

[22] The Eleventh Amendment reads: "The Judicial Power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another state, or by citizens or subjects of any foreign state."

[23] States may consent to be sued in individual cases, they may waive their sovereign immunity in certain types of lawsuits, or Congress may abrogate states' sovereign immunity through federal legislation in certain cases. See *Seminole Tribe v. Florida,* 517 U.S. 44 (1996); *Alden v. Maine,* 527 U.S. 706 (1999); *Florida Prepaid Postsecondary Education Expense Board v. College Savings Bank,* 527 U.S. 627 (1999).

[24] Compare *Muller v. Costello,* 187 F.3d 298 (2nd Cir. 1999); *Coolbaugh v. Louisiana,* 136 F.3d 430 (5th Cir. 1998); *Clark v. California,* 123 F.3d 1267 (9th Cir. 1997); *Martin v. Kansas,* 190 F.3d 1120 (10th Cir. 1999); *Kimel v. Florida Board of Regents* (11th Cir. 1998); all upholding the application of the ADA to states; with *Alsbrook v. Maumelle,* 184 F.3d 999 (8th Cir. 1999) (en banc), holding that Congress did not lawfully abrogate state soveignty.

[25] *Florida Department of Corrections v. Dickerson,* 120 S. Ct. 976 (2000), *cert. dismissed* 120 S. Ct. 1236 (2000); *Alsbrook v. Arkansas,* 120 S. Ct. 1003 (2000), *cert. dismissed* 120 S. Ct. 1265 (2000).

[26] See *Erickson v. Board of Governors for Northeast Illinois University,* 207 F.3d 945 (7th Cir. 2000).

[27] *Id.* See also *Howlett v. Rose,* 496 U.S. 356 (1990).

[28] *Id.* See also *West Virginia v. United States,* 497 U.S. 305 (1987).

[29] 42 USCA § 12112 (a).

[30] See 42 § USCA 12112 (b)(1), (4), (5)(A),(B), (6), and (7).

[31] 42 USCA § 12111(8).

[32] *McCullough v. Atlanta Brewing Company,* 929 F.Supp 1489 (N.D. Georgia 1996); *Bryant v. Delbar Products, Inc,* 18 F.Supp.2d 799 (M.D. Tenn. 1998) see also 29 CFR 1630.1(a).

[33] *Bay v. Cassens Transit Company,* 212 F.3d 969 (7th Cir. 2000).

[34] *Id.* citing 29 CFR app.1630.2(m).

[35] 42 USCA § 12113(a) and 29 CFR § 1630.15(b)(1).

[36] *Albertsons v. Kirkingburg,* 527 U.S. 555 (1999); 29 CFR § 1630.15(e).

[37] *Jablonski v. Chas. Levy Circulating Co.,* 919 F.Supp. 298 (N.D.Ill. 1996).

[38] *McDaniel v. Allied-Signal, Inc.* 896 F.Supp. 1482 (W.D.Mo. 1995).

[39] *Albertsons, Inc. v. Kirkingburg,* supra note 32.

[40] 29 CFR § 1630.10; 29 CFR pt.1630, App.1630.10.

[41] 42 USCA § 12112(b)(5)(A).

[42] The burden of defending the designation of a function as essential falls upon the employer. See *Lenker v. Methodist Hospital,* 210 F.3d 792 (7th Cir. 2000).

[43] 42 USCA § 12111(8).

[44] 29 CFR § 1630.2(n); see also *Lenker,* supra note 42.

[45] *Id.*

[46] *Id.*

[47] *Davoll v. Webb,* 194 F.3d 1116 (10th Cir. 1999).

[48] *Gonzalez v. City of New Braunfels, Texas,* 176 F.3d 834 (5th Cir. 1999).

[49] *Holbrook v. City of Alpharetta,* 112 F.3d 1522 (11th Cir. 1997).

[50] *Smith v. Midland Brake, Inc.,* 180 F.3d 1154 (10th Cir. 1999) (en banc).

*Law enforcement officers of other than federal jurisdiction who are interested in this article should consult their legal advisors. Some police procedures ruled permissible under federal constitutional law are of questionable legality under state law or are not permitted at all.*

## Wanted: Photographs



**T**he *Bulletin* staff is always on the lookout for dynamic, law enforcement-related photos for possible publication sin the magazine. We are interested in photos that visually depict the many aspects of the law enforcement profession and illustrate the various tasks law enforcement personnel perform.

We can use either black-and-white glossy or color prints or slides, although we prefer prints (5x7 or 8x10). Appropriate credit will be given to contributing photographers when their work appears in the magazine. We suggest that you send duplicate, not original, prints as we do not accept responsibility for prints that may be damaged or lost. Send your photographs to:

Brian Parnell, Art Director, *FBI Law Enforcement Bulletin,* FBI Academy, Madison Building, Room 209, Quantico, VA 22135.

# FBI Law Enforcement Bulletin
## Author Guidelines

## GENERAL INFORMATION

The *FBI Law Enforcement Bulletin* is an official publication of the Federal Bureau of Investigation and the U.S. Department of Justice.

