UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

JONATHAN CROWELL            :
SAMANTHA KILMURRAY          :
    Plaintiffs,               :
                            :
    v.                        :        File No. 2:08-CV-55
                            :
ROBERT KIRKPATRICK          :
MICHAEL GORMAN              :
CHUCK ALECK                 :
PETER DIMARINO              :
    Defendants.               :

## OPINION and ORDER
(Doc. 43)

Plaintiffs Jonathan Crowell and Samantha Kilmurray bring this civil rights action under 42 U.S.C. § 1983 against Robert Kirkpatrick, Michael Gorman, Chuck Aleck, and Peter DiMarino, all of the Town of Brattleboro, VT Police Department ("BPD"). They allege that the officers used excessive force and made unlawful arrests in violation of the Fourth Amendment and Vermont state law when they arrested the Plaintiffs to end a protest on private property on July 24, 2007. (Doc. 1). Presently before the Court is the Defendants' Rule 56 Motion for Summary Judgment, in which they assert qualified immunity from suit. Fed. R. Civ. P. 56; (Doc. 43). For the reasons stated below, the Defendants' motion is GRANTED.

1

# I. STANDARD OF REVIEW

Summary judgment should be granted when the record shows there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); see also City of Burlington v. Hartford Steam Boiler Inspection and Ins. Co., 190 F. Supp. 2d 663, 669 (D. Vt. 2002). To decide such a motion, the trial court must resolve all ambiguities and draw all reasonable inferences in favor of the non-moving party, and decide whether a rational juror could decide in favor of that party under applicable law. Id.; Scott v. Harris, 550 U.S. 372, 378 (2007). In qualified immunity cases, this generally requires the Court to adopt the Plaintiffs' version of the facts. Id.

To preclude summary judgment, however, the non-moving party must offer more than "mere speculation and conjecture[.]" Harlen Assoc. v. Vill. of Mineola, 273 F.3d 494, 499 (2d Cir. 2001). The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986). In other words, only "disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. at 249.

Finally, under this Court's Local Rules, all material facts that are set forth in the movant's statement of undisputed facts (filed here by the Defendants as Doc. 43-3) are deemed to be admitted unless controverted by the non-movant's statement of disputed facts

(filed here by Plaintiffs as Doc. 46-2).  L.R. 7.1(c)(1)-(3).

## II. BACKGROUND[1]

On the morning of July 23, 2007, a group of people including Plaintiffs Crowell and Kilmurray gathered on a recently cleared lot at the corner of Black Mountain Road and Putney Road in Brattleboro, VT.  (Doc. 47-2 ¶ 6).  The group intended to protest what they mistakenly believed to be impending commercial development by the lot's owner, Cheshire Oil.  The Plaintiffs knew that the lot was private property.  Id. ¶¶ 7-8.

Shortly after the group arrived, a passerby informed the BPD that a group of protesters was trespassing on private property, and provided the protesters' location.  (Doc. 46-2 ¶ 7).  The BPD dispatcher then contacted the President of Cheshire Oil who said that while he did not "want to start a war with them," he wanted the protesters off of the land and asked that trespass orders be issued.  (Doc. 46-3 at 9-10).

In response to the landowner's request, Lt. Kirkpatrick and Officer Gorman went to the scene and advised the protesters that there was no actual plan to develop the property, that the landowner would not allow the group to remain on the property, and that they would have to leave.  The officers said they would return in approximately one hour and arrest any remaining protesters.  (Doc. 43-3 ¶ 10).

At about 2:30 p.m., Brattleboro Police Chief John Martin and Police Captain Gene Wrinn held a meeting with Lt. Kirkpatrick about the protest.  There, Martin and Wrinn told Kirkpatrick not to be "heavy handed" with, and to take no action against, the protesters.

---

[1]        Pursuant to the Summary Judgment standard of review, the Court adopts the Plaintiffs' version of the facts and draws all inferences in their favor where reasonable to do so.

(Doc. 46-2 ¶¶ 16-17).[2]

Later that afternoon Lt. Kirkpatrick and Officer Jeremy Evans returned to the protest site and discovered that a number of protesters, including the Plaintiffs, remained on the property.  (Doc. 47-2 ¶ 11; Doc. 46-2 ¶ 19).  The Officers directed BPD dispatch to contact the landowners once again to suggest that the protesters be permitted additional time to leave on their own.  (Doc. 46-3 at 11-12).  This time Cheshire Oil said that the protesters were free to remain on the property overnight, but added that "if they're still there [in the morning], then we got to do something different."  (Doc. 46-2 ¶¶ 19-22; Doc. 46-3 at 14).

At approximately 7:02 a.m. the next morning, July 24, 2007, Officers Kirkpatrick and Gorman returned to the property and found only the two Plaintiffs remaining.  (Doc. 46-2 ¶ 28).  They also found that the Plaintiffs had each chained themselves to a barrel that the group had brought to the property the day before.  Id.  The officers could see that the Plaintiffs were each on opposite sides of the barrel, and that they each had one arm in a piece of PVC pipe that extended through the side of the barrel.  But because the barrel was filled with dirt, string, chicken wire, screws, and nails, the officers could not see inside to discern exactly how the Plaintiffs were attached.  (Doc. 47-2 ¶ 18).

Later it was learned that each Plaintiff had a chain wrapped around their

---

[2]      The Defendants dispute that this meeting occurred and that these instructions were given to Kirkpatrick.  (Doc. 47 at 3-6).  The Defendants also vehemently dispute that there is any admissible evidence in the record on which the Plaintiffs can rely to assert these facts, and therefore the facts may not be considered even at the summary judgment phase.  Id.  The Defendants are correct that the non-moving party bears the burden of asserting material facts based on admissible evidence in order to defeat a summary judgment motion.  See Fed. R. Civ. P. 56(e)(1)-(2).  But these facts are not material to the merits of this case, and the Court therefore adopts them here without deciding the issue of admissibility.

respective wrists inside the barrel, with a carabiner at the end of the chain clipped to a reinforcing steel bar–or "rebar"–which extended up from concrete poured into the base of the barrel.  Id. ¶ 17.  This barrel contraption, which is commonly known in the nomenclature of contemporary protesters as a "bear claw" or "sleeping dragon," weighed at least 300 pounds and was therefore too heavy for the officers to move.  Id. ¶¶ 18-19, 36.

It is undisputed that throughout the entire July 24 encounter the Plaintiffs could have freed themselves from the barrel and walked off the property at any time.  They could also have explained to the officers how they were attached to the barrel in order to facilitate their removal.  (Doc. 47-2 ¶¶ 30-31; Doc. 46-2 ¶ 32).

Upon observing both Plaintiffs attached to the barrel, the officers initially tried persuasion to induce the Plaintiffs to leave.  Officer Gorman told the Plaintiffs that their obstinance was pointless since the local newspaper had already published an article about their activity, and, in any case, no commercial development was about to occur.  (Doc. 47-2 ¶ 14).  When this tactic failed the officers verbally placed both Plaintiffs under arrest for criminal trespass.  Nonetheless, the Plaintiffs persisted in their refusal to unchain themselves from the barrel and leave the property.  (Doc. 47-2 ¶ 20).

At this point, Officers Kirkpatrick and Gorman called Lt. Chuck Aleck and Officer Peter DiMarino to the scene.  (Doc. 47-2 ¶ 21).  With both Aleck and DiMarino present, the officers again advised both Plaintiffs that they were under arrest, and ordered them to leave the property.  The Plaintiffs again refused to either leave or explain how the barrel could be disassembled.  (Doc. 47-2 ¶ 22).  The officers then attempted to dig the dirt

out of the barrel, but with little success.  Lt. Kirkpatrick tried to remove dirt by using a shovel that Plaintiff Crowell had brought to the site.  And in what may have been an attempt to inject some levity into the situation, Crowell complained to Kirkpatrick that "the shovel belonged to [him], that it was private property, and that [Kirkpatrick] was not allowed to use it."  (Doc. 46-6 at 3).

The officers also tried to pull the Plaintiffs' arms out of the PVC piping because they believed that they were holding hands inside the barrel, but abandoned this approach when the Plaintiffs complained of pain.  (Doc. 47-2 ¶ 26).

After failing to remove the barrel's contents, the officers called the Brattleboro Department of Public Works ("DPW") for assistance with disassembling the barrel and/or detaching the Plaintiffs without the use of force.  (Doc. 47-2 ¶ 25; Doc. 46-2 ¶ 35).  DPW employees responded, but their efforts were likewise unsuccessful.  Id.  Throughout these efforts, obviously, the Plaintiffs refused to leave the property under their own volition.

Next, the officers explored tipping the barrel as a means to disengage the Plaintiffs, but rejected that option when the Plaintiffs expressed fear that such action could break their arms or otherwise result in serious injury.  (Doc. 47-2 ¶ 29).