**Frequency of Publication:** Monthly.

**Purpose:** To provide a forum for the exchange of information on law enforcement-related topics.

**Audience:** Criminal justice professionals, primarily law enforcement managers.

## MANUSCRIPT SPECIFICATIONS

**Length:** Feature articles should contain 2,000 to 3,500 words (8 to 14 pages, double-spaced). Submissions for specialized departments, such as Police Practice and Case Study, should contain 1,200 to 2,000 words (5 to 8 pages, double-spaced).

**Format:** Authors should submit three copies of their articles typed and double-spaced on 8 1/2- by 11-inch white paper with all pages numbered. When possible, an electronic version of the article saved on computer disk should accompany the typed manuscript.

Authors should supply references when quoting a source exactly, citing or paraphrasing another person's work or ideas, or referring to information that generally is not well known. For proper footnote format, authors should refer to *A Manual for Writers of Term Papers, Theses, and Dissertations*, 6th ed., by Kate L. Turabian.

**Writing Style and Grammar:** The *Bulletin* prefers to publish articles in the third person (Point of View and Perspective submissions are exceptions) using active voice. Authors should follow *The New York Public Library Writer's Guide to Style and Usage* and should study several issues of the magazine to ensure that their writing style meets the *Bulletin's* requirements.

Authors also should contact the *Bulletin* staff for the expanded author guidelines, which contain additional specifications, detailed examples, and effective writing techniques.

## PHOTOGRAPHS AND GRAPHICS

A photograph of the author(s) should accompany the manuscript. Authors can submit photos and illustrations that visually enhance and support the text. Black-and-white glossy prints (3- by 5-inch to 5- by 7-inch) reproduce best. The *Bulletin* does not accept responsibility for lost or damaged photos or illustrations.

## PUBLICATION

**Judging Manuscripts:** The *Bulletin* judges articles on relevance to the audience, factual accuracy, analysis of the information, structure and logical flow, style and ease of reading, and length. The *Bulletin* generally does not publish articles on similar topics within a 12-month period or accept articles previously published or currently under consideration by other magazines. Because it is a government publication, the *Bulletin* cannot accept articles that advertise a product or service.

**Query Letters:** Authors may submit a query letter along with a 1- to 2-page outline before writing an article. Although designed to help authors, this process does not guarantee acceptance of any article.

**Author Notification:** The *Bulletin* staff will review queries and articles and advise the authors of acceptance or rejection. The magazine cannot guarantee a publication date for accepted articles.

**Editing:** The *Bulletin* staff edits all manuscripts for length, clarity, format, and style.

## SUBMISSION

Authors should mail their submissions to: Editor, *FBI Law Enforcement Bulletin*, FBI Academy, Madison Bldg., Room 209, Quantico, VA 22135; telephone: 703-632-1952; fax: 703-632-1968; e-mail: leb@fbiacademy.edu.

# *The Bulletin Notes*

Law enforcement officers are challenged daily in the performance of their duties; they face each challenge freely and unselfishly while answering the call to duty. In certain instances, their actions warrant special attention from their respective departments. The *Bulletin* also wants to recognize their exemplary service to the law enforcement profession.



*Officer Carey*


*Officer Theard*

Officers Donald Carey and Avery Theard of the New Orleans, Louisiana, Police Department arrived at an apartment complex where they found a 12-year-old boy face down in the bottom of a swimming pool. Officers Carey and Theard entered the water, brought the boy out of the pool, and performed mouth-to-mouth resuscitation on him, saving his life. Without the quick efforts of Officers Carey and Theard, the young boy would have drowned.


*Officer Carter*

Officer Robert Carter of the Oak Creek, Wisconsin, Police Department was assisting a woman, who was hearing impaired, and her infant child in locating a hotel. The woman was lost and needed a place for her and her child to sleep that night. After arriving at the hotel, followed by the woman in her own vehicle, Officer Carter entered the hotel to make the arrangements for her. Suddenly, the woman ran into the hotel screaming hysterically holding her infant. The child had turned blue and was covered with vomit. Officer Carter, realizing the infant's airway was obstructed, cleared the passage, began CPR, and revived the child. Officer Carter's quick response and CPR skills saved the infant's life.


*Officer Ladner*

While on early morning patrol, Officer Christine Ladner of the Nantucket, Massachusetts, Police Department radioed the dispatcher that she could smell smoke in the area. After determining that the smoke was coming from a residence, Officer Ladner entered the smoke-filled house and found an 18-year-old man asleep on a couch, which was engulfed in flames. After alerting the man and assisting him outside to safety, Officer Ladner determined that no one else remained in the house. She returned to the dwelling with a fire extinguisher and put out the fire. Due to her keen observation, prompt action, and disregard for her personal safety, Officer Ladner prevented the death or serious injury of the man and serious damage to the residence.

U.S. Department of Justice
Federal Bureau of Investigation
*935 Pennsylvania Avenue, N.W.*
*Washington, DC 20535-0001*

Periodicals
Postage and Fees Paid
Federal Bureau of Investigation
ISSN 0014-5688

Official Business
Penalty for Private Use $300

## Patch Call





The Derry Township, Pennsylvania, Police Department patch emphasizes the community's commitment to its historical origins. The Township Police Department has responsibility for the unincorporated community of Hershey, known as "Chocolatetown, U.S.A."

The colorful patch of the Riverside, Illinois, Police Department reflects the city's trees, river, gaslights, swinging bridge, and Hoffman dam, all of which incorporate Riverside's theme of landscape.