At some point while the officers were trying to either disassemble the barrel or persuade the Plaintiffs to leave, Plaintiff Kilmurray yelled to a friend standing nearby and told him to "call members of the [protester] group so that they would return to the property."  (Doc. 43-9 ¶ 23; Doc. 46-6 at 4).

After all of the aforementioned means of removing the Plaintiffs proved

6

ineffectual, and after Kilmurray signaled for more protesters to return to the property, the officers decided to use their Tasers in the "drive-stun" mode as a pain compliance tool that would force the Plaintiffs to release themselves.  (Doc. 47-2 ¶ 35).  When used in the drive-stun mode, the Taser is placed directly against a suspect's clothing or skin.  An electrical charge is delivered that causes significant localized pain in the area touched by the taser, and may also cause "significant redness" at the point of contact that can last over a week.  (Doc. 47-2 ¶¶ 64-65; Doc. 46-2 ¶ 54).  Generally, people who are "tased" in the drive-stun mode cease to feel pain either immediately or within seconds after the Taser device has been turned off.  Id. ¶ 81.

Before actually employing the Tasers, however, the officers warned the Plaintiffs that Tasers would be used, and that being "tased" would "hurt a lot."  Officer DiMarino also "sparked" his taser to demonstrate its live electric current.  (Doc. 46-2 ¶¶ 44-46; Doc. 47-2 ¶¶ 39-40).  These warnings caused the Plaintiffs to become apprehensive and, although they still did not simply unchain themselves and leave the property, they offered alternatives to using the Tasers.  For example, the Plaintiffs suggested that the officers "make a more serious effort at disassembling the barrel," or wait out the protest.  (Doc. 46-2 ¶¶ 47-48).[3]

The officers did not adopt any of the Plaintiffs' suggestions, and, when their warnings went unheeded, Kirkpatrick and DiMarino simultaneously tased each Plaintiff in

---

[3]     In their inaptly titled "Statement of Material Disputed Fact" (Doc. 46-2), the Plaintiffs include the (apparently undisputed) fact that the "design and construction plans of such barrels [as the Plaintiffs were chained to] is, and was in 2007, readily available on the internet."  Id. ¶ 37.  Presumably, this is included to suggest that the Defendants should have performed some online research about Sleeping Dragons before using their Tasers.

the forearm for several seconds.  (Doc. 47-2 ¶ 42).  Ultimately, Plaintiff Kilmurray was tased two times and Plaintiff Crowell three times, with officer warnings in between each occurrence, before they disengaged themselves from the barrel.  (Doc. 46-2 ¶ 50).  The officers could see for the first time how each Plaintiff was attached to the barrel after Kilmurray released herself.  Using this new information the officers attempted to tip the barrel in order to release Crowell, but stopped when it appeared Crowell could be injured.  The officers then warned Crowell once again, and, when he failed to comply, tased him the third and final time for two to three seconds.  (Doc. 47-2 ¶¶ 47-51).  Neither Officer Aleck nor Evans objected to or otherwise attempted to interfere with the tasings.  (Doc. 46-2 ¶ 52).

Approximately 40 minutes elapsed between the time the officers first arrived that morning until they administered the third and final tasing to Plaintiff Crowell.  (Doc. 46-2 ¶ 61).  Neither Plaintiff complained of any injuries at the scene.  (Doc. 47-2 ¶ 52).

Both Plaintiffs were ultimately charged with unlawful trespass in violation of 13 V.S.A. § 3705(a) and resisting arrest in violation of 13 V.S.A. § 3017(a)(1).  The Vermont District Court found probable cause for all charges on September 7, 2007.  (Doc. 47-2 ¶ 53; Doc. 43-12 at 2; Doc. 43-13).  Plaintiff Crowell pleaded guilty to the unlawful trespass charge and the court referred Plaintiff Kilmurray to participate in a pretrial diversion program.  Id.

On March 3, 2008, the Plaintiffs filed a six count civil Complaint against the Defendants under 42 U.S.C. § 1983 and various supplemental state law causes of action alleging that their arrests were unlawful and that the use of Tasers was excessive force under the Fourth Amendment of the U.S. Constitution.  (Compl., Doc. 1 ¶¶ 104-105); U.S. Const.

amend. IV.  They also allege that the Defendants conspired to violate, and failed to prevent a violation of, their civil rights in violation of 42 U.S.C. §§ 1985-1986.  (Doc. 1 ¶¶ 106-114).  On April 2, 2009, the Defendants jointly filed the present Motion for Summary Judgment in which they claim qualified immunity from suit.  (Doc. 43).

### III. DISCUSSION

Qualified immunity shields government officials, including law enforcement officers, "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  McEvoy v. Spencer, 124 F.3d 92, 97 (2d Cir. 1997) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  Qualified immunity protects government officials from lawsuits over errors made while reasonably performing their duties, whether resulting from "a mistake of law, a mistake of fact, or a mistake of mixed questions of law and fact."  Pearson v. Callahan, 129 S.Ct. 808, 815 (2009) (quoting Groh v. Ramirez, 540 U.S. 551, 567 (2004) (Kennedy, J., dissenting)).

Accordingly, granting qualified immunity generally involves a two-part inquiry.  First the Court must ask, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"  Saucier v. Katz, 533 U.S. 194, 201 (2001), overruled on other grounds by Pearson, 129 S.Ct. at 821.  If the plaintiffs' constitutional rights were not violated then the issue of qualified immunity need not be further addressed, since "where there is no viable constitutional claim, defendants have no need of an immunity shield."  Walcyk v. Rio, 496 F.3d 139, 154 (2d Cir.

2007) (internal citations omitted).  Assuming a constitutional violation, the next question is "whether the right was clearly established . . . in light of the specific context of the case."  Id. A right is "clearly established" when ignorance of its existence would be unreasonable.  Thus, if all that a rational jury could decide is that "reasonable officers would disagree about the legality of the defendants' conduct under the circumstances, then qualified immunity applies and summary judgment for the officers is appropriate."  Lennon v. Miller, 66 F.3d 416, 421 (2d Cir. 1995).

Earlier this year, in Pearson v. Callahan, the Supreme Court held that district courts are not obligated to follow the analytical protocol set forth in Saucier, and have the discretion to evaluate claims of qualified immunity by deciding only whether a particular right was "clearly established."  Pearson, 129 S.Ct. at 816.  In other words, courts need not necessarily decide first whether a constitutional violation occurred, especially when that query is particularly complex, and it is obvious that reasonable officials could disagree about the legality of the challenged conduct.  Id. at 818; Finigan v. Marshall, 574 F.3d 57, 61 n.3 (2d Cir. 2009).  Here, however, the issues are not unduly complex, the record is sufficiently complete, and the parties have fully litigated the constitutional question.  Thus, the Court will first decide whether the Defendants violated the Plaintiffs' Fourth Amendment rights.  See Scott, 550 U.S. at 378 n.4; Sacramento v. Lewis, 523 U.S. 833, 841 n.5 (1998).

### A.    Unlawful Arrest

The Plaintiffs claim that their arrests constitute illegal seizures under the Fourth Amendment because the Defendants lacked probable cause to believe that a crime was being

committed.  (Doc. 1 ¶ 105); see Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 128 (2d Cir. 1997) ("The right to be free from arrest . . . in the absence of probable cause is a long established constitutional right.").  In particular, the Plaintiffs stress that landowner Cheshire Oil gave permission for the protesters to remain overnight, while adding only that "something different" must be done if they remained in the morning.  (Doc. 46 at 8).  After this instruction on July 23, the Defendants did not further communicate with Cheshire Oil before making the arrests.

From this the Plaintiffs conclude that they possessed unrevoked permission to be on the land at the time of their arrests, and thus were not violating the Vermont criminal trespass statute.  (Doc. 49 at 10); 13 V.S.A. § 3705(a).

### i. Crowell's Claim Is Cognizable In A § 1983 Lawsuit For Damages Because A Writ Of Habeas Corpus Is Not An Available Remedy

The Defendants argue that Crowell's claim for unlawful arrest is not cognizable under § 1983 because he pleaded guilty to criminal trespass in Vermont District Court. (Doc. 43-12).  They invoke Heck v. Humphrey, 512 U.S. 477 (1994), in which the Supreme Court held that when a plaintiff "seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction . . . if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction . . . has already been invalidated."  Id. at 487; see also Thomas v. Roach, 165 F.3d 137, 144 (2d Cir. 1999) (observing that a "§ 1983 action for arrest without probable cause may be barred by the arrestee's conviction at trial or by the

arrestee's guilty plea.").[4]

Heck would apply here if the only question was whether Crowell's unlawful arrest claim implies the invalidity of his subsequent conviction.[5]  But under Second Circuit law the "Heck Rule" does not preclude § 1983 actions–even those that directly challenge a conviction–brought by Plaintiffs for whom no remedy of habeas corpus exists.  Jenkins v. Haubert, 179 F.3d 19, 21 (2d Cir. 1999).  In this case, Crowell is not and never was in the custody of the State, thus he may not challenge his conviction by petitioning for a writ of habeas corpus.  Leather v. Eyck, 180 F.3d 420, 424 (2d Cir. 1999); Bock v. Gold, No. 05-CV-149, 2009 WL 2365330, *2 (D. Vt. July 29, 2009).  Accordingly, the Court turns to the merits of the Plaintiffs' unlawful arrest claim.

### ii. The Defendants Had Probable Cause To Arrest Both Plaintiffs

The existence of probable cause to arrest defeats both Plaintiffs' claims for unlawful arrest.  See Jenkins v. City of New York, 478 F.3d 76, 84 (2d Cir. 2007) ("The existence of probable cause to arrest constitutes justification and 'is a complete defense to an action for false arrest,' whether that action is brought under state law or under § 1983.")

---

[4]     To date, Crowell's state court criminal conviction remains intact.  However, on August 18, 2009, Crowell filed a motion in Windham County District Court asking the court to vacate his guilty plea.  Regardless of whether his motion is granted, though, Heck v. Humphrey does not bar any of Crowell's § 1983 claims.   Also, even if Crowell's state case is re-opened, abstention under Younger v. Harris, 401 U.S. 37 (1971) would not apply here because Crowell is seeking only damages, and not injunctive or declaratory relief, in federal court.  Kirschner v. Klemons, 225 F.3d 227, 237 -238 (2d Cir. 2000) (citing Giulini v. Blessing, 654 F.2d 189, 192-94 (2d Cir.1981)).  And, in any event, Crowell would not be able to litigate his excessive force claim in the course of his state court criminal proceedings.

[5]     While it is of course theoretically possible for an unlawful arrest claim to be consistent with a later conviction, see, e.g., Covington v. City of New York, 171 F.3d 117, 123 (2d Cir. 1999), such is not the case here.

(quoting Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996) (other internal quotation marks omitted)); see also Long v. L'Esperance, 166 Vt. 566 (1997).

Probable cause to arrest is present when, based on the totality of the circumstances, "the arresting officer 'has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime.'" Escalera v. Lunnu, 361 F.3d 737, 743 (2d Cir. 2004) (quoting Weyant, 101 F.3d at 852). This standard "is 'a fluid concept . . . not readily, or even usefully, reduced to a neat set of legal rules,'" and "its focus is on 'probabilities,' not 'hard certainties.'" Walczyk, 496 F.3d at 156 (quoting Illinois v. Gates, 462 U.S. 213, 231-232 (1983)). Therefore, "probable cause does not demand any showing that a good-faith belief be 'correct or more likely true than false.' It requires only such facts as make wrongdoing . . . probable." Id. (quoting Texas v. Brown, 460 U.S. 730, 742 (1983)).

A person commits unlawful trespass in Vermont "if, without legal authority or the consent of the person in lawful possession, he enters or remains on any land . . . as to which notice against trespass is given by: (1) Actual communication by the person in lawful possession or his agent or by a law enforcement officer acting on behalf of such person[.]" 13 V.S.A. § 3705(a).

The Court's inquiry into whether probable cause existed here is an objective one that focuses on the facts available to the arresting officers at the time of the arrests. Finigan, 574 F.3d at 61-62; see also Jaegly v. Couch, 439 F.3d 149, 154 (2d Cir. 2006). And when

13

there is no dispute as to the facts on which the officers relied, the existence of probable cause is a question of law for the Court to decide.[6]  Walczyk, 496 F.3d at 157.

It is undisputed that the Defendants knew the following facts on the morning of July 24: (1) Cheshire Oil owned the land on which the Plaintiffs were protesting; (2) the day before, Cheshire Oil informed the BPD that it wanted the protesters removed from the land, and authorized the issuance of trespass orders; (3) after the Plaintiffs refused to leave in response to a lawful police order, BPD dispatch contacted Cheshire Oil to suggest that the Plaintiffs be allowed more time to leave on their own; (4) Cheshire Oil gave permission for them to remain on the land overnight, but further told the BPD that "if they're still there tomorrow, then we got to do something different"; (5) the Plaintiffs refused to comply with police orders to leave on the morning of July 24.  (Doc. 46-3 at 10-12; Doc. 47-2 ¶¶ 7-8, 20; Doc. 46-2 ¶ 19).

The Court concludes that these facts are sufficient to warrant a "person of reasonable caution" to believe that the Plaintiffs violated the Vermont unlawful trespass statute.

The precise issue in dispute here is whether, given the undisputed facts, a reasonable officer would have believed that asking the protesters to leave effectively communicated the landowner's intent.  In arguing that a reasonable officer would have

---

[6]     To say that the test is "objective" is to say that only the facts confronted by the Defendants are relevant to the determination of probable cause, and that a finding of probable cause cannot be disturbed by an officer's subjective intent.  Thus, any allegations that the Defendants were vindictive, or were intending only to advance their own agenda via these arrests, are entirely irrelevant.  See Finigan, 574 F.3d at 63 n.5 (citing Singer v. Fulton County Sheriff, 63 F.3d 110, 120 (2d Cir. 1995)).

concluded otherwise, the Plaintiffs ask the Court to interpret the landowner's statement: "if [the protesters] are still there in the morning, then we got to do something different," as granting indefinite permission that was valid until specifically withdrawn, and to impute that interpretation to the proverbial "person of reasonable caution."[7]  While the Court is obligated to draw all inferences in favor of the non-moving party, it is so obligated only when the inferences are reasonable.  Scott, 550 U.S. at 378; Anderson v. Liberty Lobby, 477 U.S. at 255.  Here, it would shirk reality to infer that Cheshire Oil provided the protesters indefinite permission to remain on the land, and more implausible still to infer with such certainty that it would be unreasonable to conclude otherwise.  The landowner's admonition "to do something different" in the morning would itself establish probable cause, but that conclusion is further secured by the prior direction to issue trespass orders, and the fact that permission to remain overnight came only after police urging.[8]

       While a jury may not conclude that the above facts are sufficient to prove the elements of unlawful trespass beyond a reasonable doubt, that is not the issue to be decided here.  To the contrary, the "facts available at the time of the arrest need only cause a person

---

[7]     The Plaintiffs of course never received any permission directly from Cheshire Oil.  Instead, it was the BPD that informed the protesters they could remain overnight, and it is undisputed that the police also told them that they would have to leave in the morning.  (Doc. 47-2 ¶ 12).  Further, there is no claim that the Plaintiffs had permission to enter the premises initially.

[8]     The Plaintiffs also point out that when BDP dispatch told Lt. Kirkpatrick that the Plaintiffs could remain overnight, he replied, "We'll just keep in contact with them."  (Doc. 46-3 at 16).  They argue this shows that the Defendants intended to contact the landowner again before making any arrests.  The Defendants dispute this interpretation, and represent that Kirkpatrick intended to "keep in contact" with the protesters, not Cheshire Oil.  But, in any case, this off-hand comment is immaterial to the probable cause determination, which is plainly established here by all of the *objective* facts and circumstances known to the Defendants on July 24.  Even if Kirkpatrick did abandon his initial intent, that does not eliminate probable cause.

of reasonable caution to believe that a crime had been or was [being] committed, a threshold that was easily met here."  Finigan, 574 F.3d at 63; see also Williams v. Town of Greenburgh, 535 F.3d 71,  78-79 (2d Cir. 2008) (holding that police had probable cause to arrest suspect for trespass, even though a court later determined that permission to be on premises had not been sufficiently withdrawn).

The Plaintiffs complain vehemently that the Defendants never contacted the landowners on July 24, suggesting that no arrests could be made without another round of landowner consultation.  (Doc. 46 at 8).  But this fact would only be relevant if probable cause did not already exist.  The Defendants had probable cause to arrest independent of any further contact with the landowners, and the Fourth Amendment requires nothing more. Put differently, the existence of probable cause is not erased, nor are its legal consequences diminished, by the possibility of further investigation.  See Ricciuti, 124 F.3d at 128 ("Once a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest"); Curley v. Vill. of Suffern, 268 F.3d 65, 70 (2d Cir. 2001) (applying principle as stated in Ricciuti, even where "a better procedure may have been for the officers to investigate plaintiff's version of events more completely," and where "an investigation might have cast doubt upon the basis for the arrest."); Kelley v. Myler, 149 F.3d 641, 646-647 (7th Cir. 1998) (holding that once probable cause is established that a suspect is trespassing, an officer is not required to investigate further before making arrest).

This would be a different case if the officers had no knowledge of facts relating to

the landowner or its intentions with regard to the protesters.  But here the Defendants knew enough such facts to satisfy probable cause, even if they theoretically could have learned more information.[9]

### iii. The Defendants Are Entitled To Qualified Immunity

Finally, even if facts supporting probable cause did not exist, that is, if probable cause required the Defendants to learn more from Cheshire Oil, the Defendants would nonetheless be entitled to qualified immunity based on "arguable probable cause."  This requires the Defendants to show that it was either "objectively reasonable to believe that probable cause existed or that 'officers of reasonable competence could disagree on whether the probable cause test was met.'" Finigan, 574 F.3d at 61 (quoting Escalera, 361 F.3d at 743).

In this case, it was objectively reasonable for the Defendants to conclude that there was probable cause to believe that the Plaintiffs were unlawful trespassers.  As stated above, the Defendants knew that the land was privately owned, they knew that the landowners asked previously for the issuance of trespass orders, and they knew that the landowners had only provided explicit authorization for the protesters to remain overnight

---

[9]    Of note, even those cases (of which the Plaintiffs cite not a single one) suggesting that officers are obligated to make some "minimal inquiry" before making an arrest acknowledge that the inquiry may end once enough facts are known for an officer to reasonably conclude that a crime is being committed.  And in some circumstances the inquiry need  not even go that far.  See Bradley v. Jusino, 2009 WL 1181617, *8 (S.D.N.Y. May 4, 2009); 2 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 3.2(d)(4th ed. 2008) (explaining that where certain exigencies are present the probable cause standard may be "watered down"); United States v. Woolbright, 831 F.2d 1390, 1394 (8th Cir. 1987); cf. Kuehl v. Burtis, 173 F.3d 646, 650-651 (8th Cir. 1999) ("probable cause does not exist when a minimal further investigation would have exonerated the suspect.") (internal quotation marks omitted).

(and only then at the BPD's suggestion). Given the totality of these circumstances, it was objectively reasonable for the officers to conclude that a reasonably cautious person would believe that the Plaintiffs lacked permission to remain on the land on the morning of July 24. This point also shows that while additional landowner communication may have been useful in further clarifying the landowner's intent, it was nonetheless reasonable for the Defendants to believe that probable cause was satisfied by the facts they already knew, and by the landowner communications they already obtained.[10]

**B.    Excessive Force**

**i. Defendants' Use Of Force Was Not Excessive Under The Fourth Amendment**

Claims of excessive force during an arrest are analyzed under the Fourth Amendment's general reasonableness standard. Jones v. Parmley, 465 F.3d 46, 61 (2d Cir. 2006); Graham v. M.S. Connor, 490 U.S. 386, 394 (1989). "In order to establish that the use of force to effect an arrest was unreasonable . . . plaintiffs must establish that the government interests at stake were outweighed by the 'nature and quality of the intrusion on [plaintiffs'] Fourth Amendment interests." Amnesty America v. Town of West Hartford, 361 F.3d 113, 123 (2d Cir. 2004) (quoting Graham, 490 U.S. at 396). Evaluating this claim "requires careful attention to the facts and circumstances of each particular case, including

---

[10]     Although it is not probative of whether probable cause existed at the time of arrest, the Vice President of Cheshire Oil submitted an uncontroverted affidavit in this case saying that he intended to convey to the BPD that he wanted any remaining protesters to be removed on July 24. (Doc. 43-15, G.B. Robertson Aff. ¶ 3). Thus, the Plaintiffs are literally asking the Court to find that it was objectively unreasonable for the Defendants to conclude what was in fact subjectively true–i.e., that the landowners intended to grant temporary permission valid only until the morning of July 24.

the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  Graham, 490 U.S. at 396; see also Jones, 465 F.3d at 61.

This reasonableness determination is a pure question of law,[11] and must be made from the "perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  Id. (citing Terry v. Ohio, 392 U.S. 1, 20-22 (1968)).

Finally, while Graham does list several factors that are relevant to evaluations of excessive force, it does not announce a rigid three-part test that strictly limits the inquiry to those factors.  See Forrester v. City of San Diego, 25 F.3d 804, 806 n.2 (9th Cir. 1994). Rather, as in other Fourth Amendment contexts, the inquiry into whether force is reasonable requires an objective examination of the "totality of circumstances."  Graham, 490 U.S. at 396-397 (quoting Tennessee v. Garner, 471 U.S. 1, 8-9 (1985)); Amnesty America, 361 F.3d at 123; see also Brigham City, Utah v. Stuart, 547 U.S. 398, 404-405 (2006); Scott v. United States, 436 U.S. 128, 137-139 (1978); Terry, 392 U.S. at 21.

Turning first to the factors listed by Graham, it is clear that the severity of the crime being committed (unlawful trespass) was low, and that the Plaintiffs posed no threat of harm to either the Defendants or anyone else.  The Plaintiffs were sitting on a vacant lot,

---

[11]     "At the summary judgment stage, however, once we have determined the relevant set of facts and drawn all inferences in favor of the nonmoving party . . . the reasonableness of [the officer's] actions . . . is a pure question of law."  Scott, 550 U.S. at 381 n.8.  Further, this Circuit and the Supreme Court routinely treat objective reasonableness inquiries in other Fourth Amendment contexts as questions of law for the court.  See, e.g., Brigham City, Utah v. Stuart, 547 U.S. 398, 406 (2006) (reasonableness of police entry into home); Walczyk, 496 F.3d at 157 (reasonableness of arrest or search); Brown v. City of Oneonta, NY,  235 F.3d 769, 776 n.2 (2d Cir. 2000).  The Plaintiffs offer no reason why the context of excessive force is *sui generis* in this regard.

were unarmed, and were not interfering with the use of any roadway or the operations of any business.

Next, there has been a significant dispute between the Parties as to whether the Plaintiffs "actively" or "passively" resisted arrest when they chained themselves to the immovable barrel contraption.  (Doc. 43-2 at 11; Doc. 46 at 9).[12]  Apparently, the Parties (and in particular, the Plaintiffs) have seized on Graham's directive to consider "whether [the suspect] is *actively resisting arrest* or attempting to evade arrest by flight," Graham, 490 U.S. at 396 (emphasis added), and concluded that there is some particular constitutional significance to whether resisting arrest receives the label "passive" or "active."

This strict application of Graham's language is erroneous.  Such a technical approach to Fourth Amendment analysis undermines the totality of circumstances evaluation that Graham, both in letter and spirit, requires.  Forrester, 25 F.3d at 806 n.2.  This could be why the Second Circuit has sometimes done away with the distinction entirely, and asks only "whether the suspect is resisting or attempting to evade arrest."  Jones, 465 F.3d at 61; Thomas, 165 F.3d at 143.

Of course, it remains relevant whether suspects resist arrest with violence or threats, and of course it matters that the Plaintiffs here, at least on their account, did not resist by physically attacking the Defendants.  Likewise, the Court may also consider that the

---

[12]      The Plaintiffs argue that "whether [they] were 'actively' or 'passively' resisting is a question of fact for the jury to determine.  And in this case, there is a dispute as to that material fact."  (Doc. 49 at 13).  The Plaintiffs are wrong not just that this is a material question of fact, but that this is a question at all.  The Plaintiffs offer zero authority to say that some determination must be made (by the Court, the jury, or anyone else) that the Plaintiffs were either "active" or "passive" resistors.

Plaintiffs did more than lay on the ground–they attached themselves to an immovable object about which the officers knew nothing, and then ignored officer requests that the barrel contraption be explained or disassembled.  But the point is that *all* of the relevant objective circumstances must be considered to evaluate use of force, and, in reality, degrees of resistance fit along a continuum, not into one of two distinct categories.  See Schumacher v. Halverson, 467 F. Supp. 2d 939, 952 (D. Minn. 2006) ("The Court has no difficulty, contrary to plaintiff's characterization, in finding plaintiff's resistance was active.  But even if passive, the legal analysis of the use of force would not change.").[13]

Here it is clear that the Tasers were not necessary to prevent the Plaintiffs from fleeing (quite the opposite, in fact), and were not necessary as a means of self-defense.  But the Plaintiffs were plainly resisting arrest, and in doing so took steps beyond mere noncompliance with police orders.  Rather, they chained themselves to a 300 lb. object that the police could not move, thus eliminating some less forceful options for the Plaintiffs' removal that otherwise may have worked.

Taken together, if these so-called "Graham factors" fully encapsulated all of the relevant circumstances here, then this would be an entirely different case.  For example, had the Defendants immediately tased the Plaintiffs without first asking them to leave, and without providing any opportunity to comply, then the Plaintiffs would have a stronger

---

[13]    The Plaintiffs' expert, Andrew Scott III, concedes that his conclusion that the Plaintiffs were "passive" resistors is not based on any particular standard (legal or otherwise), but rather his "30 years of training."  (Doc. 46-9, Scott dep. 103:1-10, Nov. 20, 2008).  Not surprisingly, the Defendants' expert disagrees with the "passive" characterization, saying that the "use of the barrel mechanism . . . is recognized by law enforcement as a form of active resistance."  (Doc. 43-11, John J. Ryan Aff. ¶ 44).

21

Fourth Amendment claim.  <u>See</u>, <u>e.g.</u>, <u>Brown v. City of Golden Valley</u>, 574 F.3d 491 (8th Cir. 2009) (denying officer's motion for summary judgment on an excessive force claim alleging that tasing culminated a series of belligerent, violent, and unprovoked police action against suspects who did not resist arrest).

But here there are three additional facts that are critical to the Fourth Amendment analysis: (1) the Plaintiffs remained in control of the situation the entire time, and could have avoided the use of force entirely by simply complying with a lawful order; (2) the Defendants gradually progressed through varying degrees of lesser force before deciding to use their Tasers; and (3) the Plaintiffs' call for more protesters to return enhanced the Defendants' already significant interest in concluding the stand-off efficiently.

The Plaintiffs had literally 17 hours to leave the property without being arrested or issued a trespass citation, but they chose not to.  Once the Defendants arrived on the morning of July 24, the Plaintiffs again could have left without being arrested, or at least explained how the barrel could be disassembled.  They chose to do neither, even though they knew at this point that their protest was based on nothing more than misinformation.

As for the Defendants, they began the morning of July 24 with a renewed attempt to persuade the Plaintiffs to leave, and provided the opportunity to walk away without being arrested.  When that failed, the Defendants then tried moving the barrel, digging through the barrel's contents to detach the Plaintiffs, calling the Brattleboro Department of Public Works for assistance, placing the Plaintiffs under arrest, pulling the Plaintiffs out of the barrel, and then warning the Plaintiffs that Tasers would be used, and that being "tased" would "hurt a

lot."  By progressing through less forceful options, the Defendants acted in accord with the

"Use of Force Continuum," a sliding scale that both Parties agree provides guidance to law

enforcement as to how much force may be used in a given situation.  (Doc. 47-2 ¶¶ 73-77;

Doc. 46-10 ¶ 41; Doc. 46-8 at 7; Doc. 46-9, Scott Dep. 106:4-25).  In law enforcement

parlance, the Defendants attempted to resolve the situation with "officer presence," "verbal

communication," and "soft hand control," before resorting to "hard hand control" by using

their Tasers.  (Doc. 46-9, Scott dep. 106:4-110:8).

     The ultimate "nature and quality of the intrusion" on the Plaintiffs' Fourth

Amendment rights in this case, which consisted of two or three applications of an electric

current to the Plaintiffs' skin, has been described by other courts as "moderate, non-lethal

force."  Buckley v. Haddock, 292 Fed. Appx. 791, 795 (11th Cir. 2008) (Not Reported).

While each application of the Taser undoubtedly caused several seconds of acute–even

severe–physical pain, the Plaintiffs complained of no injuries at the scene, and now cite only

burn marks lasting approximately two weeks as a resulting physical injury.[14]  (Doc. 46-7 at 9;

Doc. 46-6 at 11; Doc. 46-2 ¶ 53; Doc. 47-2 ¶ 52).

     As the Defendants point out, circumstances similar to these have been considered

in other jurisdictions, with courts finding the use of Tasers to be reasonable and within the

Fourth Amendment's boundaries.  For example, in Buckley, 292 Fed. Appx. 791 (11th Cir.

---

[14]    The Plaintiffs also make vague references to resulting "psychological" and/or "emotional
trauma," (Doc. 46-6 ¶ 18; Doc. 46-7 ¶ 18), but there are no medical records, doctors' notes, treating
providers' affidavits,  or any other piece of evidence in the record to support this assertion.  See, e.g.,
Cohen v. Board of Educ., Smithtown Cent. School Dist. No. 1, 728 F.2d 160, 162 (2d Cir. 1984)
(recognizing that vague subjective testimony alone as insufficient to support an award of damages for
mental suffering).

2008) (Not Reported), a handcuffed suspect arrested for speeding was tased three times because he resisted arrest by laying on the ground, refusing to stand, and crying. Id. at 792-793.  In finding that no Fourth Amendment violation occurred, the 11th Circuit noted that while the suspect was handcuffed and unthreatening, he was nonetheless resisting arrest and was provided a full opportunity to comply with the officer's lawful orders. Id. at 794.  The court also recognized the exigencies created by nightfall and a nearby roadway. Id.

Similarly, in Schumacher v. Halverson, 467 F. 2d 939 (D. Minn. 2006), a suspect arrested for "driving while impaired" was tased because he resisted arrest by grabbing onto a basketball pole on his own property. Id. at 943-945.  In the subsequent § 1983 action, the court found no Fourth Amendment violation, remarking in particular that the suspect was intoxicated, resisting arrest by grabbing the pole, and failed to heed several commands to release the pole before the Taser was used. Id. at 950-952.

Finally, in Devoe v. Rebant, 2006 WL 334297 (E.D. Mich. Feb. 13, 2006) (Not Reported), police officers tased a handcuffed suspect arrested for "hindering and obstructing" after he refused to enter the officers' patrol car, spoke angrily using profanity, and refused to provide identification. Id. at *1-2.  Again, the court rejected the suspect's excessive force claim, and explained that even though the suspect was handcuffed and there were multiple officers present, the suspect persisted in resisting arrest. Id. at *6.  The court also noted, though, that the suspect was obviously angry, and had accused the officers of harassment rather than cooperating with them. Id.

The steps taken by the Plaintiffs to resist arrest surpass those used by any of the

suspects in these other three cases.  Indeed, two of the cases involved the tasing of suspects already handcuffed by police.  While these cases involve some further exigency not present here–e.g., a roadway, darkness, an intoxicated or angry suspect–the Plaintiffs here created an exigency of their own by calling for additional protesters to return to the scene.  Moreover, all three decisions emphasized the relevance of officer warnings and the suspects' volitional decision to resist despite an ability to comply.  See also Beaver v. City of Federal Way, 507 F. Supp. 2d 1137 (W.D. Wash. 2007) ("[A]ny decision to apply multiple applications of a Taser must take into consideration whether a suspect is capable of complying with an officer's commands.").

Here, the Court agrees with the Defendants and these other courts that using a Taser as a last resort to effect the arrests of suspects who are resisting, who have repeatedly been given lawful orders with which they could have easily complied, and who received repeated warnings specifically about the use of pain compliance techniques, is not unreasonable, and does not rise to the level of a Fourth Amendment violation.  The government's significant interests in effecting arrests expeditiously and enforcing lawful police orders are not outweighed in this case by the infliction of temporary pain that caused no lasting or significant physical injury.  "Our system of law enforcement depends on police officers having the ability to back up their directives with force and take a subject into custody once he is placed under arrest.  It would render their authority illusory if police officers with probable cause to arrest a suspect were obligated to abandon their arrest whenever a suspect disregards lawful commands[.]"  Magee v. City of Daphne, 2006 WL

3791971, *9 (S.D. Ala. Dec. 20, 2006) (Not Reported).

This is not to say, of course, that the Fourth Amendment would permit escalation to *any* degree of force, such that if Tasers did not work then protesters could be reasonably beaten or shot dead.  Under Graham it is always critical to assess the "nature and quality" of the force used, and when the force is too severe it may not be justified by whatever governmental interest is at stake.  Here, however, the Tasers provided an effective and non-lethal means of taking the Plaintiffs into custody that did not cause any lasting physical injuries or even pain beyond a few seconds.  Accordingly, the Defendants acted within the range of reasonable conduct under the Fourth Amendment.

The Plaintiffs' protestations in opposition to this conclusion are unpersuasive.  First, they advance the incredibly absurd argument that using the Tasers was unreasonable because the Plaintiffs were "suggest[ing] . . . specific alternatives to the use of force."  (Doc. 46 at 9).  The Plaintiffs, however, dismissed the most obvious alternative themselves, which was to follow police orders by detaching themselves from the barrel and leaving the property.  Moreover, "[a] person being placed under arrest has no right to prescribe the conditions under which he will comply with an officer's orders[.]"  Schumacher, 467 F. Supp. at 951.  Far from being in a position to make demands, the Plaintiffs were under arrest, and had a legal obligation to comply with the Defendants' orders.

The Plaintiffs' complaint that the Defendants waited only 40 minutes before using the Tasers is also unavailing.  The Defendants gradually progressed through less intrusive means of effecting the arrests, and, by the Plaintiffs' own choosing, those means were

26

ineffectual.  Nowhere do the Plaintiffs claim that they were denied an opportunity to comply with the Defendants' orders, and it was reasonable for the Defendants to conclude that any more time spent on a non-forceful resolution would amount to nothing more than a continued waste of law enforcement resources.  See Buckley, 292 Fed.Appx. at 794 ("The government has an interest in arrests being completed efficiently and without waste of limited resources: police time and energy that may be needed elsewhere at any moment.").

The Plaintiffs think that the Defendants should have assumed that further discussion would resolve the stand-off, since after the initial talks on July 23 only two protesters (the Plaintiffs) remained on July 24.  (Doc. 1 ¶¶ 96-97).  But, if anything, this point only proves that discussions were entirely *ineffective* for the Plaintiffs (the only protesters of relevance here), since they were the only ones who persisted in trespassing when others decided to leave.

Finally, the Plaintiffs are mistaken to the extent they suggest that there is a per se prohibition against using force–even painful force–against resistors who are not violent or threatening.  See, e.g., Forrester, 25 F.3d 804, 807-808 (9th Cir. 1994) (concluding that there was no Fourth Amendment violation where officers used pain compliance techniques–which caused injuries including bruises, a pinched nerve, and one broken wrist-to move demonstrators who were passively resisting arrest).

Police officers "are not required to use the least intrusive degree of force possible" to effect an arrest.  Rather, the constitutional inquiry is whether the force used was reasonable under the circumstances.  Id.  Because it was reasonable to use their Tasers, the

27

Defendants are entitled to judgment as a matter of law on the Plaintiffs' excessive force claims (Count 1).

### ii. Even Assuming A Fourth Amendment Violation, The Defendants Are Entitled To Qualified Immunity

Subsequent to the initial constitutional inquiry, whether qualified immunity applies depends next on "whether the right [alleged to be violated] was clearly established . . . in light of the specific context of the case." Walczyk, 496 F.3d at 154. Here, even if the Court were to find that a Fourth Amendment violation occurred (and it does not), the Defendants would nonetheless be entitled to qualified immunity because the Plaintiffs' allegations do not implicate a "clearly established" right.

The essential thrust of qualified immunity is that officers are immune from lawsuits regarding conduct that they could have reasonably believed to be lawful, even if it is ultimately determined that the conduct violated a constitutional or federal statutory right. "In this respect, the Supreme Court has observed that qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" Walczyk 496 F.3d at 154 (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).[15]

To ensure this result, the Supreme Court has taught that the contours of the right

---

[15]    It may be tempting to view this qualified immunity question of "reasonableness" as merging with the merits of the underlying constitutional claim, especially in the context of excessive force where the Fourth Amendment analysis depends on whether the Defendants acted reasonably. However, the Supreme Court has repeatedly cautioned that these are separate and distinct inquiries, explaining that qualified immunity protects those officers who reasonably yet mistakenly believe their conduct is reasonable, which is to say, those officers who are in effect "reasonably unreasonable." See Saucier, 533 U.S. at 197; Anderson v. Creighton, 483 U.S. 635 (1987) (rejecting the contention that officers who were found to have conducted an unreasonable search could not, as a matter of law, be entitled to qualified immunity); see also Poe v. Leonard, 282 F.3d 123, 133 n.9.

at issue–that is, the right alleged to have been violated–must be defined by the particular circumstances in which the challenged conduct took place.  Thus, the "relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier, 533 U.S. at 202; see also Scott, 550 U.S. at 377.

"If the right [alleged to be violated] was not clearly established . . ., then qualified immunity shields the defendant." Walczyk, 496 F.3d at 154.  Additionally, the Second Circuit has added that "[e]ven if the right at issue was clearly established in certain respects . . . an officer is still entitled to qualified immunity if officers of reasonable competence could disagree on the legality of the action at issue in its particular factual context." Id. (internal quotation marks omitted); see also Poe v. Leonard, 282 F.3d 123, 132-133 (2d Cir. 2002).[16]

Since the inquiry into whether a right is clearly established depends on the specific actions of the Defendants along with the specific factual context in which they acted, the Plaintiffs are wrong to state that the right implicated here is the "right to be free from excessive force" and to conclude that right is obviously "clearly established." (Doc. 46 at

---

[16]    The Supreme Court has consistently said that whether a right is "clearly established" depends on whether a reasonable officer could believe that his or her conduct was lawful given the particular circumstances he or she confronted.  Thus, when the Second Circuit adopts this formulation of "clearly established rights," but nonetheless says that it could be reasonable to believe that conduct falling within the formulation is lawful, its standard seems duplicative at best.  Then-Judge Sotomayer observed this discrepancy in Walczyk: "whether an officer's conduct was objectively reasonable is part and parcel of the inquiry into whether the law was clearly established at the time of the challenged conduct and for the particular context in which it occurred.  To ask whether an officer's violation of an individual's right was objectively reasonable *after* we have found the right was clearly established . . . finds no warrant" in Supreme Court precedent. Walczyk, 496 F.3d at 165-169 (Sotomayer, J., concurring).  The Second Circuit may have corrected the problem, and done away with the possibility that an official could reasonably violate clearly established rights, in Okin v. Village of Cornwall, — F.3d —, 2009 WL 2500197, *14 n.11 (2d Cir. Aug. 18, 2009).

11).  While "there is no doubt that Graham v. Connor . . . clearly establishes the general proposition that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness . . . that is not enough."  Saucier, 533 U.S. at 201-202. Rather, "'the right the official is alleged to have violated must have been clearly established in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  Id. (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)); see also Brosseau v. Haugen, 543 U.S. 194, 198-199 (2004).

This particularized inquiry does not mean that "an official action is protected by qualified immunity unless the very same action in question has previously been held unlawful."  Anderson v. Creighton, 483 U.S. at 640.  But it does mean that pre-existing law must make it "apparent," or provide the officers "fair warning," that the specific conduct in question is unlawful.  Id.; Hope, 536 U.S. at 741.  Whether the Defendants here violated a clearly established right is a question of law answered by examining Supreme Court and Second Circuit precedent existing in July of 2007.  Zellner v. Summerlin, 494 F.3d 344, 367 (2d Cir. 2007); Moore v. Vega, 371 F.3d 110, 114 (2d Cir. 2004).

Once the concept of "clearly established rights" is correctly apprehended, it becomes plain that the Plaintiffs fail to allege violations of such a right here.  First, the Plaintiffs offer not a single case beyond the general excessive force standard promulgated in Graham, which was necessarily "cast at a high level of generality."  Brosseau, 543 U.S. at 199; (Doc. 46 at 12-14).  To be sure, in the most obvious and egregious of cases this broad notion

of excessive force will suffice to put officials on notice that their conduct is unlawful.  Id.

(citing Hope, 536 U.S. at 738); see also Casey v. City of Federal Heights, 509 F.3d 1278 (10th

Cir. 2007).  But as the number of factually similar cases discussed above make clear, "[t]he

present case is far from the obvious one where Graham . . . alone offer[s] a basis for

decision."  Id.; see also Draper v. Reynolds, 369 F.3d 1270 (11th Cir. 2004) (finding no

excessive force when a suspect pulled over for having an improperly illuminated taillight was

tased after five separate orders to produce proper documentation); Dargan v. Hernandez-

Vega, 2006 WL 822558 (M.D. Fla. March 24, 2006) (Not Reported) (finding no excessive

force when officers told suspect twice to leave a private home and then tased the suspect in

the back when he began walking towards the door in response to the second order).

      The Court's own research also failed to yield any Second Circuit decision that

provided fair warning to the Defendants that using their Tasers in this case would violate the

Fourth Amendment.  The closest cases are probably Amnesty America, 361 F.3d 113 (2d Cir.

2004) and Parmley, 465 F.3d 46 (2d Cir. 2006), but neither case truly aids in the analysis.  In

Amnesty, the court found that anti-abortion protesters had alleged sufficient facts to defeat

summary judgment on their excessive force claim.  But the court did not resolve the Fourth

Amendment issue because, unlike here, material facts remained in dispute.  The court also

conceded the possibility that "the police officers' use of force was objectively reasonable

given the circumstances and the plaintiffs' resistance techniques."  Amnesty America, 465

F.3d at 123.

      And although Parmley concerns the use of force against protesters, its facts are

easily distinguished from those present here.  In <u>Parmley</u>, the police allegedly acted without warning and beat, kicked, and choked protesters who were on their own property.  The plaintiffs there included young children, an infant thrown from his stroller, and an elderly man in the act of praying when police choked him.  <u>Parmley</u>, 465 F.3d at 53, 63.  Clearly, a finding of excessive force in <u>Parmley</u> provides no guidance to officers faced with resisting trespassers provided with ample opportunity to comply with police orders.

   The Plaintiffs attempt to cure this deficiency of case law by pointing out that "[i]t is not necessary to have a case on 'all fours' with the facts of a particular situation to qualify a right as clearly established."  (Doc. 46 at 11).  And they argue that such a requirement would be particularly unfair if applied here, since the use of Tasers is a relatively recent phenomena, and factually similar case law is scarce.[17]  <u>Id.</u> at 14-15.  While the point is not entirely without merit, <u>see</u> <u>Hope</u>, 536 U.S. at 741 ("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances."), it does nothing to refute the validity of cases that *do* deal specifically with the use of Tasers, and which find such use to be reasonable under the Fourth Amendment.  Such cases may be unpersuasive for other reasons, but certainly not because of what would be the truly bizarre rule that those cases most closely reflecting the one at bar cannot be considered.  Moreover, the Plaintiffs were free to argue by analogy to cases involving comparable types of pain compliance used by law

---

[17]    Notwithstanding this claim, and after the Court heard oral argument on this Motion, the Plaintiffs submitted the citation to a 133 page American Law Report ("A.L.R.") entry that discusses literally hundreds of cases involving tasers and allegations of excessive force.  (Doc. 63); John M. Zitter, Annotation, *When Does Use of Taser Constitute Violation of Constitutional Rights*, 45 A.L.R. 6th 1 (2009).  No reason was provided as to why, if the Plaintiffs now believe the Annotation to be helpful, none of the cases cited therein are discussed in the Plaintiffs' pleadings, or why no particular case or even annotation page number are cited now.

enforcement, such as pepper spray, but they offered no such case.

Finally, the Plaintiffs contend that the Defendants had an "abundance of 'fair warning'" that their conduct was unconstitutional because of (1) "their Department's Use of Force Policy and explicit directives from their superiors in the chain of command" and (2) "a well-publicized public policy unique to Vermont."[18]  (Doc. 46 at 12).

First, assuming departmental rules and regulations may be considered "in conjunction with prevailing circuit or Supreme Court law," Okin v. Village of Cornwall–On–Hudson Police Dept., — F.3d —, 2009 WL 2500197, *14 (2d Cir. 2009), the directives cited here are irrelevant as to whether the Defendants' conduct violated a clearly established constitutional right.  In Hope v. Pelzer, the Supreme Court considered a Department of Justice Report explaining the "constitutional infirmity" of certain conduct to find that conduct violated a clearly established right.  Hope, 336 U.S. at 741-745.  But here the Plaintiffs present a use of force policy that says nothing at all about constitutional rights, and that, according to their own expert witness, "did not provide clear guidelines as to when various types of force or various levels of force could be used and when they should be used," and left the Defendants "with little guidance as to its application given a particular situation."  (Doc. 46-8 at 7).  They also allege a verbal police order not to be "heavy handed" with the protesters, which likewise fails to provide any guidance as to the scope of Fourth

_____

[18]    The Plaintiffs also find notice based on "unwithdrawn consent for the Plaintiffs' presence [on the land] from the landowners."  (Doc. 46 at 12).  As discussed above, though, this fact only goes to whether or not probable cause existed to make arrests in the first place.  Having already concluded that the Defendants had probable cause, allegations of "unrevoked consent" are irrelevant to the issues of whether the force used to effect these arrests was excessive, and whether a clearly established right is implicated.

Amendment rights.  No doubt such authorities are important insofar as they establish

supervisor expectations, but constitutional law they do not make.  "Under § 1983, the issue is

whether [the officer] violated the Constitution, not whether he should be disciplined by the

local police force." Smith v. Freland, 954 F.2d 343, 347 (6th Cir. 1992); see also Soares v.

State of Conn., 8 F.3d 917, 922 (2d Cir. 1993) (finding that a Connecticut Department of

Environmental Protection directive "has no bearing on whether the officers violated clearly

established constitutional or statutory rights[.]").

      This distinction between local policy and constitutional law is particularly stark in

the Fourth Amendment context, where the Supreme Court has held that the Fourth

Amendment cannot "be made to turn upon such trivialities" as local law enforcement

practices–even practices set by rule.  Whren v. United States, 517 U.S. 806, 815 (1996).[19]

      Next, the Plaintiffs' reliance on a supposed "well-publicized public policy unique

to Vermont" is as absurd as it is irrelevant.  As an initial matter, no Vermont state law, let

alone some ill-defined and vague "public policy," can alter what rights are protected by the

Fourth Amendment.  See Id.; Virginia v. Moore, 128 S.Ct. 1598, 1607 (2008) (holding that an

---

[19]     As suggested by the Plaintiffs' own expert, it is not readily apparent that the Defendants
even violated the existing BPD use of force policy.  In fact, the two pieces of "evidence" on which
the Plaintiffs principally rely–a Brattleboro Selectboard commissioned report by attorney Gordon
Black, and a report by the Vermont Attorney General (Docs. 46-4,5)–conclude that the Defendants
may have been working within the BPD Use of Force Policy when they employed their Tasers.
Black's Report concluded that "[t]he use of force policy in place at the time of the incident did give
the officers discretion in their use of the Tasers," (Doc. 46-4 at 12), and the Attorney General
remarked that, "it is at least arguable that the departmental protocols allowed a use of force in
effecting a arrest, even if the officers were not in the defense of themselves or others." (Doc. 46-5 at
36).  At best these two "authorities" are split, and thus counsel against finding that the BPD use of
force policy clearly established the illegality of the Defendants' conduct.  Again, the Defendants
dispute that this evidence is admissible, see note 2, supra, but it would only hurt the Plaintiffs'
argument in this instance.

arrest which is prohibited by state law, but for which there is probable cause, does not violate the Fourth Amendment because "state restrictions do not alter the Fourth Amendment's protections."); Davis v. Scherer, 468 U.S. 183, 193-196 (1984) (holding that state officials do not lose their immunity in § 1983 lawsuits by violating the clear command of a state statute). Indeed, the very characterization of Vermont's alleged policy as "unique" cuts against the argument that the Defendants violated a right that is "clearly established."[20]

Additionally, the only evidence the Plaintiffs offer to establish the existence of Vermont's unique excessive force jurisprudence is one 1994 state criminal case against two town police officers that ultimately ended in acquittal.  (Doc. 46 at 13-14).  And in that case the officers were charged for tasing a handcuffed prisoner who refused to spit out chewing tobacco, not an unlawful trespasser who voluntarily chained himself to an immovable object as a means to resist arrest.  Id.  In any event, it is left entirely unexplained how one is supposed to discern some kind of Vermont policy (never mind a clearly established constitutional right) from the unsuccessful prosecution of those two officers.

In sum, all of the reasons put forth by the Plaintiffs to support their argument that a "clearly established" right is implicated are not only inadequate, but obviously so. Moreover, the Plaintiffs complete failure to either (a) offer case law or other authority to show that the Defendants had fair warning of a constitutional prohibition, or (b) refute, distinguish, or even address the body of excessive force related law cited by the Defendants,

---

[20]     Of course, state law could be relevant to whether a Fifth or Fourteenth Amendment Due Process right is clearly established, since constitutionally protected liberty interests may be created by state law.  See Wilkinson v. Austin, 545 U.S. 209, 222 (2005).  But there is no Due Process claim here, and Fourth Amendment rights are not defined by state law.  Moore, 128 S.Ct. at 1606.

is fatal.  Accordingly, even if the Court now held that the Defendants' actions constitute excessive force, that rule would not be "clearly established," and the Defendants would be entitled to qualified immunity.

## C. The Plaintiffs' Additional Claims

In addition to their Fourth Amendment excessive force and unlawful arrest claims, the Plaintiffs' bring two other federal claims alleging a conspiracy to violate civil rights and a failure to prevent a violation of civil rights, as well as three supplemental state common law claims.  Of note, the Plaintiffs advance no argument whatsoever on these claims in their pleadings,[21] and none can withstand the Defendants' Motion for Summary Judgment.

### i. Federal Claims

First, the Plaintiffs' claim based on a conspiracy to interfere with civil rights pursuant to 42 U.S.C. § 1985(3) is frivolous.  In addition to other requirements not even remotely met here, "[a] § 1985(3) 'conspiracy must also be motivated by some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action.'" Cine SK8, Inc. v. Town of Henrietta, 507 F.3d 778, 791 (2d Cir. 2007) (quoting Thomas v. Roach, 165 F.3d 137, 146 (2d Cir. 1999)); see also Herrmann v. Moore, 576 F.2d 453, 456-457 (2d Cir. 1978) (affirming summary judgment on § 1985(3) claim because

---

[21]     District courts may deem a claim abandoned when a party moves for summary judgment on one ground and the opposing party fails to address the argument in any way.  See Douglas v. Victor Capital Group, 21 F. Supp. 2d 379, 393 (S.D.N.Y. 1998) (collecting cases).  For this reason alone, the Court could grant summary judgment on all of the Plaintiffs' state law claims.  Taylor v. City of New York, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003).

plaintiff did not show discriminatory animus).  Here, the Plaintiffs do not even allege class-based animus, let alone provide facts to prove it.  Accordingly, the Defendants are entitled to judgment as a matter of law on this claim (Count II).

Second, 42 U.S.C. § 1986 concerns only "wrongs . . . mentioned in § 1985," and thus the Plaintiffs' claim under § 1986 (Count III) must also fail.  See  Jews for Jesus, Inc. v. Jewish Cmty. Relations Council of New York, Inc., 968 F.2d 286, 292 (2d Cir. 1992) ("there can be no violation of § 1986 without a violation of § 1985").

### ii. State Law Claims[22]

First, the Plaintiffs assert a claim for "Outrageous Conduct," which at oral argument their counsel indicated to be a state law claim for Intentional Infliction of Emotional Distress (IIED).  In Vermont, "[a] prima facie case of intentional infliction of emotional distress requires a plaintiff to establish 'outrageous conduct, done intentionally or with reckless disregard of the probability of causing emotional distress, resulting in the suffering of extreme emotional distress, actually or proximately caused by the outrageous conduct."  Cook v. Arrowsmith Shelburne, Inc., 69 F.3d 1235, 1242 (2d Cir. 1995) (quoting McHugh v. Univ. of Vermont, 758 F. Supp. 945, 949 (D. Vt. 1991)).  The question of

---

[22]       The Court has supplemental jurisdiction over the Plaintiffs' state law claims because they are so related to their federal causes of action that they form part of the same case or controversy under Article III of the United States Constitution.  28 U.S.C. § 1367(a).  Although it is generally true that state law claims should be dismissed when all federal claims are dismissed before trial, Marcus v. AT&T Corp., 138 F.3d 46, 57 (2d Cir. 1998); 28 U.S.C. § 1367(c)(3), the statute clearly provides district courts with discretion.  Id.  Here, principles of judicial economy and fairness between the parties favor the retention of jurisdiction, because the state claims are essentially redundant of the federal claims, and no novel or undecided state legal principle need be applied.  See Morse v. University of Vermont, 973 F.2d 122, 127-128 (2d Cir. 1992).

whether a jury could reasonably find that conduct was "so outrageous and extreme as to 'go beyond all possible bounds of decency,'" Jobin v. McQuillen, 158 Vt. 322, 327 (1992) (quoting Demag v. American Ins. Co., 146 Vt. 608, 611 (1986)), is one of law for the Court.

Here, the Defendants were effecting the arrests of two individuals trespassing and resisting arrest.  As established by this Opinion, the Defendants acted reasonably in choosing to use their Tasers when other less forceful means of arresting the Plaintiffs failed, and so failed only because the Plaintiffs did not comply.  Given these circumstances, no jury could reasonably conclude that the Defendants' conduct was either (a) outrageous to the point of falling outside all possible bounds of decency, or (b) committed with the requisite intentional or reckless state of mind.  Accordingly, the Plaintiffs' IIED claim (Count IV) fails as a matter of law.[23]

Second, the Plaintiffs' common law claims for assault and battery essentially duplicate their constitutional excessive force claims.  When assault and battery is alleged against police officers, "the inquiry is whether the officer's conduct was reasonably necessary and thereby privileged."  Smith v. District of Columbia, 882 A.2d 778, 788 (D.C. 2005); see also City of Miami v. Sanders, 672 So. 2d 46 (Fla. Dist. Ct. App. 1996).  As one treatise explains, "[a] police officer is not liable for assault and battery based upon the officer's lawful

---

[23]     The Plaintiffs' IIED claim may also fail as duplicative of their assault and battery, and false arrest claims.  Under New York law, the "tort of intentional infliction of emotional distress may not be used as a substitute for an available traditional tort theory."  Brewton v. City of New York, 550 F. Supp. 2d 355, 371 (E.D.N.Y. 2008); Leonard v. Reinhardt, 799 N.Y.S.2d 118, 119 (N.Y. App. Div. 2005) ("the cause of action alleging intentional infliction of emotional distress should have been dismissed as duplicative of the cause of action alleging malicious prosecution and assault and battery.").  Given the independent reasons for dismissing this claim, however, the Court need not decide whether Vermont would apply this rule.

arrest of a person, where there was no use of excessive force, unreasonable contact, or the threat of unreasonable contact by the officer."  6 AM. JUR. 2D *Assault and Battery* § 98 (2009). Here, the Court has already held that the Defendants used reasonable force to arrest the Plaintiffs, and that the arrests were lawful.  Accordingly, this claim (Count V) must fail.

Third, the Plaintiffs bring a state law claim for false imprisonment (Count VI) that fails as a matter of law because probable cause existed for the Defendants to arrest the Plaintiffs.  See Kent v. Katz, 327 F. Supp. 2d 302, 306 (D. Vt. 2004); Decker v. Fish, 126 F. Supp. 2d 342, 347 (D. Vt. 2000); State v. Greenslit, 151 Vt. 225, 228 (1989).

Finally, even if the Plaintiffs' state law claims possessed merit (which they do not) the Defendants would be entitled to qualified immunity under Vermont state law.  Under Vermont law, "lower-level government employees are immune from tort liability when they perform discretionary acts in good faith during the course of their employment and within the scope of their authority."  Hudson v. Town of East Montpelier, 161 Vt. 168, 171 (1993). Further, to determine whether a state employee is acting in "good faith," Vermont law relies on the same federal objective standard described in Harlow, 457 U.S. at 818, and asks whether the Defendants' conduct violated "clearly established rights . . . of which a reasonable person would have known."  Stevens v. Stearns, 175 Vt. 428, 434 (2003) (quoting Harlow, 457 U.S. at 818); see also Murray v. White, 155 Vt. 621, 630 (1991) ("Good faith exists were an official's acts did not violate clearly established rights of which the official reasonably should have known.").  And, just as in the § 1983 context, whether a right is "clearly established" depends on the specific circumstances encountered by the Defendants,

39

and the contours of the right must be sufficiently clear that a reasonable officer would know that his conduct is unlawful.  Cook v. Nelson, 167 Vt. 505, 512 (1998); Napolitano v. Flynn, 949 F.2d 617, 624 (2d Cir. 1991) (recognizing "Vermont's public policy that '[government] officials should fear suit only where . . . the unlawfulness of their acts is apparent.'") (quoting Murray, 155 Vt. at 632).[24]

Thus, even assuming that one could rely on a "clearly established right" to be free from a common law tort–the only state law "rights" asserted here–in order to defeat qualified immunity, Vermont's "good faith" requirement is satisfied because the Defendants acted in an objectively reasonable way when they arrested the Plaintiffs, and could have reasonably believed their conduct to be lawful.  See Stevens, 175 Vt. at 437-438.  More specifically, there is no law to support the conclusion that reasonable officers could not disagree about whether using a Taser under these circumstances would violate any state or federal rights.  See Sprague v. Nally, 178 Vt. 222, 230 (2005).  Accordingly, summary judgment against the Plaintiffs on all of their state law claims is granted on the basis of qualified immunity as well.

## IV. CONCLUSION

The Supreme Court's "Fourth Amendment jurisprudence has long recognized that the right to make an arrest . . . necessarily carries with it the right to use some degree of

---

[24]  The Plaintiffs offer no reason why the Vermont standard for state law qualified immunity does not apply.  But to the extent there is any (unstated) dispute that the Defendants were performing "discretionary acts," that issue is decided by Libercent v. Aldrich, 149 Vt. 76, 81 (1987) (explaining that a discretionary duty is defined as "one requiring the exercise of judgment in its performance," in contrast to a ministerial duty, which is "one where nothing is left to discretion–a simple and definite duty, imposed by law, and arising under conditions admitted or proved to exist.") (internal quotation marks omitted); see also Kent, 146 F. Supp. 2d at 457.

physical coercion or threat thereof to effect it." Graham, 490 U.S. at 396.  Here, after a careful analysis of the applicable law and all of the relevant facts, the Court concludes that the level of "physical coercion" used by the Defendants to arrest Crowell and Kirkpatrick was reasonable under the circumstances and thus constitutional.

Further, deciding the merits of the Fourth Amendment and qualified immunity issues at this stage is appropriate because there are no genuine disputes of material fact yet unresolved.  In arguing otherwise, the Plaintiffs mistake many questions of law for questions of fact, and many irrelevant facts for material facts.  And when the Plaintiffs' version of the *material* facts is adopted, and all reasonable inferences are drawn in their favor, the applicable law dictates that their claims must fail.

Accordingly, the Defendants' Rule 56 Motion for Summary Judgment (Doc. 43) is GRANTED.[25]  With all counts of the Complaint now resolved, this case is DISMISSED.

Dated at Burlington, in the District of Vermont, this 14th day of September, 2009.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge

---

[25]    The Parties consented to the exercise of jurisdiction by a United States Magistrate Judge on April 4, 2008 and April 7, 2008 respectively.  (Docs. 14 & 15).